JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ❏ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance<br>❏ 120 Marine<br>❏ 130 Miller Act<br>❏ 140 Negotiable Instrument<br>❏ 150 Recovery of Overpayment & Enforcement of Judgment<br>❏ 151 Medicare Act<br>❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>❏ 153 Recovery of Overpayment of Veteran's Benefits<br>❏ 160 Stockholders' Suits<br>❏ 190 Other Contract<br>❏ 195 Contract Product Liability<br>❏ 196 Franchise | **PERSONAL INJURY**<br>❏ 310 Airplane<br>❏ 315 Airplane Product Liability<br>❏ 320 Assault, Libel & Slander<br>❏ 330 Federal Employers' Liability<br>❏ 340 Marine<br>❏ 345 Marine Product Liability<br>❏ 350 Motor Vehicle<br>❏ 355 Motor Vehicle Product Liability<br>❏ 360 Other Personal Injury<br>❏ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>❏ 365 Personal Injury - Product Liability<br>❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>❏ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>❏ 370 Other Fraud<br>❏ 371 Truth in Lending<br>❏ 380 Other Personal Property Damage<br>❏ 385 Property Damage Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881<br>❏ 690 Other | ❏ 422 Appeal 28 USC 158<br>❏ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>❏ 820 Copyrights<br>❏ 830 Patent<br>❏ 840 Trademark<br>**SOCIAL SECURITY**<br>❏ 861 HIA (1395ff)<br>❏ 862 Black Lung (923)<br>❏ 863 DIWC/DIWW (405(g))<br>❏ 864 SSID Title XVI<br>❏ 865 RSI (405(g)) | ❏ 375 False Claims Act<br>❏ 400 State Reapportionment<br>❏ 410 Antitrust<br>❏ 430 Banks and Banking<br>❏ 450 Commerce<br>❏ 460 Deportation<br>❏ 470 Racketeer Influenced and Corrupt Organizations<br>❏ 480 Consumer Credit<br>❏ 490 Cable/Sat TV<br>❏ 850 Securities/Commodities/ Exchange<br>❏ 890 Other Statutory Actions<br>❏ 891 Agricultural Acts<br>❏ 893 Environmental Matters<br>❏ 895 Freedom of Information Act<br>❏ 896 Arbitration<br>❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>❏ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>❏ 210 Land Condemnation<br>❏ 220 Foreclosure<br>❏ 230 Rent Lease & Ejectment<br>❏ 240 Torts to Land<br>❏ 245 Tort Product Liability<br>❏ 290 All Other Real Property | **CIVIL RIGHTS**<br>❏ 440 Other Civil Rights<br>❏ 441 Voting<br>❏ 442 Employment<br>❏ 443 Housing/ Accommodations<br>❏ 445 Amer. w/Disabilities - Employment<br>❏ 446 Amer. w/Disabilities - Other<br>❏ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❏ 463 Alien Detainee<br>❏ 510 Motions to Vacate Sentence<br>❏ 530 General<br>❏ 535 Death Penalty<br>**Other:**<br>❏ 540 Mandamus & Other<br>❏ 550 Civil Rights<br>❏ 555 Prison Condition<br>❏ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>❏ 710 Fair Labor Standards Act<br>❏ 720 Labor/Management Relations<br>❏ 740 Railway Labor Act<br>❏ 751 Family and Medical Leave Act<br>❏ 790 Other Labor Litigation<br>❏ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>❏ 462 Naturalization Application<br>❏ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>❏ 870 Taxes (U.S. Plaintiff or Defendant)<br>❏ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ❏ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ❏ Yes    ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: _____

Address of Defendant: 333 North Summit Street Toledo, OH 43604

Place of Accident, Incident or Transaction: NATIONWIDE

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes☒  No☐

Does this case involve multidistrict litigation possibilities?  Yes☐  No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
    (Please specify) *FALSE CLAIMS ACT* _____

B. *Diversity Jurisdiction Cases*:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

---

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, *THOMAS W. SHERIDAN* _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 2/22/2016 _____  _____  56939 _____

Attorney-at-Law  Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 2/22/2016 _____  _____  56939 _____

Attorney-at-Law  Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| PLAINTIFF UNDER SEAL | : | CIVIL ACTION |
| | : | |
| v. | : | NO. |
| | : | |
| DEFENDANT UNDER SEAL | : | JURY TRIAL DEMAND |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.) (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

| | | |
|---|---|---|
| February 19, 2016 | Thomas W. Sheridan | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 977-9500 | (215) 977-9800 | tsheridan@sheridanandmurray.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

<u>FILED UNDER SEAL</u>

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ──────────────── | : | **CIVIL ACTION NO.** |
| | : | |
| **PLAINTIFF UNDER SEAL** | : | |
| | : | **HON.** |
| **v.** | : | |
| | : | **FILED IN CAMERA & UNDER SEAL** |
| **DEENDANT UNDER SEAL** | : | |
| | : | **JURY TRIAL DEMANDED** |
| ──────────────── | | |

<u>**ORIGINAL COMPLAINT FOR FALSE CLAIMS ACT
VIOLATIONS 31 U.S.C. § 3729 ET SEQ.**</u>

**Thomas W. Sheridan, Esquire
SHERIDAN & MURRAY, LLC
424 South Bethlehem Pike, Third Floor
Fort Washington, PA 19102
Phone:         (215) 977-9500
Facsimile:     (215) 977-9800**

*Of Counsel*:

**Joseph Trautwein, Esquire
JOSEPH TRAUTWEIN & ASSOCIATES, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Phone:         (215) 764-2301
Facsimile:     (267) 464-0400**

**David T. Marks, Esquire
Jacques G. Balette, Esquire
Jason N. Young, Esquire
MARKS, BALETTE & GIESSEL, P.C.
10000 Memorial Drive, Suite 760
Houston, TX 77024
Phone:         (713) 681-3070
Facsimile:     (713) 681-2811**

*Counsel for Plaintiff / Relator*

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TEXAS, STATE OF WASHINGTON, and COMMONWEATH OF VIRGINIA,<br><br>Plaintiffs,<br>*Ex rel.*<br>JOHN DOE<br>Plaintiff-Relator,<br>v.<br><br>HCR MANORCARE, INC.; MANOR CARE, INC.; HCR-MANOR CARE SERVICES, LLC; and HEARTLAND EMPLOYMENT SERVICES, LLC<br><br>Defendants. | |

**ORIGINAL COMPLAINT FOR**
**FALSE CLAIMS ACT VIOLATIONS-31 USC § 3729, ET SEQ.**

2

This action is brought by John Doe Relator by and through the undersigned attorneys on behalf of the United States of America and States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Washington, and the Commonwealth of Virginia, against HCR Manorcare, Inc.; Manor Care, Inc.; HCR-Manor Care Services, LLC; and Heartland Employment Services, LLC; who own and operate 232 nursing homes identified in *Exhibit 1*[1] attached hereto (collectively, "MANORCARE" or "Defendants") to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., and various state false claims acts[2] for tens of thousands of false claims presented or caused to be presented for payment or approval to Medicare and Medicaid by Defendants.

---

[1] *Exhibit 1* identifies 232 nursing homes, listing the name, provider number, address, and dates of ownership/operation by MANORCARE, and the wholly-owned corporate subsidiary through which MANORCARE operated each facility during all or or portion of the time frame of January 1, 2008 to December 15, 2015. Relator alleges that the facilities listed in *Exhibit 1* engaged in a routine pattern and practice of presenting false claims or causing the same to be presented to federal and state governments during the aforementioned timeframe. The ongoing and routine fraudulent practices by MANORCARE are illustrated by these representative facilities listed in *Exhibit 1*. Additionally, key financial data for the facilities identified in *Exhibit 1* will be provided to the United States of America and States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Washington, and the Commonwealth of Virginia with Relator's Disclosure Statement in *Exhibit 1A*.

[2] The state False Claims Acts invoked for purpose of this case include *inter alia*: California (CALIFORNIA FALSE CLAIMS ACT, Government Code §§12650-12656), Colorado (COLORADO MEDICAID FALSE CLAIMS ACT, § 25.5-4-303.5, *et seq*.), Delaware (DELAWARE FALSE CLAIMS ACT, 6 Del. C. §1201, et seq.), Florida (FLORIDA FALSE CLAIMS ACT, F.S. § 68.081-68.09), Georgia (GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT, codified at §§ 23-3-120 to 23-3-127 and STATE FALSE MEDICAID CLAIMS ACT, §§ 49-4-168 to 49-4-168.6), Illinois (ILLINOIS FALSE CLAIMS ACT, 740 ILCS § 175/1, et seq.), Indiana (INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IC § 5-11-5.5, *et seq*.), Iowa (IOWA FALSE CLAIMS ACT, Title XV, Subtitle 5, Chapter 685.3), Maryland (MARYLAND FALSE HEALTH CLAIMS ACT § 2-604), Michigan (MICHIGAN MEDICAID FALSE CLAIMS ACT, MCL § 400.610a), Minnesota (MINNESOTA FALSE CLAIMS ACT § 15C.05), Nevada (NEVADA - SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT, NRS § 357.010, *et seq*.), New Jersey (NEW JERSEY FALSE CLAIMS ACT, NJSA:32-5b), New Hampshire (NEW HAMPSHIRE FALSE CLAIMS ACT, § 167:61-B, *et seq*.), North Carolina (NORTH CAROLINA FALSE CLAIMS ACT, § 1-605, *et seq*.), Oklahoma (OKLAHOMA FALSE CLAIMS ACT, 63 OS § 5053, et seq.), Texas (TEXAS FALSE CLAIMS ACT, THRC Ch. 36) Virginia (VIRGINIA FRAUD AGAINST TAXPAYERS ACT, § 8.01-216.1, *et seq*.), and Washington (WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, RCW §74.66.005, *et seq*.).

## I.    INTRODUCTION

1.     This case involves a nationwide false claim scheme by MANORCARE which is one of the largest nursing home chains in the country to obtain payment from Medicare and Medicaid for necessary resident care that it claimed to have provided, but in fact, did not provide.

2.     MANORCARE implemented and deliberately pursued a strategy to recruit residents[3] with high acuity levels (*i.e.*, residents who were extremely dependent upon staff for their most basic care needs) in order to allow it to reap higher Medicare and Medicaid reimbursements.  While pressuring its nursing homes to target and recruit physically-dependent, seriously impaired residents, MANORCARE intentionally understaffed its facilities in order to skim more money from federal and state healthcare payors.  These continuing practices not only violated the law but made it humanly and mathematically impossible for the applicable MANORCARE nursing homes to deliver essential care services that they claimed to Medicare and Medicaid were required and provided.  In short, MANORCARE was paid for services it claimed to provide, but did not.

3.     Medicare, a federal program, covers care in "skilled nursing facilities" ("SNFs") for a fixed period for those who need skilled nursing services following discharge from a qualifying hospital stay.  42 U.S.C. § 1395i–3.  Medicaid, a joint federal and state program, covers long term care in a "nursing facility" ("NF") for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.  (Since a single MANORCARE facility may and typically does serve residents in each program, the term "nursing home" will

---

[3] The Social Security Act §§ 1810 and 1919, and 42 CFR § 483, *et seq.*, refer to a nursing home *patient* as a *resident*.  The terms are used interchangeably herein.

refer to a facility with both Medicare and Medicaid residents.)  By reason of their loss of physical function and cognitive decline, both Medicare and Medicaid residents may need essential bedside care, also known as assistance with activities of daily living (ADLs) including (a) toileting assistance, (b) incontinent care and changing of wet and soiled clothing and linen, (c) assistance transferring to chair and back, (d) assistance with dressing, (e) assistance with bathing and personal hygiene, (f) assistance with turning and repositioning immobile residents, (g) feeding assistance, (h) a.m. and p.m. care, and (i) exercise or range of motion for debilitated residents.

4.    When MANORCARE knowingly admitted Medicare and Medicaid residents, it knew that it was required by law to provide these essential care services to every resident needing the same.

5.    Despite its aggressive recruitment of residents who were dependent upon nursing home staff for all or many of the labor-intensive ADLs listed above, MANORCARE deliberately limited the number of staff allowed to be on duty in its nursing homes.  This practice made it impossible for MANORCARE to deliver the ADL services that it claimed to Medicare and Medicaid were provided to residents in an individualized resident document known as a Minimum Data Set ("MDS"),[4] as well as the Comprehensive Care Plan[5] and daily ADL staff

---

[4] The MDS is a document that is required to be completed for every nursing home resident and submitted to Medicare/Medicaid as a condition of payment. The MDS contains a list of specific ADLs required by each resident, as well as a list of the ADL services the nursing home claimed to have provided (including whether any of those services required the assistance of 2 staff members.  A nursing home must complete an MDS for each resident upon admission to the facility and then periodically update it at specified times (5-day, 14-day, 30 day, quarterly, annually) and upon significant changes in the resident's condition.  The MDS information is collected electronically by the facility and transmitted to states and/or to the national MDS database at CMS.  As the Seventh Circuit has stated, the MDS "form is both a billing document and a care assessment certification for Medicare and Medicaid …" *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).

support and performance records[6] for each resident.  As a consequence, MANORCARE residents were routinely deprived of essential bedside care.  MANORCARE employed "staffing ladders" and other mandatory controls designed to limit labor hours and costs and deliberately forced its nursing homes to be staffed at levels that were (a) incompatible with the amount of ADL services required by residents, (b) insufficient to deliver the ADL services for which MANORCARE submitted claims for payment from Medicare and Medicaid, (c) resulted in MANORCARE violating both federal and state false claims acts and (d) neglected and harmed its most vulnerable residents.

      6.     The profound difference between the amount of ADL services that MANORCARE claimed to have provided and the amount of those services that were humanly possible given MANORCARE's staffing is at the heart of this case.

      7.     John Doe Relator has direct and independent knowledge that:

---

[5] The facility must develop a Comprehensive Care Plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment.  42 CFR S 483.20(k).  This document is part of each resident's medical record.
The Comprehensive Care Plan must be—
    (i) Developed within 7 days after completion of the comprehensive assessment;
    (ii) Prepared by an interdisciplinary team, that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs, and, to the extent practicable, the participation of the resident, the resident's family or the resident's legal representative; and
    (iii) Periodically reviewed and revised by a team of qualified persons after each assessment.
The services provided or arranged by the facility must—
    (i) Meet professional standards of quality; and
    (ii) Be provided by qualified persons in accordance with each resident's written plan of care.  42 CFR S 483.20(k)(2)-(3)

[6] Additionally, facilities must have sufficient medical record documentation to justify the ADL coding in each resident's MDS for ADL care claimed to be required and provided to residents.

a.     MANORCARE continually exerted pressure from the top down on its subject nursing homes to recruit highly-dependent residents who required assistance with labor-intensive ADL care.

b.     Despite its aggressive recruitment of highly-dependent residents, MANORCARE deliberately employed a non-acuity-based staffing scheme that ignored the essential ADL care needs of its residents and caused the staffing levels/labor hours to be insufficient to meet the needs of its residents as defined by their MDSs and Comprehensive Care Plans.

c.     MANORCARE's systemic non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and harm.

d.     Despite MANORCARE's awareness of the care deprivations its staffing and resident recruitment practices caused, it refused to increase staffing levels or decrease the number of heavy care residents in the subject facilities to make it possible for the limited number of staff to deliver the essential ADL care required by dependent residents.

e.     The staffing targets and resident recruitment targets that MANORCARE imposed and enforced at its facilities made it humanly impossible for the limited numbers of staff to deliver the essential bedside care that MANORCARE claimed in its MDSs, (resident Comprehensive Care Plans) and resident medical records was necessary for and actually provided to its highly-dependent nursing home residents.

7

8.      Relator has direct knowledge that MANORCARE understaffed each of the subject nursing homes and has quantified the extent to which it deprived residents the basic ADL care that was required and that MANORCARE claimed was provided.  MANORCARE nonetheless submitted claims for payment to the federal and state governments for ADL services that were mathematically and humanly impossible for it to have provided.

9.      While the gravamen of Relator's claim, brought pursuant to federal and state False Claims Acts, is that government payors were being billed for services that were not provided, it is also the case here that Defendants have shortchanged care to their most vulnerable resident population – many of whom lack the capacity to complain on their own – in order to increase MANORCARE's profits and raise the cash necessary to finance debt, support excessive spending and a zealous acquisition strategy.

10.      The false claims and statements in this case include tens of thousands of false MDSs submitted to Medicare and Medicaid.  MANORCARE knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in these MDSs and that the submission of false resident ADL information in these MDSs may subject it to substantial criminal, civil and administrative penalties. The false claims in this case also include the various claims for payment that MANORCARE submitted to Medicare and Medicaid, certifying as a condition of payment that the care it claimed to have delivered complied with federal and state laws.

## II.    JURISDICTION AND VENUE

11.      John Doe Relator brings this action on behalf of himself and on behalf of the United States for Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the the California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa,

Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Washington, and the Commonwealth of Virginia, for violations of their respective State False Claims Acts (collectively referred to as the "Qui Tam States").

12.    This Court has both subject matter and personal jurisdiction under 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law causes of action as well as claims brought under State False Claims Acts under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

13.    Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because one or more of Defendants can (1) be found in, (2) resides in, and (3) transacts business in this District, and because acts proscribed by 31 U.S.C § 3729 occurred in this District.  For example, the MANORCARE Defendants owned, operated, and managed the Manorcare Health Services-Easton in Easton, Northampton County (provider number #395540).  Further, the acts proscribed by 31 U.S.C § 3729 occurred at this facility.

14.    There has been no public disclosure of the allegations herein.  To the extent that there has been a public disclosure unknown to the John Doe Relator, he is the "original source" under 31 U.S.C. § 3730(e)(4) and similar state laws.  John Doe Relator has direct and independent knowledge of the information on which the allegations are based.

## III.    THE PARTIES

### A.    THE RELATOR

15.    John Doe Relator is a citizen of the United States and has standing to bring this action under the False Claims Act, 31 U.S.C. § 3730(b)(1) and the various state False Claims Acts.

16.    John Doe Relator has direct and independent knowledge of the facts and circumstances giving rise to this claim.

17.    Recognizing that fraud on the government can be diffuse and institutional, the Relator has established the systemic nature of Defendants' fraudulent practices.

**B.    DEFENDANTS**

18.    Defendant HCR Manorcare, Inc. ("MANORCARE" or the "Company") was listed by Provider Magazine as the second largest nursing facility company in the United States in 2015.  MANORCARE boasts some 280 nursing homes with over 38,000 beds in 24 states. MANORCARE also owns and operates over 200 other healthcare facilities, including assisted living facilities, memory care facilities, outpatient rehabilitation clinics, hospice agencies, and home health care agencies.

19.    As the second largest provider of nursing home services in the United States, MANORCARE consistently pumps out significant revenues, a substantial portion of which are derived through Medicare and Medicaid funding paid to MANORCARE's nursing home operations (skilled nursing facilities and nursing facilities).

20.    From 2008 to 2014, MANORCARE's nursing home operations generated revenues well in excess of $10 billion, based on a volume of over 38 million resident days.  By far, the largest purchaser of this nursing home care was the government, with over approximately 80% of these revenues since 2008 being derived from the Medicare, Medicare Advantage, and Medicaid.

21.    HCR Manorcare, Inc. is a Delaware corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

10

22.     Manor Care, Inc. is a Delaware corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

23.     HCR Manor Care Services, LLC is an Ohio limited liability corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

24.     Heartland Employment Services, LLC is an Ohio limited liability corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

25.     Of particular relevance to this case are the 232 MANORCARE owned, operated, managed, and/or maintained nursing homes listed in *Exhibit 1* by name, address, and provider number.  These nursing homes are both "skilled nursing facilities" and "nursing facilities" as such are defined by Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r, as well as by state laws and regulations governing the operation of nursing facilities. With respect to each of the nursing homes listed in *Exhibit 1,* MANORCARE entered into provider agreements with Medicare and Medicaid and systematically presented false claims for government payment under each facility's unique provider number in violation of 31 U.S. § 3729, as described in more detail below.

26.     Also, as described in more detail below, the facilities listed in *Exhibit 1* were not only owned, operated, controlled, managed, and dominated by Defendants but were also mere agents, instrumentalities, or conduits through which the MANORCARE Defendants did business.  Defendants managed, operated, obtained licenses, and distributed the revenues, profits and assets for a national network of nursing homes, including the facilities listed in *Exhibit 1*. By reason of the conduct described herein, Defendants and the subject nursing homes directly participated in the false claim violations described herein and were the alter egos of one another,

there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.

## IV.    MEDICARE, MEDICAID, AND MANORCARE'S CERTIFIED CLAIMS OF STAFF AND CARE PROVIDED

27.    The federal and state governments are the principal purchasers of nursing home services, primarily through their Medicare and Medicaid programs.  Medicare is a federal government health program primarily benefiting the elderly and disabled that is administered by CMS.  Medicare pays for short-term post-acute nursing home care that includes skilled nursing and rehabilitation services (in what it calls "skilled nursing facilities" or "SNFs").   It covers up to 100 days of nursing home services per episode of illness after a qualifying inpatient hospital stay.  Medicare's payments to SNFs are for the provision of both skilled nursing services and the ADLs needed by the Medicare beneficiary.

28.    Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that pays for medical expenses of primarily low-income residents.  Funding for Medicaid is shared between the federal government and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  Medicaid pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS.  42 U.S.C. §§ 1396a(a)-(b).  Medicaid pays for long term care in a "nursing facility" (NF), including ADLs, for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.

29.    Federal law requires operators of both SNFs and NFs to conduct a comprehensive assessment of each residents' specific needs, and to submit the list of these needs to CMS.  42 U.S.C. § 1395i–3 (Medicare); 42 U.S.C. § 1396 (Medicaid).   The nursing homes report this list

12

in a document known as the "Minimum Data Set" ("MDS") for every resident in the nursing home regardless of the resident's age, diagnosis, length of stay, or payment category (*i.e.*, Medicare, Medicaid, or private insurance). 42 CFR § 483.20. In *Section G* of the MDS, the nursing home provides a specific list of the ADL care each resident needs and a list of the ADL services the nursing home claimed to have provided to the resident. An example of *Section G* of the MDS is set forth below:

## Section G — Functional Status

**Coding:**

**Activity Occurred 3 or More Times**
0. **Independent** - no help or staff oversight at any time
1. **Supervision** - oversight, encouragement or cueing
2. **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
3. **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
4. **Total dependence** - full staff performance every time during entire 7-day period

**Activity Occurred 2 or Fewer Times**
7. **Activity occurred only once or twice** - activity did occur but only once or twice
8. **Activity did not occur** - activity (or any part of the ADL) was not performed by resident or staff at all over the entire 7-day period

**Coding:**
0. **No** setup or physical help from staff
1. **Setup** help only
2. **One** person physical assist
3. **Two+** persons physical assist
8. ADL activity itself **did not occur** during entire period

| | 1. Self-Performance | 2. Support |
|---|---|---|
| | ↓ Enter Codes in Boxes ↓ | |
| **A. Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | 3 | 3 |
| **B. Transfer** - how resident moves between surfaces including to or from: bed, chair, wheelchair, standing position (**excludes** to/from bath/toilet) | 3 | 3 |
| **C. Walk in room** - how resident walks between locations in his/her room | 8 | 8 |
| **D. Walk in corridor** - how resident walks in corridor on unit | 8 | 8 |
| **E. Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **F. Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments). **If facility has only one floor**, how resident moves to and from distant areas on the floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **G. Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose. Dressing includes putting on and changing pajamas and housedresses | 3 | 2 |
| **H. Eating** - how resident eats and drinks, regardless of skill. Do not include eating/drinking during medication pass. Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | 1 | 2 |
| **I. Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes. Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | 3 | 3 |
| **J. Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (**excludes** baths and showers) | 2 | 2 |

**G0120. Bathing**

How resident takes full-body bath/shower, sponge bath, and transfers in/out of tub/shower (**excludes** washing of back and hair). Code for **most dependent** in self-performance and support

| Enter Code | A. Self-performance |
|---|---|
| 3 | 0. **Independent** - no help provided<br>1. **Supervision** - oversight help only<br>2. **Physical help limited to transfer only**<br>3. **Physical help in part of bathing activity**<br>4. **Total dependence**<br>8. **Activity itself did not occur** during the entire period |

| Enter Code | B. Support provided |
|---|---|
| 3 | (Bathing support codes are as defined in item **G0110 column 2, ADL Support Provided**, above) |

*Example: MDS 3.0 Section G*

14

30.     On each MDS MANORCARE submitted to CMS and state governments, it made

specific claims in *Section G* of the MDS[7] regarding both the functional status of each of its

residents ***and*** the number of staff provided to help residents with each ADL: (a) bed mobility, (b)

transfer, (c) walk in room, (d) walk in corridor, (e) locomotion on unit, (f) locomotion off unit,

(g) dressing, (h) eating, (i) toilet use, (j) personal hygiene, and (k) bathing.[8]

31.     Every nursing home operated by MANORCARE is required to accurately assess

and code in Column 1 ("Self-Performance") each resident's ability to perform each ADL, and in

Column 2 ("Support") the level of assistance and support required by and provided to each

resident by nursing home staff for each ADL.  In the example above, the use of code "3" in

Column 1 to describe the resident's ability to perform basic ADL functions indicates the resident

has minimal ability to perform these basic functions and is highly dependent on nursing home

staff for the same.  Further, by coding a "3" in various "staff support" boxes under Column 2, the

nursing home in this example claims that the resident required and was provided *2-person*

*physical assistance* by nursing home staff for those specific *ADL* functions.  Thus, the example

above indicates the resident required (and was provided) the assistance of two nursing home staff

members in connection with moving in her bed (Bed Mobility), transfers to and from her bed

(Transfer), and the use of toilet (Toileting).

32.     Every time MANORCARE submitted an MDS to the federal and state

government for a resident, MANORCARE made the following certification or one substantially

similar to it (emphasis added):

---

[7] A true and complete copy of MDS 2.0 and 3.0 will be produced to the United States and the above listed states
with Relator's Disclosure Statement.

[8] Further, to support its specific MDS claims regarding the ADL care required and provided to residents,
Defendants created medical record documentation of the ADL needs and care provided each resident.

I certify that the accompanying information **accurately reflects resident assessment information** for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable **Medicare and Medicaid** requirements. I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and **as a basis for payment from federal funds**. I further **understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information**, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for **submitting false information**. I also certify that I am authorized to submit this information by this facility on its behalf.

33.    Each MANORCARE nursing home was also required to submit staffing data to CMS, including specific information as to the time available to certified nurse aides and licensed nurses in a CMS-671 form[9] as part of the annual survey process. As stated in CMS's State Operations Manual, completion of the Form CMS-671 is a condition of payment by Medicare and Medicaid:

Skilled nursing facilities and nursing facilities **must be in compliance** with the requirements in 42 CFR Part 483, Subpart B **to receive payment under Medicare or Medicaid**. To certify a skilled nursing facility or nursing facility, complete at least:

- A life safety code survey; and

- A standard survey (Forms **CMS-**670, **671**, 672, 677, 801 through 807).

(*emphasis added*).[10]

34.    MANORCARE also repeatedly submitted claims to Medicare and Medicaid for payment for resident care. If the resident was covered by Medicare, then the MANORCARE

---

[9]    A copy of the CMS-671 form will be produced to the United States and the above listed states with Relator's Disclosure Statement.

[10]    State Operations Manual, Chapter 7 - Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, pp. 23-24, (Rev. 12/13/13). *Also see* §§1819 and 1919 of the Social Security Act which require the survey process.

facility - which was proving SNF services and seeking reimbursement for the same – submitted a claim to a Medicare Administrative Contractor ("MAC") on either the 837I electronic form or the CMS-1450 paper form.  Medicare pays SNFs a pre-determined daily rate for each day of care under a prospective payment system ("PPS").  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).  The PPS payment is expected to cover all operating and capital costs that efficient facilities would be expected to incur in furnishing SNF services (Medicare will pay more for certain high-cost, low-probability ancillary services not relevant here).  This PPS payment consists of a nursing component and a therapy component.  Both of these are adjusted for (1) geographic differences and (2) the facilities "case mix index" ("CMI").   As described below, the CMI is unique to each facility and incorporates information from *Section G* of the MDS.

35.    MANORCARE also repeatedly submitted-claims for payment to state Medicaid programs to receive payments for residents covered by Medicaid, using an electronic form that contains similar information as to that found in the CMS 1450.  While state Medicaid program payments to NFs vary from state to state, every state (except Maryland and Wyoming) uses a prospective payment system similar in nature to the Medicare PPS system.  The Medicaid programs in many states (such as Colorado, Georgia, Indiana, Nevada, North Carolina, Virginia, and Washington), like Medicare, adjust the daily payment amount (a per diem payment) based on the facility's CMI which includes the information MANORCARE reported in *Section G* of each resident's MDS. [11] The Medicaid Programs in a few states (such as California and

---

[11] *See generally*, Ariz. Rev. Stat. § 36-2959 (Arizona); Colo. Rev. Stat. § 25.5-6-202 (Colorado); Ga. Laws 111-4-1-.10 (Georgia); 405 Ind. Admin. Code 5-13-3 (Indiana); Nevada Medicaid Services Manual Chapter 500, publically available at https://dhcfp.nv.gov/MSM/CH0500/MSM%20Ch%20500%20Packet%20(03-22-13).pdf (Nevada); North Carolina Clinical Coverage Policy 2B-1, publically available at http://www.ncdhhs.gov/dma/mp/2B1.pdf (North Carolina); 12 Va. Admin. Code § 30-90-10 (Virginia); and Wash. Admin. Code 388-96-010 *et seq.*, (Washington).

Tennessee) also pay NFs a per diem rate but do not use a case mix index in making adjustments to the per diem rate.

36.    As a provider of health care to frail and elderly nursing home residents covered by Medicare and Medicaid, MANORCARE repeatedly affirmed and certified to federal and state governments for each of the subject nursing homes that the services it was paid by taxpayers to provide complied in all respects with applicable law and conditions of payment.  In addition to its certifications regarding the MDS and CMS-671 forms described above, MANORCARE also certified that it would abide by Medicare and Medicare regulations as a condition of payment.

37.    The Social Security Act and federal regulations require all nursing homes to have sufficient numbers of nursing staff, including certified nurse aides (CNAs), to provide "nursing and related services to attain or maintain the highest practical physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care."[12] 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); and 42 C.F.R. § 483.30. Further, every nursing home:

> [M]ust provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans: (i) Except when waived under paragraph (c) of this section, licensed nurses; and (ii) Other nursing personnel [including certified nurse aides (CNAs)].[13]

---

[12] The definition and specific requirements for a "resident assessment" (also known as a Minimum Data Set or MDS) and "individual plan of care" are also set forth in 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C. § 1396r(b)(4)(A)(i), and 42 C.F.R. § 483.30.

[13] "Other nursing personnel" includes certified nurse aides (CNAs), which are specifically defined in 42 C.F.R. § 483.75 as:

> [A]ny individual providing nursing or nursing-related services to residents in a facility who is not a licensed health professional, a registered dietitian, or someone who volunteers to provide such services without pay.  Nurse aides do not include those individuals who furnish services to residents only as paid feeding assistants as defined in § 488.301 of this chapter.

42 C.F.R. § 483.30(a)(1).  These staffing laws and regulations require, as condition to

Medicare/Medicaid reimbursement, that each nursing home must have sufficient numbers

of staff on a 24-hour basis to provide the basic bedside care services needed by residents,

as defined by each resident's MDS assessment and individual plan of care.

      38.    Further, Medicare and Medicaid payments to nursing homes are explicitly

premised upon compliance with § 1819(d)(1) (Medicare) and § 1919(d)(1) (Medicaid) of the

Social Security Act (42 U.S.C. § 1395i-3(d)(1)(A) and 42 U.S.C. § 1396r(d)(1)(A)) that provide:

> A skilled nursing facility (and "non-skilled" nursing facility) must be
> administered in a manner that enables it to use its resources effectively and
> efficiently to attain or maintain the highest practicable physical, mental, and
> psychosocial well-being of each resident.

      39.    MANORCARE's repeated assurances that it would comply with these laws began

when it filed applications for each of its nursing homes to participate in the Medicare program.

Each MANORCARE facility subject to this case completed a *Medicare Enrollment Application*

*for Institutional Providers* (CMS-855A), certifying and affirming on an ongoing basis that:

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this provider. The Medicare laws, regulations, and program instructions
> are available through the Medicare contractor.

> I understand that **payment of a claim** by Medicare is **conditioned** upon the claim
> and the *underlying transaction complying with such laws, regulations, and
> program instructions* (including, but not limited to, the Federal anti-kickback
> statute and the Stark law), and on the *provider's compliance* with all applicable
> conditions of participation in Medicare.

> My signature legally and financially binds this provider to the laws, regulations,
> and program instructions of the Medicare program. (*emphasis added*).

      40.    Further, in order to qualify for Medicare payments, MANORCARE's nursing

homes were required to sign and did, in fact, execute *Health Insurance Benefit Agreements*

(CMS-1561) under 42 U.S.C. § 1395cc, conditioning payment on compliance with federal

regulations, including those referenced above.  Specifically, these Agreements state, "In order to *receive payment* under [Medicare]," the nursing home, "as the provider of services, agrees to conform to the ... applicable provisions in 42 CFR."[14]

41.     MANORCARE's certifications as compliance for payment from Medicare are described in the *Medicare Benefit Policy Manual*.  This *Manual* provides that payment for care in a SNF is covered only if all of the following conditions were met:

- The patient requires skilled nursing services or skilled rehabilitation services, i.e., services that must be performed by or under the supervision of professional or technical personnel (*see* §§30.2 -30.4); are ordered by a physician and the services are rendered for a condition for which the resident received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services; [and]

- The patient requires these skilled services on a daily basis (*see* §30.6); [and]

- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF (*see* §30.7.); and

- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. ***The services must also be reasonable in terms of duration and quantity.***

**If any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered.**  For example, payment for a SNF level of care could not be made if a resident needs an intermittent rather than daily skilled service.

*Medicare Benefit Policy Manual*, Ch. 8, § 30 (*emphasis added*).

---

[14] *Id.*  CMS Form 1561 is available at http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1561.pdf

42.     Accordingly, throughout the applicable timeframe in this case, MANORCARE knew that Medicare would not pay it for services that were: (1) not reasonable, (2) not consistent with the nature and severity of the resident's individual needs, (3) not consistent with accepted standards of medical practice, and (4) not reasonable both in terms of ***duration and quantity***.

43.     Another condition of Medicare payment is found in the Patient's Assessment Requirements of the Social Security Act:

> A skilled nursing facility **must conduct** a comprehensive, accurate, standardized, reproducible **assessment of each resident's functional capacity**, which assessment—
>
> (i) describes the resident's ***capability to perform daily life functions and significant impairments*** in functional capacity;
>
> (ii) is based on a uniform minimum data set [MDS] specified by the Secretary . . .;
>
> (iii) uses an instrument which is specified by the State under subsection (e)(5); and
>
> (iv) includes the identification of medical problems.
>
> Each such [MDS] assessment must be conducted or coordinated (with the appropriate participation of health professionals) by a registered professional nurse who signs and ***certifies*** the completion of the assessment. Each individual who completes a portion of such an assessment shall sign and ***certify as to the accuracy*** of that portion of the assessment.

42 U.S.C. 1395i–3 and 42 U.S.C. 1396r (*emphasis added*). Put simply, to be paid by Medicare and Medicaid, nursing homes must accurately complete MDS assessments for each and every resident.

44.     Each MANORCARE nursing home also signed a Medicaid Provider Agreement agreeing that the provider is only entitled to be reimbursed for furnishing covered services when all federal and state laws, regulations and program rules have been followed by the provider. Each state's Provider Agreement is slightly different, but this over-riding similarity that

21

compliance with law is a required condition of payment is present throughout the country and in every state involved in this litigation.

45.    Similarly, the various state regulations under Medicaid establish the same requirements that are present under federal law concerning using nursing home resources to meet resident needs and having sufficient staff to meet those needs.

46.    Finally, submission of accurate and true MDS information is also a condition of payment under Medicaid just as it is for Medicare.  Accordingly, MANORCARE certified in every one of its Medicaid and Medicare residents' MDSs that:

> I certify that the accompanying information accurately reflects resident assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. **I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.** I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.  [*emphasis added.*]

## V.    MANORCARE PACKED ITS NURSING HOMES WITH HEAVY CARE RESIDENTS WHILE UNDERSTAFFING ITS NURSING HOMES

47.    John Doe Relator has direct and independent knowledge that the resident-to-staff ratios established and enforced by the company made it humanly impossible to deliver the essential ADL care required by dependent residents due to the sheer number of residents they were assigned and the residents' overwhelming needs.[15]  As a consequence of nursing home staff

---

[15] Relator has reason to believe that CNAs were pressured to falsify medical records to make it appear that they had provided care that they did not provide; for example, it was a practice to falsify records to show that residents received care on days when, according to employee time cards, the CNA was not in the building to deliver such care and/or on dates when the resident was not in the facility to receive it.

not having enough time to provide the basic daily care, residents frequently were (a) forced to use their beds as toilets; (b) left in their own urine and feces for extended periods ("until the urine had dried and formed brown rings on the bed linens" or "until the feces had dried and stuck hard to the resident's body"); (c) left in pajamas/gowns and not gotten out of bed; (d) left in bed in the same position for hours on end; (e) left with a food tray next to the bed without any feeding assistance; (f) left smelly and unclean, unshaven, and unbathed; (g) left yelling/crying for help after call lights were pushed but not answered; (h) not provided oral care; (i) not encouraged or even given liquids to drink; and (j) found on the floor due to a lack of assistance.[16]

48.    Predictably, the residents who experienced the most care deprivation were those who were most vulnerable and unable to move or transfer from bed to chair, who did not have control of bowel and bladder function, whose wet and soiled clothing frequently had to be changed, and who were incapable of feeding themselves, bathing themselves, dressing themselves, and getting out of bed by themselves.  Based on Relator's direct and independent knowledge, these are the very type of residents who MANORCARE targeted for recruitment.

49.    In its quest to increase revenues and cash flows,[17] MANORCARE directed and required every nursing home in its chain to target and recruit high acuity residents including those requiring 2-person assist.  These targeted residents shared a common dependence upon

---

[16] A study done by the United States Government Accountability Office ("GAO") in 2008 described widespread, nationwide patterns of state surveys failing to identify deficiencies in the delivery of basic ADL care.  The most frequently missed type of deficiency identified in these resurveys was poor quality of care, including things like failing to ensure proper nutrition and hydration and failing to prevent pressure sores.  A 2009 study by the GAO identified several causes for this high level of deficiency understatement including the high number of survey tasks that surveyors were expected to complete, surveyors' inexperience with the survey methodology, and surveyor workforce shortages.  The limitations of the survey process and the likelihood that surveys significantly understate ADL care issues at nursing homes are well-known and well-documented.

[17] MANORCARE's corporate strategy of increasing occupancy levels, numbers of high acuity residents, and revenues and cash flows came from the top down.  This strategy was memorialized in multiple SEC filings and emails.

nursing home staff for basic bedside care including: (a) toileting assistance, (b) incontinent care and changing wet/soiled clothing/linen, (c) assistance transferring in and out of bed/wheelchair, (d) repositioning in bed or wheelchair, (e) assistance with feeding and hydration, and (f) bathing and personal hygiene.

### A.    MANORCARE PRESSURED ITS NURSING HOMES TO INCREASE OCCUPANCY RATES AND RECRUIT HEAVY CARE RESIDENTS

50.     Like all large nursing homes chains, MANORCARE's goal is to fill all its beds in each of its nursing homes.  More residents translate to more revenue.  While there is nothing wrong with maximizing resident census[18] and revenue, it is wrong to do so when facility staffing levels have been deliberately limited to the point that needed care cannot be provided to residents.

51.     MANORCARE made resident recruitment a top company-wide priority.  Drops in a nursing home's resident census (also known as "negative budget variances") were regarded as a crisis by the Company, which strictly monitored the number of filled and empty beds each day in every one of its facilities.

52.     Relator has information and reason to believe that MANORCARE also sought to increase its admission of high acuity residents who required more care because federal and state health care programs pay more for such residents.  Indeed, some heavy care residents are so dependent that two CNAs are required to provide certain services; these are known as 2-person assists.  Compared to a resident that did not require a 2-person assist, MANORCARE could collect over $115 dollars more per resident, per day in Medicare reimbursement for a resident requiring 2-person assist for ADL services, such as assistance for toileting/incontinent care,

---

[18]"Census" is the count of residents in a nursing home.

repositioning in bed, and transferring bed to chair and back. For this reason, MANORCARE required every nursing home to target high rate-of-pay residents, including those requiring 2-person assist.

53.    With a finite number of beds, MANORCARE wanted them filled with heavy care, high rate-of-pay residents. Due to the fierce competition that existed in the marketplace for such residents, MANORCARE had a coordinated strategy to ensure that its nursing homes were aggressively recruiting heavy care residents. MANORCARE hired admission coordinators and sales directors who were required to follow MANORCARE's corporate wide marketing action plans designed to increase admissions of heavy care residents. Relator has reason to believe that MANORCARE also incentivized its admission coordinators/sales directors through bonuses paid for hitting the specified census and payor-mix targets. ("Payor-mix" refers to the resident's source of payment or insurance, such as Medicare or Medicaid). Relator also has reason to believe that MANORCARE management also routinely chastised, reprimanded, and/or terminated admission coordinators/sales directors who failed to achieve MANORCARE's payor-mix objectives.

54.    MANORCARE's payor and patient acuity targets emanated from the top of MANORCARE's corporate structure and were implemented throughout the company.

### B.    MANORCARE STAFFED ITS NURSING HOMES WITHOUT REGARD TO RESIDENT NEEDS

55.    As noted above, federal law requires that every nursing home must have sufficient numbers of nursing staff, including CNAs, to provide all nursing and related care services to each resident as defined by and in accordance with his/her MDS and individualized care plan. 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. § 483.30 and § 483.30(a)(1). These federal laws mandate that MANORCARE staff its nursing homes based on

the resident acuity, including the ADL services defined in MDS *Section G* that are required by each home's unique resident population.

56.     MANORCARE deliberately ignored these regulations.  Rather than basing staffing on resident acuity, MANORCARE MANORCARE implemented a company-wide policy that in effect restricted staffing at its facilities to an average 2.01 PPD, regardless of the residents' needs.

57.     Relator has reason to believe that to ensure compliance with its prescribed staffing targets, MANORCARE restricted the staffing at its nursing homes, issuing mandatory ratios to control the number of licensed nurses and CNAs on each work shift in each MANORCARE nursing home.

58.     The staffing targets prescribed for each facility were closely monitored and enforced by MANORCARE.  MANORCARE used payroll software programs to meticulously track all staffing levels and identify staffing or budget variances at each of its facilities on a daily basis.  The results of this monitoring were regularly reported to MANORCARE on an ongoing basis from at least 2008 through 2015.  These reports show that MANORCARE set, knew, and controlled the staffing levels at each of its nursing homes.

59.     During the relevant time frame, MANORCARE made it clear to the employees of each nursing home that the inability to comply with MANORCARE's staffing targets and budgets was unacceptable.  Relator has reason to believe that nursing home administrators unable to comply with MANORCARE's set staffing targets were admonished and/or fired. Verbal and written communications, including emails, were routinely sent from Regional Senior Vice President and District Directors of Operations making it clear that facilities had to run their labor hours according to the prescribed budget.

26

C.    **MANORCARE KNEW ITS ADMISSION AND STAFFING POLICIES RESULTED IN POOR CARE THAT HARMED ITS RESIDENTS**

60.    MANORCARE's policies of admitting as many residents as possible and recruiting high acuity residents (which maximized workload) while understaffing its nursing homes resulted in residents not receiving necessary care.  The fallout from such policies not only resulted in numerous lawsuits by families of residents but also generated countless complaints from MANORCARE's own employees, all of which placed Defendants on notice of the consequences of their business decisions.

61.    MANORCARE knew that the levels of staff it mandated and enforced in its facilities made it impossible to meet the needs of residents as defined by *Section G* of the MDS, care plans, and the ADL flow records.  At all pertinent times, MANORCARE was aware that core care services required by the heavy care residents it recruited vastly exceeded the physical work capacity of the limited number of CNAs approved to work in its facilities.

62.    Further, MANORCARE knew its policies of maximizing workload levels while minimizing labor levels created a dangerous gap between the amount of time required by caregivers to provide the necessary *Section G* care versus the amount of time available to provide such care.  The fallout from such policies has not only inundated MANORCARE with an avalanche of complaints by families of residents, but also generated countless complaints from MANORCARE's own employees (e.g., CNAs, nurses, and facility administrators).

63.    As previously described, MANORCARE implemented a company-wide staffing policy.  In prescribing and enforcing these staffing levels, MANORCARE either knew of or acted with reckless disregard to widely disseminated and scientifically uncontroverted findings that:

27

a. CNA staffing levels of 1:8 day shift, 1:10 evening shift, and 1:20 night shift had been determined to cause very long waits for services and no assistance during meals for many residents, even when staff worked hard.[19]

b. Staffing at 2.2 CNA hours per patient day was predicted to result in long waits for service and inconsistent implementation of care even when staff worked at unrealistically high productivity levels.[20]

c. Staffing at the CNA levels MANORCARE dictated, in its staffing ladders, and enforced, had been determined to cause 2-3 hour waits for changes of diapers and wet linens, as well as high rates of omitted care and missed or late food service.[21]

d. In even low workload nursing homes, 2.8 CNA hours per patient day were minimally required to meet the core care needs of residents as defined by their MDS assessments.[22]

64.    Such findings were published by CMS in 2001 in its Report to Congress. Accordingly, five years after CMS tested the effects of CNA staffing levels on care and reported its findings, MANORCARE implemented mandatory policies and staffing ladders requiring its nursing homes to staff at the very same CNA PPDs and ratios known to cause widespread and significant care deprivation.

65.    Furthermore, MANORCARE knew the CNA staffing levels it imposed upon its facilities were also woefully below the minimum nursing home staffing levels recommended by the Institute of Medicine in 2004.[23]

---

[19] Phase II Final Report to Congress:  *The Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes*, 3-28.

[20] *Id.* at 1-7.

[21] *Id.* at 3-25, 26.

[22] *Id.* at 3-31.

[23] The Institute of Medicine in its 2004 report entitled, *Keeping Patients Safe,* recommended a minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for every 18 patients (1.3 hours per resident day), and one nurse assistant for every 8.5 patients (2.8 hours per resident day)."  The IOM's

66.     By reason thereof, in continuing to pressure its nursing homes to hit CNA staffing targets, MANORCARE knew it was humanly impossible for the limited workforce in its facilities to provide: (a) the essential bedside care required by the high acuity residents it purposely recruited; and (b) essential bedside care and staff support it claimed to have actually provided in *Section G* of each resident's MDS.

67.     The human costs of MANORCARE's staffing practices were often drastic and devastating: they caused widespread deprivations of human dignity, suffering, catastrophic injuries, and even death to residents across the country.  While the severity and nature of the injuries suffered by residents varied due to a number of factors,[24] the core care omission levels at MANORCARE's subject facilities remained intractably high due to the MANORCARE's willful blindness to the effects of its staffing based on headcount without consideration of acuity.

68.     The disparity between MANORCARE's staffing and acuity in the subject facilities had real world consequences.  Not only were residents of these facilities forced to suffer the indignities and health consequences from such routine care omissions, they further were subjected to long waits for the most basic human care.

---

recommendations were based on the findings contained in CMS's Phase II Report to Congress, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes*.

[24] Factors affecting the degree and nature of injury suffered by residents exposed to routine understaffing and core care omissions include: (a) the precise nature of the resident's dependency and length of exposure to care deprivation, (b) whether the resident received a proportionate or disproportionate share of the limited care, (c) how care omissions for an individual resident were distributed among the *Section G* core services, *i.e.*, which basic services were neglected the most, (d) the individual resident's physiological capacity to withstand care deprivation, and (e) the extent to which the resident's diagnosis and chronic disease process mask facility neglect.

## VI.    THE PRINCIPAL PURCHASER OF MANORCARE'S NURSING HOME SERVICES:  FEDERAL AND STATE GOVERNMENTS

69.     Federal and state Medicare and Medicaid programs are the primary purchasers of SNF and NF services, and the major source of income for MANORCARE's nursing homes.[25]

70.     From 2008 to 2014, MANORCARE's nursing home operations generated revenues well in excess of $10 billion, based on a volume of over 38 million resident days.  By far, the largest purchaser of this nursing home care was the government, with over approximately 80% of these revenues since 2008 being derived from the Medicare, Medicare Advantage, and Medicaid.

## VII.    MANORCARE'S FALSE CLAIMS

71.     MANORCARE knowingly and methodically presented or caused to be presented false or fraudulent claims for payment by or approval of the United States government as well as state governments in violation of 31 U.S.C. § 3729(a)(1)(A) and similar state False Claim Acts. From at least 2008-2015, MANORCARE knowingly presented or caused to be presented false or fraudulent claims by submitting false MDS forms and by submitting false claims for PPS payments for thousands of nursing home residents.

72.     The MDS form "both a billing document and a care assessment certification for Medicare and Medicaid …"  *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).  Each MDS MANORCARE submitted to CMS with false information is a false claim; each is also, as described below, a false statement that caused a false claim to be submitted.  In addition to the

---

[25] Most MANORCARE nursing homes are certified to provide both Medicare and Medicaid services.

MDS forms, the claims MANORCARE submitted to Medicare and Medicaid for PPS payments for services that it did not provide are also false claims.

73.     MANORCARE knowingly made, used, or caused to be made or used false statements, claims, and certifications in its MDS assessments which it (a) knew were a material condition of payment; (b) knew were the basis of payment from federal and state funds; (c) knew that such claims were required to be accurate and truthful as expressly certified; and (d) knew were impossible.

74.     Further, from at least 2008 to the present, MANORCARE knowingly presented or caused to be presented false or fraudulent claims to Medicare and Medicaid for per diem payments, usually via the CMS 1450, 837I, 1450 and 1500 forms, for services that it did not provide.  Additionally, these forms also contained false and inflated RUG and HIPPS billing codes.

75.     Government payment to MANORCARE for nursing home care, by statute, is conditioned on that care being "reasonable."  As set forth above, the care that MANORCARE delivered to its residents was so patently unreasonable in duration, quantity, and medical value that MANORCARE's submission of requests for payments for the same constituted false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B), as well as similar state False Claims Acts.

76.     Furthermore, throughout the timeframe of this case MANORCARE understood -- and certified -- in its Medicare Enrolment Application for Institutional Providers (CMS-855A) and Health Insurance Agreements (CMS-1561) that payment of claims by Medicare and Medicaid were conditioned upon the claim and underlying transaction complying with applicable laws.  Accordingly, MANORCARE knew that its payments from federal and state governments

31

were conditioned on compliance with those previously discussed regulations which govern: (a) nursing home allocation and use of government funds, 42 C.F.R. § 483.75; and (b) essential staffing, 42 CFR § 483.30.  Moreover, by reason of the above enrollment certifications, MANORCARE certified, as to each Form CMS-1450 (UB-04) it submitted for payment, that it had complied with the above regulations.  MANORCARE's certifications of compliance stand in contrast to its knowing violations of these laws by its diversion of government payments intended for nursing home care and decision to staff its facilities without regard for resident acuity.

77.    In addition to the above, as a matter of practice, MANORCARE knowingly made, caused to be made, or used false records and statements within the medical records of numerous residents to support and mask its false claims for payment and certifications of compliance. Such conduct also violated 31 U.S.C. § 3729(a)(1)(B).

A.    **THE AMOUNT OF DAILY PAYMENT TO MANORCARE UNDER MEDICARE AND MOST MEDICAID PROGRAMS HINGED UPON ACCURATE REPORTING ON THE MDS FORM**

78.    Medicare and most Medicaid programs[26] paid MANORCARE and other nursing home providers a predetermined daily amount on a per resident, per day basis.  The per diem rate for each Medicare and Medicaid resident was determined, in part for Medicare and for most Medicaid programs, by the MDS assessment that was a *prerequisite to payment* for all Medicare and Medicaid claims.

79.    The Medicare program uses a prospective payment system ("PPS") to pay a predetermined daily rate to nursing homes (also called a per diem payment).  *See* 63 Fed. Reg.

---

[26] These states include Alabama, Arizona, California, Connecticut, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Utah, Vermont, Virginia, and Washington and Wisconsin.

26,252, 26,259-60 (May 12, 1998).  Numerous Medicaid programs use a similar per diem payment system.[27]

80.    Medicare and Medicaid programs adjust the per diem rate based on a variety of factors.  Medicare and most Medicaid programs recognize the differences in resources utilized by residents in determining a range of per diem reimbursement rates.  Some residents require total assistance with their activities of daily living, while others require less assistance.  The recognition of these differences forms the premise for Medicare's and most Medicaid programs' "case-mix" adjustment to the per diem rate which alters the reimbursement amount based on the resource needs of each resident in a particular nursing home.  Residents with heavy care needs require more staff resources, and payment levels are higher than for those with less intensive care needs.  In a case-mix adjusted payment system, the amount of reimbursement to a nursing home is based on the resource intensity of the resident as measured by items on the MDS, including *Section G*.[28]

81.    Accordingly, insomuch as these MDS ADLs are used to classify each resident into different case-mix categories called Resource Utilization Groups ("RUGs"), MANORCARE's coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments.

### B.    RELATIONSHIP BETWEEN MDS, RUGS, AND MANORCARE'S MEDICARE PER DIEM PAYMENTS

82.    The daily PPS/per diem rate that Medicare and various Medicaid programs pay a nursing facility depends, in part, on the RUG to which a resident is assigned which, as stated

---

[27] *Id.*  As previously noted, these states adjust the daily Medicaid payment amount based on the facilities CMS.

[28] CMS's RAI Version 3.0 Manual, Chapter 6, *Medicare Skilled Nursing Facility Prospective Payment System (SNF PPS)*.

above, is calculated off a resident's MDS.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries (*i.e.,* residents) with similar characteristics or resource needs.  The number of possible RUGs categories and the corresponding payment rate depends on whether RUG-III or RUG-IV was in effect.  For Medicare, for example, from January 1, 2006, to October 1, 2010, there were 53 RUGs in the RUG-III classification system.  *See* 70 Fed. Reg. 45026 to 45031 (Aug. 4, 2005).  After October 1, 2010, Medicare began the implementation of RUG-IV which recognized 66 possible resident classifications and payment rates.  Regardless of whether payment was based on a RUG-III or RUG-IV classification, at all times material to this case, the per diem rate for Medicare and most Medicaid programs for each of the 53 to 65 RUGs categories[29] was based on CMS-initiated nursing home staff time measurement studies and estimated cost for required care.

83.    The RUG-IV classification system has eight major classification categories: (1) Rehabilitation Plus Extensive Services, (2) Rehabilitation, (3) Extensive Services, (4) Special Care High, (5) Special Care Low, (6) Clinically Complex, (7) Behavioral Symptoms and Cognitive Performance Problems, and (8) Reduced Physical Function.  All eight major categories, except for Extensive Services, are further subdivided based on the resident's *late loss* ADL score which enables Medicare (and/or a Medicaid program) to distinguish those nursing home residents requiring more care and therefore requiring more resources.[30]

---

[29] CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010.  CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes. 74 Fed. Reg. 40288 (Aug. 11, 2009).

[30] CMS's RAI Version 3.0 Manual, Chapter 6.3, *Resource Utilization Groups Version IV (RUG-IV)*.  Additionally, the Special Care High, Special Care Low, and Clinically Complex categories are also divided by the presence of depression. Finally, the Behavioral Symptoms and Cognitive Performance Problems and the Reduced Physical Function categories are divided by the provision of restorative nursing services.

84.    In addition to reflecting a resident's rehabilitation therapy needs and special clinically complexities, each RUG also takes into account each resident's ability to perform and the staff support provided for the following four activities of daily living ("ADLs"): (1) toileting, (2) bed mobility, (3) transferring in and out of bed or chair, and (4) eating.  These four ADL activities are known as "late-loss" ADLs because of the fact that they are generally the last physical functions to be lost in the cycle of life.  For RUGs classification purposes, each resident received a "*late loss*" ADL score[31] that is based on the resident's dependency levels and staff support that MANORCARE provided in *Section G* of the MDS.  For example, a very dependent resident who (a) could not toilet, change position in bed, or transfer without assistance and (b) was provided 2-person staff support would receive the maximum "*late loss*" ADL score of 4 for each of these three *late loss* ADLs or a total *late loss* score of 12 (not including feeding).[32] Significantly, to obtain the highest "*late loss*" ADL score, highest RUG code, and largest Medicare (and/or Medicaid) reimbursement, a nursing home must claim in *Section G* of the MDS that the resident was provided the assistance of two staff members for a number of these "*late loss*" ADLs.  In sum, the extent of the "*late loss*" ADL services required by a resident and actually provided by staff significantly impacts the resident's RUGs classification and the nursing home's corresponding payment from Medicare and most Medicaid programs.

85.    For example, the table below contains the 2013-2014 RUG rates paid by Medicare for nursing homes operated in rural areas.  Medicare makes annual adjustments to RUGs rates based on locality and wage index.  *See* 42 U.S.C § 1395yy(e)(4)(E)(ii)(IV).  An

---

[31] CMS recognizes that the "*late loss*" ADL score is "very important component of the classification process." "Other ADLs are also very important, but the research indicates that the *late loss* ADLs predict resource use most accurately."  *See* CMS RAI Version 3.0 Manual, CH 6: Medicare SNF PPS, page 6-24.

[32] Under MDS 2.0 which was in effect until October 1, 2010, the possible *late loss* ADL scoring ranged from 4 to 18.  Under MDS 3.0, the *late loss* ADL scoring ranged/ranges from 0 -16.

adjusted chart similar to that found below (Table 4) is available for each county in the United States where a facility is operated.  The first column in Table 4 below identifies each of the 8 major RUG Categories that are associated with a rehabilitation level or clinical needs grouping. The second column provides an abbreviated description of the rehabilitation or clinical basis for the RUG grouping, and the third column provides the specific RUG payment classification utilizing a three letter code.  Column four provides a breakdown of the possible MDS "*late loss*" ADL Scores for each RUG billing code, and the fifth and final column provides the corresponding per diem rate for each RUG classification.

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| 1 | RU (Rehab Ultra-High) | RUX | 11 to 16 | $778.44 |
| | RU (Rehab Ultra-High) | RUL | 2 to 10 | $762.60 |
| 2 | RU (Rehab Ultra-High) | RUC | 11 to 16 | $602.61 |
| | RU (Rehab Ultra-High) | RUB | 6 to 10 | $602.61 |
| | RU (Rehab Ultra-High) | RUA | 0 to 5 | $512.32 |
| | RV (Rehab Very High) | RVX | 11 to 16 | $683.97 |
| | RV (Rehab Very High) | RVL | 2 to 10 | $617.44 |
| | RV (Rehab Very High) | RVC | 11 to 16 | $509.72 |
| | RV (Rehab Very High) | RVB | 6 to 10 | $446.36 |
| | RV (Rehab Very High) | RVA | 0 to 5 | $444.77 |
| | RH (Rehab High) | RHX | 11 to 16 | $612.55 |
| | RH (Rehab High) | RHL | 2 to 10 | $549.18 |
| | RH (Rehab High) | RHC | 11 to 16 | $438.19 |
| | RH (Rehab High) | RHB | 6 to 10 | $397.11 |
| | RH (Rehab High) | RHA | 0 to 5 | $352.75 |
| | RM (Rehab Medium) | RMX | 11 to 16 | $556.67 |
| | RM (Rehab Medium) | RML | 2 to 10 | $512.32 |
| | RM (Rehab Medium) | RMC | 11 to 16 | $380.84 |
| | RM (Rehab Medium) | RMB | 6 to 10 | $358.66 |
| | RM (Rehab Medium) | RMA | 0 to 5 | $298.46 |
| | RL (Rehab Low) | RLX | 2 to 16 | $484.52 |
| | RL (Rehab Low) | RLB | 11 to 16 | $364.13 |

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| | RL (Rehab Low) | RLA | 0 to 10 | $238.98 |
| 3 | ES (Extensive Services) | ES3 | 2 to 16 | $670.87 |
| | ES (Extensive Services) | ES2 | 2 to 16 | $526.71 |
| | ES (Extensive Services) | ES1 | 2 to 16 | $471.27 |
| 4 | (Special Care High) | HE2 | 15 to 16 | $455.43 |
| | (Special Care High) | HD2 | 11 to 14 | $426.92 |
| | (Special Care High) | HC2 | 6 to 10 | $403.15 |
| | (Special Care High) | HB2 | 2 to 5 | $398.40 |
| | (Special Care High) | HE1 | 15 to 16 | $379.39 |
| | (Special Care High) | HD1 | 11 to 14 | $357.22 |
| | (Special Care High) | HC1 | 6 to 10 | $338.21 |
| | (Special Care High) | HB1 | 2 to 5 | $335.04 |
| 5 | (Special Care Low) | LE2 | 15 to 16 | $414.24 |
| | (Special Care Low) | LD2 | 11 to 14 | $398.40 |
| | (Special Care Low) | LC2 | 6 to 10 | $350.88 |
| | (Special Care Low) | LB2 | 2 to 5 | $333.45 |
| | (Special Care Low) | LE1 | 15 to 16 | $347.71 |
| | (Special Care Low) | LD1 | 11 to 14 | $335.04 |
| | (Special Care Low) | LC1 | 6 to 10 | $297.02 |
| | (Special Care Low) | LB1 | 2 to 5 | $284.35 |
| 6 | (Clinically Complex) | CE2 | 15 to 16 | $369.89 |
| | (Clinically Complex) | CD2 | 11 to 14 | $350.88 |
| | (Clinically Complex) | CC2 | 6 to 10 | $308.11 |
| | (Clinically Complex) | CB2 | 2 to 5 | $285.93 |
| | (Clinically Complex) | CA2 | 0 to 1 | $243.16 |
| | (Clinically Complex) | CE1 | 15 to 16 | $341.38 |
| | (Clinically Complex) | CD1 | 11 to 14 | $322.37 |
| | (Clinically Complex) | CC1 | 6 to 10 | $285.93 |
| | (Clinically Complex) | CB1 | 2 to 5 | $265.34 |
| | (Clinically Complex) | CA1 | 0 to 1 | $227.32 |
| 7 | (Behavior Symptoms and Cognitive Performance) | BB2 | 2 to 5 | $257.42 |
| | (Behavior Symptoms and Cognitive Performance) | BA2 | 0 to 1 | $214.65 |
| | (Behavior Symptoms and Cognitive Performance) | BB1 | 2 to 5 | $246.33 |
| | (Behavior Symptoms and | BA1 | 0 to 1 | $205.14 |

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| | Cognitive Performance) | | | |
| 8 | (Reduced Physical Functioning) | PE2 | 15 to 16 | $341.38 |
| | (Reduced Physical Functioning) | PD2 | 11 to 14 | $322.37 |
| | (Reduced Physical Functioning) | PC2 | 6 to 10 | $278.01 |
| | (Reduced Physical Functioning) | PB2 | 2 to 5 | $236.82 |
| | (Reduced Physical Functioning) | PA2 | 0 to 1 | $197.22 |
| | (Reduced Physical Functioning) | PE1 | 15 to 16 | $325.53 |
| | (Reduced Physical Functioning) | PD1 | 11 to 14 | $306.52 |
| | (Reduced Physical Functioning) | PC1 | 6 to 10 | $265.34 |
| | (Reduced Physical Functioning) | PB1 | 2 to 5 | $227.32 |
| | (Reduced Physical Functioning) | PA1 | 0 to 1 | $189.30 |

*Table 4*:  *Rural RUG Rates for 2013-2014 (unadjusted for location)*

86.    The RUG billing is incorporated into the Health Insurance Prospective Payment System (HIPPS) code that MANORCARE submits to Medicare (or to the various state Medicaid programs) and would affect the amount paid to MANORCARE.

87.    MANORCARE used CMS software, or private software developed with the CMS tools, to encode and electronically transmit to Medicare and/or Medicaid its residents' most current MDS assessment data and to automatically convert the data into a RUG billing group/HIPPS code which it submitted per resident on at least a monthly basis as part of its request for payment.  In the PPS/per diem claims submitted by MANORCARE to Medicare and Medicaid programs, the first three characters in the HIPPS code matched the RUG billing code and the last two characters defined the applicable payment periods and the type of assessment.

88.    Accordingly, submission of false MDS forms were also false statements that caused Medicare and various Medicaid programs to pay MANORCARE in excess of what MANORCARE was actually entitled to receive.

## VIII.  MANORCARE FINANCED ITS BLOATED OVERHEAD AND THIRD-PARTY TRANSACTIONS BY STEALING FROM THE GOVERNMENT

89.     During the time period described above in which MANORCARE has schemed to defraud the government of millions of dollars in Medicare and Medicaid reimbursements, its revenues and returns on investment have grown to record levels.  Rather than deploying its Medicare and Medicaid funds in a manner to ensure that the most basic needs of its vulnerable residents were met, MANORCARE diverted taxpayer dollars specifically earmarked for nursing home care to pay for massive corporate administrative expenses and related party transactions. This scheme siphoned off critical Medicare and Medicaid dollars from nursing homes that could have paid for critically needed nurse aide staffing.   Rather than using such funds, as intended, to provide care to meet the needs of its residents, MANORCARE reallocated and repurposed these resources to fund MANORCARE's:

    a.  Bloated corporate overhead and home office;

    b.  Self-dealing through its related-party subsidiaries and internal corporate charges; and

    c.  Lavish compensation and performance bonuses paid to the top senior executives despite the fact that MANORCARE's revenue stream primarily derived from government funding.

90.      In sum, not only were taxpayers shortchanged—being ultimately saddled with PRUITTHEALTH's staggering corporate overhead and related-party transactions, nursing home residents were also shortchanged—being deprived of the care that was paid for and needed.

39

## IX.   MANORCARE'S DIRECT PARTICIPATION IN THE OPERATION OF ITS NURSING HOMES AND JOINT VENTURE RESPONSIBILITY

91.    Defendants HCR Manorcare, Inc.; Manor Care, Inc.; HCR-Manor Care Services, LLC; and Heartland Employment Services, LLC *directly participated* in the false claim violations described above at the subject nursing homes by:

a.    requiring MANORCARE nursing homes to increase their occupancy rates and target high acuity residents, whose needs were well beyond the care capabilities of the nursing home's staff;

b.    directing MANORCARE's nursing homes to: (i) recruit and admit high acuity residents and increase resident; and (ii) retain residents whose needs exceeded the qualification and care capability of the nursing home staff;

c.    determining and controlling at each MANORCARE nursing home: (i) the numbers of staff and hours of labor at each facility, (ii) the expenditures for labor, (iii) the revenue targets, census targets and payor-mix targets, and (iv) resident recruitment strategies and discharge practices;

d.    overriding the decisions of nursing home administrators, department heads and licensed nursing staff charged with the legal responsibility for determining the staffing necessary to meet the needs of residents; and

e.    submitting claims for payment on behalf of its nursing homes and centrally controlling the claims and reimbursement process at each nursing home.

92.    Further, Defendants and the nursing homes listed in *Exhibit 1* were the alter egos of one another, each forming a part of a single entity.  Defendants exerted pervasive and continual control over the nursing homes listed in *Exhibit 1* such that the nursing homes were mere agents, instrumentalities and conduits through which Defendants did business.

40

93.     Furthermore, at all times material, Defendants treated the funds of one entity as the funds of another.  Defendants collected, distributed and shared the revenues, profits, and assets of its nursing homes.  They also continually siphoned all the revenues from each of the individual nursing homes including those listed in *Exhibit 1* into a centralized master account. Additionally, Defendants diverted revenues away from nursing homes to related business entities.  Without control of their revenues and with no significant assets, MANORCARE's nursing homes were entirely dependent on Defendants for their continued existence and ongoing operations.

94.     Each of MANORCARE's nursing homes were grossly undercapitalized with essentially all cash generated by the nursing home's operations swept into accounts controlled by the Defendants.  The Defendants collected and managed all revenues created by operations of its nursing homes and controlled all of their expenditures.

95.     Defendants and the nursing homes portrayed themselves as a single entity, publicly promoting themselves as a unified nation-wide operation through brochures, marketing materials, website, communications with the media, as well as correspondence to state licensing and certification agencies.  MANORCARE is a vertically-integrated company that uses "Manorcare" or "Heartland" as a brand, often branding its facilities by using "Manorcare" or "Heartland" in their name and inserting a "Manorcare" or "Heartland" logo throughout facility policies, procedures, and forms, as well as the medical records of residents.  MANORCARE holds the trademark for the "Manorcare" or "Heartland" logos that are found on virtually all its nursing homes' signs, advertisements, medical records, policies, contracts, and websites.

96.     Defendants also provided a broad range of administrative, consulting, and support services to MANORCARE's nursing homes, including accounting and administrative services,

41

auditing, compliance services, cost report preparation and audit representation, legal services, operational consulting and oversight support, and local, state, and federal tax preparation.

97.     Accordingly, there is and was sufficient unity of interest and ownership among and between each Defendant and the subject nursing homes, such that the acts of one were for the benefit of and could be imputed to all others.  Further, at all times herein mentioned, each Defendant acted as the agent and partner of, conspired and participated in a joint venture with the remaining Defendants.  Furthermore, in engaging in the conduct described below, the Defendants all acted with the express or implied knowledge, consent, authorization, approval, and/or ratification of their Co-Defendants.

## X.    COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

98.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

99.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

100.     By virtue of the conduct described above, Defendants knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

101.     Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the

Government false or fraudulent claims for the improper payment or approval of nursing home services.

102.    The United States and its contractors, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

103.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWO**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

104.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

105.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

106.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims submitted to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

107.    Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

43

108.    The United States and its contractors, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

109.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
### California False Claims Act, Cal. Gov't Code § 12651(a)(1) and § 12651(a)(2)

110.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

111.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12650, *et seq.*

112.    By virtue of conduct described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (i.e., Medi-Cal) false or fraudulent claims for improper payment for nursing home services.

113.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

114.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(a)

115.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

116.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*

44

117.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval for improper payment for nursing home services.

118.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

119.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT FIVE**
**Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(b)**

120.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

121.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*

122.    By virtue of the conduct described above, Defendants knowingly made, used or caused to made or used false records or statements material to a false or fraudulent claim made to the Colorado Medicaid Program for improper payment for nursing home services.

123.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

124.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT SIX**
**Delaware False Claims and Reporting Act, Del. Code Ann., Title 6, § 1201, *et seq.***

125.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. Code Ann., Title 6, § 1201, *et seq.*

45

127.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for improper payment for nursing home services.

128.    The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

129.    By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT SEVEN
### Florida False Claims Act, Fla. Stat. Ann. § 68.081-68.09

130.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

131.    This is a claim for treble damages and civil penalties under the Florida False Medicaid Claims Act, Fla. Stat. Ann. § 68.081, *et seq.*

132.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid program false or fraudulent claims for improper payment for nursing home services.

133.    The Florida Medicaid program, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

134.    By reason of these payments, the Florida Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT EIGHT
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)

46

135.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

136.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq*.

137.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for improper payment for nursing home services.

138.    The Georgia Medicaid program, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

139.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT NINE**
**Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2)**

140.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

141.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq*.

142.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims for improper payment for nursing home services.

143.    The Georgia Medicaid program, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims for nursing home services that otherwise would not have been allowed.

47

144.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TEN
### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1)

145.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

146.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1).

147.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program and other government funded health insurance programs false or fraudulent claims for improper payment for nursing home services.

148.    Georgia, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

149.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT ELEVEN
### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)

150.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

151.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2).

152.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements to the Georgia Medicaid program and other

government funded health insurance programs material to false or fraudulent claims for improper payment for nursing home services.

153.    Georgia, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

154.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWELVE
### Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. § 175/1, *et seq.*

155.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

156.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. § 175/1, et seq.

157.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for improper payment for nursing home services.

158.    The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

159.    By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THIRTEEN
### Indiana False Claims And Whistleblower Protection Act,
### Indiana Code § 5-11-5.5-2(b)(1)

160.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

161.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

162.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid program false or fraudulent claims for improper payment for nursing home services.

163.    The Indiana Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

164.    By reason of these payments, the Indiana Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT FOURTEEN**
**Indiana False Claims and Whistleblower Protection Act,**
**Indiana Code § 5-11-5.5-2(b)(2)**

165.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

166.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

167.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used a false record or stamen to obtain payment or approval of a false claim from the Indiana Medicaid Program false or fraudulent claims for improper payment for nursing home services.

168.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

169.    By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FIFTEEN
**Iowa False Claims Act, Iowa Code § 685.1, *et seq.***

170.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

171.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1, *et seq*.

172.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid program false or fraudulent claims for improper payment for nursing home services.

173.    The Iowa Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

174.    By reason of these payments, the Iowa Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIXTEEN
**Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604, *et seq*.**

175.    **Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.**

176.    **This is a claim for treble damages and civil penalties under the** Maryland False Health Claims Act, Md. Code. Ann. Health-Gen. **§ 2-601.**

177.    **By virtue of the conduct described above, defendants knowingly presented or caused to be presented to the** Maryland **Medicaid program false or fraudulent claims for improper payment for nursing home services.**

178.    **The** Maryland **Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by defendants, paid for claims that otherwise would not have been allowed.**

179.    **By reason of these payments, the** Maryland **Medicaid program has been damaged, and continues to be damaged, in a substantial amount.**

## COUNT SEVENTEEN
### Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. § 400.601, *et seq.*

180.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

181.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. § 400.601, *et seq.*

182.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for nursing homes services.

183.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

184.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHTEEN
### Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.040(1)(a)

185.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

186.    This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, *et seq.*

187.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the Nevada Medicaid Program false or fraudulent claims for improper payment for nursing home services.

188.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

189.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINETEEN
### Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(b)

190.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

191.    This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, *et seq.*

192.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or statements to get a false claim paid or approved by the Nevada Medicaid Program for nursing home services.

193.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

194.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY
### New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

195.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

196.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

197.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for improper payment for nursing home services.

198.    The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

199.    By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-ONE
### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(1)

200.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

201.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*

202.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid program false or fraudulent claims for payment or approval for nursing home services.

203.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

204.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-TWO
### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(2)

210.    Relator re-alleges and incorporates the allegations contained in the preceding paragraphs of this Complaint.

211.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

212.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or statements to get a false claim paid or approved by the North Carolina Medicaid program for nursing home services.

213.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

214.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-THREE
### Oklahoma False Claims Act, 63 O.S. § 5053, et seq.

215.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

216.    This is a claim for treble damages and civil penalties under the Oklahoma False Claims Act, 63 OS § 5053, et seq.

217.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for improper payment for nursing home services.

218.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

219.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-FOUR
### Texas False Claims Act, THRC CH. 36

220.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

221.    This is a claim for treble damages and civil penalties under the Texas False Claims Act, THRC Chapter 36, *et seq.*

222.    By virtue of the conduct described above, Defendants knowingly caused to be presented to the Texas Medicaid Program false or fraudulent claims for improper payment for nursing home services.

223.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

224.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-FIVE
### Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(1)

225.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

226.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1, *et seq.*

227.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for improper payment for nursing home services.

228.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

229.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWENTY-SIX**
**Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(2)**

230.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

231.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act. Va. Code Ann. §8.01-216.1, *et seq.*

232.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or statements to get a false claim paid or approved by the Virginia Medicaid Program for nursing home services.

233.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

234.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWENTY-SEVEN**
**Washington Medicaid Fraud Act,**
**Rev. Code Wash. § 74.66.020(1)(a)**

235.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

236.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud Act, Rev. Code Wash. § 74.66.005, *et seq.*

57

237.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval for nursing home services.

238.    The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

239.    By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWENTY-EIGHT**
**Washington Medicaid Fraud Act,**
**Rev. Code Wash. § 74.66.020(1)(b)**

240.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

240.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud Act, Rev. Code Wash. § 74.66.005, *et seq.*

241.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or statements to get a false claim paid or approved by the Washington Medicaid program for nursing home services.

242.    The Washington Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

243.    By reason of these payments, the Washington Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## XI.    REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by jury.

**WHEREFORE,** Plaintiff/Relator, on behalf of himself, the United States of America and the *Qui Tam* States, demands and prays that judgment be entered as follows against the Defendants under the Federal FCA Counts and under supplemental FCA counts, as follows:

(a)    In favor of the United States against Defendants for treble the amount of damages to the United States, Medicare, Medicaid and other Government Funded Health Insurance Programs, from the false or fraudulent claims for improper payment or approval of nursing home services alleged herein plus the maximum civil penalties (plus interest) for each false claim caused to be submitted, for each false record submitted by Defendants conspiracy to submit false claims;

(b)    In favor of the United States and/or the *Qui Tam* States against the Defendants for disgorgement of the profits earned by the Defendants as a result of their false or fraudulent claims for improper payment or approval of nursing home services alleged herein;

(c)    In favor of Plaintiff/Relator for the maximum allowed pursuant to 31 U.S.C. §3730(d) to include reasonable expenses, attorneys' fees and costs incurred by Plaintiff/Relator;

(d)    For all costs of this Federal FCA civil action;

(e)    In favor of the Plaintiff/Relator and the United States for such other relief as this Court deems just and equitable;

(f)    In favor of the Plaintiff/Relator and the *Qui Tam* states against Defendants in an amount equal to three times the amount of damages that the *Qui Tam* States have sustained as a result of the Defendants' actions, as well as the statutory maximum penalty against the Defendants for each violation of each state's FCA;

(g)    In favor of Plaintiff/Relator for the maximum amount allowed as Plaintiff/Relator's share pursuant to the *Qui Tam* States FCAs as follows: the California False

59

Claims Act, Cal Govt. Code  §12650, *et seq.*; Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. §1201, *et seq.*; Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.;* Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168, *et seq.*; Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121, *et seq.*; Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1, *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5, *et seq.*; Iowa False Claims Act, Iowa Code 685.1, *et seq.*; Maryland False Health Claims Act, Md. Code Ann. § 2-601, *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.610, *et seq.*; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*; New Jersey False Claims Act, N.J. Stat. Ann. §2A:32C-1, *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*; Oklahoma False Claims Act, 63 Okla. Stat. § 5053, *et seq.*; Texas False Claims Act, THRC Ch. 36, *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1, *et seq.*; Washington Medicaid Fraud False Claims Act, RCW §74.66.005, *et seq.*

(h)     In favor of the Plaintiff/Relator for all costs and expenses associated with the supplemental claims of the *Qui Tam* States, including attorney's fees and costs;

(i)     In favor of the *Qui Tam* States and Plaintiff/Relator for all such other relief as the Court deems just and proper;

(j)     In the event that the United States or any *Qui Tam* State proceeds with this action, Plaintiff/Relator, be awarded an appropriate amount for disclosing evidence or information that the United States and/or *Qui Tam* States did not possess when this action was brought to the government. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Plaintiff/Relator also

includes the results of government actions or settlement of claims arising from the expansion of claims through the government's further investigation directly generated from or attributable to Plaintiff/Relator's information; and

(k)    Such other relief as this Court deems just and appropriate.

Dated:  February 22, 2016

Respectfully submitted,

_/s/ Thomas W. Sheridan_____
Thomas W. Sheridan
Sheridan & Murray, LLC
424 S. Bethlehem Pike
Third Floor
Fort Washington, PA 19034
Tel:     215-977-9500
Fax:     215-977-9800

Joseph Trautwein
Joseph Trautwein & Associates, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Tel:     215-764-2301
Fax:     267.464.0400

*Of Counsel*

David Marks
Marks, Balette & Giessel, PC
10000 Memorial Dr., Suite 760
Houston, TX 77025
Tel:     713-681-3070
Fax:     713-681-2811

| provnum | NAME of Home | ADDRESS | CITY | STATE | ZIP | Chain / Ownership |
|---|---|---|---|---|---|---|
| 65241 | MANORCARE HEALTH SERVICES - DENVER | 290 SOUTH MONACO PARKWAY | DENVER | CO | 80224 | HCR MANOR CARE SERVICES LLC |
| 65267 | MANORCARE HEALTH SERVICES - BOULDER | 2800 PALO PARKWAY | BOULDER | CO | 80301 | HCR MANOR CARE SERVICES LLC |
| 85028 | MANORCARE HEALTH SERVICES - WILMINGTON | 700 FOULK ROAD | WILMINGTON | DE | 19803 | HCR MANOR CARE SERVICES LLC |
| 85033 | MANORCARE HEALTH  SERVICES - PIKE CREEK | 5651 LIMESTONE ROAD | WILMINGTON | DE | 19808 | HCR MANOR CARE SERVICES LLC |
| 105481 | MANORCARE HEALTH SERVICES | 375 NW 51ST STREET | BOCA RATON | FL | 33431 | HCR MANOR CARE SERVICES LLC |
| 115246 | MANOR CARE REHABILITATION CENTER - DECATUR | 2722 NORTH DECATUR ROAD | DECATUR | GA | 30033 | HCR MANOR CARE SERVICES LLC |
| 115283 | MANOR CARE REHABILITATION CENTER - MARIETTA | 4360 JOHNSON FERRY PLACE | MARIETTA | GA | 30068 | HCR MANOR CARE SERVICES LLC |
| 145004 | MANORCARE OF ELGIN | 180 SOUTH STATE STREET | ELGIN | IL | 60123 | HCR MANOR CARE SERVICES LLC |
| 145012 | HEARTLAND OF GALESBURG | 280 EAST LOSEY STREET | GALESBURG | IL | 61401 | HCR MANOR CARE SERVICES LLC |
| 145021 | HEARTLAND OF MACOMB | 8 DOCTORS LANE | MACOMB | IL | 61455 | HCR MANOR CARE SERVICES LLC |
| 145027 | HEARTLAND OF MOLINE | 833 SIXTEENTH AVENUE | MOLINE | IL | 61265 | HCR MANOR CARE SERVICES LLC |
| 145031 | HEARTLAND OF NORMAL | 510 BROADWAY | NORMAL | IL | 61761 | HCR MANOR CARE SERVICES LLC |
| 145038 | HEARTLAND OF DECATUR | 444 WEST HARRISON STREET | DECATUR | IL | 62526 | HCR MANOR CARE SERVICES LLC |
| 145039 | HEARTLAND OF PEORIA | 5600 GLEN ELM DRIVE | PEORIA | IL | 61614 | HCR MANOR CARE SERVICES LLC |
| 145043 | MANORCARE OF KANKAKEE | 900 WEST RIVER PLACE | KANKAKEE | IL | 60901 | HCR MANOR CARE SERVICES LLC |
| 145045 | MANORCARE OF NAPERVILLE | 200 MARTIN AVENUE | NAPERVILLE | IL | 60540 | HCR MANOR CARE SERVICES LLC |

| 145087 | MANORCARE OF OAK LAWN WEST | 6300 WEST 95TH STREET | OAK LAWN | IL | 60453 | HCR MANOR CARE SERVICES LLC |
|--------|----------------------------|------------------------|----------|-----|--------|------------------------------|
| 145190 | HEARTLAND OF CHAMPAIGN | 309 EAST SPRINGFIELD | CHAMPAIGN | IL | 61820 | HCR MANOR CARE SERVICES LLC |
| 145199 | MANORCARE OF ARLINGTON HEIGHTS | 715 WEST CENTRAL ROAD | ARLINGTON HTS | IL | 60005 | HCR MANOR CARE SERVICES LLC |
| 145246 | MANORCARE OF HINSDALE | 600 WEST OGDEN AVENUE | HINSDALE | IL | 60521 | HCR MANOR CARE SERVICES LLC |
| 145338 | MANORCARE OF WESTMONT | 512 EAST OGDEN AVENUE | WESTMONT | IL | 60559 | HCR MANOR CARE SERVICES LLC |
| 145350 | MANORCARE OF ROLLING MEADOWS | 4225 KIRCHOFF ROAD | ROLLING MEADOWS | IL | 60008 | HCR MANOR CARE SERVICES LLC |
| 145363 | MANORCARE OF OAK LAWN EAST | 9401 SOUTH KOSTNER AVENUE | OAK LAWN | IL | 60453 | HCR MANOR CARE SERVICES LLC |
| 145524 | HEARTLAND OF RIVERVIEW | 500 CENTENNIAL DRIVE | EAST PEORIA | IL | 61611 | HCR MANOR CARE SERVICES LLC |
| 145593 | MANORCARE OF LIBERTYVILLE | 1500 SOUTH MILWAUKEE AVENUE | LIBERTYVILLE | IL | 60048 | HCR MANOR CARE SERVICES LLC |
| 145600 | HEARTLAND OF CANTON | 2081 NORTH MAIN STREET | CANTON | IL | 61520 | HCR MANOR CARE SERVICES LLC |
| 145603 | HEARTLAND OF PAXTON | 1001 EAST PELLS STREET | PAXTON | IL | 60957 | HCR MANOR CARE SERVICES LLC |
| 145607 | MANORCARE OF PALOS HEIGHTS EAST | 7850 WEST COLLEGE DRIVE | PALOS HEIGHTS | IL | 60463 | HCR MANOR CARE SERVICES LLC |
| 145608 | MANORCARE OF SOUTH HOLLAND | 2145 EAST 170TH STREET | SOUTH HOLLAND | IL | 60473 | HCR MANOR CARE SERVICES LLC |
| 145684 | MANORCARE OF HOMEWOOD | 940 MAPLE AVENUE | HOMEWOOD | IL | 60430 | HCR MANOR CARE SERVICES LLC |
| 145689 | MANORCARE OF ELK GROVE VILLAGE | 1920 NERGE ROAD | ELK GROVE VILLAGE | IL | 60007 | HCR MANOR CARE SERVICES LLC |
| 145893 | MANORCARE OF PALOS HEIGHTS WEST | 11860 SOUTHWEST HIGHWAY | PALOS HEIGHTS | IL | 60463 | HCR MANOR CARE SERVICES LLC |
| 145932 | MANORCARE OF WILMETTE | 432 POPLAR DRIVE | WILMETTE | IL | 60091 | HCR MANOR CARE SERVICES LLC |
| 145982 | MANORCARE OF NORTHBROOK | 3300 MILWAUKEE AVE. | NORTHBROOK | IL | 60062 | HCR MANOR CARE SERVICES LLC |

| 155005 | MANORCARE HEALTH SERVICES | 1345 N MADISON AVE | ANDERSON | IN | 46011 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 155247 | MANORCARE HEALTH SERVICES | 8549 S MADISON AVE | INDIANAPOLIS | IN | 46227 | HCR MANOR CARE SERVICES LLC |
| 155338 | MANORCARE HEALTH SERVICES - PRESTWICK | 445 S CR 525 E | AVON | IN | 46123 | HCR MANOR CARE SERVICES LLC |
| 155618 | MANOR CARE HEALTH SERVICES SUMMER TRACE | 12999 N PENNSYLVANIA ST | CARMEL | IN | 46032 | HCR MANOR CARE SERVICES LLC |
| 165017 | MANORCARE HEALTH SERVICES | 1940 FIRST AVENUE NE | CEDAR RAPIDS | IA | 52402 | HCR MANOR CARE SERVICES LLC |
| 165033 | MANORCARE HEALTH SERVICES | 815 EAST LOCUST STREET | DAVENPORT | IA | 52803 | HCR MANOR CARE SERVICES LLC |
| 165034 | MANORCARE HEALTH SERVICES | 201 WEST RIDGEWAY AVENUE | WATERLOO | IA | 50701 | HCR MANOR CARE SERVICES LLC |
| 165104 | MANORCARE HEALTH SERVICES | 901 WEST THIRD STREET | DUBUQUE | IA | 52001 | HCR MANOR CARE SERVICES LLC |
| 165575 | MANORCARE HEALTH SERVICES-UTICA RIDGE | 3800 COMMERCE BLVD | DAVENPORT | IA | 52807 | HCR MANOR CARE SERVICES LLC |
| 165601 | MANORCARE HEALTH SERVICES -WEST DES MOINES | 5010 GRAND RIDGE DRIVE | WEST DES MOINES | IA | 50265 | HCR MANOR CARE SERVICES LLC |
| 175168 | MANORCARE HEALTH SERVICES - WICHITA | 7101 E 21ST ST N | WICHITA | KS | 67206 | HCR MANOR CARE SERVICES LLC |
| 175172 | MANORCARE HEALTH SERVICES - TOPEKA | 2515 SW WANAMAKER RD | TOPEKA | KS | 66614 | HCR MANOR CARE SERVICES LLC |
| 215024 | MANOR CARE HEALTH SERVICES - HYATTSVILLE | 6500 RIGGS ROAD | HYATTSVILLE | MD | 20783 | HCR MANOR CARE SERVICES LLC |
| 215029 | MANOR CARE HEALTH SERVICES - CHEVY CHASE | 8700 JONES MILL ROAD | CHEVY CHASE | MD | 20815 | HCR MANOR CARE SERVICES LLC |
| 215048 | MANOR CARE HEALTH SERVICES - WHEATON | 11901 GEORGIA AVENUE | WHEATON | MD | 20902 | HCR MANOR CARE SERVICES LLC |
| 215054 | MANORCARE HEALTH SERVICES -TOWSON | 509 EAST JOPPA ROAD | TOWSON | MD | 21286 | HCR MANOR CARE SERVICES LLC |
| 215064 | MANORCARE HEALTH SYSTEM - ADELPHI | 1801 METZEROTT ROAD | ADELPHI | MD | 20783 | HCR MANOR CARE SERVICES LLC |
| 215069 | MANORCARE HEALTH SERVICES - DULANEY | 111 WEST ROAD | TOWSON | MD | 21204 | HCR MANOR CARE SERVICES LLC |

| 215077 | MANORCARE HEALTH SERVICES - RUXTON | 7001 CHARLES STREET | TOWSON | MD | 21204 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 215095 | MANORCARE HEALTH SERVICES - BETHESDA | 6530 DEMOCRACY BOULEVARD | BETHESDA | MD | 20817 | HCR MANOR CARE SERVICES LLC |
| 215109 | MANORCARE HEALTH SERVICES - ROSSVILLE | 6600 RIDGE ROAD | BALTIMORE | MD | 21237 | HCR MANOR CARE SERVICES LLC |
| 215171 | MANORCARE HEALTH SERVICES - POTOMAC | 10714 POTOMAC TENNIS LANE | POTOMAC | MD | 20854 | HCR MANOR CARE SERVICES LLC |
| 215224 | MANORCARE HEALTH SERVICES -SILVER SPRING | 2501 MUSGROVE ROAD | SILVER SPRING | MD | 20904 | HCR MANOR CARE SERVICES LLC |
| 215301 | MANORCARE HEALTH SERVICES - ROLAND PARK | 4669 FALLS ROAD | BALTIMORE | MD | 21209 | HCR MANOR CARE SERVICES LLC |
| 215331 | MANOR CARE HEALTH SERVICES - LARGO | 600 LARGO ROAD | GLENARDEN | MD | 20774 | HCR MANOR CARE SERVICES LLC |
| 215347 | MANORCARE HEALTH SERVICES - WOODBRIDGE VALLEY | 1525 NORTH ROLLING ROAD | CATONSVILLE | MD | 21228 | HCR MANOR CARE SERVICES LLC |
| 235004 | HEARTLAND HEALTH CARE CENTER-KNOLLVIEW | 1061 W HACKLEY AVE | MUSKEGON | MI | 49441 | HCR MANOR CARE SERVICES LLC |
| 235016 | HEARTLAND HEALTH CARE CENTER-JACKSON | 434 W NORTH ST | JACKSON | MI | 49202 | HCR MANOR CARE SERVICES LLC |
| 235023 | HEARTLAND HEALTH CARE CENTER-BATTLE CREEK | 200 E ROOSEVELT | BATTLE CREEK | MI | 49017 | HCR MANOR CARE SERVICES LLC |
| 235032 | HEARTLAND HEALTH CARE CENTER-IONIA | 814 E LINCOLN AVE | IONIA | MI | 48846 | HCR MANOR CARE SERVICES LLC |
| 235057 | HEARTLAND HEALTH CARE CENTER-LIVONIA | 28550 FIVE MILE RD | LIVONIA | MI | 48154 | HCR MANOR CARE SERVICES LLC |
| 235077 | HEARTLAND OF HOLLAND | 493 W 32ND ST | HOLLAND | MI | 49423 | HCR MANOR CARE SERVICES LLC |
| 235103 | HEARTLAND HEALTH CARE CENTER-GRAND RAPIDS | 2320 E BELTLINE SE | GRAND RAPIDS | MI | 49546 | HCR MANOR CARE SERVICES LLC |
| 235109 | HEARTLAND HEALTH CARE CENTER - GROSSE POINTE WOODS | 21401 MACK AVE | GROSSE POINTE WOODS | MI | 48236 | HCR MANOR CARE SERVICES LLC |
| 235114 | HEARTLAND HEALTH CARE CENTER-KALAMAZOO | 3625 W MICHIGAN AVE | KALAMAZOO | MI | 49006 | HCR MANOR CARE SERVICES LLC |
| 235139 | HEARTLAND HEALTH CARE CENTER-SAGINAW | 2901 GALAXY DR | SAGINAW | MI | 48601 | HCR MANOR CARE SERVICES LLC |

| 235184 | HEARTLAND HEALTH CARE CENTER-BRIARWOOD | 3011 N CENTER RD | FLINT | MI | 48506 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 235206 | HEARTLAND HEALTH CARE CENTER-WHITEHALL | 916 E LEWIS ST | WHITEHALL | MI | 49461 | HCR MANOR CARE SERVICES LLC |
| 235217 | HEARTLAND HEALTH CARE CENTER-BLOOMFIELD HILLS | 2975 N ADAMS ROAD | BLOOMFIELD HILLS | MI | 48304 | HCR MANOR CARE SERVICES LLC |
| 235261 | HEARTLAND HEALTH CARE CENTER-GREENVIEW | 1700 LEONARD ST N E | GRAND RAPIDS | MI | 49505 | HCR MANOR CARE SERVICES LLC |
| 235267 | MANORCARE NURSING AND REHABILITATION CENTER | 1225 WOODWARD AVENUE | KINGSFORD | MI | 49801 | HCR MANOR CARE SERVICES LLC |
| 235351 | HEARTLAND HEALTH CARE CENTER-PLYMOUTH | 105 HAGGERTY RD | PLYMOUTH | MI | 48170 | HCR MANOR CARE SERVICES LLC |
| 235365 | HEARTLAND HEALTH CARE CENTER - LIVONIA NE | 29270 MORLOCK | LIVONIA | MI | 48152 | HCR MANOR CARE SERVICES LLC |
| 235395 | HEARTLAND HEALTH CARE CENTER-THREE RIVERS | 517 S ERIE ST | THREE RIVERS | MI | 49093 | HCR MANOR CARE SERVICES LLC |
| 235428 | HEARTLAND HEALTH CARE CENTER-DEARBORN HEIGHTS | 26001 FORD RD | DEARBORN HEIGHTS | MI | 48127 | HCR MANOR CARE SERVICES LLC |
| 235439 | HEARTLAND HEALTH CARE CENTER-ALLEN PARK | 9150 ALLEN RD | ALLEN PARK | MI | 48101 | HCR MANOR CARE SERVICES LLC |
| 235441 | HEARTLAND HEALTH CARE CENTER-CRESTVIEW | 625 36TH ST SW | WYOMING | MI | 49509 | HCR MANOR CARE SERVICES LLC |
| 235487 | HEARTLAND-WEST BLOOMFIELD | 6950 FARMINGTON RD | WEST BLOOMFIELD | MI | 48322 | HCR MANOR CARE SERVICES LLC |
| 235580 | HEARTLAND HEALTH CARE CENTER-ANN ARBOR | 4701 E. HURON RIVER DR | ANN ARBOR | MI | 48105 | HCR MANOR CARE SERVICES LLC |
| 235618 | HEARTLAND HEALTH CARE CENTER-CANTON | 7025 LILLEY ROAD | CANTON | MI | 48187 | HCR MANOR CARE SERVICES LLC |
| 235626 | HEARTLAND HEALTH CARE CENTER-OAKLAND | 925 W SOUTH BLVD | TROY | MI | 48085 | HCR MANOR CARE SERVICES LLC |
| 235665 | HEARTLAND HEALTH CARE CENTER - STERLING HEIGHTS | 38200 SCHOENHERR ROAD | STERLING HEIGHTS | MI | 48312 | HCR MANOR CARE SERVICES LLC |
| 265112 | MANORCARE HEALTH SERVICES | 1200 GRAHAM ROAD | FLORISSANT | MO | 63031 | HCR MANOR CARE SERVICES LLC |
| 265188 | MANORCARE HEALTH SERVICES | 2915 SOUTH FREMONT | SPRINGFIELD | MO | 65804 | HCR MANOR CARE SERVICES LLC |

| 295043 | MANOR CARE HEALTH SERVICES | 3101 PLUMAS | RENO | NV | 89509 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 295088 | MANOR CARE HEALTH SERVICES WINGFIELD HILLS | 2350 WINGFIELD HILLS DR | SPARKS | NV | 89436 | HCR MANOR CARE SERVICES LLC |
| 315005 | MANORCARE HEALTH SERVICES-NEW PROVIDENCE | 144 GALES DRIVE | NEW PROVIDENCE | NJ | 07974 | HCR MANOR CARE SERVICES LLC |
| 315246 | MANORCARE HEALTH SERVICES-WEST DEPTFORD | 550 JESSUP ROAD | WEST DEPTFORD | NJ | 08066 | HCR MANOR CARE SERVICES LLC |
| 315259 | MANOR CARE MOUNTAINSIDE | 1180 ROUTE 22 WEST | MOUNTAINSIDE | NJ | 07092 | HCR MANOR CARE SERVICES LLC |
| 315500 | MANORCARE HEALTH SERVICES - VOORHEES | 1086 DUMONT CIRCLE | VOORHEES | NJ | 08043 | HCR MANOR CARE SERVICES LLC |
| 315506 | MANORCARE HEALTH SERVICES-WASHINGTON TOWNSHIP | 378 FRIES MILL ROAD | SEWELL | NJ | 08080 | HCR MANOR CARE SERVICES LLC |
| 345177 | MANOR CARE HEALTH SVCS PINEHURST | 205 RATTLESNAKE TRAIL | PINEHURST | NC | 28374 | HCR MANOR CARE SERVICES LLC |
| 355024 | MANOR CARE HEALTH SERVICES | 1315 S UNIVERSITY DR | FARGO | ND | 58103 | HCR MANOR CARE SERVICES LLC |
| 355031 | MINOT HEALTH AND REHAB, LLC | 600 S MAIN ST | MINOT | ND | 58701 | HCR MANOR CARE SERVICES LLC |
| 365186 | HEARTLAND OF MADEIRA | 5970 KENWOOD ROAD | CINCINNATI | OH | 45243 | HCR MANOR CARE SERVICES LLC |
| 365206 | MCHS-WESTERVILLE | 140 OLD COUNTY LINE ROAD | WESTERVILLE | OH | 43081 | HCR MANOR CARE SERVICES LLC |
| 365293 | HEARTLAND OF MT AIRY | 2250 BANNING ROAD | CINCINNATI | OH | 45230 | HCR MANOR CARE SERVICES LLC |
| 365305 | MANORCARE HEALTH SERVICES-WILLOUGHBY | 37603 EUCLID AVE | WILLOUGHBY | OH | 44094 | HCR MANOR CARE SERVICES LLC |
| 365310 | MANORCARE HEALTH SERVICES - NORTH OLMSTED | 23225 LORAIN RD | NORTH OLMSTED | OH | 44070 | HCR MANOR CARE SERVICES LLC |
| 365315 | HEARTLAND VICTORIAN VILLAGE | 920 THURBER DRIVE WEST | COLUMBUS | OH | 43215 | HCR MANOR CARE SERVICES LLC |
| 365316 | MANORCARE HEALTH SERVICES-AKRON | 1211 W MARKET ST | AKRON | OH | 44313 | HCR MANOR CARE SERVICES LLC |
| 365324 | MANORCARE HEALTH SVCS-BELDEN VILLAGE | 5005 HIGBEE AVENUE NW | CANTON | OH | 44718 | HCR MANOR CARE SERVICES LLC |

| 365330 | HEARTLAND OF WAUSEON | 303 W LEGGETT ST | WAUSEON | OH | 43567 | HCR MANOR CARE SERVICES LLC |
| 365340 | MANORCARE HEALTH SERVICES-BARBERTON | 85 THIRD STREET SE | BARBERTON | OH | 44203 | HCR MANOR CARE SERVICES LLC |
| 365355 | MANORCARE HEALTH SERVICES-MAYFIELD HTS | 6757 MAYFIELD RD | MAYFIELD HEIGHTS | OH | 44124 | HCR MANOR CARE SERVICES LLC |
| 365365 | HEARTLAND OF URBANA | 741 E WATER STREET | URBANA | OH | 43078 | HCR MANOR CARE SERVICES LLC |
| 365374 | HEARTLAND OF BEAVERCREEK | 1974 NORTH FAIRFIELD ROAD | BEAVERCREEK | OH | 45432 | HCR MANOR CARE SERVICES LLC |
| 365392 | MANORCARE HEALTH SERVICES-ROCKY RIVER | 4102 ROCKY RIVER DR | CLEVELAND | OH | 44135 | HCR MANOR CARE SERVICES LLC |
| 365393 | HEARTLAND OF JACKSON | 8668 STATE ROUTE 93 | JACKSON | OH | 45640 | HCR MANOR CARE SERVICES LLC |
| 365453 | HEARTLAND OF OREGON | 3953 NAVARRE AVE | OREGON | OH | 43616 | HCR MANOR CARE SERVICES LLC |
| 365514 | HEARTLAND OF SPRINGFIELD | 2615 DERR ROAD | SPRINGFIELD | OH | 45503 | HCR MANOR CARE SERVICES LLC |
| 365525 | HEARTLAND OF CENTERBURG | 212 FAIRVIEW AVENUE | CENTERBURG | OH | 43011 | HCR MANOR CARE SERVICES LLC |
| 365532 | HEARTLAND OF GREENVILLE | 243 MARION DRIVE | GREENVILLE | OH | 45331 | HCR MANOR CARE SERVICES LLC |
| 365535 | HEARTLAND OF PERRYSBURG | 10540 FREMONT PIKE RD | PERRYSBURG | OH | 43551 | HCR MANOR CARE SERVICES LLC |
| 365557 | HEARTLAND OF EATON | 515 SOUTH MAPLE STREET | EATON | OH | 45320 | HCR MANOR CARE SERVICES LLC |
| 365559 | HEARTLAND-LANSING | 68222 COMMERCIAL DRIVE | BRIDGEPORT | OH | 43912 | HCR MANOR CARE SERVICES LLC |
| 365576 | HEARTLAND OF CHILLICOTHE | 1058 COLUMBUS ST | CHILLICOTHE | OH | 45601 | HCR MANOR CARE SERVICES LLC |
| 365577 | HEARTLAND OF MARYSVILLE | 755 SOUTH PLUM STREET | MARYSVILLE | OH | 43040 | HCR MANOR CARE SERVICES LLC |
| 365584 | HEARTLAND OF PORTSMOUTH | 20 EASTER DRIVE | PORTSMOUTH | OH | 45662 | HCR MANOR CARE SERVICES LLC |
| 365594 | MANORCARE HEALTH SERVICES-EUCLID BEACH | 16101 EUCLID BEACH BLVD | CLEVELAND | OH | 44110 | HCR MANOR CARE SERVICES LLC |

| 365607 | HEARTLAND OF PIQUA | 275 KIENLE DRIVE | PIQUA | OH | 45356 | HCR MANOR CARE SERVICES LLC |
| 365611 | HEARTLAND OF WESTERVILLE | 1060 EASTWIND DRIVE | WESTERVILLE | OH | 43081 | HCR MANOR CARE SERVICES LLC |
| 365615 | HEARTLAND OF BELLEFONTAINE | 221 NORTH SCHOOL STREET | BELLEFONTAINE | OH | 43311 | HCR MANOR CARE SERVICES LLC |
| 365616 | HEARTLAND OF KETTERING | 3313 WILMINGTON PIKE | KETTERING | OH | 45429 | HCR MANOR CARE SERVICES LLC |
| 365617 | HEARTLAND OF WATERVILLE | 8885 BROWNING DRIVE | WATERVILLE | OH | 43566 | HCR MANOR CARE SERVICES LLC |
| 365619 | HEARTLAND OF BUCYRUS | 1170 W MANSFIELD STREET | BUCYRUS | OH | 44820 | HCR MANOR CARE SERVICES LLC |
| 365620 | HEARTLAND OF RIVERVIEW | 7743 COUNTY ROAD 1 | SOUTH POINT | OH | 45680 | HCR MANOR CARE SERVICES LLC |
| 365621 | HEARTLAND OF HILLSBORO | 1141 NORTHVIEW DRIVE | HILLSBORO | OH | 45133 | HCR MANOR CARE SERVICES LLC |
| 365640 | HEARTLAND OF MIAMISBURG | 450 OAK RIDGE BOULEVARD | MIAMISBURG | OH | 45342 | HCR MANOR CARE SERVICES LLC |
| 365666 | HEARTLAND OF INDIAN LAKE REHAB | 14442 STATE ROUTE 33 WEST | LAKEVIEW | OH | 43331 | HCR MANOR CARE SERVICES LLC |
| 365691 | HEARTLAND OF MENTOR | 8200 MENTOR HILLS DRIVE | MENTOR | OH | 44060 | HCR MANOR CARE SERVICES LLC |
| 365738 | HEARTLAND OF WOODRIDGE | 3801 WOODRIDGE BOULEVARD | FAIRFIELD | OH | 45014 | HCR MANOR CARE SERVICES LLC |
| 365780 | HEARTLAND OF MARIETTA | 5001 STATE ROUTE 60 | MARIETTA | OH | 45750 | HCR MANOR CARE SERVICES LLC |
| 365849 | HEARTLAND - HOLLY GLEN | 4293 MONROE ST | TOLEDO | OH | 43606 | HCR MANOR CARE SERVICES LLC |
| 366100 | HEARTLAND OF CENTERVILLE | 1001 ALEX BELL ROAD | CENTERVILLE | OH | 45459 | HCR MANOR CARE SERVICES LLC |
| 366199 | HEARTLAND-FAIRFIELD NURSING CENTER | 7820 PLEASANTVILLE ROAD | PLEASANTVILLE | OH | 43148 | HCR MANOR CARE SERVICES LLC |
| 366304 | HEARTLAND OF MARION | 400 BARKS ROAD WEST | MARION | OH | 43302 | HCR MANOR CARE SERVICES LLC |
| 366343 | MANORCARE HEALTH SERVICES - PARMA | 9055 WEST SPRAGUE ROAD | PARMA | OH | 44133 | HCR MANOR CARE SERVICES LLC |

| 366418 | HEARTLAND OF DUBLIN | 4075 WEST DUBLIN-GRANVILLE ROAD | DUBLIN | OH | 43017 | HCR MANOR CARE SERVICES LLC |
| 366419 | HEARTLAND OF TWINSBURG | 8551 DARROW ROAD | TWINSBURG | OH | 44087 | HCR MANOR CARE SERVICES LLC |
| 375094 | MANORCARE HEALTH SERVICES-TULSA | 2425 SOUTH MEMORIAL | TULSA | OK | 74129 | HCR MANOR CARE SERVICES LLC |
| 375098 | MANORCARE HEALTH SERVICES-MIDWEST CITY | 2900 PARKLAWN DRIVE | MIDWEST CITY | OK | 73110 | HCR MANOR CARE SERVICES LLC |
| 375135 | MANORCARE HEALTH SERVICES-SOUTHWEST | 5600 SOUTH WALKER | OKLAHOMA CITY | OK | 73109 | HCR MANOR CARE SERVICES LLC |
| 395037 | MANORCARE HEALTH SERVICES-KINGSTON COURT | 2400 KINGSTON COURT | YORK | PA | 17402 | HCR MANOR CARE SERVICES LLC |
| 395041 | MANORCARE HEALTH SERVICES-ERIE | 3805 FIELD STREET | ERIE | PA | 16511 | HCR MANOR CARE SERVICES LLC |
| 395068 | MANORCARE HEALTH SERVICES-PITTSBURGH | 550 SOUTH NEGLEY AVENUE | PITTSBURGH | PA | 15232 | HCR MANOR CARE SERVICES LLC |
| 395199 | MANORCARE HEALTH SERVICES-LANCASTER | 100 ABBEYVILLE ROAD | LANCASTER | PA | 17603 | HCR MANOR CARE SERVICES LLC |
| 395221 | DONAHOE MANOR | 136 DONAHOE MANOR ROAD | BEDFORD | PA | 15522 | HCR MANOR CARE SERVICES LLC |
| 395249 | HAMPTON HOUSE | 1548 SANS SOUCI PARKWAY | WILKES BARRE | PA | 18702 | HCR MANOR CARE SERVICES LLC |
| 395251 | MANORCARE HEALTH SERVICES-SHADYSIDE | 5609 FIFTH AVENUE | PITTSBURGH | PA | 15232 | HCR MANOR CARE SERVICES LLC |
| 395264 | MANORCARE HEALTH SERVICES-WEST ALLEN | 535 NORTH 17TH STREET | ALLENTOWN | PA | 18104 | HCR MANOR CARE SERVICES LLC |
| 395309 | MANORCARE HEALTH SERVICES-YORK SOUTH | 200 PAULINE DRIVE | YORK | PA | 17402 | HCR MANOR CARE SERVICES LLC |
| 395344 | MANORCARE HEALTH SERVICES-POTTSVILLE | PULASKI AND LEADER DRIVES | POTTSVILLE | PA | 17901 | HCR MANOR CARE SERVICES LLC |
| 395348 | MANORCARE HEALTH SERVICES-CHAMBERSBURG | 1070 STOUFFER AVENUE | CHAMBERSBURG | PA | 17201 | HCR MANOR CARE SERVICES LLC |
| 395351 | MANORCARE HEALTH SERVICES-WEST READING NORTH | 425 BUTTONWOOD STREET | WEST READING | PA | 19611 | HCR MANOR CARE SERVICES LLC |
| 395359 | MANORCARE HEALTH SERVICES-JERSEY SHORE | 1008 THOMPSON STREET | JERSEY SHORE | PA | 17740 | HCR MANOR CARE SERVICES LLC |

| 395364 | MANORCARE HEALTH SERVICES-WILLIAMSPORT NORTH | 300 LEADER DRIVE | WILLIAMSPORT | PA | 17701 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 395374 | MANORCARE HEALTH SERVICES-YEADON | LANSDOWNE AND LINCOLN AVE | YEADON | PA | 19050 | HCR MANOR CARE SERVICES LLC |
| 395396 | MANORCARE HEALTH SERVICES-WILLIAMSPORT SOUTH | 101 LEADER DRIVE | WILLIAMSPORT | PA | 17701 | HCR MANOR CARE SERVICES LLC |
| 395397 | MANORCARE HEALTH SERVICES-KINGSTON | 200 SECOND AVENUE | KINGSTON | PA | 18704 | HCR MANOR CARE SERVICES LLC |
| 395402 | MANORCARE HEALTH SERVICES-POTTSTOWN | 724 NORTH CHARLOTTE ST | POTTSTOWN | PA | 19464 | HCR MANOR CARE SERVICES LLC |
| 395429 | MANORCARE HEALTH SERVICES-BETHLEHEM (2021) | 2021 WESTGATE DRIVE | BETHLEHEM | PA | 18017 | HCR MANOR CARE SERVICES LLC |
| 395440 | MANORCARE HEALTH SERVICES-CAMP HILL | 1700 MARKET STREET | CAMP HILL | PA | 17011 | HCR MANOR CARE SERVICES LLC |
| 395442 | MANORCARE HEALTH SERVICES-YORK NORTH | 1770 BARLEY ROAD | YORK | PA | 17404 | HCR MANOR CARE SERVICES LLC |
| 395451 | MANORCARE HEALTH SERVICES-DALLASTOWN | 100 WEST QUEEN STREET | DALLASTOWN | PA | 17313 | HCR MANOR CARE SERVICES LLC |
| 395469 | MANORCARE HEALTH SERVICES-ELIZABETHTOWN | 320 SOUTH MARKET STREET | ELIZABETHTOWN | PA | 17022 | HCR MANOR CARE SERVICES LLC |
| 395472 | MANORCARE HEALTH SERVICES-LEBANON | 900 TUCK STREET | LEBANON | PA | 17042 | HCR MANOR CARE SERVICES LLC |
| 395477 | MANORCARE HEALTH SERVICES-LAURELDALE | 2125 ELIZABETH AVENUE | LAURELDALE | PA | 19605 | HCR MANOR CARE SERVICES LLC |
| 395512 | MANORCARE HEALTH SERVICES-SUNBURY | 901 COURT STREET | SUNBURY | PA | 17801 | HCR MANOR CARE SERVICES LLC |
| 395527 | MANORCARE HEALTH SERVICES-BETHLEHEM (2029) | 2029 WESTGATE DRIVE | BETHLEHEM | PA | 18017 | HCR MANOR CARE SERVICES LLC |
| 395540 | MANORCARE HEALTH SERVICES-EASTON | 2600 NORTHAMPTON STREET | EASTON | PA | 18045 | HCR MANOR CARE SERVICES LLC |
| 395541 | MANORCARE HEALTH SERVICES-SINKING SPRING | 3000 WINDMILL ROAD | SINKING SPRING | PA | 19608 | HCR MANOR CARE SERVICES LLC |
| 395666 | MANORCARE HEALTH SERVICES-NORTHSIDE | 2170 RHINE STREET | PITTSBURGH | PA | 15212 | HCR MANOR CARE SERVICES LLC |
| 395685 | MANORCARE HEALTH SERVICES - WALLINGFORD | 115 SOUTH PROVIDENCE ROAD | WALLINGFORD | PA | 19086 | HCR MANOR CARE SERVICES LLC |

| 395731 | MANORCARE HEALTH SERVICES-BETHEL PARK | 60 HIGHLAND ROAD | BETHEL PARK | PA | 15102 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 395743 | MANORCARE HEALTH SERVICES-GREEN TREE | 1848 GREENTREE ROAD | PITTSBURGH | PA | 15220 | HCR MANOR CARE SERVICES LLC |
| 395746 | MANORCARE HEALTH SERVICES-CARLISLE | 940 WALNUT BOTTOM ROAD | CARLISLE | PA | 17013 | HCR MANOR CARE SERVICES LLC |
| 395760 | MANORCARE HEALTH SERVICES-ALLENTOWN | 1265 SOUTH CEDAR CREST BLVD | ALLENTOWN | PA | 18103 | HCR MANOR CARE SERVICES LLC |
| 395783 | MANORCARE HEALTH SERVICES-PETERS TOWNSHIP | 113 WEST MCMURRAY ROAD | MCMURRAY | PA | 15317 | HCR MANOR CARE SERVICES LLC |
| 395796 | MANORCARE HEALTH SERVICES-LANSDALE | 640 BETHLEHEM PIKE | MONTGOMERYVILLE | PA | 18936 | HCR MANOR CARE SERVICES LLC |
| 395817 | MANORCARE HEALTH SERVICES-OXFORD VALLEY | 1480 OXFORD VALLEY ROAD | YARDLEY | PA | 19067 | HCR MANOR CARE SERVICES LLC |
| 395826 | MANORCARE HEALTH SERVICES-NORTH HILLS | 1105 PERRY HIGHWAY | PITTSBURGH | PA | 15237 | HCR MANOR CARE SERVICES LLC |
| 395834 | MANORCARE HEALTH SERVICES-KING OF PRUSSIA | 600 WEST VALLEY FORGE ROAD | KING OF PRUSSIA | PA | 19406 | HCR MANOR CARE SERVICES LLC |
| 395913 | MANORCARE HEALTH SERVICES-HUNTINGDON VALLEY | 3430 HUNTINGDON PIKE | HUNTINGDON VALLEY | PA | 19006 | HCR MANOR CARE SERVICES LLC |
| 395989 | MANORCARE HEALTH SERVICES-MERCY FI | 600 SOUTH WYCOMBE AVE | YEADON | PA | 19050 | HCR MANOR CARE SERVICES LLC |
| 396003 | MANORCARE HEALTH SERVICES-MONROEVILLE | 885 MACBETH DRIVE | MONROEVILLE | PA | 15146 | HCR MANOR CARE SERVICES LLC |
| 396066 | MANORCARE HEALTH SERVICES-WHITEHALL BOROUGH | 505 WEYMAN ROAD | PITTSBURGH | PA | 15236 | HCR MANOR CARE SERVICES LLC |
| 396077 | OLD ORCHARD HEALTH CARE CENTER | 4100 FREEMANSBURG AVENUE | EASTON | PA | 18045 | HCR MANOR CARE SERVICES LLC |
| 425008 | HEARTLAND OF COLUMBIA REHAB AND NURSING CENTER | 2601 FOREST DRIVE | COLUMBIA | SC | 29204 | HCR MANOR CARE SERVICES LLC |
| 425106 | HEARTLAND HEALTH CARE CENTER - GREENVILLE EAST | 601 SULPHUR SPRINGS ROAD | GREENVILLE | SC | 29611 | HCR MANOR CARE SERVICES LLC |
| 425289 | HEARTLAND HEALTH AND REHABILITATION CARE CENTER-HA | 1800 EAGLE LANDING BLVD | HANAHAN | SC | 29406 | HCR MANOR CARE SERVICES LLC |
| 425294 | HEARTLAND HEALTH CARE CENTER - GREENVILLE WEST | 600 SULPHER SPRINGS ROAD | GREENVILLE | SC | 29611 | HCR MANOR CARE SERVICES LLC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 425362 | HEARTLAND OF WEST ASHLEY REHAB AND NURSING CENTER | 1137 SAM RITTENBURG BLVD | CHARLESTON | SC | 29407 | HCR MANOR CARE SERVICES LLC |
| 435004 | MANORCARE HEALTH SERVICES | 400 8TH AVENUE NW | ABERDEEN | SD | 57401 | HCR MANOR CARE SERVICES LLC |
| 455333 | MANORCARE HEALTH SERVICES | 7505 BELLERIVE | HOUSTON | TX | 77036 | HCR MANOR CARE SERVICES LLC |
| 455457 | MANORCARE HEALTH SERVICES | 2129 SKYLINE DR | FORT WORTH | TX | 76114 | HCR MANOR CARE SERVICES LLC |
| 455472 | MANORCARE HEALTH SERVICES | 750 W TEXAS AVE | WEBSTER | TX | 77598 | HCR MANOR CARE SERVICES LLC |
| 455494 | MANORCARE HEALTH SERVICES | 7625 GLENVIEW DR | NORTH RICHLAND HILLS | TX | 76180 | HCR MANOR CARE SERVICES LLC |
| 455742 | HEARTLAND CARE CENTER - SAN ANTONIO NORTH | 7703 BRIARIDGE | SAN ANTONIO | TX | 78230 | HCR MANOR CARE SERVICES LLC |
| 455756 | MANORCARE HEALTH SERVICES - WEST HOUSTON | 2939 WOODLAND PARK DR | HOUSTON | TX | 77082 | HCR MANOR CARE SERVICES LLC |
| 455762 | HEARTLAND OF SAN ANTONIO | ONE HEARTLAND DR | SAN ANTONIO | TX | 78247 | HCR MANOR CARE SERVICES LLC |
| 455794 | HEARTLAND HEALTH CARE CENTER AT WILLOWBROOK | 13631 ARDFIELD DR | HOUSTON | TX | 77070 | HCR MANOR CARE SERVICES LLC |
| 455798 | HEARTLAND HEALTH CARE CENTER | 2001 FOREST RIDGE DR | BEDFORD | TX | 76021 | HCR MANOR CARE SERVICES LLC |
| 455799 | HEARTLAND HEALTHCARE CENTER | 11406 RUSTIC ROCK DRIVE | AUSTIN | TX | 78750 | HCR MANOR CARE SERVICES LLC |
| 495011 | MANORCARE HEALTH SERVICES-ALEXANDRIA | 1510 COLLINGWOOD ROAD | ALEXANDRIA | VA | 22308 | HCR MANOR CARE SERVICES LLC |
| 495045 | MANORCARE HEALTH SERVICES-RICHMOND | 2125 HILLIARD ROAD | RICHMOND | VA | 23228 | HCR MANOR CARE SERVICES LLC |
| 495077 | HEARTLAND HEALTH CARE CENTER - LYNCHBURG | 2200 LANDOVER PLACE | LYNCHBURG | VA | 24501 | HCR MANOR CARE SERVICES LLC |
| 495102 | MANORCARE HEALTH SERVICES-ARLINGTON | 550 SOUTH CARLIN SPRINGS ROAD | ARLINGTON | VA | 22204 | HCR MANOR CARE SERVICES LLC |
| 495217 | MANORCARE HEALTH SERVICES-FAIR OAKS | 12475 LEE JACKSON MEMORIAL HIGHWAY | FAIRFAX | VA | 22033 | HCR MANOR CARE SERVICES LLC |
| 495283 | MANORCARE HEALTH SERVICES-IMPERIAL | 1719 BELLEVUE AVENUE | RICHMOND | VA | 23227 | HCR MANOR CARE SERVICES LLC |

| 505289 | MANOR CARE OF TACOMA WA, LLC | 5601 S ORCHARD STREET | TACOMA | WA | 98409 | HCR MANOR CARE SERVICES LLC |
|---|---|---|---|---|---|---|
| 505319 | MANOR CARE HEALTH SERVICES | 3701 188TH STREET SOUTHWEST | LYNNWOOD | WA | 98037 | HCR MANOR CARE SERVICES LLC |
| 505322 | MANOR CARE HEALTH SERVICES-SPO | NORTH 6025 ASSEMBLY | SPOKANE | WA | 99205 | HCR MANOR CARE SERVICES LLC |
| 505522 | MANORCARE HEALTH SERVICES - SALMON CREEK | 2811 NE 139TH STREET | VANCOUVER | WA | 98686 | HCR MANOR CARE SERVICES LLC |
| 525009 | MANORCARE HEALTH SERVICES-EAST | 600 S WEBSTER AVE | GREEN BAY | WI | 54301 | HCR MANOR CARE SERVICES LLC |
| 525179 | MANORCARE HEALTH SERVICES-KENOSHA | 3100 WASHINGTON RD | KENOSHA | WI | 53144 | HCR MANOR CARE SERVICES LLC |
| 525219 | MANORCARE HEALTH SERVICES-PLATTEVILLE | 1300 N WATER ST | PLATTEVILLE | WI | 53818 | HCR MANOR CARE SERVICES LLC |
| 525232 | MANORCARE HEALTH SERVICES-WEST | 1760 SHAWANO AVE | GREEN BAY | WI | 54303 | HCR MANOR CARE SERVICES LLC |
| 525264 | MANORCARE HEALTH SERVICES | 1335 S ONEIDA ST | APPLETON | WI | 54915 | HCR MANOR CARE SERVICES LLC |
| 525274 | MANORCARE HEALTH SERVICES | 265 S NATIONAL AVE | FOND DU LAC | WI | 54935 | HCR MANOR CARE SERVICES LLC |
| 525335 | MANORCARE HEALTH SERVICES-SHAWANO | 1436 S LINCOLN ST | SHAWANO | WI | 54166 | HCR MANOR CARE SERVICES LLC |
| 525646 | MANORCARE HEALTH SERVICES-PEWAUKEE | N26 W23977 WATERTOWN RD | WAUKESHA | WI | 53188 | HCR MANOR CARE SERVICES LLC |
| 555297 | MANORCARE HEALTH SERVICES-HEMET | 1717 WEST STETSON AVENUE | HEMET | CA | 92545 | HCR MANOR CARE SERVICES LLC |
| 555328 | MANORCARE HEALTH SERVICES (FOUNTAIN VALLEY) | 11680 WARNER AVENUE | FOUNTAIN VALLEY | CA | 92708 | HCR MANOR CARE SERVICES LLC |
| 555339 | MANORCARE HEALTH SERVICES-PALM DESERT | 74-350 COUNTRY CLUB DRIVE | PALM DESERT | CA | 92260 | HCR MANOR CARE SERVICES LLC |
| 555444 | MANORCARE HEALTH SERVICES (SUNNYVALE) | 1150 TILTON DRIVE | SUNNYVALE | CA | 94087 | HCR MANOR CARE SERVICES LLC |
| 555446 | MANORCARE HEALTH SERVICES-WALNUT CREEK | 1226 ROSSMOOR PARKWAY | WALNUT CREEK | CA | 94595 | HCR MANOR CARE SERVICES LLC |
| 555710 | MANORCARE HEALTH SERVICES - TICE VALLEY | 1975 TICE VALLEY BLVD. | WALNUT CREEK | CA | 94595 | HCR MANOR CARE SERVICES LLC |