### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al., ex. rel.* LUVETTA COMPTON | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No: 16-cv-0851 |
| HCR MANORCARE, INC., *et al.*, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |
| _____ | ) ) | |
| UNITED STATES OF AMERICA, *ex. rel.* JAMES BONNER | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No: 17-cv-2860 |
| HCR MANORCARE, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

### THE UNITED STATES' CONSOLIDATED COMPLAINT IN INTERVENTION

### INTRODUCTION

1.     The United States of America brings this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and federal common law theories of payment by mistake and unjust enrichment. Defendants are (a) HCR ManorCare, Inc.; (b) ProMedica Health System, Inc. ("ProMedica"); (c) ProMedica Employment Services, LLC (formerly known as Heartland Employment Services, LLC); (d) Manor Care, Inc.; (e) HCR Manor Care Services, LLC; (f) Manor Care-Imperial of Richmond VA, LLC, which did business as ProMedica Skilled

1

Nursing and Rehabilitation – Imperial ("Imperial"); (g) Heartland-Riverview of South Point OH, LLC, which did business as ProMedica Skilled Nursing and Rehabilitation – Riverview ("Riverview"); (h) Oakmont East-Greenville SC, LLC, which did business as ProMedica Skilled Nursing and Rehabilitation – Greenville East ("Greenville"); and (i) Manor Care of Pottstown PA, LLC, which did business as ProMedica Skilled Nursing and Rehabilitation – Pottstown ("Pottstown"). Imperial, Riverview, Greenville, and Pottstown are hereinafter referred to as the "Four Defendant Facilities." The collective defendant parties are hereinafter referred to as "Defendants."

2.      This action arises from Defendants' provision of nonexistent, grossly substandard skilled nursing facility services, and/or services that failed to comport with the quality of care and/or quality of life requirements under the Nursing Home Reform Act ("NHRA"), 42 U.S.C. §§ 1395i-3, 1396r *et seq*. The at-issue services were provided to certain Medicare and Medicaid beneficiaries at Imperial (from at least January 1, 2017, to February 1, 2023), Riverview (from at least January 1, 2017, to December 31, 2023), Greenville (from at least January 1, 2017, to December 31, 2023), and Pottstown (from at least January 1, 2017, to November 11, 2022). As a result, the Defendants caused serious physical and emotional harm to some residents, who were elderly, disabled, and/or otherwise highly vulnerable. The facilities also, in some cases, failed to treat residents with dignity and respect and to care for them in a manner and in an environment that promoted the enhancement of quality of life.

3.      During the relevant time, each of the Four Defendant Facilities failed to maintain adequate staffing levels and failed to create and/or follow individualized care plans for some of their residents. Moreover, these facilities failed to provide adequate wound care to prevent pressure ulcers, failed to maintain residents' hygiene and provide showers as required, and failed

to provide residents with appropriate assistance with feeding, which led to severe weight loss in many cases. These facilities further failed to attend to residents' needs such that residents' ability to move worsened and residents developed severe contractures that caused them tremendous pain and suffering.

4.      During all times relevant to these claims, the low staffing levels, failure to promote maintenance or enhancement of the quality of life of each resident, and the poor quality of care provided to some residents led certain clinical staff members to fear jeopardizing their nursing licenses by continuing to work at Defendants' facilities. As a result, several of these clinical staff members resigned their employment at Defendants' skilled nursing facilities rather than be present and witness such grossly substandard, nonexistent, and/or non-NHRA compliant care.

5.      To conceal their provision of grossly substandard, nonexistent, and/or non-NHRA compliant care, Defendants' staff members in some instances falsely documented in resident medical records that care and services were provided to residents when services were not provided. Some Defendants' staff members even falsely documented that care was provided to residents on days when residents were not in the buildings.

6.      For example, Imperial Resident KJ departed Imperial and was hospitalized elsewhere beginning on August 24, 2021at 11:45 a.m. Yet Imperial falsely documented in the resident's Treatment Administration Record ("TAR") that it provided care to him during the 3:00 p.m. and 11:00 p.m. shifts, an impossibility because KJ had not yet returned to Imperial during those shifts. What's more, Imperial documented in Medication Administration Records ("MARs") that Resident KJ was provided medication—even though his progress notes

specifically indicated that this medication was unavailable and still awaiting delivery from the pharmacy on these dates.

7.    Additionally, Riverview Resident PS was hospitalized from June 26, 2020, to July 11, 2020. Yet, on June 30, 2020, Riverview falsely documented that the resident refused a shower even though she had left Riverview days earlier and had yet to return. Another resident, WK, was admitted to a nearby hospital multiple times between November 28, 2019, and February 16, 2023, during which times Riverview falsely documented on at least six occasions that it provided care on days she was still in the hospital and not at Riverview.

8.    During all relevant times, each of the Four Defendant Facilities prioritized revenue over the quality of care and/or quality of life of their residents. This is evidenced by the fact that Defendants' nursing facilities seldom paused admissions and continued to admit residents, including high acuity residents,[1] despite Defendants' systematic and pervasive understaffing and inability to care for many of these residents at the time. This resulted in staff members, in some cases, failing to provide care in accordance with (a) the residents' individual care plans; (b) quality of care standards under the NHRA; and/or (c) promoting maintenance or enhancement of the quality of life of each resident.

9.    The Four Defendant Facilities each provided their residents with grossly substandard care, nonexistent care, and/or care that failed to comport with the NHRA. These facilities nevertheless knowingly submitted claims to Medicaid and Medicare for payment for

---

[1] In Centers for Medicare & Medicaid Services("CMS") regulations, "resident acuity" refers to the level of care needed by residents in long-term care facilities, which is determined by factors like their medical conditions, cognitive abilities, and the amount of assistance they require with daily activities. CMS uses this information, alongside other factors, to assess staffing needs and ensure facilities provide appropriate care.

these services, even though State Surveyors in Ohio, South Carolina, Virginia, and Pennsylvania repeatedly cited the facilities for deficiencies in surveys conducted by the State Surveyors.

10.    Moreover, the state survey findings did not capture the full extent of the problems at the Four Defendant Facilities because the facilities increased staffing and changed their protocols when they anticipated that a survey was about to take place. The facilities had a general sense of when a survey would occur, known as the "survey window," which gave the facilities an opportunity to prepare for outside scrutiny. According to former employees at each of the Four Defendant Facilities, whenever State Surveyors would conduct inspections, the facilities would increase staff members on these "survey days," thereby portraying the facility as adequately staffed. After the State Surveyors completed their inspection and departed the facility, however, the facilities would decrease staff to the typical, inadequate staffing levels.

11.    Defendants' regional and corporate employees to whom facility leadership reported also knew about these state surveys and the grossly substandard, nonexistent care, and/or non-NHRA compliant care provided during the relevant times. State survey findings and citations were (a) addressed to the Administrator of each facility and (b) conveyed to regional and corporate leadership, employees, and/or agents at "HCR ManorCare." After "HCR ManorCare" was renamed, these survey results were reviewed by regional and corporate leadership, employees, and/or agents at "ProMedica Senior Care."[2]

12.    "ProMedica Senior Care" is the name for ProMedica's business unit and Senior Care division, for which ProMedica provides overall direction, management, and control over

---

[2] "HCR ManorCare" is not a legal entity but merely a trade name used by ProMedica Health System, Inc. for its Senior Care division and business unit until pre-October 2020, at which time it was renamed "ProMedica Senior Care." Defendant HCR ManorCare, Inc. is a legal entity, acts as a holding company, and has been a direct subsidiary of Defendant ProMedica since July 2018.

the facilities. "ProMedica Senior Care" comprises ProMedica executives, employees, and/or agents.[3] Notably, ProMedica Senior Care's principal officers, including its President, Chief Medical Officer, and Chief Financial Officer, were employees and/or agents of ProMedica, according to the sworn testimony of the President of "ProMedica Senior Care" and ProMedica's 2020 tax records (Form 990). The regional and corporate employees at "ProMedica Senior Care," who managed and supported ProMedica's skilled nursing facilities, were ProMedica executives, employees, and/or agents.[4]

13.    The Administrators for the Four Defendant Facilities were further required to send state survey results (a) to Corporate Audit and Compliance employees associated with the Survey Hotline at "HCR ManorCare" and (b) later, to "ProMedica Senior Care" employees.

14.    Defendants' knowledge of the nonexistent, grossly substandard, and/or non-NHRA compliant care in their facilities was far more extensive than the poor quality care and quality of life deficiencies documented in the state surveys. During all relevant times, regional and corporate employees and/or agents from "ProMedica Senior Care" would periodically visit Defendants' facilities and participate in staff meetings where employees would complain about inadequate staffing levels and its negative impact on resident care.

---

[3] The United States has not named "ProMedica Senior Care" and "HCR ManorCare" as Defendants because these are merely trade names for ProMedica.

[4] This is evidenced by business correspondence ProMedica sent to Ohio government officials in January 2023 concerning upcoming layoffs by ProMedica. The letter stated, "ProMedica Employment Services, LLC" would "be reducing the regional and corporate staff that serviced" its "skilled nursing facilities." Upon information and belief, ProMedica Employment Services, LLC is a co-employer to which ProMedica pays the salary of its employees and/or agents. The correspondence to state officials was on ProMedica letterhead, contained the ProMedica trademark, contained the address for its corporate headquarters, from ProMedica's Chief Government Relations Officer, and stated, among other things, that ProMedica would "implement layoffs in Ohio." *See* https://dam.assets.ohio.gov/image/upload/jfs.ohio.gov/warn/pdf/Promedica.pdf.

15.     Despite receiving regular reports detailing the nonexistent, grossly substandard, and/or non-NHRA compliant care provided by the Four Defendant Facilities, the Defendants were focused more on financial performance than on quality of resident care. Defendants' strategies to increase profits at the expense of resident care involved: (a) increasing the number of residents (or "census") at the facilities beyond their capacity to adequately care for the residents; and (b) cutting or limiting staffing below the level required to care adequately for their residents. "ProMedica Senior Care" regional and corporate executives, employees and/or agents regularly influenced the facilities to increase the resident census at the nursing facilities even though the facilities were not providing quality care to their residents at the lower census.

16.     Specifically *first*, ProMedica executives, employees and/or agents from "ProMedica Senior Care" regularly demanded that facilities increase resident census while also mandating that each facility stay within a labor budget that was determined by "ProMedica Senior Care" executives, employees, and/or agents substantially without regard to resident acuity. This approach tied the hands of leadership at each individual facility, who were forced to care for residents without the means adequately to staff each shift. In fact, throughout 2018 and 2019, the Vice President and Director of Marketing for "HCR ManorCare" (after the ProMedica acquisition but before it was rebranded as "ProMedica Senior Care") regularly sent emails to his subordinates demanding an increase of resident admissions. To that end, each facility could not reject a potential resident admission or pause admissions without the approval of higher authority in the corporate chain of command.

17.     ***Second***, ProMedica regional and corporate employees/agents—including (a) the Regional Directors of Operations ("RDOs") from "ProMedica Senior Care," and (b) others within "ProMedica Senior Care"—controlled the average hours of direct care nursing staff

provided to each resident (known as Hours Per Patient Day, or "HPPD") at each facility, tracked the overall number, and ensured that the facilities did not exceed the allotted HPPD. The allotted HPPD was often lower than what was needed to care adequately for the residents in the facility at that time based on resident acuity and census. On an occasion where the facility exceeded its budgeted HPPD, this overage had to be reported to the RDO. To avoid scrutiny from their supervising RDOs, management at each of the Four Defendant Facilities were tasked with keeping their HPPD below the Corporate-determined HPPD. For example, Imperial's Administrator admitted that, in order to avoid exceeding her budgeted HPPD for the day, she directed staff members not to show up to work. As a result, Imperial failed to make staffing decisions based on the particular needs of the residents and care quality suffered.

18.     ***Third,*** related to controlling labor costs and expenses, executives, employees, and/or agents for ProMedica also required reductions and "adjustments" to decrease overall HPPD. For example, on March 25, 2019, a ProMedica employee emailed the Vice President of Human Resources ("HR") for ProMedica at the Vice President's ProMedica email address. The employee wrote, "Per your request attached are the reductions that were accomplished in the East Division. The adjustments in HPPD were accomplished through adjustments to schedules, reduction in agency usage,[5] and not filling open positions. We also eliminated five Mobile [nurse] positions and one Mobile [Director of Nursing] position[.]" ProMedica's Vice President of HR simply replied, "Thanks John." ProMedica employees and/or agents therefore reduced or caused the reduction of hours of direct resident care and avoided filling open positions to meet

---

[5] When short-staffed or otherwise in need of coverage, a skilled nursing facility may use "agency" nurses or Certified Nurse Assistants ("CNAs"), who are usually employed by a staffing agency. Here, Defendants discouraged the use of agency staff because such use would negatively impact corporate profits.

corporate financial demands, thereby contributing to understaffing at its facilities and the grossly substandard, nonexistent, and/or non-NHRA complaint care that was provided at the Four Defendant Facilities.

19.    *Fourth*, another significant way in which Defendants prioritized financial incentives over care quality was their bonus policies. The President of "ProMedica Senior Care," who was an executive and employee of ProMedica, created, implemented, and/or oversaw a corporate bonus policy that financially incentivized decision makers for each facility—including the Administrator, Director of Nursing ("DON"), Admissions Staff, and RDO—to (a) increase resident admissions, (b) generate more revenue for the company, and (c) limit clinical staffing hours. For example, the bonus policy for Admission Staff during the relevant time explicitly stated that the purpose of bonuses was to "increase Profitability" through "increase [in] admissions." Yet, when it came to staff members most involved in direct resident care (that is, Certified Nurse Assistants ("CNAs")), Defendants generally paid less than their local competition, resulting in high turnover of CNA staff, excessive call outs, and inadequate staffing overall.

20.    The foregoing strategies and policies implemented by Defendants—including ProMedica and ProMedica Employment Services, LLC executives, employees and/or agents—ultimately resulted in Defendants knowingly submitting or causing the submission of false and fraudulent claims for skilled nursing facility care that (a) was either nonexistent or grossly substandard, and/or (b) consistently violated the standards of care and/or quality of life requirements set forth in the NHRA and its implementing regulation, 42 U.S.C. §§ 1395i-3, 1396r et seq.; and 42 C.F.R. §§ 483.1-483.95.

21.    The Unites States' allegations against Defendants span from at least January 1, 2017 to at least December 21, 2023. A portion of this timeframe includes the period of the COVID-19 Public Health Emergency ("PHE"). The United States contends that Defendants' strategies both to increase census beyond the facilities' capacity to adequately care for their residents and to cut or limit staffing below the level required to care for their residents occurred before the start of the PHE and continued up to and including the 2023 timeframe.

22.    The United States suffered millions of dollars in damages when Medicare and Medicaid paid Defendants for these false and fraudulent claims.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3723(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

24.    During all relevant times, HCR ManorCare, Inc., ProMedica Health System, Inc. (including its employees and/or agents from its post-acute division known as "ProMedica Senior Care"), ProMedica Employment Services, LLC, and Pottstown transacted business and committed acts proscribed by 31 U.S.C. § 3729 in this District, which is the District in which Relators filed their original *qui tam* Complaints in these actions. Venue is therefore proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c).

25.    Because of the dates of the Defendants' false claims, and because of the dates when Medicare and Medicaid paid those claims, the causes of action alleged in this Complaint are timely brought and within the statute of limitations period set forth at 31 U.S.C. § 3731(c). In this case, for statute of limitations purposes, the United States' Complaint in Intervention relates back to the filing dates of the Complaints of the Relators who originally brought the actions,

because the claims arise out of the conduct, transactions, or occurrences set forth in the two

Relator Complaints at issue here.

26.    Relator Luvetta Compton filed her original Complaint on February 22, 2016.

27.    Relator James Bonner filed his Complaint on June 26, 2017.

## PARTIES

**Plaintiff**

28.    The United States brings this action on behalf of the United States Department of

Health and Human Services ("HHS") and one of its operating divisions, the Centers for

Medicare & Medicaid Services ("CMS"), for losses that the United States incurred under the

Medicare and Medicaid programs. During the relevant periods, the United States provided a

substantial majority of the funds paid to Defendants by Pennsylvania Medicaid, South Carolina

Medicaid, Ohio Medicaid, and Virginia Medicaid.

**Relators**

29.    Relator Compton worked as a DON and Assistant DON at the 132-bed, for-profit

skilled nursing facility known as "Manorcare-Northwest" in Oklahoma City, Oklahoma between

January 2008 and December 2014.[6]

30.    Relator Bonner worked as an HR Director at the 150-bed, for-profit skilled

nursing facility known as "Pottstown Manor Care" or "Manor Care of Pottstown, PA, LLC"

d/b/a ManorCare Health Services-Pottstown from March 2015 to February 2017.

---

[6] Relator Compton was employed at this specific nursing facility during a period that predated
ProMedica Health System, Inc.'s acquisition of the 218 skilled nursing homes. The United
States' Complaint in Intervention is for January 1, 2017, to December 31, 2023.

**Defendants**

31.     Defendant ProMedica Health System, Inc. ("ProMedica") is an Ohio non-profit corporation with its headquarters and principal place of business at 100 Madison Ave., Toledo, Ohio. Since July 2018, through its wholly owned subsidiaries and ProMedica's officers, directors, agents, and/or employees, ProMedica owned, supervised, led, exerted financial control over, oversaw, and/or directed the management, strategy and/or operations of at least 218 skilled nursing facilities in different states around the country, including Riverview, Imperial, Pottstown, and Greenville.

32.     According to ProMedica's Corporate Disclosure statement from the *Zantaz* action, ProMedica also does business under the trade names of "ProMedica Senior Care" and "HCR Manor Care, Inc."[7]

33.     Liability for nonexistent, grossly substandard, and/or non-NHRA compliant care provided at the Four Defendant Facilities from January 1, 2017, to July 26, 2018, rests not only with the Four Defendant Facilities and ProMedica Employment Services, LLC, but also with ProMedica, which, based on information and belief, assumed the liabilities of these facilities.

34.     Defendant HCR ManorCare, Inc. ("HCR Ohio") is an Ohio non-profit corporation located at 333 North Summit St, Suite 100, Toledo, Ohio. Its sole member is ProMedica. Revenue generated from the operation of the Four Defendant Facilities, owned by HCR Ohio and ProMedica, was distributed to ProMedica through HCR Ohio.[8]

---

[7] *See Zantaz Enterprise Archive Solution, LLC v. ProMedica Health System, Inc.*, 1:22-cv-00802, Dkt. No. 3, at *1, FN 1 (W.D.N.Y. Nov. 3, 2022) (ProMedica's Federal Rule of Civil Procedure 7.1 statement stating its goes by "[t]rade names 'ProMedica Senior Care' and 'HCR Manor Care Inc.'")

[8] *See* Fed. R. Evid. 30(b)(6) testimony of HCR ManorCare, Inc. Corporate Representative from *Marray v. ManorCare of Topeka*, Dkt. 201-5, 2:19-cv-02148 (D. Kansas July 15, 2022) (Dep. 69:12 - 70:6).

35.    Based on information and belief, ProMedica is a successor in interest and assignee of liability for HCR Ohio.

36.    Manor Care, Inc. is a Delaware corporation located at 333 N Summit Street, Toledo, Ohio. It is an indirect subsidiary of HCR Ohio and ProMedica.

37.    HCR Manor Care Services, LLC is an Ohio limited liability corporation located at 333 N Summit Street, Toledo, Ohio. It is also an indirect subsidiary of HCR Ohio and ProMedica.

38.    Defendant ProMedica Employment Services, LLC (f/k/a Heartland Employment Services, LLC), is an Ohio limited liability company and indirect subsidiary of HCR Ohio and ProMedica. Since at least January 1, 2017, Heartland Employment Services, LLC served as a co-employer for the staff members at the 218 skilled nursing facilities purchased by ProMedica, including the Four Defendant Facilities here, along with regional and corporate executives, employees, and/or agents at ProMedica's Senior Care division after ProMedica acquired these nursing facilities. In December 2021, Heartland Employment Services, LLC changed its name to ProMedica Employment Services, LLC ("ProMedica Employment Services" or "PES"). Upon information and belief, PES essentially serves the role of a payroll company with which the other Defendants contract to pay the salaries of their employees. PES is then reimbursed by the other Defendants, which maintain day-to-day control of the employees.[9]

39.    Defendant Manor Care-Imperial of Richmond VA, LLC did business as ProMedica Skilled Nursing and Rehabilitation – Imperial ("Imperial"). It is a 126-bed nursing facility located at 1719 Bellevue Avenue, Richmond, Virginia.

---

[9] This arrangement is further described in detail in paragraphs 144 through 149.

40.     Defendant Heartland-Riverview of South Point OH, LLC does business as ProMedica Skilled Nursing and Rehabilitation – Riverview ("Riverview"). It is a 100-bed nursing facility located at 7743 County Road 1, South Point, Ohio.

41.     Defendant Manor Care of Pottstown PA, LLC does business as ProMedica Skilled Nursing and Rehabilitation – Pottstown ("Pottstown"). It is a 150-bed nursing facility located at 724 North Charlotte Street, Pottstown, Pennsylvania.

42.     Defendant Oakmont East-Greenville SC, LLC does business as ProMedica Skilled Nursing and Rehabilitation – Greenville East ("Greenville"). It is a 132-bed nursing facility located at 601 Sulphur Springs Road, Greenville, South Carolina.

43.     A majority of the revenue accrued by the Four Defendant Facilities derived from Medicare or Medicaid, and a majority of the residents at these facilities were Medicare or Medicaid beneficiaries. All of the Defendants are wholly owned ProMedica subsidiaries. During the relevant times, ProMedica and ProMedica Employment Services exercised pervasive and extensive control over the Four Defendant Facilities, had the ability to control management and policies at each facility, employed regional and corporate employees at ProMedica's Senior Care division, and employed certain staff members at each Defendant Facility.

## THE FALSE CLAIMS ACT

44.     The FCA establishes civil liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1).

45.    Under the FCA, "knowingly" means that a person has actual knowledge that information is false, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A).

46.    No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. 31 U.S.C. § 3729(b)(1)(B).

47.    Courts have held that only "material" false claims are actionable under the FCA. The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

48.    The FCA provides for a recovery of three times the damages sustained by the United States, plus a civil penalty for each violation of the FCA. 31 U.S.C. § 3729(a)(1).

49.     The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation as adjusted by the Federal Civil Penalties Inflation Act of 1990. 31 U.S.C. § 3729(a)(1)(G). For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015). At this time, for all FCA penalties assessed after July 3, 2025, whose associated violations occurred after November 2, 2015, the penalty range is $14,308 to $28,619 per violation. 28 C.F.R. § 85.5.

50.    The United States may bring an action under the FCA within 6 years of the violation or within 3 years of when material facts were known or reasonably should have been known by the Department of Justice official charged with enforcing the FCA, whichever occurs last. 31 U.S.C. § 3731(b).

## NURSING FACILITY REIMBURSEMENT UNDER MEDICARE AND MEDICAID

51.    In order to participate in and receive payments under the Medicare and Medicaid programs, a nursing facility must execute a Health Insurance Benefit Agreement, Form CMS-1561. *See* 42 U.S.C. § 1395cc. By doing so, a provider expressly agrees to conform with the applicable portions of Title 42 in the Code of Federal Regulations, which includes the standard of care regulations implementing the NHRA, 42 U.S.C. §§ 1395i-3, 1396r et seq. *See* 42 C.F.R. §§ 483.1-483.95.

52.    A nursing facility's compliance with the standard of care regulations set forth in the NHRA are reemphasized in CMS' State Operations Manual for Survey and Enforcement for Skilled Nursing Facilities and Nursing Facilities. The Manual states that a skilled nursing facility and nursing facility "must be in compliance with the requirements in 42 CFR Part 483, Subpart B to receive payment under Medicare or Medicaid." (emphasis in original).

53.    In order to bill Medicare electronically, providers must execute an Electronic Data Interchange Enrollment Form, in which they agree to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete, and truthful."

54.    The standard form for Medicare and Medicaid claims submitted by nursing facilities is CMS-1450 (also known as UB-04). This form requires the submitting party to represent that the billing information on the claim form is true, accurate, and complete. The submitting party further certifies that it "did not knowingly or recklessly disregard or misrepresent or conceal material facts."

55.    At times relevant to this case, the Medicare and Medicaid programs used a prospective payment system ("PPS") to pay for a bundle of nursing facility services that facilities

16

provide to eligible residents. This means that payments are based on a predetermined, fixed amount.

56.     To receive reimbursement from Medicare and Medicaid, facilities are required to complete and submit a Minimum Data Set ("MDS") assessment to CMS for all residents. 42 C.F.R. § 483.315. Facilities are required to complete MDS assessments for all residents upon admission and then quarterly thereafter. 42 U.S.C. § 1395i-3(b)(3)(C)(i)(I); 42 U.S.C. § 1395i-3(b)(3)(C)(ii). Facilities must also examine each resident once per quarter and revise the resident's MDS Assessment accordingly. 42 U.S.C. § 1395i-3(b)(3)(C)(ii).

57.     In the MDS Assessment, facilities have to provide CMS with an accurate and comprehensive assessment of each resident's functional capabilities, identify health problems, and formulate a resident's individual plan of care.

58.     Ultimately, the medical condition, nursing care needs, and other information provided in the MDS Assessment impact the Medicare and Medicaid reimbursement rate for each resident.

59.     Facilities must certify that their submitted MDS information is accurate, timely, and collected in accordance with applicable Medicare and Medicaid requirements. Facilities must also acknowledge that they understand that (a) the MDS Assessment is used as a basis for reimbursement with federal funds, (b) their continued participation in Medicare and Medicaid is conditioned on the accuracy and truthfulness of the submitted information, and (c) the submission of false information can lead to substantial criminal, civil, or administrative penalties.

60.     Specifically, in the MDS assessments, which are submitted typically on a quarterly basis, the facility certifies that it "understand[s] that the information [provided in the

MDS assessment] is used as a basis for ensuring residents receive ***appropriate and quality care***, and as a ***basis for payment*** from federal funds." (emphasis added).

## MEDICARE AND MEDICAID REQUIREMENTS FOR NURSING FACILITIES

61.     The Medicare and Medicaid programs require nursing facilities to comply with rules and regulations relating to standards of care. *See* 42 C.F.R. § 483.1(b).

62.     By executing Form CMS-1561, a provider expressly agrees to conform with the applicable regulations in Title 42 of the Code of Federal Regulations, which includes the standard of care regulations that implement the NHRA, 42 U.S.C. §§ 1395i-3, 1396r et seq. *See* 42 C.F.R. §§ 483.1-483.95.

63.     These rules stem from the NHRA, 42 U.S.C. §§ 1395i-3, 1396r et seq. The NHRA's implementing regulations are set forth at 42 C.F.R. §§ 483.1-483.95 and provide more clarity as well as additional requirements for nursing facilities.

64.     The NHRA defines a "skilled nursing facility" or "nursing facility" as an institution that is primarily engaged in providing skilled nursing care and related services, rehabilitation services, or "health related care and services" to people who require care that is "available to them only through institutional facilities and is not primarily for the care and treatment of mental diseases." 42 U.S.C. § 1396r(a).

65.     During the relevant periods, each of the Four Defendant Facilities fit this definition and was thus covered by the NHRA.

66.     Under the NHRA, nursing facilities must comply with federal and state requirements relating to the provision of services, as well as applicable professional standards and principles. 42 U.S.C. § 1396r(b); 42 U.S.C. § 1396r(d)(4)(A).

67.     Specifically, a nursing facility "must care for its residents in such a manner and in such an environment as will ***promote maintenance or enhancement of the quality of life*** of each resident." 42 U.S.C. § 1395i-3(b)(1)(A) (emphasis added).

68.     Along these lines, a nursing facility must provide nursing services and medically related social services "***to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident***." 42 U.S.C. §§ 1395i-3(b)(4)(A)(i) and (ii) (emphasis added).

69.     Nursing facilities must also provide pharmaceutical, dietary, and dental services sufficient "to meet the needs of each resident." 42 U.S.C. §§ 1395i-3(b)(4)(A)(iii), (iv), and (vi). Thus, facilities must help residents make dental appointments and arrange their transportation. 42 C.F.R. § 483.55(a)(4). Facilities must also provide nourishing, palatable, and balanced diets that meet the individual needs of residents. 42 C.F.R. § 483.60(d).

70.     In addition, nursing facilities must provide a professionally directed activities program "designed to meet the interests and the physical, mental, and psychosocial well-being of each resident." 42 U.S.C. § 1395i-3(b)(4)(A)(v).

71.     For residents with mental disorders, facilities must provide "appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being." 42 C.F.R. § 483.40(b)(1); *see also* 42 U.S.C. § 1395i-3(b)(4)(A)(vii) (requiring facilities to provide treatment and services required by mentally ill residents that is not otherwise supplied by the state).

72.     In general, nursing facilities must be administered in a way that uses resources effectively and efficiently to attain and maintain the highest practicable well-being of residents.

42 C.F.R. § 483.70. This includes maintaining medical records that are complete, accurate, accessible, and organized. 42 C.F.R. § 483.70(i)(1).

73.    Nursing facilities are required to discern the needs of each resident through assessments. Facilities must conduct a comprehensive, accurate, and standardized assessment of the resident's functional abilities and identify medical problems. 42 U.S.C. § 1395i-3(b)(3)(A). This assessment must be completed within two weeks of a resident's admission and then "promptly after a significant change in the resident's physical or mental condition." 42 U.S.C. §§ 1395i-3(b)(3)(C)(i)(I) and (II). Even if there are no obvious significant changes to a resident's condition, the facility must still assess the resident at least once per year. 42 U.S.C. § 1395i-3(b)(3)(C)(i)(III). In addition to the more comprehensive annual assessment, the facility must examine each resident once per quarter and revise the resident's assessment accordingly. 42 U.S.C. § 1395i-3(b)(3)(C)(ii).

74.    The NHRA further directs nursing facilities to create a written care plan for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met." 42 U.S.C. § 1395i-3(b)(2)(A). Within 48 hours of a resident's admission, the facility needs to develop a "baseline care plan" that includes the minimum information needed to properly care for the resident. 42 C.F.R. § 483.21(a)(1). Then, once the facility has completed its initial comprehensive assessment, it must develop a corresponding comprehensive care plan that includes measurable objectives and timeframes for meeting the resident's needs, as well as the services that are to be furnished to attain or maintain the resident's highest practicable well-being. 42 C.F.R. §§ 483.21(b)(1)(i) and (2)(i). The nursing facility must then follow the care plan and provide the relevant services and activities for each

resident. 42 U.S.C. § 1395i-3(b)(2)(A). These care plans must be periodically reviewed and revised each time a resident is assessed. 42 U.S.C. § 1395i-3(b)(2)(C).

75.    The services provided by a nursing facility must "meet professional standards of quality" and be provided by qualified personnel. 42 U.S.C. §§ 1395i-3(b)(4)(A) and (b). The implementing regulations set forth in more detail what this entails at 42 C.F.R. § 483.25. Some of the relevant quality of care standards are as follows:

76.    **Skin integrity**. The facility must ensure that residents receive care to prevent pressure ulcers (also referred to as pressure sores or bed sores), unless they are clinically unavoidable, and receive treatment for existing pressure ulcers "to promote healing, prevent infection, and prevent new ulcers from developing." 42 C.F.R. § 483.25(b).

77.    **Accidents**. Facilities must be "as free of accident hazards as possible," and each resident must receive "adequate supervision and assistance devices to prevent accidents" like falls. 42 C.F.R. § 483.25(d).

78.    **Respiratory care**. Facilities must ensure that residents needing respiratory care, including tracheostomy care, receive the care consistent with professional standards of practice. 42 C.F.R. § 483.25(i).

79.    **Pain management**. Facilities must ensure that "pain management is provided to residents who require such services, consistent with professional standards of practice." 42 C.F.R. § 483.25(k).

80.    A nursing facility must provide 24-hour licensed nursing services "sufficient to meet the nursing needs of its residents," as well as "a registered professional nurse at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. § 1395i-3(b)(4)(C)(i). This means having a sufficient number of licensed nurses and other nursing personnel "to provide nursing care to all

residents in accordance with resident care plans," along with ensuring that the licensed nurses "have the specific competencies and skill sets necessary to care for residents' needs. 42 C.F.R. §§ 483.35(a)(1) and (3). In addition, nursing aides, who are individuals providing nursing or related services without being registered or licensed, must be trained and have demonstrated their competency. 42 U.S.C. §§ 1395i-3(b)(5)(A), (C), and (F).

81.     Furthermore, the NHRA has specific provisions related to infection control. The facility must have an infection control program "designed to provide a safe, sanitary, and comfortable environment" and "to help prevent the development and transmission of disease and infection." 42 U.S.C. § 1395i-3(d)(2)(A). This includes having a system for identifying potential outbreaks and following precautions to prevent the spread of infection and disease, such as the proper handling and storage of linens. 42 C.F.R. §§ 483.80(a) and (e).

82.     Nursing facilities must also provide pharmaceutical services, including prescription medications, to meet the needs of each resident. 42 C.F.R. § 483.45(a). In addition, the drug regimen for nursing facility residents "must be free from unnecessary drugs," which includes drugs used in excessive doses, for excessive durations, without adequate monitoring, without adequate indications, or with adverse consequences. 42 C.F.R. § 483.45(d). Nursing facilities must further ensure that its medication error rate is less than 5 percent, and residents are not subjected to "any significant medication errors." 42 C.F.R. § 483.45(f). Medications must be labeled with accurate and complete information and be stored safely. *See* 42 C.F.R. §§ 483.45(g) and (h).

83.     Psychotropic drugs—including antipsychotic, antidepressant, antianxiety, and hypnotic medications—have additional requirements when used in nursing facilities. 42 C.F.R. §§ 483.45(c)(3) and (e). Facilities must ensure that residents only receive psychotropic drugs

when "the medication is necessary to treat a specific condition" that is diagnosed and documented. 42 C.F.R. § 483.45(e)(1). And unless clinically contraindicated, residents who receive psychotropic drugs must also receive gradual dose reductions and behavioral interventions "in an effort to discontinue these drugs." 42 C.F.R. § 483.45(e)(2).

84.    To help nursing facilities employ appropriate pharmaceutical processes and practices, facilities must hire or retain a licensed pharmacist to, among other tasks, consult "on all aspects of the provision of pharmacy services in the facility." 42 C.F.R. § 483.45(b)(1). A licensed pharmacist must review each resident's drug regimen at least once a month and "report any irregularities to the attending physician and the facility's medical director and director of nursing." 42 C.F.R. § 483.45(c)(4). The facility must then act upon any reports of irregularities, which can include the identification of drugs that are unnecessary due to an excessive dose, excessive duration, inadequate monitoring, inadequate indications for use, or adverse consequences. 42 C.F.R. §§ 483.45(c)(4)(i) and (d)(4).

85.    In addition to clinical care, nursing facilities must provide necessary care for each resident's "whole emotional and mental well-being," which includes the prevention and treatment for mental health disorders and substance abuse issues. 42 C.F.R. § 483.40. The facilities must have "sufficient staff" with "appropriate competencies and skills," including "caring for residents with mental and psychosocial disorders" as well as "implementing non-pharmacological interventions." 42 C.F.R. § 483.40(a). Facilities must also ensure that residents who display or are diagnosed with mental health issues receive "appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being," and that other residents do "not display a pattern of decreased social interaction and/or increased withdrawn, angry, or depressive behaviors," unless it is clinically

inevitable. 42 C.F.R. § 483.40(b); *see also* 42 U.S.C. § 1395i-3(b)(4)(A)(vii) (requiring facilities to provide treatment and services required by mentally ill residents that is not otherwise supplied by the state).

86. Relatedly, nursing facilities with more than 120 beds must also have at least one full time qualified social worker. 42 U.S.C. §§ 1395i-3(b)(7). And all facilities "must provide medically-related social services to attain or maintain the highest practicable . . . well-being of each resident." 42 C.F.R. § 483.40(d).

87. Along with its other provisions, the NHRA also confers various rights on nursing facility residents. For instance, residents have the right to choose their doctor, be fully informed, and participate in their care or treatment. 42 U.S.C. § 1395i-3(c)(1)(A)(i); *see also* 42 C.F.R. §§ 483.10(c) and (d). Nursing facilities must also immediately inform a resident and (if appropriate) his or her representative, as well as consult with the resident's physician, when the resident is hurt in an accident, undergoes a significant change in physical or mental condition, has a need for significantly altered treatment, or is to be transferred or discharged from the facility. 42 C.F.R. § 483.10(g)(14).

88. Nursing facility residents also have the right to be free from abuse, as well as physical or chemical restraints that are not required by medical symptoms and are instead imposed for discipline or convenience. 42 U.S.C. § 1395i-3(c)(1)(A)(ii). As the regulations further state, residents also have the right to be free of mental or verbal abuse, as well as "neglect, misappropriation of resident property, and exploitation." 42 C.F.R. § 483.12(a)(1). Facilities must develop and implement policies to prohibit, prevent, promptly report, thoroughly investigate, and address such misconduct. 42 C.F.R. §§ 483.12(b) and (c).

24

89.     Residents also have the right to a safe and orderly transfer and discharge from a nursing facility. 42 U.S.C. § 1395i-3(c)(2)(C). Per the implementing regulations, this right means the facility "must provide and document sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility." 42 C.F.R. § 483.15(c)(7). The nursing facility must also "ensure that the transfer or discharge is documented in the resident's medical record and appropriate information is communicated to the receiving health care institution or provider."  42 C.F.R. § 483.15(c)(2). The receiving provider must receive, at a minimum, the resident's care plan goals, contact information for the resident's representative, and all other necessary information and documentation "to ensure a safe and effective transition of care." 42 C.F.R. § 483.15(c)(2)(iii).

90.     The implementing regulations explain that the NHRA also requires a nursing facility to "***treat each resident with respect and dignity***" and to "care for each resident in a manner and in an environment that ***promotes the maintenance or enhancement of his or her quality of life***." 42 C.F.R. § 483.10(a)(1) (emphases added). Accordingly, residents also have the right "to retain and use personal possessions," as long as there is sufficient space, and the possessions do not endanger other residents or interfere with their rights. 42 C.F.R. § 483.10(e)(2). And when residents have grievances, they have the right to voice them freely and have the facility "make prompt efforts" to resolve their concerns. 42 C.F.R. §§ 483.10(j)(1) and (2).

91.     The NHRA regulations further state that "[q]uality of life is a fundamental principle that applies to all care and services provided to facility residents." 42 C.F.R. § 483.24. Therefore, nursing facilities "***must provide the necessary care and services to ensure that a resident's abilities in activities of daily living do not diminish***" unless it is clinically

unavoidable. 42 C.F.R. § 483.24(a) (emphasis added). If, however, a resident is unable to perform certain Activities of Daily Living ("ADLs"), the facility must provide "the necessary services to maintain good nutrition, grooming, and personal and oral hygiene." 42 C.F.R. § 483.24(a)(1). In addition, the facility must provide activities directed by a qualified professional that are "designed to meet the interests" and support the well-being of each resident, "encouraging both independence and interaction in the community." 42 C.F.R. § 483.24(c).

92.     Finally, the NHRA and its implementing regulations set forth requirements for the nursing facility building and physical environment. Under the NHRA, a nursing facility must be "equipped and maintained to protect the health and safety of residents, personnel, and the general public." 42 U.S.C. § 1395i-3(d)(2)(B). The implementing regulations further state that facilities must provide an environment that is "safe, clean, and comfortable," which includes exercising "reasonable care for the protection of the resident's property from loss or theft." 42 C.F.R. §§ 483.10(i)(1) and (ii). Nursing facilities must also provide maintenance and housekeeping services "necessary to maintain a sanitary, orderly, and comfortable interior," as well as bed and bath linens that are clean and in "good condition." 42 C.F.R. §§ 483.10(i)(2) and (3). Moreover, the facility must have functional equipment and maintain an effective pest control system. 42 C.F.R. §§ 483.90(d) and (i)(4).

### STATE SURVEYS AND SANCTIONS

93.     Each state is responsible for certifying nursing facilities' compliance with the NHRA. 42 U.S.C. § 1395i-3(g)(1)(A). States check compliance by conducting on-site surveys of each nursing facility. These surveys are conducted for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid. 42 C.F.R. § 483.1(b).

94.     The surveys are either "standard" surveys that are conducted roughly once a year for all facilities or "complaint" surveys in which the state investigates alleged problems at a nursing facility. *See* 42 U.S.C. § 1395i-3(g)(2)(A); 42 U.S.C. § 1395i-3(g)(4)(A); 42 C.F.R. § 488.332. Facilities are not supposed to receive any advance notice of these surveys. 42 U.S.C. § 1395i-3(g)(2)(A)(i). Because the standard surveys are conducted at roughly annual intervals, however, facilities often have some sense of when a standard survey may occur. *See* 42 U.S.C. § 1395i-3(g)(2)(A)(iii).

95.     The standard surveys examine a sample of residents to assess the quality of care furnished, review care plans, audit assessments, and determine whether resident rights have been violated. 42 U.S.C. § 1395i-3(g)(2)(A)(ii).

96.     If the surveys reveal noncompliance, then CMS or the state can apply one or more administrative remedies. 42 C.F.R. § 488.402. These remedies include the termination of the nursing facility's provider agreement, payment denials, and civil monetary penalties, among others. 42 C.F.R. § 488.406.

97.     For example, if a state finds that a nursing facility has violated the NHRA and that the care deficiencies pose an immediate jeopardy to the health and safety of residents, then the state or CMS ***must*** terminate the facility's provider agreement, appoint a temporary manager to remove the immediate jeopardy, or both. 42 U.S.C. § 1395i-3(h)(4); 42 C.F.R. § 488.408(e)(2)(i); 42 C.F.R. § 488.410(a). "Immediate jeopardy" is a situation where the provider's noncompliance has caused, or is likely to cause, "serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

98.     In addition, if CMS or a state finds that a facility has widespread NHRA deficiencies that pose less than immediate jeopardy but more than minimal harm, or one or more

deficiency(ies) that constitute(s) "actual harm" but not immediate jeopardy, then CMS can deny all payments to the facility, deny payments for new admissions, or issue civil penalties. 42 U.S.C. §§ 1395i-3(h)(2)(a) and (b); 42 C.F.R. § 488.408(d).

99.    CMS also ***must*** deny payments for all new admissions if a nursing facility is found to be noncompliant with one of the NHRA's requirements and still is not in substantial compliance with the NHRA three months later. 42 U.S.C. § 1395i-3(h)(2)(D); 42 C.F.R. § 488.412(c); 42 C.F.R. § 488.417(b)(1). This repeated noncompliance is for any of the NHRA's facility requirements and need not be for the exact same deficiency. 42 U.S.C. § 1395i-3(h)(2)(D). "Substantial compliance" means that any NHRA violations "pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

100.    Similarly, if a facility has not obtained substantial compliance by six months after the last date of the survey, then CMS must either terminate the facility's provider agreement with Medicare or discontinue Medicare and federal Medicaid payments to the facility. 42 C.F.R. § 488.450(d).

101.    Finally, if a nursing facility is "found to have provided substandard quality of care" in three consecutive standard inspection surveys, CMS is obligated to deny payments for all new admissions until the facility satisfactorily demonstrates its compliance. 42 U.S.C. § 1395i-3(h)(2)(E); 42 C.F.R. § 488.414(a); 42 C.F.R. § 488.417(b)(1). This repeated noncompliance is based on an overall assessment of care and does not mean that the exact same deficiencies were repeated. 42 C.F.R. § 488.414(b). "Substandard quality of care" means one or more violations of identified NHRA requirements which constitute immediate jeopardy to resident health or safety, a pattern of or widespread actual harm that is not immediate jeopardy, or widespread potential for more than minimal harm. 42 C.F.R. § 483.301.

## STATEMENT OF FACTS

102.    By virtue of the conduct alleged herein, the Defendants knowingly submitted, or caused the submission of, false claims to Medicare and Medicaid for nursing facility care and services that were grossly substandard, nonexistent, and/or non-NHRA compliant, in violation of the FCA. The Medicare and Medicaid programs provided reimbursement for these claims. These payments were provided by mistake because CMS did not know the true and full extent of the Defendants' grossly substandard, nonexistent, and/or non-NHRA compliant care. By obtaining reimbursement for these grossly substandard, nonexistent, and/or non-NHRA compliant services, the Defendants were unjustly enriched.

## I.    PROMEDICA'S AND PES' LIABILITY FOR CONDUCT OCCURING AT THE FOUR DEFENDANT FACILITIES

**History of ProMedica's Relationship with HCR Entities.**

103.    On April 25, 2018, ProMedica announced that it would enter into a Joint Venture with Welltower, Inc., a private equity firm, to acquire the predecessor of HCR ManorCare, Inc., which was also known as HCR ManorCare, Inc. ("HCR Delaware" or "HCR Entities"). In July 2018, ProMedica acquired HCR Delaware and its 218 skilled nursing facilities, including the Four Defendant Facilities.

104.    Beginning on or about July 26, 2018, ProMedica controlled, managed, and/or directed strategy and operations for the Four Defendant Facilities through ProMedica's regional and corporate executives, employees, and/or agents affiliated with "ProMedica Senior Care" and through ProMedica's wholly owned subsidiary, HCR Ohio.

105.    ProMedica has acknowledged that it does business as "ProMedica Senior Care" and "HCR ManorCare, Inc.[10] And, as further detailed below in paragraphs 131 to 149, individuals affiliated with ProMedica played a key role in overseeing, managing, and/or operating the Four Defendant Facilities ultimately owned by ProMedica.

**ProMedica's and PES' Direct Involvement with the Fraud at Issue.**

106.    ProMedica and PES' FCA liability arises from their own executives' and employees' actions, or actions by individuals acting as a representative of or otherwise acting on behalf of ProMedica and PES. In other words, ProMedica's and PES' officers, directors, co-agents, and/or co-employees directly participated in—or were directly involved with knowingly submitting—or causing the submission of, false claims for skilled nursing facility services that were grossly substandard, nonexistent, and/or otherwise violated the requirements of the NHRA.

107.    Liability for nonexistent, grossly substandard and/or non-NHRA compliant care provided at the Four Defendant Facilities from at least January 1, 2017, to July 26, 2018 not only rests with the Four Defendant Facilities and PES but also, on information and belief, was assumed by ProMedica.

108.    After the July 2018 acquisition, ProMedica and PES employed, co-employed, and/or otherwise formed an agency relationship with: (a) clinical staff members who provided direct resident care (for example, CNAs and registered nurses ("RNs")); (b) management for

---

[10] In ProMedica's Answer in 2023 in an action in another District, it acknowledged that it does business as "ProMedica Senior Care," formerly known as "HCR ManorCare, Inc." *See Zantaz Enterprise Archive Solution, LLC v. ProMedica Health System, Inc.*, 1:22-cv-12074-FDS, Dkt. No. 36, at *1, *4, and *5 (D. Mass. Sept. 1, 2023) (ProMedica's attorney stating three times: "Defendant ProMedica Health System, Inc. d/b/a ProMedica Senior Care f/k/a HCR ManorCare, Inc."). In a Corporate Disclosure Form filed in another action, ProMedica stated that its trade names are "ProMedica Senior Care" and "HCR Manor Care, Inc." *See Zantaz Enterprise Archive Solution, LLC v. ProMedica Health System, Inc.*, 1:22-cv-00802, Dkt. No. 3, at *1, FN 1 (W.D.N.Y. Nov. 3, 2022).

each Defendant Nursing Facility (that is, Admission Directors, Administrators, and Directors of Nursing ("DONs")); and (c) regional and corporate executives, employees, and/or agents overseeing each nursing facility's care quality during the relevant timeframe (that is, RDOs, General Managers, Vice Presidents, executives, and even the President of "ProMedica Senior Care").[11]

109.    In July 2018, ProMedica's outside counsel characterized the skilled nursing facility employees as ProMedica employees and/or agents. The Jones Day law firm announced that it served as antitrust counsel for ProMedica and "HCR ManorCare, Inc." and that ProMedica's acquisition of "HCR ManorCare, Inc." transformed "ProMedica into one of the largest U.S. nonprofit health systems, with 70,000 employees, $7 billion in revenue, and presence in 30 states spanning the full spectrum of care, including wellness, skilled nursing, memory care, assisted living, hospice, home care, and health plans."

110.    Through its subsidiary, PES, ProMedica co-employed some of the regional and corporate and clinical employees mentioned above. In a sworn declaration submitted in the *Ngamby* litigation, a ProMedica HR employee stated that, after ProMedica's acquisition of the skilled nursing facilities in July 2018, "Heartland Employment Services, LLC" was the

---

[11] ***Chain of Command***. Each of ProMedica's skilled nursing facilities was generally staffed by CNAs and licensed nurses, who reported to a Unit Manager; multiple Unit Managers reported to one Director of Nursing, a corporate employee and/or agent; the Director of Nursing reported to the facility's Administrator, a corporate employee and/or agent. Each ProMedica facility reported to additional Regional and Corporate executives, employees and/or agents within the "ProMedica Senior Care" (or "HCR ManorCare") chain of command. Each facility's Administrator reported to one RDO, who was in charge of overseeing several nursing facilities in a specific geographic region. The RDO would report to the General Manager for a geographic Division. The General Manager would report to individuals at the "Vice President" level, who ultimately reported to the President of "ProMedica Senior Care." The President of "ProMedica Senior Care," an executive and employee of ProMedica, reported to the Chief Executive Officer of ProMedica.

"employing entity for the thousands of employees who worked at all of Manorcare's facilities nationwide," including skilled nursing facilities. And, after it was renamed in 2021 to "ProMedica Employment Services, LLC," PES still had "more than 25,000 employees working in over 62 of ProMedica's healthcare facilities in more than 13 states throughout the United States" as of January 18, 2024.[12]

111.    PES served essentially as the payroll company for ProMedica's nursing facility staff, Admission Officers, DONs, Administrators, and even for regional and corporate employees at "ProMedica Senior Care's corporate offices." These individuals were also employees of, jointly employed by, and/or agents of ProMedica, as further discussed in paragraphs 144 through 149 below.

112.    Throughout the relevant period, executives, employees and/or agents for ProMedica's Senior Care division and PES took the following actions and enacted the following policies, among others, that caused the provision of nonexistent, grossly-substandard, and/or otherwise non-NHRA compliant care: (a) setting each nursing facility's labor budget, which, in numerous cases, was below that required to care adequately for their residents; (b) setting and capping staffing ratios (HPPD) for each facility based on financial rather than clinical acuity considerations, thereby limiting each facility's ability to staff its nursing facility adequately to care for its unique resident population; (c) setting employee compensation rates that were directly linked to staffing below budgeted staffing numbers; (d) pressuring the facilities to increase admissions even at times when a facility clearly lacked the capacity to care adequately for its residents; (e) creating annual bonus policies for nursing facility management that

---

[12] *Ngamby v. Manor Care of Potomac, MD, LLC d/b/a ProMedica Skilled Nursing and Rehabilitation*, Dkt. 14-2, at *1-2, 1:23-cv-03185-RDB (D. Md. January 19, 2024).

incentivized understaffing; and (f) reprimanding management overseeing each facility if they did not increase revenue through excessive admissions.

113.    These policies and actions—created and implemented by ProMedica and PES (acting through their officers, directors, agents, and/or employees)—among others, were a substantial factor in causing the natural and foreseeable consequences alleged in this Complaint in Intervention. ProMedica and PES therefore caused (a) each facility to provide nonexistent, grossly substandard, and/or otherwise non-NHRA conforming care and, (b) subsequently, the knowing submission of false claims.

**ProMedica's Integration with "HCR ManorCare" During the Relevant Period.**

114.    After its acquisition of 218 skilled nursing facilities in July 2018, including the Four Defendant Facilities, ProMedica began (a) to consolidate its Audit, Compliance, and HR Departments and employees and its newly acquired senior care division ("HCR ManorCare") into single, unified departments, and (b) to control and manage the operations of the facilities.

115.    For example, on July 3, 2019, the Director for ProMedica's Audit Department, who worked at ProMedica's Headquarters and had a ProMedica email address, emailed several other managers for a ProMedica skilled nursing facility located in Virgina.[13] The e-mail's subject line was "Final Audit Report." In the email, the ProMedica Executive stated, "[A]s ProMedica and HCR [ManorCare] continue down the path of integration, both ProMedica and HCR Internal Audit [are] combined into a single department on January 1, 2019 under [me], Director of Internal Audit."

---

[13] ManorCare Health Services – Fair Oaks.

116.     In response to the above email, the Administrator for the Fair Oaks nursing facility separately emailed colleagues on June 9, 2019, in which he referred to ProMedica as the "company's new owner[.]"

117.     ProMedica employees and/or agents also oversaw and controlled the strategy and operations of the newly acquired nursing facilities. Critically, the President of ProMedica's Senior Care Division was identified as one ProMedica's "highest compensated employee[s]" in ProMedica's tax records (Form 990) for 2020.[14] After "HCR ManorCare" was renamed "ProMedica Senior Care," the President of "ProMedica Senior Care" admitted in a deposition that she was in fact an employee of ProMedica, not any of its subsidiaries or any other entity. She also admitted that her duties included overseeing the strategy and operations of ProMedica's Senior Care Division, which included the operation of the skilled nursing facilities.

118.     Given the pervasive and extensive control ProMedica employees exercised over the Four Defendant Facilities, among others, as further evidenced below, in paragraphs 131 through 149, it is clear that, after its acquisition, ProMedica controlled the operations of the nursing facilities, and its subsidiary HCR Ohio did not exercise the ultimate control over the facilities. In fact, ProMedica described HCR Ohio as merely "a holding company with no operations."[15]

**ProMedica Tracked and Controlled the Facilities' Census, Labor Budget, and Nurse Agency Staff Usage.**

119.     After the 2018 acquisition, ProMedica incrementally began rebranding former "HCR ManorCare" employees as ProMedica employees and began to take control of the

---

[14] ProMedica's 2020 Ttax records (Form 990) also listed the then-Chief Financial Officer of "ProMedica Senior Care," and the then-Chief Medical officer of "ProMedica Senior Care," as some of ProMedica's "highest compensated employees."

[15] ProMedica's Quarterly Disclosures For the Period Ended June 30, 2022.

facilities' census, labor budget, and agency usage. For example, an HR executive from ProMedica was involved in the management of the newly acquired nursing facilities.

120.    Before ProMedica purchased the entity that became HCR Ohio, one particular executive served as the Vice President of HR and Labor Relations for "HCR ManorCare",[16] and, concurrently, as the President of Heartland Employment Services (n/k/a ProMedica Employment Services). Sometime after ProMedica purchased HCR Delaware, however, this executive's email address changed to an email domain affiliated with ProMedica. This executive considered herself a ProMedica employee. In her online LinkedIn profile, she described her new role as "Vice President Human Resources – ProMedica." She also stated in her online profile that "HCR ManorCare merged with ProMedica in 2018," and that she "[led] the HR Operations function for the Senior Care Division, with operations in 20+ states and over 25,000 employees."

121.    Starting in 2019, in her capacity as Vice President of HR at ProMedica, the HR executive received—at her e-mail domain affiliated with ProMedica—regular Census Reports for all the nursing facilities owned by ProMedica.

122.    The HR executive also meticulously tracked each nursing facility's use of outside agency nursing staff and expressed dissatisfaction when agency usage increased because this resulted in increased expenses for ProMedica. In an email from June 7, 2019, she wrote to her subordinates: "Every division is up [in agency expense] …. Not what I was hoping or expecting to see. We will discuss on our call this morning."

123.    The HR executive was also updated on the daily labor costs for the nursing facilities. On June 24, 2019, she, along with the President of "HCR ManorCare," were copied to

---

[16] The Government refers to the predecessor "HCR ManorCare" entity as HCR Delaware.

an email that the Vice President of Operations Support for "HCR ManorCare" directed to all nursing facility General Managers with the subject line: "Still 7 days to make an impact."

124.    This particular email encouraged the skilled nursing facilities to decrease the number of hours of care every resident received from the nursing staff (HPPD) and made no mention of resident acuity considerations: "There are 7 days left in June and still time to make an impact on labor. Based on the last 14 days, there are 66 centers running over [Hours per Patient Day] budget so we have at least 66 opportunities to lower our costs. As summer heats up, census cools down, so it is important that we adjust our costs for that lower census."

125.    Again, on June 20, 2019, the Vice President of HR at ProMedica, was copied to an email, along with the President of "HCR ManorCare," in which General Managers were strongly encouraged to stay within labor budgets set by corporate by decreasing staffing levels at nursing facilities. These budgets were set by "corporate" and did not substantially consider clinical staff requests or resident acuity.

**Tax Records Reveal ProMedica's "Significant Involvement" in HCR Ohio's Facility Operations.**

126.    HCR Ohio's 2018 tax records (Form 990, Schedule O) also revealed the unified relationship between ProMedica and HCR Ohio.

127.    According to these records, HCR Ohio is not merely ProMedica's subsidiary. Rather, according to these records, HCR Ohio "is the Post-Acute Division of [ProMedica]" and a "business unit" for which ProMedica "provides overall direction, management, and control[.]"

128.    ProMedica exercised firm oversight and control over HCR Ohio, including the following: (a) determining HCR Ohio's budget; (b) whether certain expenditures could be made; and (c) having significant involvement in HCR Ohio's operations. According to the 2018 tax documents, ProMedica (as it relates to HCR Ohio and other subsidiaries) "retains approval rights

with respect to certain corporate actions such as (i) adoption of the business unit's strategic plans and financial plans, (ii) expenditures for non-budgeted items in excess of certain dollar limits set from time to time by the member, (iii) expenditures for items which are included in the business unit's annual budgets but which exceed the budgeted amount by an amount in excess of certain dollar limits set from time to time by the member, (iv) incurrence, assumption or guarantee of any indebtedness, (v) sale, lease or other disposition of real property or assets with a value in excess of certain dollar limits set from time to time by the member, and (vi) any merger, consolidation, reorganization, dissolution or liquidation."

129.    ProMedica also determined the compensation of HCR Ohio's top management and other officers.

130.    ProMedica's involvement with its subsidiaries was therefore not limited to corporate formalities. Instead, ProMedica had significant involvement in the operations of its wholly owned subsidiaries, including HCR Ohio and the Four Defendant Facilities. For example, according to ProMedica's Corporate tax records (Form 990) from 2019, "[t]he reserved powers and overall system control ensure that [ProMedica] will be responsive to the needs of each supported organization…common supervision and control are shared through the structural relationship of [ProMedica]," and "[ProMedica] has maintained, and will continue to maintain, a ***significant involvement in each supported organization's operations***." (emphasis added).

**During this Time, ProMedica Does Business as "ProMedica Senior Care" and "HCR ManorCare, Inc.," and Thereby is Directly Responsible for the Fraud at Issue.**

131.    After the 2018 acquisition, ProMedica's Press Releases marketed its newly acquired nursing facilities as a direct result of uniting "HCR ManorCare" and ProMedica. Critically, ProMedica characterized the skilled nursing facilities as "ProMedica Senior care

facilities" for which, according to ProMedica's Quarterly Disclosure Form, ProMedica Senior Care was the "provider" of skilled nursing services.

132.    In a Press Release dated October 2, 2020, ProMedica announced "that its division, HCR ManorCare, has been renamed ProMedica Senior Care. The rebrand is part of an evolving journey to unite two organizations, which began with ProMedica's acquisition of HCR ManorCare in 2018. Today, ProMedica is comprised of three distinct, but aligned care divisions: Senior Care, Provider and Clinical Services, and Paramount Health Plan."[17]

133.    The Press Release continued, stating that, "Over the next 18 months, facility names and physical sign changes will be rolled out at ProMedica Senior Care facilities across the nation. The brands that will be changing include Heartland, ManorCare, and Arden Courts."

134.    And ProMedica has stated in court filings that it does business under the trade names of "ProMedica Senior Care" and "HCR ManorCare, Inc." Yet it has also described "ProMedica Senior Care" and "HCR ManorCare" as tradenames—non-legal entities with no employees of its own and incapable of being sued.[18]

---

[17] https://www.promedica.org/newsroom/press-releases/promedica-announces-hcr-manorcare-name-change-and-rebrand.

[18] Further evidence that "ProMedica Senior Care" is a DBA is that when this entity was named as a Defendant in another action, ProMedica moved to dismiss it from the lawsuit, asserting that "ProMedica Senior Care" is not a legal entity, has no employees, and has no operations." According to ProMedica, "ProMedica Senior Care is an industry trade name/service mark only and does not refer to any currently or previously existing legal entity." *See Loyko v. Old Orchard Health Care Center-Easton PA, LLC,* 5:24-cv-0360, Dkt. No. 1, at *3 (E.D. Pa. Jan. 25, 2024). When referring to "ProMedica Senior Care" and "HCR Manor Care" in a motion to dismiss for a separate matter, ProMedica has argued that these "Non-Existent Defendants should be dismissed as parties because they lack the capacity to be sued." *See Williams v. ProMedica Senior Care,* 2022 WL 20470215, 3:22-cv-2611, Dk. No. 30 (N.D. Cal. Oct. 11, 2022) (Defendants' Notice of Motion and Motion to Dismiss Nonexistent Defendants). According to an affidavit by an officer of one of the nursing facilities owned by ProMedica, "ProMedica Senior Care has no physical presence. It has no employees, nor does it have any documents. It is merely a trade name." *Williams v. ProMedica Senior Care*, 3:22-cv-02611, Dkt. No. 1, Ex. 2, at *2-3 (N.D. Cal. April 29, 2022). In the same affidavit, the officer also stated that "HCR ManorCare is an industry trade

135.    ProMedica applied to register the "ProMedica Senior Care" trademark in December 2019 and still owns this trademark. The regional and corporate executives, employees and/or agents from ProMedica's business unit and senior care division ("ProMedica Senior Care" and/or "HCR ManorCare") managed and oversaw its skilled nursing facilities, including the Four Defendant Facilities at issue here.

136.    ***"ProMedica Senior Care" corporate***. Regional and corporate employees who worked at "ProMedica Senior Care" were ProMedica employees and/or agents during the relevant period. During the relevant timeframe, the Chief Government Relations Officer for ProMedica sent correspondence on ProMedica letterhead to Ohio state and local government officials confirming this. The letterhead also listed the corporate address for ProMedica (100 Madison Ave., 3rd Floor, Toledo, Ohio) and its website (promedica.org).

137.    This letter stated that, because "ProMedica Health System divested its interest in the majority of its skilled nursing facilities," PES would be "reducing the regional and corporate support staff that serviced these facilities" and that "ProMedica Health Systems [would] implement layoffs in Ohio," to include "255 employees" who were "assigned to the ProMedica Senior Care corporate office, located at the ProMedica Summit Center, 333 North Summit Street, Toledo, OH." This is the same address as HCR Ohio.

138.    ***"ProMedica Senior Care" is the "[P]rovider" of Care at Skilled Nursing Facilities***. In ProMedica's Quarterly Disclosures For the Period Ended June 30, 2022, ProMedica boasted about how the "Senior Care division of ProMedica is a leading ***provider*** of

name registered with the United States Patent and Trademark Officer. HCR ManorCare has no physical presence. It has no employees, nor does it have any documents. It is merely a trade name."

short-term, post-hospital services and long-term care with decades of experience helping

patients, residents, and their families. Quality care is provided through a network of 332 skilled

nursing and rehabilitation centers, assisted living facilities, and hospice and home health care

agencies in 26 states." (emphasis added).

139. ***The President of "ProMedica Senior Care" is a ProMedica Employee***. On

August 19, 2021, a ProMedica executive and employee testified under oath that, as "President of

the Senior Care Division at ProMedica," she was employed by ProMedica and that the Chief

Operating Officer of ProMedica was her "boss." *See Francis v. ProMedica Health System, Inc.*,

3:19-cv-02627, Dkt. No. 34-3 (N.D. Ohio Dec. 17, 2021) (Dep. 10:11-16 and 11:2-11). As

President of "ProMedica Senior Care," this executive became a member of ProMedica's

Executive System Team, which "plans and administers the strategic plans of ProMedica and its

subsidiaries," according to ProMedica's Quarterly Disclosure.

140. ***ProMedica Employee Oversees the Nursing Facility's Strategy and Operations***.

When asked what her primary duties were as President of "ProMedica Senior Care," the

executive testified it was "[o]verseeing the strategy and operations of our Senior Care Division

which is assisted living, independent living, skilled nursing, home care, Hospice and palliative."

(Dep. 11:17-20).

141. ***ProMedica Employee Leads the Clinical and Direct Care Team.*** As President of

"ProMedica Senior Care," this executive participated in a Senior Living Executive Conference in

Minneapolis, Minnesota. In her official conference biography, she stated that she "leads the

largest clinical service division for ProMedica. With a diverse clinical portfolio of skilled nursing

rehabilitation services, home care, hospice, assisted living and independent living her team cares

for a daily census of 30,000 patients and residents across 26 states."

142.    ***ProMedica Is Involved with the Hiring, Managing, and Admissions.*** The executive was also interviewed by Skilled Nursing News at the 2022 LTC 100 Leadership Conference taking place in Florida. During her interview on or about June 14, 2022, the executive made statements revealing that "ProMedica Senior Care" was involved with hiring staff members, managing the use of agency staff, and controlling admissions at its nursing facilities. ProMedica, acting through its officers, directors, agents, and/or employees within ProMedica's "Senior Care Division," were indeed involved in overseeing the strategy and operations of nursing facilities ultimately owned by ProMedica.

143.    And, as further discussed below in paragraphs 180 through 191, the President of "ProMedica Senior Care" implemented and oversaw bonus policies that caused Imperial, Riverview, Greenville, and Pottstown to provide grossly substandard, nonexistent, and/or non-NHRA compliant care to residents and caused the submission of false claims to the United States.

**PES Is Co-Employer of Facility Staff Members and Directly Involved with Fraud at Issue.**

144.    PES essentially served as a payroll company for the other Defendants and co-employer for the facility employees. For example, according to the 2018 Employment Life Cycle Process Manual for "HCR ManorCare," PES was defined as "an employment company for HCR ManorCare."

145.    To that end, each ProMedica skilled nursing facility, including the Four Defendant Facilities at issue here, entered into agreements with PES in which the facility engaged PES "to provide professional employer services, as well as certain employment-related advisory and administrative services," so that the facility (a) obtained access to PES's resources

and expertise, (b) reduced its administrative burdens, and (c) and obtained PES's advice and assistance with respect to the facility's employment-related compliance.

146.    The agreement expressly stated that "the parties acknowledge that this Agreement creates a co-employer relationship between the parties with respect to the [PES] employees made available to perform services for [the facility] and subject to [the facility's] day to day control[.]" And, where required by state law, PES would provide written notice of the co-employment relationship to each employee.

147.    Under the agreement, PES was responsible for payroll administration, paying wages and federal and state employment taxes, and other administrative duties. The facility would then pay PES an amount equal to the direct wage and compensation expenses incurred by PES.

148.    Likewise, PES co-employed the Administrators, DONs, Admission Officers, and RDOs. For example, after the ProMedica acquisition, the bonus agreements continued to state that these individuals were employed with "Heartland Employment Services, LLC." However, the bonus policies for these employees were disseminated by the President of ProMedica's Senior Care division and later updated to be on "ProMedica" letterhead and to contain ProMedica's address and website. The President of "ProMedica Senior Care" stated in the policies that the bonus plan could be amended, eliminated, or replaced at "ProMedica Senior Care's sole discretion," and stated that the signed agreements should be returned to ProMedica's HR Department.

149.    In addition to these individuals, PES also served as the co-employer for other ProMedica regional and corporate employees and/or agents at "ProMedica Senior Care" in a

similar manner, while ProMedica exercised day-to-day control over these individuals and had the power to terminate them.

**ProMedica is Liable for the Actions of HCR Ohio and "HCR ManorCare" Executives, Employees, and Agents from July 2018 to December 2023.**

150.    The actions of HCR Ohio and "HCR ManorCare" executives, employees, and/or agents can also be imputed to ProMedica from July 2018 because these individuals were also ProMedica employees, there existed a lawful agency relationship between the individuals and ProMedica, and/or ProMedica jointly employed and/or controlled these individuals.

151.    After the ProMedica acquisition of 2018, the President of "HCR ManorCare," which was the name of ProMedica's Senior Care division and business unit before it was renamed "ProMedica Senior Care," reported directly to the CEO and President of ProMedica.

152.    In 2019 tax records, HCR Ohio identified its website as www.promedicaseniorcare.org and identified the then-President and CEO of ProMedica as an "Individual trustee or director" and "Officer" for HCR Ohio.

153.    The 2019 tax records for both HCR Ohio and ProMedica also revealed that, at one point in time, the two entities shared the same phone number (419-252-5772) and listed the same individual and address for the entity's principal officer.

154.    In ProMedica's tax records for 2020, ProMedica identified the then-President of "ProMedica Senior Care", Chief Financial Officer of "ProMedica Senior Care", and Chief Medical Officer of "ProMedica Senior Care", as three out of eleven "highest compensated employee[s]" within ProMedica.

155.    In ProMedica's tax records for 2023, ProMedica listed the current President of "ProMedica Senior Care" as a "Key employee" for ProMedica.

156.    These individuals had oversight of the skilled nursing facilities ProMedica acquired in 2018, including the Four Defendant Facilities. According to an official online biography of the current President of "ProMedica Senior Care" on ProMedica's website, "[the President] has executive oversight of the ProMedica Senior Care division, which primarily consists of memory care communities and a smaller number of skilled nursing facilities and home health and hospice agencies."[19]

**ProMedica Signs Facility Lease Agreement and Joint Venture as Guarantor.**

157.    On July 26, 2018, ProMedica's subsidiary (HCR III Healthcare, LLC) signed a Master Lease Agreement with Well PM Properties LLC (WellTower) concerning 218 skilled nursing facilities, including the Four Defendant Facilities. Under the agreement, Well PM Properties LLC served as the landlord of the properties, and HCR III Healthcare, LLC was the tenant.

158.    ProMedica expressly affirmed in writing that it had the power to direct and control the management and policies of the tenant of the 218 skilled nursing facilities.

159.    Another executive, later identified in ProMedica's 2020 tax records as the Chief Financial Officer of "ProMedica Senior Care" and listed as one of the ProMedica's "highest compensated employee[s]," signed the lease agreement on HCR III Healthcare, LLC's behalf as its "authorized person." At the time he signed the lease, this individual was also the Chief Financial Officer of HCR Ohio.

160.    ***Substantial Economic Benefit to ProMedica.*** In the agreement, among other things, ProMedica acknowledged that it (a) was an "affiliate" of HCR III Healthcare, LLC, (b) would act as HCR III Healthcare, LLC's Guarantor, (c) would "derive substantial economic

---

[19] https://www.promedica.org/about-promedica/executive-bios/Justin-Skiver.

benefit from the execution and delivery of the Lease," and (d) "derived and expects to derive financial and other advantages and benefits directly and indirectly, from the making of the Lease and payment and performance of the Obligations."[20]

161.    ***ProMedica's Participation was Critical to the Deal.*** ProMedica also acknowledged that it recognized that WellTower "would not enter into the Lease" unless ProMedica agreed to act as its subsidiary's guarantor.

162.    ***ProMedica Controlled the Management and Policies of Each Nursing Facility.*** ProMedica also represented and warranted that each facility's Tenant was "indirectly owned and controlled" by ProMedica. The agreement defined "control" and "controlled by" as follows: "With respect to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such entity."

163.    The then-President and Chief Executive Officer of ProMedica signed the Lease Agreement on ProMedica's behalf as its subsidiary's Guarantor.

164.    ProMedica therefore had the power to direct the management and policies implemented by Defendants at the Four Defendant Facilities.

**ProMedica Continued Problematic Bonus Plans Implemented by HCR Delaware.**

165.    Not only did ProMedica control these nursing facilities, but it also implemented problematic policies that caused nonexistent, grossly substandard, and/or non-NHRA care to be provided at Riverview, Imperial, Greenville, and Pottstown.

---

[20] According to the testimony in another action of HCR Ohio's Fed. R. Civ. P. 30(b)(6) witness, ProMedica began receiving revenue generated from the operation of the skilled nursing homes owned by HCR Ohio. The two entities entered into an agreement in which ProMedica could request HCR Ohio provide to it, on a monthly basis, HCR Ohio's net distributable cash, which was "dividended [sic] up the, the chain [to ProMedica]." *See Murray v. ManorCare of Topeka*, 2:19-cv-2148, Dkt. 201-5, at *10 (D. Kansas July 15, 2022) (Dep. 69:12 - 70:6).

166.    Before ProMedica acquired these nursing facilities in July 2018, the bonus policies created, implemented, and overseen by HCR Delaware contributed to these nursing facilities providing grossly substandard, nonexistent, and/or non-NHRA compliant care. After ProMedica acquired the "HCR ManorCare" trademark and these nursing facilities in July 2018, ProMedica continued these same problematic bonus policies.

**HCR ManorCare's and ProMedica's Bonus Policies Negatively Impacted the Care Quality at the Four Defendant Facilities.**

167.    On January 1, 2017, the President of "HCR ManorCare" (who later became the Chief Financial Officer of ProMedica in June 2019), sent the 2017 Director of Nursing Bonus Plan to each nursing facility's DON. The DON's Administrator, RDO, General Manager, and Vice President, all superiors within the DON's chain of command, were copied on the correspondence.

168.    The 2017 DON Bonus Plan outlined that the DONs would "have the opportunity to improve Company profitability." Among other factors, the Bonus Plan financially rewarded DONs for (a) increasing resident admissions; and (b) generating revenue for the company. For example, if a facility generated more revenue by increasing resident admissions and therefore contributed more to HCR ManorCare's total revenue, this resulted in a larger bonus for the DON. Conversely, as a facility's revenue decreased, so did the percentage of bonus. DONs would also lose 25% of their quarterly bonus if their facility used any staff from agencies (that is, agency nurses or CNAs). Although the bonus plan also factored in quality-of-care indicators, the survey results did not accurately reflect the true state of the facilities, because the facilities were aware of the "survey windows," prepared for these inspections, and would increase staffing for surveys.

169.    The 2017 Bonus Plan for Facility Administrators similarly stated that Administrators would "have the opportunity to improve profitability" through their performance. The Administrator's bonus plans, similar to the bonus plan for the DON, also financially rewarded Administrators for (a) increasing resident admissions and (b) generating revenue for the company.

170.    The purpose of such bonus plans was to increase resident population, thereby increasing revenue for "HCR ManorCare." For example, the 2017 Bonus Plans for each facility's Manager of Market Development and Manager of Case Management explicitly stated that "[p]erformance under the Plan is intended to increase the number of Patient (as defined below) referrals and admissions, and improving Company profitability, census and revenue, while maintaining the integrity of HCR ManorCare's corporate compliance program."

171.    ***Co-Employers.*** Although the bonus plans for the DONs, Administrators, and other management officials stated that these individuals were "employed with Heartland Employment Services, LLC," (now known as ProMedica Employment Services, LLC) the bonus plans were on "HCR ManorCare" letterhead, from the President of "HCR ManorCare," and stated that the bonus plan could be amended, eliminated, or replaced "at HCR ManorCare's sole discretion." The plans also reminded participants that "no HCR ManorCare employee or contractor" may offer illegal kickbacks for referring business to the facility and that such behavior "contradicts the HCR ManorCare corporate compliance program."

172.    ***ProMedica Perpetuates Problematic Bonus Policies.*** After ProMedica acquired the 218 nursing facilities, including the Four Defendant Facilities, ProMedica continued to implement the exact same problematic policies because ProMedica's Bonus Plans largely remained the same from 2019 through 2023.

173.    On January 1, 2019, the President of "HCR ManorCare" disseminated the Senior Care division's bonus policies for management employees.

174.    The 2019 Bonus Plan for "HCR ManorCare" Admissions employees (that is, for Admissions Directors, Hospital Liaisons, Nurse Liaisons, and Central Intake employees) stated that the bonus plan was "intended to increase the number of Patient (as defined below) referrals and admissions, improving Company profitability, census and revenue, while maintain the integrity of HCR ManorCare's corporate compliance program."

175.    Under the plan, each participant could earn $5,063 per quarter (or a total of $20,252 a year) by satisfying certain metrics, but the bonus would be significantly decreased or eliminated completely if financial goals and admission targets established by HCR ManorCare were not satisfied. According to these metrics, the more residents admitted, the higher the bonus.

176.    The 2019 Bonus Plans for the RDOs, similar to the bonus plans for the Administrators and DONs, also financially rewarded the RDOs for: (a) increasing resident admissions; (b) generating revenue for the company; (c) satisfying certain financial targets; and (d) ensuring that facilities under the RDO's responsibility did not exceed their budgeted HPPD (that is, their predetermined staffing ratios).

177.    On January 1, 2020, HCR ManorCare's President again disseminated the Bonus Plans for the Administrators, DONs, RDOs, and Admissions Staff on "HCR ManorCare" letterhead. These documents contained similar provisions as in earlier years, including that "HCR ManorCare" had the sole discretion to revise or eliminate the plan.

178.    On January 1, 2021, the President of HCR ManorCare sent the 2021 Bonus Plans to the RDOs, Administrators, DONs, and Admissions Staff, and this document revealed that

individuals from "ProMedica Senior Care" directly or indirectly compensated or otherwise controlled these employees.

179.    The agreement was described as "ProMedica Senior Care's Bonus Award Plan" for "employees employed with Heartland Employment Services." Although the provisions of each policy were substantially similar to earlier years, there were several significant updates. This year's Bonus Plans (a) prominently displayed ProMedica's registered trademark "ProMedica" on top of the letter, (b) stated that the Bonus Plan could be eliminated or replaced at "ProMedica Senior Care's sole discretion," (c) displayed on the letter the address from which ProMedica's principal officers operated ProMedica (100 Madison Ave., Toledo, Ohio), (d) contained the website for ProMedica (promedica.org), and (e) directed the individuals to sign and return the bonus plan policy to ProMedica's HR Department at HRCOMPENSATION@ProMedica.org. The bonus plan also stated that, "as part of ProMedica Senior Care's commitment to be an electronic payor of compensation, payout of any bonus payments" would be via direct deposit.

180.    The 2022 bonus plans were nearly identical to prior year's version. On January 1, 2022, the President of "ProMedica Senior Care," (a ProMedica executive and employee) disseminated to each facility's Administrator and DON a bonus plan on ProMedica letterhead, which listed ProMedica's address and website, and also stated that the Bonus Plan could be revised or eliminated at "ProMedica Senior Care's sole discretion." Moreover, the recipients were directed to sign acknowledgment of the bonus plans and return the forms via email to ProMedica's HR Department at HRCOMPENSATION@ProMedica.org. This version also described the document as "ProMedica Senior Care's Bonus Award Plan" for "employees employed with Heartland Employment Services."

181.    The January 2022 Bonus Plan for Administrators stated that participants would "have the opportunity to improve profitability while remaining innovative and creative in organizational and administrative techniques." Depending on the profitability of each facility, the Administrator received an increased percentage in bonus. For example, if the contribution margin (that is, the amount of revenue generated) was 110% or greater than the facility's budget, the Administrator would receive 30% of the Quarterly Bonus. On the other hand, if the contribution margin was 92.9% to 92% of the budget, the Quarterly Bonus was decreased to 2%. Anything in between resulted in a reduced percentage. Bonus plans for earlier years also contained a similar provision, in which the bonus amount was impacted by the revenue a facility generated for the company.

**Contribution Margin vs. Budget (30%)**

- 110.0% or Greater    30%
- 105.0% to 109.9%    28%
- 104.0% to 104.9%    26%
- 103.0% to 103.9%    24%
- 102.0% to 102.99%    22%
- 101.0% to 101.99%    20%
- 100.0% to 100.99%    18%
- 99.0% to 99.99%    16%
- 98.0% to 98.99%    14%
- 97.0% to 97.99%    12%
- 96.0% to 96.99%    10%
- 95.0% to 95.99%    8%
- 94.0% to 94.9%    6%
- 93.0% to 93.9%    4%
- 92.0% to 92.9%    2%

182.    The 2022 Bonus Plan for the DONs—which was also disseminated by ProMedica Senior Care's President on ProMedica letterhead—generally contained the same provisions as the 2021 Bonus Plan. The 2022 Bonus Plan similarly rewarded the participant for increasing revenue.

183.    The 2022 Bonus Plan also required Administrators to match the prior year's revenue: "Prior Year's Contribution Margin means the percentage of a Plan Participant's revenue that was retained as profit (that is, if your contribution margin last year was 85% then this year it would be expected to be at or better than 85%.").

184.    ***Failure to Meet Prior Year's Profit***. If an Administrator failed to match or exceed the prior year's contribution margin or another metric set by ProMedica, this resulted in a 100% reduction of the annual discretionary bonus, which was equal to 10% of their annual salary.

185.    The President of "ProMedica Senior Care" sent substantially similar bonus plans to facility management officials on January 1, 2023.

186.    ***Problematic Policies***. These policies were problematic because they prioritized generating revenue, increasing resident admissions, and limiting operating costs (like the labor costs associated with staffing) at the expense of the care and services actually required by their nursing home residents.

187.    ***Increased Census Drives Profits***. On May 24, 2019, the Assistant Vice President and Assistant General Manager for HCR ManorCare's Eastern Division sent an email to a small group of "HCR ManorCare" executives "regarding financial performance and improvement." In big bold red letters, he wrote in this email, "PLEASE DO NOT SHARE." The attached PowerPoint was name "Establishing a Blueprint to improve Financial Improvement."

188.    On the slide concerning census, the Assistant Vice President wrote that their "continued focus has to be on saying YES to [resident] referrals" in order "to drive" the average daily census and revenue.

189.    On the slide concerning Operating Expenses, he wrote that "the key takeaway here is that over 60% of our costs are dedicated to labor, or people management. It we don't control this metric, it continues to be a difficult task to manage the overall performance."

190.    Executives, employees, and agents from "HCR ManorCare" and "ProMedica Senior Care" therefore influenced RDOs, Administrators, and DONs to increase the daily census of each facility and limit operating expenses.

191.    The foregoing policies, in addition to predetermined labor budgets and maximum HPPD by "HCR ManorCare," "ProMedica Senior Care," and ProMedica, caused inadequate understaffing at each facility because Administrators and DONs were financially incentivized to prioritize revenue and profit for ProMedica, instead of ensuring the facility staffed to resident acuity (that is, the degree of care and support a nursing facility resident medically required).

**"Corporate" Policies Result in Understaffing and Problematic Resident Care.**

192.    In addition to the problematic Bonus Plans, ProMedica developed and implemented policies and practices that led to systematic and pervasive understaffing at the Four Defendant Facilities. Regional and corporate employees from "ProMedica Senior Care" set the labor budget and established the allotted HPPD that each facility could not exceed. If the facility ever surpassed the predetermined daily HPPD, each facility's Administrators, a ProMedica employee/agent, would be required to report exceeding their HPPDs to his or her RDO, another ProMedica employee. This naturally created the natural and foreseeable scenario where Administrators heavily scrutinized their daily HPPD and avoided exceeding this number. Failure to do so would require a mandatory report to their RDO.

193.    ***The Budget Was Developed by Corporate***. The Administrator for Imperial from July 2015 through October 2021 stated that Imperials' preliminary budget was sent to the facility

by the "corporate office." Although the facility provided "suggestions" on changes to the budget, each facility's final budget, including its labor costs, was determined by individuals higher in the chain of command, above the Administrator, at the corporate level and not at the facility or clinical levels.

194.    *Hours Per Patient Day*. Individuals at "HCR ManorCare" and later "ProMedica Senior Care" also determined each facility's permitted HPPD and tightly controlled this figure.

195.    Whenever a facility exceeded its allotted daily HPPD, some Administrators instructed staff members not to report to work. For example, Imperial's Administrator admitted that she would regularly order her subordinates to not report to work if this meant that the facility would exceed its set HPPD.

196.    *Use of Agency Nurses*. Because use of agency staff resulted in a 25% reduction in the quarterly bonus, the policy created, implemented, and overseen by ProMedica essentially punished a facility for providing adequate staffing and financially disincentivized the use of nursing agency staff to supplement its workforce whenever staffing was low. This resulted in poor quality of care outcomes in some cases.

197.    *Central Intake*. The decision to admit a resident was made by a "corporate" employee within a department known as Central Intake, rather than each facility's Administrator or DON, who were the individuals in the best positions to determine whether there was adequate staffing and equipment at each facility to properly care for each resident based on their individual needs and acuity. Residents would therefore be admitted into the nursing facilities even if staff members at each facility believed they were inadequately staffed to care for such residents.

198.    ***Admissions Ban***. Each nursing facility did not have the independent authority to implement an admissions ban without the permission of their RDO or other executives in the "ProMedica Senior Care" chain of command. In other words, the facility could not stop admissions on its own. Only higher-ranking corporate employees for ProMedica Senior Care or its predecessor could do that. According to the former DON for Pottstown, "Admission bans were something out of my control or [the Administrator's] control. That came from corporate."

199.    ***"Corporate" Pushes Admissions Even When a Facility is Not Well-Positioned to Care for Residents.*** According to the former Administrator for Greenville, her superior in the corporate chain of command at the predecessor HCR entity instructed her to keep her facility at full capacity. Her performance evaluation included financial metrics, including how much money the facility made and how full she kept the nursing facility with residents. Even as the facility's Administrator, she could not decline a resident referral. Rather, if she wanted to decline a referral because she did not believe her facility could handle the resident, she was required to report her reasoning to her superiors. An employee from the facility's marketing department also reviewed referrals and any rejections. This employee would also notify the Administrator's superior at corporate if a referral was ever rejected.

200.    The Greenville Administrator was concerned about her nursing facility Administrator's License, and her Director of Nursing was worried about her nursing license if there was a negative outcome for a resident that the facility was not equipped to handle. In one instance, the facility accepted a resident with severe psychiatric and behavioral problems. The Administrator was uncomfortable with accepting the resident because she did not believe the facility had adequate resources. Despite these concerns, her superior ordered her to admit the resident. Once admitted to the facility, this resident pushed another resident, who fell and broke

her hip. Another time, the Administrator did not want to admit a resident because, according to the medical records, the resident's throat needed to be suctioned every two hours, but there were not enough staff to cover the need. When she told her superior about her concerns, he responded, "Who says they have to be suctioned every two hours," dismissing her concerns.

## ProMedica and "HCR ManorCare" Corporate Drive Admissions and Cut Staffing to Increase Profitability.

201.    Corporate employees for "HCR ManorCare" and "ProMedica Senior Care" were intimately involved in the management, control, and/or operations of the nursing facilities, including admitting residents to increase revenue and profitability for ProMedica.

202.    On July 26, 2018, the Vice President and Director of Marketing for "HCR ManorCare," (before it was renamed "ProMedica Senior Care") sent an email to various executives and managers within HCR ManorCare, copying to his email the President and Chief Operating Officer of "HCR ManorCare." In his email, entitled "Daily Census Report as of 07/25/2018," the Vice President included a chart and breakdown of the "daily census" (that is, resident population) across the entire organization. The purpose of his email was to increase resident admissions: "Good day yesterday; thank you! We are very close to budget and need only +102 to get there. Let's double our efforts today and finish the week above budget!"

203.    On June 19, 2019, the Director of Marketing again sent an email to management within "HCR ManorCare," including the President of HCR ManorCare (whom ProMedica later identified as one of its "highest compensated employees" in 2020 tax records) and to the Vice President of HR (referenced in paragraph 120 above). In his email, the Director of Marketing praised his subordinates on the increasing flow of resident admissions: "Good day yesterday; we need to keep it going to cover the lost ground from Monday. Keep the admissions coming!"

204.    On July 13, 2019, the Director of Marketing sent another email to multiple "HCR ManorCare" managers and executives with the subject line "Immediate action!" The email read: "Very disappointing week and month so far, and *it cannot continue*! Our problem is not referral flow; in fact we [have] seen an uptick in the last week. The problem is our admission volume over the 6 weeks. We are not converting nearly enough to keep pace with the rate of discharges. Times like these require[] a village to change our course. Every staff in every department in every building must show urgency in supporting the admission process, and the front line staff must step up their conversion rates by moving faster and closing more efficiently. *We cannot continue on this path for one more day*!" (emphasis in original).

205.    The Director of Marketing chastised his subordinates that resident referrals must increase: "We are almost to the mid-point of July and we are in very real danger of having the worst census and revenue month of the year. ***We need immediate action***!" (emphasis in original).

206.    ProMedica employees and/or agents also influenced staffing decisions. On March 25, 2019, a ProMedica employee emailed the Vice President of HR for ProMedica at her ProMedica email address. The employee wrote, "Per your request attached are the reductions that were accomplished in the East Division. The adjustments in HPPD were accomplished through adjustments to schedules, reduction in agency [nurse] usage, and not filling open positions. We also eliminated five Mobile [nurse] positions and one Mobile [Director of Nursing] position[.]"

**Defendants Knew When Submitting Claims That the Care was Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Based on Several Sources of Data Available to Them.**

207.    During all relevant times, ProMedica was aware of state survey results because (a) these were sent to each facility's Administrator, (b) these were conveyed to the responsible

RDOs, and (c) the Administrators were required to send the survey results to the Survey Hotline for ProMedica's Senior Care division.

208.    For example, on December 18, 2020, the Administrator for the Imperial facility emailed Corporate employees (survyehotline@hcr-manorcare.com) the preliminary results of a survey that had just occurred at her facility, in which she summarized the complaints and whether any deficiencies were substantiated.

209.    After "HCR ManorCare" was renamed "ProMedica Senior Care," agents from "ProMedica Senior Care" even helped individual facilities prepare for upcoming state surveys. By way of example, on March 10, 2021, the Director of Development and Implementation for "ProMedica Senior Care" emailed the Administrator for the Imperial facility from her ProMedica email address. The ProMedica Director wrote: "In preparation for your Standard Survey, I have completed e-look of Activity PCC documentation, and my findings are attached." She requested that the Administrator review her findings and offered to conduct a virtual call to review the findings or provide further education.

210.    Accordingly, ProMedica, through its employees and agents, was aware of Survey results and documents because state inspectors sent survey results directly to the Administrator for each facility, who was then required to convey the results to the RDO and even to ProMedica's Survey Hotline Department.

211.    Sometime after ProMedica acquired these nursing facilities, whenever there was a survey or inspection at a facility, it was standard practice that the Survey Hotline Department (Surveyhotline@ProMedica.org) was notified of any visit, any formal complaints made by residents or family members, and the results of the inspection.

212.    For example, on March 25, 2022, the Administrator for the Riverview facility emailed ProMedica's Survey Hotline (SURVEYHOTLINE@PROMEDICA.ORG) that a complaint survey was conducted that day based on a resident's complaint.

213.    What's more, on April 11, 2022, an employee from ProMedica's Survey Hotline Department wrote an email summarizing that the Imperial facility had undergone a survey, received 20 deficiencies, and that the complaint was substantiated.

214.    On December 2, 2022, a ProMedica representative from the email address SURVEYHOTLINE@PROMEDICA.ORG emailed the management for a nursing facility requesting that "[t]his was a friendly reminder to forward the requested Survey Documentation to the Survey Hotline. If you have not received documentation at this time, please respond with a status update."

215.    In addition to the state surveys, Quality Assurance Consultants from "HCR ManorCare" and "ProMedica Senior Care" would (a) regularly visit each facility, in some cases twice a month, (b) participate in staff meetings, and (c) if the facility was preparing for an external survey, often conduct internal audits and other self-assessments for the benefit of each individual facility.

216.    Finally, during all relevant times, the Bonus Plans for the Administrator, DON, and RDO—overseen and implemented by a ProMedica executive and employee (the President of "ProMedica Senior Care")—factored in the external survey results and any deficiencies.

**In Sum, ProMedica, HCR Ohio, and PES are Liable for the Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care Provided at the Four Defendant Facilities During the Relevant Timeframe because ProMedica, HCR Ohio, and PES directly participated in the allegations here and/or controlled the Four Defendant Facilities.**

217.    The actions of the nursing facilities and the employees are attributable to ProMedica, HCR Ohio, and PES because there existed a lawful agency relationship in which the

DONs, Administrators, RDOs, and other staff members were employed or co-employed by ProMedica and/or PES, and/or acted as representatives of or otherwise acted on behalf of ProMedica/PES and directed the actions of the facilities. ProMedica had the power to change the management and policies at each facility, but nonetheless caused the submission of false claims by, among other things, (a) prioritizing policies that rewarded decisionmakers for increasing resident admissions and limiting adequate staffing, (b) implementing problematic Bonus Plans, (c) pressuring the facilities to increase resident admissions to generate revenue, (d) prohibiting the implementation of an Admissions Ban, (e) imposing HPPDs requirements, (f) ignoring negative survey results and complaints of understaffing, and (g) failing to adequately compensate their employees.

218.    The Defendants' conduct caused false claims to be submitted because the conduct alleged herein was a substantial factor in producing the harm, and was the foreseeable outcome of grossly substandard, nonexistent, and/or otherwise non-NHRA compliant care.

219.    Despite knowledge of grossly substandard, nonexistent, and/or otherwise non-NHRA compliant care based on the state survey results, complaints by staff members and residents, and internal audits and inspections, ProMedica and PES did not materially change their practices and policies. And by continuing to prioritize profits over residents, ProMedica and PES acted with actual knowledge, deliberate ignorance, or reckless disregard that the claims that were being submitted were false.

## II.    DEFENDANTS' NONEXISTENT, GROSSLY SUBSTANDARD, AND/OR NON-NHRA COMPLIANT SERVICES PROVIDED TO RESIDENTS AT RIVERVIEW, IMPERIAL, POTTSTOWN, AND GREENVILLE.

220.    ProMedica, HCR Ohio, and PES were responsible for ensuring that the Four Defendant Facilities provided their residents with a bundle of nursing home services that met the

regulatory requirements that, overall, would ensure "the highest practicable level of physical, mental, and psychosocial well-being [of] every resident." 42 U.S.C. § 1396r(b)(2)(A).

221.    Instead, from on or about January 1, 2017, to December 31, 2023, the Four Defendant Facilities provided and billed the government for nonexistent, grossly substandard nursing home services, and/or non-NHRA compliant care.

222.    For example, and as described further below, the Four Defendant Facilities systemically:

> a.    Failed to provide skilled nursing services in accordance with physicians' orders;
>
> b.    Failed to provide standard infection control, resulting in urinary tract infections (UTIs) and wound infections;
>
> c.    Failed to provide wound care as ordered by physicians, or take necessary prophylactic measures to prevent pressure ulcers, such as turning and repositioning;
>
> d.    Failed to manage residents' pain adequately;
>
> e.    Did not revise or update residents' plans of care to account for pressure ulcers, increased pain, or other deterioration in residents' conditions;
>
> f.    Failed to prevent excessive resident falls; and
>
> g.    Failed to meet the basic nutrition and hygiene requirements of residents in accordance with their care plans.

223.    Many of these failures of care were related to the Four Defendant Facilities' failure to provide sufficient staffing to meet their residents' needs.

224.    The NHRA and its regulations required Defendants to ensure that the Four Defendant Facilities had "sufficient nursing staff to provide nursing and related services" to ensure "the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care." 42 C.F.R. § 483.30. The Four Defendant Facilities, however, did not maintain sufficient nursing staff to provide the level of

services necessary for their residents to receive the most basic nursing home goods and services such as food, drink, and assistance with bathing and toileting, among other goods and services needed to attain or maintain their highest practicable physical, mental, and psychosocial well-being.

225.    Defendants thereby violated the standard of care regulations that implement the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396r et seq.; *see* 42 C.F.R. §§ 483.1-483.95.

226.    Staff members at the Four Defendant Facilities, as well as family members of residents, observed inadequate staffing levels and alerted the Defendants. But Defendants failed to increase staffing to a level sufficient to provide the requisite care to the Four Defendant Facilities' residents.

227.    In fact, ProMedica, HCR Ohio, and PES took various actions that contributed to the staffing shortages. Among other things, they failed to provide adequate resources to attract and retain qualified staff and cut labor costs, resulting in a poor work environment and very high turnover among both managerial medical staff and other staff.

228.    Defendants' failure to provide qualified and adequate staffing at the Four Defendant Facilities contributed greatly to their provision of nonexistent and substandard care.

229.    Defendants were responsible for providing their nursing facility residents with a clean, safe and sanitary living environment. Defendants failed to do so at the Four Defendant Facilities. As a result, residents could not bathe for long periods of time.

230.    Defendants were aware of the problems with insufficient resources at the Four Defendant Facilities and the resulting adverse health effects on their residents, but recklessly disregarded them, were deliberately ignorant of them, and, ultimately, failed to resolve them, or to do so in a timely fashion.

231.    Defendants focused on achieving a high resident census at the Four Defendant Facilities, rather than on delivering quality resident care at those facilities.

232.    The following paragraphs set forth instances and resident examples of nonexistent, grossly substandard, and/or otherwise non-NHRA compliant care provided by Defendants for which Defendants made, or caused to be made, false or fraudulent claims to Medicaid and/or Medicare, and for which they wrongfully received and retained payments.

233.    Attached to and made part of this Consolidated Complaint in Intervention is **Exhibit A**, which contains a summary chart of the respective false claims for the residents at Riverview, Imperial, Pottstown, and Greenville, discussed below. The residents in these examples have not been identified here so as to protect resident privacy. The United States will serve Defendants with a document that identifies each resident by name.

## III.    <u>RIVERVIEW, OHIO</u>

234.    From at least January 1, 2017, to December 31, 2023, due to pervasive understaffing exacerbated by the continued admission of residents without the staff to care for them, failure to follow appropriate clinical protocols, and failure to develop and implement individualized care plans, Riverview provided care that was grossly substandard, nonexistent, and/or otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA.

### a)    <u>Riverview was Aware of General Care Deficiencies</u>

235.    Riverview was aware that there were serious problems with the care it provided for its residents. Among other issues, the facility had recurring and substantial problems concerning the following: (a) meeting the nutritional needs of their residents, which led to preventable weight loss; (b) lack of showers and appropriate hygiene; (c) failure to create and

follow individualized written care plans for each resident; (d) depriving its residents of their dignity and significantly reducing the residents' quality of life; and (e) failure follow appropriate resident fall protocols. As a result, in some cases, the facility failed to treat residents with dignity and respect and care for them in a manner and in an environment that promoted the enhancement of the quality of life.

236.    Notwithstanding this knowledge during the relevant time period, the facility continued to provide care that was grossly substandard, nonexistent, and/or otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA.

b)    **Former Riverview Employees and Residents' Families Corroborated Poor Quality of Care and/or Quality of Life at Riverview During the Relevant Timeframe**

**Nurse Supervisor A**

237.    The Riverview facility was "a place you go to work and lose your [nursing] license" according to one former employee. Nurse Supervisor A worked at the Riverview facility December 2020 through January 2021 before she quickly decided to resign. She was trained by RN D, who told her that working at Riverview "would be the easiest job she ever had," in part because RN D completed medical records without actually assessing residents under his care but rather engaged in forgeries and "paper compliance."

238.    During Nurse Supervisor A's shifts, she was assigned too many residents to provide adequate and quality care, and, as a result, the shift was short-staffed. On her shifts, she had too few nurse aides to cover an entire hallway of high acuity and complex residents, and there were at least 50 residents per hallway. She described this as "absolutely ridiculous."

239.    According to Nurse Supervisor A, there were around 50 residents per hallway, and this lack of staffing was particularly problematic because some of the residents had

Alzheimer's disease and were bedbound, meaning these residents required substantial assistance from multiple staff members for feeding, turning and repositioning, and toileting.

240.    Besides not having the appropriate number of staff, the facility also did not have the appropriate skill level of staff. The on-duty Licensed Practical Nurse ("LPN") asked Nurse Supervisor A for help because the LPN did not even know how to properly remove a catheter – something that should be routine for an LPN working at a nursing facility.

241.    When another resident needed an IV to receive antibiotics, Nurse Supervisor A was able to easily do so. The same LPN mentioned above later told Nurse Supervisor A that it usually took a squad of staff members to accomplish this routine task.

242.    At Riverview, during one of Nurse Supervisor A's shifts while she was treating a resident with a tracheostomy, Nurse Supervisor A noticed that there was no humidification and that the sponge was completely dry and hard. Based on her knowledge and experience, the condition of the sponge meant that no one had touched it for at least two days. The sponge should have been changed at least once per shift or even more frequently, based on the amount of the resident's secretions.

243.    Due to these issues, only after a few shifts, Nurse Supervisor A decided to quit in order to protect herself and her nursing license. Based on her experience working at the facility, she would never send a loved one to the Riverview facility.

**CNA J**

244.    This understaffing at Riverview was systematic and pervasive. According to CNA J, who worked at the Riverview facility from June 2019 through February 2020, the facility "absolutely" had staffing issues. She reported that during her approximately nine months of

working at the facility, she could not recall a shift for which there were enough staff members to adequately meet the needs of all the residents.

245.    Each shift, one CNA was assigned a wing, comprised of approximately 24 residents. A hallway was comprised of two wings, and there should have been at least two CNAs per hallway.

246.    However, according to CNA J, there would be many times only one CNA per hallway, and therefore a single CNA would be responsible for the needs of around 48 residents during a particular shift.

247.    But it was impossible to meet the needs of all the residents under such circumstances. CNA J was frequently unable to turn residents every two hours, as standard wound care protocol requires.

248.    Nor was CNA J able to provide showers to all the residents under her care because she was unable to locate a second staff member to assist her.

249.    On many days, CNA J was unable to get any help. As a result, there were some days when residents who were supposed to receive showers did not receive them due to understaffing.

250.    In part due to the facility's failure to maintain adequate staffing, residents did not receive treatment and care in accordance with professional standards of practice, their care plans, and the residents' choices, as required by 42 C.F.R. 483.25.

**Dietary Aide R**

251.    Actual resident harm resulted due to the Defendants' failure to adequately staff the Riverview facility. For example, another former employee, Dietary Aide R, personally observed resident harm due to understaffing while working at the Riverview facility in 2019.

252.    As a dietary aide, Dietary Aide R's primary role was to work in the kitchen and prepare meals for residents. According to Dietary Aide R, it was typical for one CNA to be assigned to one hall, consisting of 40-50 residents during her time.

253.    Due to the facility's understaffing issues, however, she had to sometimes feed residents because the CNAs were unable to complete these tasks in a timely manner. Feeding residents, however, was never part of her official duties or job description.

254.    On one occasion, Dietary Aide R was asked by the facility's Director of Nursing to "work overtime" and supervise a resident – even though she lacked the requisite medical experience for such a task.

255.    Dietary Aide R agreed, and she was assigned to ensure one resident did not get out of bed. During her shift, an LPN assigned Dietary Aide R additional duties, including watching a second resident.

256.    Because the two residents were in separate rooms, Dietary Aide R had to go back and forth to look after both residents. While she was checking in on one resident, the other resident fell and his head. As a result, this second resident had to be seen at the local hospital and received stitches.

**Activity Assistant KN**

257.    Even when staff members provided nursing services to residents, the treatment was at times "rushed" and inadequate. Activity Assistant KN worked at the Riverview facility from 2015 through 2020. In her opinion, the nursing section was extremely understaffed, and, as a result, the quality of care provided to residents and their quality of life were negatively impacted. Some residents did not receive a bath or have enough time to eat because the nursing aides, who had to tend to the needs of other residents, would "rush" the residents along.

258.    Due to this systematic understaffing, the residents suffered. For instance, Activity Assistant KN recalled Resident WK, whose injury was a direct result of understaffing at the facility. This resident was a "two person" assist (meaning she needed two staff members to help her with ADLs), but no one was available to help the CNA on a particular occasion.

259.    Because no one came to assist the CNA, the CNA tried to move Resident WK alone. As a result, Resident WK fell out of the bed and injured her hip. Activities Assistant KN later departed the facility because she did not want to affiliate herself with a nursing facility that was not providing the type of care she would want to receive.

**HR Employee F**

260.    A former HR employee also corroborated that Riverview facility was typically short-staffed. HR Employee F worked in the HR Department at Riverview from 2020 to 2022. During that time period, staff often called out, and the facility routinely did not have consistent staffing.

**Resident WK's Son**

261.    Family members of residents also recognized that the Riverview facility failed to adequately meet the needs of the residents due to understaffing.

262.    According to Resident WK's son, on days he visited his mother, he observed only one staff member for an entire wing, which housed around 25-30 residents.

263.    Resident WK was a two-person assist, and, because he was worried about his mother's safety in the event of an emergency, he asked the facility's staff how they planned to evacuate his mother should the need arise. The staff could not answer his question.

**Resident LH's Daughter**

264.    Because understaffed and overworked staff members regularly tried to lift residents who were "two person" assists by themselves, the residents suffered falls, fractures, and hospitalizations. For example, in 2020, Resident LH was dropped by a single staff member who was required to have a second staff member assisting. According to Resident LH's daughter, her mother was in the hospital for four days because she suffered a broken femur and injured hip due to this incident.

265.    When Resident LH's daughter visited her mother, her mother's clothes were dirty, the facility smelled "like dirty diapers," and the facility "hardly changed" her mother's diapers and clothes.

266.    Resident LH told her daughter that she was developing urinary tract infections and bedsores because of the lack of changing and turning and repositioning by staff.

c)    **Riverview Was Aware of Understaffing and Misled Surveyors by Staffing Up and Improving Protocols when Surveyors were Present**

267.    The Riverview facility had a general sense of when Ohio surveyors were going to come to the facility to conduct a state inspection and survey and took steps to prepare for these reviews. Once the facility knew inspectors were in the building, said CNA J, "Somebody would go around, let you know. Then you kind of just knew, you know, dot all your I's, cross all your T's. Make sure all your residents are, like, clean[.]" And, because the surveys were multiday inspections, once the facility knew inspectors were in the building, the facility "would be fully staffed" during the next shift and "[the facility] actually had too many [staff] those days." Supervisors and the DON would assist the CNAs to complete tasks during inspection days, and extra CNAs would be scheduled for days when the facility was aware the surveyors would be present in the building.

268.    However, when the survey was complete and after the inspectors departed the facility, the facility would go back to being understaffed, and, as a result, CNA J was unable to find another staff member to assist her with turning and showering residents on some days.

269.    Furthermore, Nurse Aide MN, who provided nurse aide services at Riverview for eleven months in 2021, explained that "management would come out of the woodwork" when surveys were being conducted or during times management knew state inspectors would be in the facility. During this time, Nurse Aide MN explained that Riverview would call in extra staff for overtime shifts, and overtime was readily approved. During non-survey periods, Nurse Aide MN reported that low staffing was a constant problem. She explained that each shift was always short staffed, and most of the time she was the only nurse aide at the facility during a night shift.

270.    HR Employee F also said that when inspectors and surveyors from the State were present at the facility, there would be an adequate number of staff members compared to other days. On "inspection" days, HR Employee F would make more of an effort to be on the floor, working directly with residents. HR Employee F would help pass food trays and check on the residents, receiving directions from others when something needed to be done.

d)    **Poor Care was Documented by State Surveyors and Known to ProMedica and PES**

271.    Even when the facility prepared for surveys and was staffed beyond the norm during non-survey shifts, the State Surveyors discovered general care deficiencies and contemporaneously documented these issues.

272.    Among other issues, Riverview had recurring and substantial problems and deficiencies on surveys concerning the following: (a) failure to create and follow individualized written care plans for each resident; (b) failure to meet the nutritional needs of their residents, which led to weight loss; (c) lack of showers; (d) in some cases, depriving residents of their

dignity and significantly reducing the residents' quality of life; and (e) failure to follow appropriate falls protocols to prevent resident falls.

273.    In a survey completed on April 23, 2018, Ohio health inspectors reviewed the medical records of a sample set of residents and discovered numerous problematic issues, including that facility staff members had failed to follow physician orders.

274.    Critically, the facility failed to create adequate and individualized resident care plans. And even when such care plans existed, the staff failed to ensure that these were followed. In some cases, this failure resulted in severe resident weight loss. For example, within a six-month span, Resident #65's weight dropped from 145 pounds to 126 pounds, reflecting an 8.9% weight loss. The weight loss was avoidable and was not a clinical goal. Although the resident's care plan required staff members to assist the resident as necessary when eating, staff members failed to meet the residents' needs

275.    Staff members failed to meet residents' needs under their care in such critical areas as feeding and ensuring that residents received adequate nutrition. For example, when questioned by Ohio state inspectors about a resident who needed assistance with eating, Staff Member #124 said, "we just set up [Resident #65's] tray and she could eat on her own." This was incorrect.

276.    Other staff members knew that Resident #65 required assistance with meals, conceding that Resident #65 was "too weak to feed herself."

277.    Riverview failed to follow physician orders with this resident because, contrary to this resident's care plan, which required assistance with eating, Riverview's task bar for this resident incorrectly indicated "set up only for meals." In other words, the task bar omitted the fact that staff members were also required to help Resident #65 eat her meals.

278.    As a result, staff members failed to regularly assist Resident #65 with eating, as required by her individualized care plan.

279.    Even when residents or family members complained, these concerns were ignored. Resident #65's son raised concerns on April 10, 2018, that his mother was not receiving help with meals or enough nutrition, but the issue remained unresolved.

280.    State inspectors observed that, even after 10 days of the son's complaints, no change had been made to the Resident #65's task bar, which still incorrectly reflected that the resident did not require assistance with eating.

281.    Compounding issues, Resident #65's dietician, when interviewed, erroneously believed that Resident #65 was able to feed herself and was unaware of Resident #65's son's complaint about his mother receiving neither assistance with meals nor enough nutrition.

282.    This resident's experience was a reoccurring problem at Riverview. When State Surveyors returned the next year, in May 2019, it was again discovered that another resident, Resident #77, lost 29 pounds over the span of three months. When surveyors requested documentation to review the resident's medical records, it was revealed that the facility did not maintain documentation of how much nutritional supplement Resident #77 had consumed over the requested time period.

283.    The facility also failed to develop and implement comprehensive individualized plans of care for residents, which was critical to ensure that residents received the skilled care that they needed on a day-to-day basis. For example, according to a state survey from October 2021, Resident #17 was admitted into the facility from a hospital after being treated for a cerebral vascular accident. The resident was identified as having impairment in their range of motion for the upper and lower extremities on one side.

284.    Accordingly, the hospital's discharge summary revealed that follow-up care was supposed to include a restorative range of motion program with the goal of improving the resident's ability to complete his own ADLs.

285.    Yet, after Resident #17 was admitted into the Riverview facility in April 2021, there was no evidence the facility implemented a restorative range of motion program between April 2021 and October 25, 2021, in accordance with the hospital discharge summary. Besides physical therapy for a few weeks from April 16, 2021, through June 24, 2021, there was no evidence that the resident's plan of care was revised after the therapy had been discontinued four months earlier.

286.    The MDS Coordinator confirmed to state inspectors that there was no evidence in the medical record that the resident's plan of care was revised to include range of motion once therapy was discontinued on June 24, 2021.

287.    The next year, state inspectors again discovered that the facility again failed to develop and implement a comprehensive plan of care to address residents' needs.

288.    Five months later, the problem still persisted. In March 2022, State Surveyors reviewed the medical records of Resident #56, whose plan of care dated January 22, 2022, and revealed that Resident #56 was at risk for behavioral symptoms related to psychosis and delusions. Resident #56 had delusions and verbal behaviors directed towards others and required extensive assistance from two staff members for ADLs, excluding for eating.

289.    According to Resident #56's plan of care dated January 22, 2022, interventions included observation for mental status/behavioral changes and "psychiatric referral as needed."

290.    Despite this plan of care being in place, even after multiple incidents of Resident #56 demonstrating aggressive behavior and agitation, the facility failed to ensure the resident

received the appropriate treatment and services to attain her highest practicable mental and psychological wellbeing.

291.    On January 23, 2022, the resident threatened to take her roommate's cup from her hands and throw it down the hallway and proceeded to go through her roommate's personal belongings. The resident then entered the hallway dressed only in her bra.

292.    A few days later, on January 26, 2022, Resident #56 was yelling, cursing, and tearing the electrical cords from the oxygen concentrator out of the wall; the resident was hallucinating. The same day, the resident threatened the housekeeper.

293.    On January 31, 2022, Resident #56 screamed at the facility's staff members and threw her lunch tray on the floor.

294.    On February 2, 2022, the resident attempted to go into another resident's room and later grabbed and cursed at a staff member.

295.    On February 3, 2022, the resident did not sleep and had been up all night yelling and cursing at the staff. She later stripped off all her clothes and refused to shut the door. She later hit the arm of a staff member and cursed at her.

296.    Despite these increasingly alarming incidents and the resident's plan of care directing a "psychiatric referral as needed," at no point did the Riverview facility refer Resident #56 to psychiatric or psychological services. State Surveyors reviewed the resident's medical records, and there was no evidence of any mental health professional referral or consultation.

297.    When the State Surveyors interviewed the Riverview facility's Licensed Social Worker and Director of Nursing (DON), both stated that the facility did not provide any psychiatric or psychological services at the moment.

298.    In an interview on March 1, 2022, the DON conceded that Resident #56 had behavioral problems, and the resident could benefit from psychiatric or psychological services.

299.    Besides the failures to develop and implement comprehensive care plans for residents, the Riverview facility also failed to assist residents with their ADLs, including personal hygiene and showers.

300.    In April 2019, State Surveyors concluded that the facility failed to provide Resident #77 with care and assistance with his ADLs. This resident's medical records reflected that, among other medical issues, Resident #77 suffered from Parkinson's disease and required extensive assistance of two staff members for bed mobility and transfer and required extensive assistance of one staff member for personal hygiene.

301.    According to Resident #77's plan of care dated February 4, 2019, the staff was required to assist the resident daily with hygiene, grooming, and dressing.

302.    The facility failed to provide regular and consistent showers for residents. The lack of showers was not an isolated occurrence; rather, the problem persisted throughout the facility. For example, according to a survey from October 2021, residents would go without a shower or bath for weeks even though clinical protocols indicate that residents should be showered several times a week.

303.    Resident #61 was admitted to the Riverview facility on September 10, 2021. When interviewed by State Surveyors on October 18, 2021, Resident #61 stated that he had not received a shower since being admitted to the facility – over five weeks ago. Resident #61's hair was greasy and unkempt.

304.    Resident #61's preference for ADLs revealed it was critical to choose between a tub bath, shower, bed bath, or sponge bath. The resident's task bar revealed that he was supposed to be showered on Monday, Wednesday, and Friday evenings.

305.    But when the surveyors reviewed Resident #61's shower documentation for September 2021, the records revealed no evidence that the resident received a shower and/or bed bath the entire month of September 2021.

306.    The surveyors similarly reviewed Resident #61's shower documentation for October 2021, which also revealed no evidence that the resident received a shower and/or bed bath on the scheduled days of October 4, 2021; October 8, 2021; October 11, 2021; and October 18, 2021.

307.    The facility also failed to provide Resident #48 with the required level of assistance with showering and/or bathing regularly. According to medical records, the resident required extensive physical assistance for personal hygiene, including from one person for bathing. The records revealed that Resident #48 was supposed to receive a shower on Mondays and Thursdays, and as needed on the day shift.

308.    That did not happen. When surveyors reviewed Resident #48's medical records for August 2021, September 2021, and October 2021, it revealed that the resident only received two total showers or baths for the month of August 2021; five total showers or baths for the month of September 2021; and two total showers or baths from October 1 to October 18, 2021.

309.    Resident #48 told surveyors the same. In an interview on October 18, 2021, Resident #48 revealed that the resident requested to be showered twice a week but only received one or two showers "here and there."

310.    The facility staff tried to shift blame for the lack of showers on Resident #48, stating to State Surveyors that Resident #48 would often refuse a shower or bath. Staff Member #420 and the Interim Director of Nursing told surveyors that, whenever Resident #48 refused a shower or bath, a staff member would document the refusal in the medical record.

311.    Yet when surveyors reviewed Resident #48's medical records, no such refusals were ever documented for the resident. On the contrary, the progress notes for the resident from August 1, 2021, through October 18, 2021, revealed no documentation of Resident #48 ever refusing a shower or bath.

312.    When confronted with this information, the DON could not explain why Resident #48 did not receive showers as scheduled or as requested.

e)    **Riverview Failed to Follow Appropriate Falls Protocols to Prevent Resident Falls**

313.    Due to (a) pervasive understaffing, (b) failure to follow appropriate clinical protocols, and (c) failure to develop and implement individualized care plans, during the relevant time period, residents at the Riverview facility routinely fell and, at times, suffered significant injuries that required emergency hospitalizations.

314.    Further compounding the issue, the facility also failed to maintain accurate medical records documenting such falls. For example, the April 2, 2018, MDS Assessment of Resident #23 was incorrect, erroneously stating that the resident had had no falls since being admitted into the facility.

315.    This was not true. In the preceding two months, Resident #23 had fallen twice. First, on February 9, 2018, the resident fell after she tried to walk to the restroom by herself without the assistance of a staff member. Second, on March 8, 2019, she fell again while trying to use the bathroom by herself, suffering an open wound to her left hand.

316.     Riverview's failure to develop a toileting plan for its residents further contributed to residents' falls. For example, the April 23, 2018, survey revealed that Resident #24 had no toileting plan, despite the resident's care plan calling for one. Three years later this issue persisted, because the State Surveyors for the October 25, 2021, survey uncovered that the facility failed to ensure Fall Risk Interventions were in place for Residents #24 and #54.

317.     Even when residents had proper care plans, due to pervasive understaffing, staff members did not follow these written care plans. For example, on March 19, 2018, Resident #93 fell, suffering lacerations on her head and a hip fracture because the facility failed to ensure that two staff members assisted the resident as required because she was a "two person assist."

318.     Such resident falls were a direct result of understaffing at the facility. According to the May 3, 2019, survey, another resident, Resident #50, had previously fallen on a prior occasion. Yet, on a later date, she fell once again, suffering an injury after she tried to get herself from her wheelchair to the restroom to use the toilet.

319.     When surveyors asked why she did not simply wait for assistance from staff members, Resident #50 responded that she in fact had requested assistance from staff members but had been waiting for a while. Even after telling staff members that she "needed to go badly," a staff member told her, "[W]ell, it will be a while. [We are all] busy."

320.     The lack of staffing and assistance with toileting remained unremedied. According to the March 11, 2021, survey, Resident #6 fell after receiving assistance from one staff member even though the Resident's MDS Assessment required two staff members to assist this particular resident.

321.     This particular fall resulted in Resident #6 suffering a fractured femur. The staff member, E.S., was questioned on why she chose to assist the resident without the help of another

staff member. E.S. replied that she believed what she was doing was correct because she had regularly observed other staff members assisting Resident #6 without a second staff member even though this resident was, according to the care plan, a two person assist.

322.    When surveyors returned approximately seven months later, it was again discovered that a separate resident, Resident #44, suffered a fractured arm on July 23, 2021, after falling. Yet, the facility's "fall list" incorrectly described Resident's #44 fall as one "without injury (or minor injury)."

323.    Riverview also failed to ensure fall risk interventions were in place and implemented for particular residents.

f)  **Specific Examples of False or Fraudulent Claims at Riverview**

324.    The following are examples of Medicare and/or Medicaid beneficiaries who received grossly substandard or nonexistent care, and/or care that otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA during the relevant period.

**Resident SQ**

325.    Her first admission to Riverview was from April 24, 2019, to May 29, 2019. During this time, Riverview (a) failed to provide care to ensure Resident SQ maintained adequate nutritional status, (b) failed to provide her the assistance she needed with hygiene and bathing, (c) failed to provide care and services necessary to prevent urinary tract infections, (d) failed to develop and implement a pain management program to address her pain, and (e) failed to implement basic fall prevention protocols to protect her from falling.

326.    Riverview failed to document her food intake for approximately 10% of her meals. To the extent that SQ's meal intake was recorded by Riverview during this stay, more

than half of the documented meals indicated her intake was 50% or less; further, in the first four weeks of her residence at Riverview, SQ's weight dropped from 136.2 pounds to 123 pounds without a clinical goal of weight loss. During this time, there were also multiple indications in the record that SQ needed more assistance with eating than the level of assistance Riverview was providing. On April 29, 2019, the dietician noted that SQ had decreased independence, and the May 8, 2019, MDS Assessment of SQ indicated she needed one-person physical assistance with eating, as opposed to the "set up help only" indicated on her earlier MDS Assessment. On May 18, 2019, SQ's medical provider also noted that she needed assistance with her meals. However, as SQ lost weight, her care plan interventions were not revised to address this weight loss, nor did Riverview change the level of assistance provided to her at meals; Riverview's documentation survey reports reveal that throughout the month of May, SQ received no assistance or set up help only for nearly 90% of her meals.

327.    From April 24 to May 29, 2019, Riverview provided many bed baths, but only one full bath and three showers to SQ, who was incontinent.

328.    Resident SQ was admitted to Riverview with an indwelling catheter and had recently been treated in the hospital for a bacterial urinary tract infection. Nevertheless, Riverview did not adequately develop and implement an individualized care plan to address her catheter care needs and to prevent future urinary tract infections. Consequently, lab results from an April 30, 2019 specimen indicated that SQ had acquired a Klebsiella Pneumoniae urinary tract infection. Shortly after this, lab results from a May 11, 2019 specimen reflected the presence of Acinetobacter Baumannii Multi Drug Resistant Organism and Vancomycin Resistant Enterococcus Faecium in her urine. Riverview did not create a care plan for her urinary tract infections until May 20, 2019.

329.     Physical therapy notes indicated that SQ was highly motivated to participate in therapy, but she experienced pain, which hindered her ability to make progress in therapy. For example, April 27, 2019, documentation indicated: "Response to Session Interventions: actively participates with skilled interventions and Compliant with adaptations. Complexities/Barriers Impacting Session: Pain levels." May 23, 2019, documentation also identified pain as a complexity/barrier impacting her therapy session. Despite the presence of pain and the impact it had on SQ, Riverview did not develop a pain management plan to address her pain.

330.     Riverview also failed to promptly implement basic fall prevention precautions, such as non-skid footwear, which contributed to SQ falling when she tried to get up from her wheelchair on May 8, 2019.

**Resident WK**

331.     Resident WK was a sixty-seven-year-old female. She was admitted to Riverview on April 1, 2019, for strengthening/rehabilitation after being hospitalized with a urinary tract infection, among other diagnoses. She remained a resident at Riverview at least until April 1, 2023. During this time, Riverview (a) failed to provide adequate hygiene care, (b) failed to develop and implement an adequate, individualized care plan to prevent urinary tract infections, (c) failed to timely treat a urinary tract infection, (d) failed to provide care and services to prevent injuries, and (e) failed to provide necessary care to prevent pressure injuries.

332.     Riverview's assessments of WK indicated she was frequently incontinent of bladder, and at times indicated she was also incontinent of bowel. The assessments also indicated that she was reliant upon Riverview for assistance with personal hygiene, bathing, toileting, and bed mobility. In May 2019, physical and occupational therapists recommended that WK receive

two-person assistance with bathing, dressing, toileting, and transfers, which is consistent with the MDS Assessments of WK.

333.    Despite WK's history of urinary tract infections and her dependence upon Riverview for assistance with ADLs, Riverview did not develop a specific, individualized care plan to address WK's risk of urinary tract infections. As a result, WK suffered multiple urinary tract infections during her residence at Riverview, including the following:

334.    On April 18, 2019, WK was admitted to the hospital with an Escherichia coli ESBL urinary tract infection. In the seventeen days preceding this, Riverview records indicated WK received only one shower/bath and no bed baths.

335.    Lab results from a specimen collected on October 3, 2019 revealed that WK had an Escherichia Coli urinary tract infection. Riverview documentation indicated WK had five bed baths from September 1, 2019, through October 3, 2019, and three showers between September 1, 2019, and September 12, 2019, but no full baths or showers after September 12, 2019. Additionally, Riverview did not administer treatment for this urinary tract infection until the evening of October 8, 2019.

336.    On February 7, 2020, WK was admitted to St. Mary's Hospital with urinary tract infection-related sepsis. The urine culture revealed ESBL Proteus and Escherichia Coli. Riverview documentation from January 1, 2020, through February 6, 2020, reflected that WK had several bed baths during that time, but no full baths and only one shower (on January 16, 2020).

337.    The March 31, 2023, lab results from a specimen collected on March 28, 2023, indicated WK had a Klebsiella Pneumoniae urinary tract infection. Riverview documentation

from March 1, 2023, through March 28, 2023, reflected that WK had eight bed baths during that time but no full baths or showers.

338.    The organisms present in all four of the above-mentioned urinary tract infections are commonly related to poor hygiene/infection control practices in a skilled nursing facility.

339.    Riverview did not provide the level of assistance WK needed with ADLs and did not develop and implement care plans to safeguard WK from injury in a timely manner. As a result, WK sustained numerous injuries at Riverview, including skin tears, abrasions, and fractures, some of which occurred during the provision of care.

340.    On February 4, 2020, WK sustained bilateral fractures of her distal femurs when she fell from bed while staff was providing care. A care plan related to the fractures was not created and initiated until February 25, 2020, even though this resident was admitted to Riverview in April 2019. Further, although the skin integrity care plan, as of February 5, 2020, included interventions of elevating heels while in bed and Prevalon boots while in bed, the TARs, progress notes, and ADLs flow sheets do not indicate that Riverview implemented these pressure-relieving interventions consistently, if at all, from February 5, 2020, to March 6, 2020.

**Resident PS**

341.    Resident PS was a seventy-year-old resident admitted to Riverview for rehabilitation due to a patella fracture. While at Riverview, staff (a) failed to provide the care and services necessary to protect her from falls and fall-related injuries and (b) failed to provide the necessary care and services to prevent and treat infections.

342.    While under Riverview's care, Resident PS suffered approximately 12falls from February 1, 2020, to December 4, 2021, and she was hospitalized from June 26, 2020, to July 11, 2020, for a fracture of her left humerus. She was hospitalized again from July 23, 2021, to July

28, 2021, when she reinjured her left arm. She suffered other injuries, including bruises and skin tears, from her falls. Additionally, Riverview staff failed to follow the physician's instructions for care of her fall-related injuries. Examples include the following:

- Staff failed to consistently apply a leg brace when she was initially admitted after the fracture of her patella.

- Staff did not consistently apply a splint to her arm after a fall on June 25, 2020, when she fractured her humerus.

- Staff did not consistently apply a splint to her arm after another fall on July 23, 2020, when she reinjured her left arm and required a long arm splint.

- There was no written, individualized care plan in the record addressing the physician-ordered brace and splints. Riverview staff also failed to provide PS with the necessary care to avoid numerous infections and failed to provide appropriate care to treat infections. For example, PS was diagnosed with 11 urinary tract infections while at Riverview, and she was sent to the emergency department on May 5, 2020, and June 21, 2022, with urinary tract infections. Yet, the care plans Riverview developed did not identify interventions to prevent infections of the urinary tract. The plans contained interventions to treat the infections after they developed.

343.    Due to the failures in assessment, monitoring, and interventions, the staff did not recognize that many of the behaviors that Resident PS demonstrated were symptomatic of infections of the urinary tract. She was sent to the hospital on June 18, 2020, when staff called Emergency Medical Services to transfer Resident PS to the hospital with "reports of violent behavior." The staff at the hospital recognized that Resident PS was "usually conversant and cooperative," that she had "a prior history of urinary tract infections," and that she had "lower

abdominal pain." She was tested and treated for a urinary tract infection and sent back to the facility four days later, on June 22, 2020.

344.    Riverview's failure to recognize some of the behavioral symptoms of a urinary tract infection as such resulted in the physician ordering a psychotropic medication. Riverview staff then failed to monitor the administration and possible side effects of this medication and failed to report them timely to the physician, causing PS to become obtunded (a dulled or reduced level of alertness or consciousness).

### IV.    IMPERIAL, VIRGINIA

345.    From at least January 1, 2017, to February 1, 2023, (a) due to pervasive understaffing exacerbated by the continued admission of residents without the ability to care for the residents in many cases, (b) failure to follow appropriate clinical protocols and (c) failure to develop and implement individualized care plans, which led to Imperial providing care that was grossly substandard, nonexistent, and/or otherwise failed to comply with the quality of care and/or quality of life requirements of the NHRA.

### a)    Imperial Aware of General Care Deficiencies

346.    Imperial was aware that there were serious problems with the care provided to residents. Among other issues, the facility had recurring and substantial problems concerning the following: (a) meeting the nutritional needs of their residents and assisting residents with eating, which led to preventable weight loss; (b) lack of showers and appropriate hygiene; (c) failure to create and follow individualized written care plans for each resident; (d) failure to administer medications as ordered; (e) failure to follow pressure ulcer protocols to avoid preventable wounds; and (f) depriving its residents of their dignity and significantly reducing the residents' quality of life. As a result, in some cases, the facility failed to treat residents with dignity and

respect and care for them in a manner and in an environment that promoted the enhancement of the quality of life.

347.    Notwithstanding this knowledge during the relevant time period, Imperial continued to provide care that was grossly substandard, nonexistent, and/or otherwise failed to comply with the quality of care and quality of care requirements in the NHRA.

b)    **Former Imperial Employees and Residents Identified Examples of the Poor Quality of Care and/or Quality of Life at Imperial during the relevant timeframe**

**Director M**

348.    Director M worked at Imperial as the Director of Activities from April 2019 to July 2020. A licensed nursing home administrator, Director M worked in the healthcare field for over 20 years in multiple nursing homes throughout her career.

349.    Based on her many years in the healthcare field, she described the Imperial facility located in Richmond, Virginia as the most understaffed facility at which she had ever worked.

350.    In her opinion, it was a "terrible place" where residents were not provided quality care. The facility was inadequately staffed, she said, and therefore residents would complain to Director M that the facility's nursing staff members were not responding to their requests for assistance.

351.    Director M often spoke to residents, who relayed to her that, despite pressing their call bell to request assistance, they would typically wait 30 minutes or even an hour for a staff member to finally arrive to help the resident. Director M said that this would happen "all the time."

352.    For example, a resident rang her bell, but because no one was answering it, Director M went down the hall to see what the problem was. The resident told Director M that

she needed help eating her breakfast because she could not see out of one eye due to recent eye surgery.

353.    Director M sought help for the resident by approaching CNA C, whose job description included assisting residents with eating. But CNA C refused to help the resident and stated that the resident should just use her other eye to eat.

354.    Pervasive understaffing also impacted the facility's ability to consistently shower residents. The facility had a policy where residents had to be showered at least twice a week, unless the resident refused.

355.    Due to understaffing, however, the facility did not abide by its own standards, and in some cases, residents would go for weeks without showers. Clinical protocols indicated that residents should be showered multiple times per week.

356.    Director M described one resident who had been at the facility for approximately two to three weeks and had complained to her because he could smell himself due to the stench coming from his body. The resident told Director M that he had never been inside the shower room throughout his entire stay at the facility. As a result, his head was itchy, and the resident "despaired," telling Director M that "I smell myself. I'm dirty. I need a bath. I need a shower."

357.    The lack of consistent showers was a significant problem among many residents at Imperial. Another resident was so desperate to be clean that when speaking with Director M, the resident said, "I'll beg for a shower. I'll cry for a shower." After Director M intervened on the resident's behalf, the facility finally showered the resident.

358.    But even after this resident was finally provided a shower, the staff members did not change the resident's dirty bedding.

359.    Director M described the lack of basic care, such as showers, as an "ongoing" issue throughout her tenure at the facility.

## Payroll Clerk S

360.    Payroll Clerk S worked at the Imperial facility for one year, from approximately 2018 through 2019. Payroll Clerk S, whose official duties did not include interaction with residents or medical care, was directed by the HR Director to regularly conduct "resident checks," during which time she was tasked with checking in on residents and checking the trash and water containers and reporting any beeping monitors. Payroll Clerk S ultimately decided to leave Imperial because she was forced to work directly with residents. She believed that she was misled in her employment interview because she was not told that she would have to work with residents and did not feel qualified to work with residents unsupervised based on her level of training.

## Friend of Resident OK

361.    Mr. K. was a close friend to Resident OK, who was admitted to the Imperial facility around November 2019. Mr. K typically visited Resident OK three times a week, and whenever he visited her, her adult diapers were soiled and never clean.

362.    Mr. K reported that the facility in general smelled like human waste, and Resident OK would smell like human feces during his visits.

363.    Resident OK was supposed to receive a shower twice a week—but showers normally happened once a month. Staff would come into the room at around midnight, when resident OK was asleep, and woke her up, stating it was time for her to shower.

364.    Because Resident OK did not want to be showered in the middle of the night, staff members would document this as if the resident had refused a shower. Had staff asked Resident

OK when she was fully awake and during normal hours, she would have readily accepted a shower.

365.    Because the Imperial facility failed to take care of Resident OK's daily needs, Mr. K would cut her nails and brush and floss her teeth.

366.    In the Spring of 2020, Resident OK started to develop bed sores and huge rashes on her back because the facility failed to regularly change her diaper and provide adequate hygiene care. She later developed a lesion on the lower half of her spine near her buttocks, and, at one point, was admitted to a nearby hospital and treated for rashes and a urinary tract infection.

367.    Around the Summer of 2020, the facility contacted Mr. K because Resident OK's wounds became so severe. She was then sent to a local wound clinic.

368.    At the first appointment at the wound clinic, Mr. K was shocked at the severity of the wounds on Resident OK. The diameter of the wounds was about three inches and went all the way down to the spine.

369.    It took around 18 months of the monthly treatments at a hospital to get Resident OK's wounds under control.

**Resident CC**

370.    Resident CC was a resident at the Imperial facility from approximately October 2021 through April 2022. She described her experience at the Imperial facility as "crap."

371.    Resident CC shared that the facility's "smell of feces would slap you in the face", and she therefore had to spray air freshener constantly because the odor was so offensive.

372.    The facility was always short on staff, which resulted in Resident CC and her fellow residents receiving medication several hours after the scheduled doses. It was common for

residents to miss doses of medication because staff were late passing out medicine. During certain shifts, residents did not receive any scheduled medication at all.

373.    According to Resident CC, when residents pressed their call bell for help, these alarms would stay on for hours before anyone would come check on the resident. And there sometimes would be no staff member at the nurse's station to answer the phone when a resident called.

**Family Friend of Resident LB**

374.    Resident LB was a resident of the Imperial facility from December 2020 through June 2021. She was unable to speak nor able to respond to stimuli. Before Resident LB was admitted to the Imperial facility, she did not have any pressure ulcers.

375.    Because family members were unable to visit the facility during the PHE, Ms. T, a medical professional and family friend of Resident LB, and Resident LB's daughters would call the Imperial facility almost daily to speak to staff members about how Resident LB was doing. At no point did the staff members convey that Resident LB had developed pressure ulcers.

376.    A few months into LB's admission, however, a State Surveyor called Resident LB's family to notify them that LB had developed a stage IV ulcer on her buttocks.

377.    Ms. T then called the facility and spoke with the charge nurse, who stated that Resident LB indeed had developed a stage IV ulcer while at the facility. Ms. T was furious because at no point in her prior conversations with the facility did they reveal that LB had developed such a severe pressure ulcer.

378.    While LB was at the facility, her weight dropped significantly, and she developed pressure ulcers. For example, from one month, she lost 10 pounds, a significant amount of

weight for a resident who weighed only 117 pounds and for whom there was no clinical weight loss plan.

379.    LB's family removed her from the Imperial facility and placed her in a hospice, after which she passed away.

c)  **Imperial Misled Surveyors and Knew that Care at the Facility was Grossly Substandard.**

380.    State inspectors did not have an accurate assessment of the facility's staffing, quality of life of residents, and quality of care because the facility increased staff during inspections.

381.    When State Surveyors were evaluating the nursing home, according to Director M, the facility had "tons of staff" working those particular days to ensure that "call bells were answered timely."

382.    During staff meetings, the facility's management would direct staff members to conduct "extra rounds" and ensure that "we were out on the floor" during the survey days. This was done "because you don't want the inspectors to find anything wrong."

383.    According to Director M, on days when the State Surveyors were present in the building, "We never had staffing issues. Everything ran perfectly." In contrast, when the survey ended, according to Director M, staffing levels "would go back to the normal poor care, poor staff, [and] poor treatment."

384.    Yet, even when the facility prepared for surveys and had a general sense of when surveyors would be visiting the facility, the State Surveyors discovered evidence of grossly substandard care and contemporaneously documented these issues.

d) **Imperial Failed to Implement the Individualized Resident Care Plans**

385.    The facility regularly failed to review, revise, and implement comprehensive care plans for residents.

386.    In July 2018, State Surveyors conducted an unannounced, abbreviated visit to Imperial based on a complaint. During the inspection, State Surveyors reviewed the medical record of Resident #1 and concluded that the facility failed to update Resident #1's care plan after he suffered a fall on June 23, 2018. Specifically, the surveyors reviewed the resident's medical record and observed that even though the resident's comprehensive care plan documented that the resident was prone to falls due to weakness, no adequate interventions were in place before the resident fell.

387.    State Surveyors interviewed the facility's staff members to inquire why the resident's care plan was not updated. When asked if she remembered updating the care plan, LPN #1 stated, "No there was a lot going on." Another nurse, RN #1, admitted that, after a resident's fall, "the nurse should update the care plan immediately," which failed to occur. The DON was also interviewed, and she admitted that the care plan was not updated, stating, "I couldn't find where we did that."

388.    When State Surveyors returned only a few months later, on December 20, 2018, it was again discovered that the facility failed to implement comprehensive care plans for residents. This time around, the issue impacted two of the four residents in the sample survey review.

389.    Resident #1's care plan, as modified by the resident's physician, called for oxygen at two liters per minute via nasal cannula. However, when State Surveyors observed Resident #1's level of oxygen on three separate occasions during the two-day survey, the rate of flow was

incorrect during every observation. When surveyors asked RN #1 if the facility was following the physician's directive since oxygen was set at the incorrect rate, the RN responded, "no."

390. During this particular December 2018 survey, State Surveyors also documented that the facility failed to implement the individualized care plan of Resident #2, who was diagnosed with, among other conditions, anxiety disorder, depression, Parkinson's disease, and emotional instability. The resident's care plan documented in part, "Focus! At risk for behavior symptom [related to] mood disorder," and that the resident was to be referred to psychiatry "as needed."

391. On August 8, 2018, Resident #2 had an altercation with another resident, which culminated with Resident #2 screaming at staff members, stating, in part, "If [another resident does not] get out of my room, I am going to come in there and fuck him up." In a Behavioral Symptom Assessment dated the same date, a staff member documented that Resident #2 exhibited "verbal aggression, agitation, irritability or hyperactivity, resistance to Activities of Daily Living, yelling/repetitive verbalizations, socially inappropriate disruptive behaviors, unrealistic demands, [and] unsafe impulsive behaviors."

392. A few days later, on August 13, 2018, a staff member documented that Resident #2 was an "immediate threat to others," having been found standing in the hall near resident room and being verbally aggressive toward his sister.

393. On October 8, October 29, and November 5, 2018, it was documented separately that the resident had called another resident inappropriate names, had displayed verbal aggression and socially disruptive behavior, and had used inappropriate language towards staff members, respectively.

394.    But when State Surveyors reviewed Resident #2's medical record, they discovered that Resident #2 had not been referred to a psychiatrist after July 14, 2018. When the State Surveyor asked why Resident #2 was not sent out for continued psychiatric services after the August 8, 2018, incident with another resident, the facility's representative responded that "she didn't know." Nor did the facility ever refer Resident #2 for psychiatric services after the August 13, October 8, October29, or November 5, 2018, incidents. Imperial's failure to implement the comprehensive care plan for residents was systematic. In an April 2021 survey, it was determined that the facility failed to develop or implement a comprehensive care plan for eight residents, or around one-third of the residents in the survey sample.

395.    For example, Resident #61's physician ordered that the resident receive oxygen at three liters continuously via nasal cannula every day and evening shift, because the resident was at risk for respiratory impairment and sleep apnea. State Surveyors, however, observed Resident #61 lying in bed receiving oxygen at the incorrect rate of flow.

396.    State Surveyors similarly documented that the facility failed to provide oxygen at the prescribed rate to Residents #3, #11, and #24.

397.    The facility also systematically failed to properly implement resident care plans concerning tracheostomy care. Specifically, Resident #25 was admitted into the facility on or about February 9, 2021, was coded as being "totally dependent on the assistance of staff members for all activities of daily living," and, per physician's order, was supposed to receive tracheostomy care every shift.

398.    That did not happen. Resident #25's clinical records revealed no evidence that the facility provided any tracheostomy care to the resident between February 9, 2021, and March 3,

2021—even though such care was ordered by Residents #25's physician during every shift (both day and evening).

399.    State Surveyors interviewed LPN #5, who admitted that, if a resident did not receive proper tracheostomy care, they were at a high risk of developing a respiratory infection.

400.    Even though a physician ordered that Resident #24 receive daily tracheostomy care, the facility failed to provide such care on April 12, 2021, April 13, 2021, and April 16, 2021.

401.    The facility also failed to provide proper respiratory care and services to Residents #44 and #35. Namely, Resident #44's tracheostomy mask, tubing, and humidifier bottle were all undated, meaning the staff did not know when the tubing needed to be changed.

402.    As for Resident #35, it was determined that the facility failed to provide respiratory services in a sanitary manner after State Surveyors observed Resident #35's tracheostomy collar mask hanging on a humidifier bottle of the machine, uncovered. Again, there was no date observed on the mask and mask tubing, all of which were inconsistent with Imperial's policy.

403.    The facility also failed to properly implement the care plan for Resident #67. Specifically, in Resident #67's comprehensive care plan, dated November 8, 2020, and updated April 1, 2021, revealed in part, that the resident was supposed to receive dialysis three times a week and was under a fluid restriction of 1500 milliliters per 24 hour period.

404.    Once again, the facility did not follow the residents' care plan. A review of Resident #67's MARs and TARs since February 17, 2021, revealed no evidence of any dialysis services, including fluid restriction. The LPN in charge of Resident #67's care stated that she believed the resident "sometimes" received dialysis (despite the lack of evidence in the medical

record), and, when asked if Resident #67 was on a fluid restriction, the LPN replied, "I thought so, but now I'm not so sure." An administrative staff member confirmed to the surveyors that there was no evidence that Resident #67's care plan for dialysis services was being followed.

405.    On the evening of July 2, 2020, the facility erroneously administered Resident #47 the same medication twice, resulting in a significant medication error and overdose. As a result, Resident #47 was transferred to a local hospital for evaluation and treatment, including the use of intravenous fluids and the administration of dextrose in the emergency room.

406.    When State Surveyors returned in February 2022, the issues had not been resolved. It was determined by State Surveyors, based on staff interviews, resident interviews, clinical record review, facility document review, and its investigation that the facility staff failed to develop and/or implement the comprehensive care plan for 7 of the 14 residents in the survey sample.

407.    For example, when it came to Resident #12, who was susceptible to pressure injuries, the facility staff failed to implement the comprehensive care plan concerning wound treatment. A review of Resident #12's medical record revealed a physician's order, dated December 7, 2021, which required the facility to "cleanse wound to sacrum with wound cleanser, pat dry, apply skin prep to area, apply calcium alginate and optifoam dress every 3 days and [as needed] every day shift every 3 day(s) for wound care." Yet, a review of Resident #12's treatment records revealed that the facility failed to carry out the physician's order 11 times between December 13, 2021, and February 20, 2022.

408.    The facility similarly failed to implement the comprehensive care plan concerning wound treatment for Resident #4. A review of Resident #4's medical records revealed a physician order, dated June 14, 2021, requiring the facility to apply hydrogel and puracol plus to

any open area, then cover the area with a dry protective dressing. This was to be changed every shift and if the dressing became soiled, wet, or removed, as needed for skin alteration. A review of the June 2021 MAR and TAR revealed that there was no documentation that this wound care was provided on a shift for June 17, 2021; June 18, 2021; June 19, 2021; June 20, 2021; June 24, 2021; and June 25, 2021.

409.     The facility also failed to provide consistent wound care for Resident #4's right foot, despite a physician's orders dated June 16, 2021; June 29, 2021; and July 14, 2021, requiring such care. A review of the June and July 2021 medical records revealed the facility failed to provide required treatments on June 17, 2021; June 18, 2021; June 19, 2021; June 20, 2021; June 24, 2021; June 29, 2021; July 4, 2021; July 11, 2021; July 16, 2021; July 18, 2021; July 21, 2021; and July 23, 2021.

410.     On February 23, 2022, State Surveyors interviewed Resident #11, who told them that, because there were times when the facility failed to apply cream on her open wound for days as her physician had directed, so she had to apply her own cream. She also disclosed that there were multiple times when she did not receive her medication.

411.     On February 23, 2022, State Surveyors interviewed another resident, Resident #2, who similarly stated that there were occasions when they did not receive their scheduled pain medications at all and other times when the medications were not given until the next shift. LPN #1 was interviewed by surveyors, and LPN #1 disclosed to surveyors that multiple residents have reported to him that they had not received their medications on February 13, 2022.

412.     Another resident, Resident #10, was admitted to the facility on September 29, 2021, with a diagnosis that included, but was not limited to, end stage renal disease. Resident #10's comprehensive care plan, dated November 1, 2021, documented, in part, "FOCUS: Renal

insufficiencies related to end stage renal disease. INTERVENTIONS: Peritoneal dialysis catheter and site care per physician orders." A physician order from September 29, 2021, mandated "Peritoneal dialysis site care. Cleanse area with normal saline and pat dry. Apply dry dressing daily as needed to maintain dry and infection free peritoneal dialysis insertion site."

413.    Despite Resident #10's comprehensive care plan requiring regular and consistent treatment concerning peritoneal dialysis site care, a review of Resident #10's TAR revealed that over a two-month span, 5of 31 treatments were missed in January 2021, and 10 out of 23 treatments were missed in February 2021. After surveyors interviewed staff members, the staff admitted that Resident #10's comprehensive care plan was not implemented due to these missing treatments.

**Imperial Failed to Follow Pressure Ulcer Protocols to Prevent Avoidable Pressure Wounds.**

414.    Due to pervasive understaffing, failure to follow appropriate clinical protocol, and failure to develop and implement individualized care plans during the relevant time period, staff members at the Imperial facility routinely failed to implement proper interventions for pressure ulcers.

415.    In a survey completed on December 5, 2019, State Surveyors determined that the facility failed to implement the comprehensive plan of care for several residents in the sample survey.

416.    For example, it was determined that, for Resident #2, the facility staff failed to provide preventative skin care routinely, in accordance with the resident's comprehensive plan of care. The resident was coded as being at risk for developing pressure ulcers. As such, Resident #2's comprehensive care plan stated the resident was "[a]t risk for alteration in skin integrity

related to impaired mobility…Administer treatment per physician orders…Provide preventative skin care routinely and as needed."

417.    But the facility failed to provide preventative skin care, in direct contradiction to the resident's comprehensive care plan. On December 3, 2019, when Virginia health inspectors observed staff members providing routine care to Resident #2, none of the staff members applied any preventative skin care product to the resident. A review of Resident #2's medical records for November and December 2019 failed to reveal any evidence of orders for skin protectant, barrier cream, or other preventative treatments for pressure ulcers.

418.    In fact, staff members were unaware that they were required to apply any skin protectant or barrier cream. During CNA #1's interview, she stated that Resident #2 was "always incontinent of bladder and bowel" and therefore had "to be changed pretty often." When asked if she applied any protectant or barrier cream to Resident #2, CNA #1 replied, "No, I didn't know I was supposed to."

419.    RN #1 was also interviewed. He admitted that, after reviewing Resident #2's medical record, the resident required "some kind of barrier cream, at least. She is always incontinent." Yet, when asked if he was aware that Resident #2's care plan called for routine preventive skin care, RN #1 stated that he was not. He also conceded that, at the very least, barrier cream should have been applied after each and every incontinent episode, stating that he would get an order for the barrier cream immediately.

420.    Imperial's failure with Resident #2, however, was not an isolated incident. During the same survey completed on December 5, 2019, Virginia State Surveyors also discovered that the facility failed to administer preventive skin care and treatment for pressure ulcers to Resident

#4. On an assessment dated November 22, 2019, this particular resident was coded as being at risk for developing pressure ulcers and as having one unstageable pressure ulcer.

421.    The resident's comprehensive care plan from October 23, 2019, directed staff members to "[a]pply Hydrogel Gel to buttocks topically every evening shift for wound care. Cleanse affected area of buttocks with normal saline, apply hydrogel and cover with foam dressing daily."

422.    Yet, a review of Resident #4's medical record revealed blank entries on October 25, 2019; October 27, 2019; and October 31, 2019, concerning the application of hydrogel and covering the wound with foam dressing daily.

423.    Moreover, as for the application of barrier cream treatment after every incontinent episode every day and evening shift, there were blank entries for five days shifts in October 2019 and blank entries for eight evening shifts during the same month.

424.    Over time, Resident #4's wound became progressively worse due to the lack of appropriate care. By November 28, 2019, the wound had festered into a "Sacral wound measuring 6.5 (centimeters) X 3.0 (cm) X 0.2 (cm). Wound bed is 95% yellow slough and black excha [dead tissue that forms over healthy skin] with purulent (contains pus) mild drainage and foul odor."

425.    During the State Surveyor's interview of LPN #3, she stated, "We document everything on the electronic health record software," and when asked what a blank entry for a TAR meant, the LPN responded, "If it's not documented, it was not given. Everyone knows that. If you do it, you document it."

426.    State Surveyors returned the next month, completing a survey on January 23, 2020. During this inspection, it was determined that Imperial staff failed to provide care and

services in a manner to prevent infection and promote healing of pressure injuries for two of eleven residents in the survey sample. Specifically, the facility failed to implement treatment after identifying that Resident #107 suffered from a pressure injury, and facility staff failed to clean scissors used during Resident #106's pressure injury wound care.

427.    In a survey completed on April 23, 2021, State Surveyors determined that Imperial failed to review and revise Resident #44's comprehensive care plan to address a worsened pressure ulcer. Around January 2021, Resident #44 was coded as having one unstageable pressure ulcer. Over several months, the pressure injury grew in size and severity. In a progress report dated March 3, 2021, a staff member documented that there was "copious amount of purulent foul odor present, peri wound is discolored."

428.    On April 21, 2021, State Surveyors observed Resident #44's wound: it was open, moist with a moderate amount of serosanguineous drainage, and by then had evolved into a stage IV pressure ulcer—the most severe kind of pressure ulcer. This meant that the pressure ulcer had become so deep that there was damage to the muscle and bone, and sometimes to tendons and joints.

429.    Despite the resident's wound growing in size and severity, there was no change in the level of care provided by Imperial. A review of Resident #44's care plan failed to reveal any revisions or updates since January 29, 2021.

430.    On April 22, 2021, State Surveyors interviewed LPN #8, who admitted that care plans should be revised and updated when a treatment was changed or there was a change on condition. LPN #8 then stated that a worsened pressure ulcer should require a review of the care plan to ensure that all appropriate interventions were in place to promote wound healing.

431.    Finally, in a survey completed on February 25, 2022, State Surveyors determined that the facility failed to provide care and services to prevent and treat pressure injuries for 3 of 14 residents in the sample survey.

432.    As previously discussed above, the facility failed to evidence that wound tracking, monitoring, and treatment evaluation was provided and that physician ordered treatment was provided to Resident #12.

433.    For Resident #4, a review of medical records and interview of the LPN evidenced that, sporadically, wound care was not provided.

434.    It was also determined that the facility failed to provide treatment and services to promote healing of a pressure ulcer for Resident #11. The resident's care plan required treatment be administered, including an instruction to staff members to clean "open area to left buttocks, pat dry, apply skin prep to peri wound, apply Silva sorb gel apply gauze affix with island dressing [twice a day and as needed] until healed. [Do so e]very evening shift and night shift for wound care."

435.    Yet, upon review of the electronic TAR of Resident #11 from February 1, 2022, through February 28, 2022, there were sixteen instances where the facility failed to provide the foregoing treatment.

436.    On February 24, 2022, an administrative staff member was interviewed by State Surveyors, and the staff member revealed that there was no wound program and no wound nurse at the facility.

e)  **Imperial Failed to Provide Showers to Residents in Violation of the Requirement to Provide Proper Hygiene to Residents.**

437.    Due to pervasive understaffing and inadequate training, Imperial also failed to consistently provide residents with regular showers.

438.     Specifically, surveyors interviewed Resident #7, who was coded as being dependent upon one staff member for bathing. When interviewed by surveyors on July 16, 2019, at 2:20 p.m., Resident #7 said that she did not receive two showers a week. When the surveyor asked why she does not receive regular showers, Resident #7 responded, "[The staff] always say they don't have enough staff."

439.     As a result of the interview with Resident #7, surveyors requested documentation of Resident #7's showers for the past three months on July 17, 2019. A few hours later, a manager presented three sheets of paper that indicated the following:

- 5/7/19 – Resident refused shower;

- 5/8/19 – Resident refused shower;

- 6/7/19 – nothing documented other than a check mark next to abnormal skin;

- 6/14/19 – a check mark next to abnormal skin;

- 7/2/19 – nothing was marked on the sheet.

440.     The manager was then asked again to provide further documentation concerning Resident #7's showers, but she confirmed she had no documentation in the computer program concerning showers and no more shower sheets to present. In other words, aside from the dates of May 7, 2019, and May 8, 2019, the facility had no documentation that Resident #7 was offered or refused a shower for a three month time period.

441.     Pervasive understaffing in 2022 led to the same result related to resident hygiene at Imperial. When State Surveyors returned in February 2022, they interviewed Resident #2, who told surveyors that she had met with staff recently and expressed her desire to receive showers.

442.     Resident #2's comprehensive care plan documented in part that, due to her paraplegia, the resident required assistance with taking showers as needed.

443.    Despite her requests, she did not receive showers. Resident #2 told State Surveyors that, after she complained to staff members about not receiving showers, they responded "that they do not have enough time to take her to the shower because they are understaffed." Surveyors reviewed Resident #2's medical record and determined that the record failed to provide documentation of the resident receiving a bed bath or shower on multiple dates over the prior several months. The lack of showers was a direct result of the lack of staffing at the Imperial facility.

444.    For the February 2022 State Survey, CNA #2 was interviewed. CNA #2 admitted that they had worked "a unit as the only CNA before and had [to] continuously [go] from one end of the unit to the other end providing incontinence care." CNA #2 stated that, although two CNAs typically worked the evening shift on weekends, many times someone "did not show up to work," and, as a result, CNA #2 would have to cover an entire unit alone.

445.    The lack of showers at Imperial was an ongoing hygiene and quality of life problem. Resident #11's comprehensive care plan documented, in part, that the resident required assistance with bathing/showering due to paraplegia. On February 23, 2022, surveyors interviewed Resident #11, who stated that—even though she was scheduled to receive showers on Saturday—she never received these because the "CNAs told [the residents] they were assigned too many residents and did not have time to do it." Resident #11 told surveyors that she did not think it was fair that she did not receive showers because of staffing. Resident #11's medical record corroborated her account that she did not receive regular showers.

446.    The next month, in March 2022, surveyors returned to the facility, and the issue persisted. Resident #43 was observed with "visible dandruff flakes and crusty patches on scalp, a

noticeable body odor, dry and cracked areas on the lips with visible film in the corners of the mouth and white filmy substance on the fold areas under their neck."

447.    When surveyors asked if Resident #43's hair was washed, Temporary Nursing Aide ("TNA") #10 admitted that they did not shampoo Resident #43's hair because they were not trained to do this. When asked if Resident #43's hair was washed on shower days, TNA #10 stated they did not take Resident #43 to the shower because they were not trained how to use the shower chair or shower stretcher. TNA #10 stated that they knew that Resident #43's family wanted the resident to have showers, but TNA #10 stated they could only do what they were trained to do.

f)    **Imperial Failed to Have a Sufficient Number and Skill Level of Staff.**

448.    The facility also failed to ensure its staff members were adequately trained to discharge their duties at the facility and care for vulnerable elderly residents. In the survey completed by State Surveyors on March 30, 2022, it was determined that the facility failed to provide annual mandatory training for all five CNAs in the sample survey. All five of the CNAs lacked dementia training; two of the five lacked abuse training; and one of the five had no performance evaluation.

449.    On March 29, 2022, State Surveyors interviewed the HR Director, who confirmed that CNA #1 lacked an evaluation and CNAs #1, #6, #7, #8, and #9 did not complete their mandatory training.

450.    In a survey completed on March 30, 2022, State Surveyors determined—based on personal observation, interviews with staff, facility document review, and in the course of a complaint investigation—that the facility failed to ensure all six TNAs in the sample survey possessed the skills and competencies to provide basic ADL care for residents.

451.    On March 29, 2022, State Surveyors observed a TNA providing ADL care to a resident. The TNA told inspectors that they were never trained to use the shower stretcher or shower chair. The TNA also told inspectors that they were never trained in how to use mouth swabs to provide oral care to residents. The TNA told inspectors that they did the best that they could with the training they had received.

452.    State Surveyors then requested the procedure and policy for TNA training and skills competencies. The HR Director provided a blank copy of a document called "Temporary Nurse Aide Skills Competency Checklist," stating that completion of the checklist was part of a "new process."

453.    Yet the Human Resource Director did not have a completed checklist for any of the six sampled TNAs above, admitting that they had realized the day before that they did not have the completed documentation, so they just started working "to catch up on these."

454.    TNA #13 stated that they had been at the facility for around a month and a half. TNA #13 confirmed that TNAs received only two days of training with a CNA and then were on their own for resident assignments. On some days, only TNAs—without any CNAs—were working on the unit, and, on other days, TNA #13 worked the unit with a brand-new TNA alone. TNA #13 stated that she had a hard time completing her tasks for her residents because the new TNA required training to complete their own resident assignments. According to TNA #13, some of the new TNAs did not even know how to use a bedpan after two days of training, and she had to teach them.

455.    TNA #13 said the facility "allowed wiggle room" with staff arriving for work because staff members rode the bus. As a result, sometimes TNA #13 would be the only aide on the floor until the other staff members arrived. She also said that "no one enforced staff arriving

at 7:00 a.m. as scheduled because they were so grateful that someone showed up at all." TNA #13 said that staff had not improved since she had been working there and that the facility was only hiring TNAs.

g) **Specific Examples of False or Fraudulent Claims at Imperial.**

456.    The following are examples of Medicare and/or Medicaid beneficiaries who received grossly substandard or nonexistent care, and/or care that otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA during the relevant period.

457.    **Resident LB**, a sixty-nine-year-old female, was a resident of Imperial from December 3, 2020, to June 18, 2021. She was admitted to Imperial with a feeding tube and a tracheostomy and had ananoxic brain injury in her medical history. While Resident LB was a resident at Imperial, Imperial failed to provide necessary care and services to prevent and treat pressure injury, failed to protect Resident LB from injuries, failed to provide appropriate care for contractures, and failed to provide appropriate care and services to prevent and treat infections.

458.    Although Imperial assessed Resident LB as being at "very high risk" for the development of pressure injuries when she was admitted to the facility, Imperial's initial care plan to prevent pressure injuries, developed on December 3, 2020, did not contain a plan to turn her every two hours to offload pressure and prevent pressure injuries from developing. Similarly, in the care plan Imperial developed on January 29, 2021, to address a "Stage IV pressure ulcer to the sacrum related to immobility," the intervention to offload pressure was to "[e]ncourage and assist as needed to turn and reposition; use assistive devices as needed." A subsequent care plan developed on April 21, 2021, called for "repositioning during ADLs." No care plans were developed with both a turning schedule and the type of assistance needed.

106

459.    Despite the fact that all MDS Assessments documented that Resident LB was totally dependent and required a two-person physical assist, aides documented that they were moving, turning, or repositioning Resident LB with only one aide providing physical assistance. The failure to adequately and appropriately assist Resident LB with two staff members to offload pressure resulted in pressure injuries, caused them to worsen, and caused LB to sustain other injuries including a "severe detachment" of her fingernail, abrasions on both inner thighs, reddened ear and open areas on her neck.

460.    Imperial failed to provide LB with adequate infection control and adequate tracheostomy monitoring and care, causing her to suffer multiple and ongoing respiratory infections and placing other residents at risk for developing infections. Examples of these failures include, but are not limited to, the following:

- On December 19, 2020, a lab test of the sputum for culture and sensitivity ("C&S") reported an abnormal lower respiratory culture; the organisms isolated were e-coli and proteus mirabilis. There was an unexplained delay in the administration of antibiotics to treat this infection. Antibiotics were only started after six days, on December 25, 2020. Droplet precautions were not ordered until seven days later.

- On February 21, 2021, a sputum specimen was sent to the laboratory. The lab deemed this specimen to be "poor quality and unacceptable for routine bacterial culture."

- On April 12, 2021, a request for a sputum culture and sensitivity was sent to the laboratory. The lab documented that the test was not performed because there was "no bacterial transport swab received."

- On April 16, 2021, an "upper respiratory culture" sent to the lab had "Pseudomonas aeruginosa – heavy growth."

- Documentation for droplet precautions on the Administration Report Record was sporadic. Documentation in the progress notes for respiratory/droplet precautions were erroneously documented as both being in place and not being in place, sometimes on the same day. Similarly, from February 6, 2021, to February 12, 2021, there is inconsistent, erratic documentation describing whether or not Resident LB was in "Airborne Respiratory Isolation."

- On February 9, 2021, a radiology report disclosed pneumonia, and by February 19, 2021, an additional radiology report revealed that the left lung infiltrates were worse. On March 4, 2021, x-rays found diffuse bilateral infiltrates of both lungs. A physician's progress note recorded that the pneumonia was ongoing on March 24, 2021. A Care Plan for Airborne Isolation Precaution was developed to include the period of April 20, 2021, to April 30, 2021. Again, documentation for "Airborne Respiratory Isolation" was erroneously documented as both being in place and not being in place, sometimes on the same day.

- On April 28, 2021, a care plan was developed to address "Infection of Pneumonia" suggesting that Resident LB had either a new infection or a continuing infection.

- On June 14, 2021, a radiology examination reported "Mild left lower lobe pneumonia vs atelectasis." There is no evidence that Resident LB was in isolation of any type from June 14, 2021, until her discharge home on June 18, 2021.

461.    LB was assessed by occupational therapists shortly after her admission to Imperial, and on December 17, 2020, occupational therapists indicated she should wear splinting devices "at all times except bathing and exercises." Yet, a care plan for the splints was not

developed until April 28, 2021, and there are multiple notes in the record about nurses not utilizing the splinting devices correctly.

462.     On April 21, 2021, State Surveyors found that the facility had not provided Resident LB with the care she needed, citing the following Federal Tags:

- F695 - Provide safe and appropriate care for a resident when needed;

- F842 - Safeguard resident-identifiable information and/or maintain medical records on each resident that are in accordance with accepted professional standards;

- F656 - Develop and implement a complete care plan that meets all the resident's needs, with timetables and actions that can be measured;

- F657 - Develop the complete care plan within 7 days of the comprehensive assessment; and prepared, reviewed, and revised by a team of health professionals;

- F686 - Provide appropriate pressure ulcer care and prevent new ulcers from developing;

- F695 - Provide safe and appropriate respiratory care for a resident when needed;

- F842 - Safeguard resident-identifiable information and/or maintain medical records on each resident that are in accordance with accepted professional standards.

463.     **Resident BF**, a seventy-three-year-old female, was a resident of Imperial from November 21, 2020, to December 8, 2020. While she was a resident at Imperial, the facility (a) failed to timely administer insulin to meet her diabetic care needs, (b) failed to follow physician's orders, (c) failed to provide care and services to prevent falls, (d) failed to provide adequate hygiene care, and (e) failed to timely and appropriately respond to a change in her condition.

464.     At times, Imperial administered Resident BF's insulin an hour or more after it was due. For example, the 4:30 p.m. doses were administered late on November 24, 2020, November 26, 2020, and November 28, 2020. Similarly, Imperial also failed to coordinate with Resident BF's physician to ensure that Resident BF's medication administration schedule did not conflict with her dialysis schedule, and as a result, BF missed doses of one or more medications (including Xifaxan, Humalog, Metformin, Pantoprazole Sodium, Midodrine HCl, and Lactulose) on November 25, 2020; November 26, 2020; December 1, 2020; December 3, 2020; December 5, 2020; and December 8, 2020.

465.     Although Resident BF was known to be at risk for falls and was occasionally incontinent, Imperial's care plan to address her fall risk was not individualized to meet her care needs, in part because it did not include interventions related to toileting or scheduled toileting. As a result of Imperial's failure to develop and implement an individualized care plan to address her fall risk, BF sustained at least one avoidable fall.

466.     According to Imperial's documentation, Resident BF did not receive a full shower or bath during her entire stay at Imperial, only receiving bed baths on November 25, 2020; November 28, 2020; December 2, 2020; and December 5, 2020.

467.     Documentation also revealed that Imperial failed to timely and appropriately respond to a significant change in BF's condition. A progress note dated December 8, 2020, at 6:48 a.m. documented, "Resident out to dialysis around 6:00, resident c/o sob, 02 sat 94-97% on [room] air, 02 sat 98% with 02 at 2 LNC, vs 124/66, 78, 18, denies pain, 02 applied per transport request in case she needed later, Dialysis nurse call, stated send resident to Memorial Regional…" A subsequent note, dated December 8, 2020, at 10:10 a.m. indicated, "writer attempted to speak with [responsible party], she was crying and yelling, then stated 'what are

110

you talking about? My mother is in ICU right now, [I] have another call [I] have to go.'" In relation to this incident, during a December 18, 2020, survey, Imperial was issued a deficiency for failure to notify and consult with Resident BF's physician concerning their initiating oxygen therapy prior to her transport to dialysis appointment on December 8, 2020. According to the survey findings, during an interview with the transportation service van driver, when the driver picked up Resident BF on December 8, 2020 for her scheduled appointment, the driver could tell that something was not right. The driver stated that Resident BF was moaning and groaning and only answering by saying "uh-huh" or "yeah." The driver stated that he alerted the nurse and asked for vital signs to be taken. The driver stated that the nurse assessed Resident BF, recorded the vital signs on paper, and then put Resident BF on oxygen at 2 liters for transport to her appointment.

468.    **Resident KJ**, a fifty-nine-year-old male, was a resident of Imperial from February 9, 2021, to December 31, 2022. Resident KJ was admitted to Imperial with a foley catheter, a feeding tube, and a tracheostomy. He had cracked heels and impaired range of motion on both sides in his upper and lower extremities. During the time KJ was a resident at Imperial, Imperial (a) failed to provide necessary foley catheter care, hygiene care, and infection prevention, resulting in multiple infections; (b) failed to provide appropriate contracture care; (c) failed to provide necessary care to prevent and treat pressure injuries; and (d) failed to provide necessary care for his tracheostomy.

469.    Although KJ had a foley catheter upon his admission to Imperial, Imperial did not develop a care plan for catheter care until April 22, 2021, the day after State Surveyors alerted Imperial's Administrator, DON, a quality consultant, and others at the facility regarding the absence of such a care plan. Additionally, TARs reflect catheter care was not consistently and

regularly performed as necessary. Compounding matters, Imperial did not provide KJ with adequate personal hygiene care or bathing. KJ was diagnosed with a urinary tract infection on multiple occasions during his residency, including but not necessarily limited to September 2021, January 2022, February 2022, April 2022, May 2022, and October 2022. Further, he was hospitalized on September 23, 2021, with urinary tract infection-related sepsis. He was again hospitalized on February 16, 2022, for acute renal failure, sepsis, acute cystitis, hyperglycemia and metabolic acidosis.

470.    Similarly, although KJ had impaired range of motion in both sides of his upper and lower extremities upon admission to Imperial, Imperial did not develop a care plan to address his contractures until April 22, 2021.

471.    Imperial also failed to timely develop a care plan and failed to provide appropriate treatment to address KJ's cracked heels, which were present upon his February 9, 2021, admission. By February 10, 2021, Imperial documentation indicates that he had multiple pressure areas on his feet, including an open area on his left heel, but Imperial did not develop a care plan to address pressure relief to his heels until February 22, 2021. TARs reflected multiple missed treatments to the left heel from February 2021 through April 2021. The left heel pressure injury continued to deteriorate for a period of time before it began to heal gradually. It finally resolved in June 2021.

472.    Additionally, Imperial did not timely develop and implement an individualized care plan and did not provide the necessary care to address KJ's tracheostomy, which was present upon his admission. The February 2021 care plans that addressed his tracheostomy simply stated, "trach care per protocol", and, on March 2, 2021, Imperial charted tracheostomy care "as ordered", although there was no order for tracheostomy care until March 4, 2021.

Resident KJ's TARs indicated that tracheostomy care was not consistently provided as necessary, and on August 25, 2021, it was discovered that KJ's tracheostomy was out, and Imperial staff were unable to reinsert it. KJ was sent to the hospital, where the otolaryngologist's assessment of the area indicated: "Stoma is healed and tracheostomy tube is out… Appears tracheostomy tube has been out for some time as the entire stoma is healed closed and attempt to dilate and open, failed[.]"

473.    **Resident HT** was seventy years old when she was admitted to Imperial on June 4, 2018, after falling in an assisted living facility. According to records provided by Imperial, she remained a resident at Imperial until at least January 10, 2023. During Resident HT's stay at Imperial, Imperial (a) failed to provide services of professional quality, (b) failed to ensure that Resident HT was free from significant medication errors, (c) failed to maintain her health record according to acceptable professional standards, (d) failed to protect her from falls, (e) failed to address her toileting needs, (f) failed to provide adequate hygiene and (g) failed to provide her with an adequate infection control program.

474.    On the evening of July 2, 2020, Resident HT received double doses of her medications when her care was assigned to two nurses, an LPN and an RN. After the LPN administered the evening medications, the LPN failed to sign the Medication Administration Record Report for administration of the following medications: Valproic Acid 625mg, Ziprasidone 40mg, Humalog 4 units (total 8 units) for a BS of 180, Humalog 75/25 (50 units), Metformin ER PO 500mg, Melatonin 1m PO, Losartan 100mg, Gabapentin 600mg, Zyrtec 5mg and Atorvastatin 10mg PO. The RN then proceeded to administer the same medications. This error prompted Resident HT to be sent to the hospital, where she was admitted for monitoring. While in the hospital, she experienced a drop in her blood pressure, a drop in her blood sugar,

and a change in her level of consciousness. She was discharged two days later, on July 4, 2020, when she reached her baseline. It is notable that, while there are four instances of nurses documenting in the progress notes on July 2, 2020, the nurses failed to document the error, the response, and the fact that Resident HT was transferred to the hospital.

475. During her residence at Imperial, Resident HT fell in excess of 35 times. All falls are required to be assessed in order to identify common causes of the resident's falls and develop interventions relative to the cause of the falls. Those interventions are then to be implemented and assessed for effectiveness. Information from the falls was not analyzed to develop individualized interventions reflective of her needs and her changing functional and cognitive abilities. The interventions' ineffectiveness was not identified and altered in the care plan. At times, the interventions were not implemented. An often repeated intervention for Resident HT was to use the call bell for assistance. Resident HT is at times described as "confused" and "forgetful," so staff could not reasonably expect her to consistently remember to use the call bell. Additionally, Imperial was cited twice (in July 2019 and March 2022) for failing to have the call lights in reach during HT's stay. HT experienced failures to answer the call bell, and when asked by staff why she didn't use the call bell for help, she responded, "I didn't think anybody would [come help]."

476. Imperial also did not provide Resident HT with adequate hygiene care. By way of example and without limiting the generality of the foregoing, from May 2020 to December 2020, Resident HT received fewer than fifteen full baths or showers; for the entire year of 2021, she received fewer than thirty full baths or showers. Additionally, Imperial did not develop and implement adequate and appropriate infection prevention care plans for Resident HT, and Imperial documentation does not support whether consistent isolation precautions were in place,

which placed other residents in the facility at risk. Before and during the PHE, the facility was cited four times with Federal Tag 880 for failing to implement infection control policies (July 2019, August 2020, April 2021, and February 2022). While HT was a resident at Imperial, she experienced ten urinary tract infections, COVID-19, yeast infections under her breasts and abdominal folds, and bilateral eye infections.

### V.    POTTSTOWN, PENNSLVANIA

#### a)    Pottstown was Aware of General Care Deficiencies

477.    During the relevant time period, Pottstown was aware of serious problems with the care it provided to its residents. Among other issues, the facility had recurring and substantial problems concerning the following: (a) lack of showers and appropriate hygiene; (b) failure to follow infection and wound care protocols; (c) failure to provide needed psychiatric care; (d) failure to create and follow individualized written care plans for each resident; (e) depriving residents of their dignity and significantly reducing the residents' quality of life; and (f) failure to follow appropriate resident-fall protocols. As a result, in some cases, the facility failed to treat residents with dignity and respect and to care for them in a manner and in an environment that promoted the enhancement of quality of life.

478.    Notwithstanding this knowledge during the relevant period, the facility continued to provide care that was grossly substandard or nonexistent and/or otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA.

#### b)    Former Pottstown Employees Corroborate Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care.

#### Relator James Bonner

479.    HCR ManorCare employed Relator James Bonner from March 2015 through February 2017 as the HR Director for ManorCare Health Services-Pottstown.

480.    Mr. Bonner observed specific instances where residents who were Medicare beneficiaries received grossly substandard or nonexistent care. For example, he witnessed staff members refuse to help residents get out of bed, get dressed, or get transported to an activity, despite the residents' wishes.

481.    He also witnessed staff members ignore resident call bells because the facility was short-staffed. As a result, residents would often cry for help. But because no staff members were available or willing to assist, the residents ultimately soiled themselves.

482.    For example, residents reported to Mr. Bonner that they were often left sitting for hours in their own urine or feces, and he observed residents sitting in their own waste for hours without being attended to.

483.    Staff members further reported to Mr. Bonner that they were so understaffed that they could not weigh residents, even though taking weights was necessary to ensure that the correct medical services were provided, including the correct amount of medication and appropriate intervention for low weight when necessary.

484.    Although residents were not weighed, staff members admitted to Mr. Bonner that they were falsely marking weight measurements in the chart as completed.

485.    Despite the facility being woefully understaffed, the facility and its management continued to accept new residents in order to increase its reimbursement and profit. Moreover, the Administrator had to abide by a daily budget of 2.7 HPPD. If Pottstown exceeded that number and approached 3.0 for a particular day, the Administrator would become frantic and request that Mr. Bonner remove a staff member from the work schedule.

486.    In 2017, Mr. Bonner received a report from a nurse's aide that the DON was falsely charting for services that she did not provide to residents.

487.    Moreover, the facility routinely failed to provide showers, despite charting in the MDS Assessments that this ADL was provided. For example, one resident told Mr. Bonner that "I have not seen water in a week."

488.    Another resident's tracheostomy tube should have been cleaned daily. One staff member noted that a resident with a tracheotomy tube had not been changed in days, despite documentation falsely reflecting that it had been changed. The tube was crusted over and filled with mucus.

489.    Mr. Bonner was directed by the facility's Administrator to review Medicine Administration Records (MARs) and TARs. He was told to track down the staff member responsible and have them sign off on blank entries. Nurses admitted to Bonner that they never completed the treatment when they were asked to sign off on these entries.

490.    One employee grew frustrated after Mr. Bonner asked her to sign, stating "It doesn't matter any way," because another employee would sign off for them.

491.    Falls were also a pervasive issue at the facility. Mr. Bonner heard about this every day during the morning Department Head meetings at 8:30 a.m.

492.    Even as the HR Director, Mr. Bonner would answer call bells to help out the staff. He did so daily because he wanted to help residents and thus answered non-clinical call bells when needed.

493.    He personally heard conversations between the Pottstown Administrator and DON about increasing resident admissions. The DON was concerned that the facility could not handle new admissions, but the Administrator responded that they had to increase revenue, stating, "We can make it work" or that "we will deal with it."

494.    When state surveys were ongoing, Pottstown would call in extra staff to give the impression that staff to resident ratios were appropriate.

495.    Mr. Bonner had a conversation with a colleague, who told him that her Department Head instructed her to input missed charting prior to a state survey.

**Unit Manager L**

496.    Unit Manager L worked at the facility for approximately three months as a Unit Manager in late 2016, during which time she was the immediate supervisor for RNs and CNAs right below the DON. She typically worked on the second floor, which would generally have thirty residents. According to her, the facility was "absolutely" understaffed.

497.    On some days, there would only be one RN and one CNA working under her during a shift when she would need two RNs and three CNAs. More staff members were required because, for some residents who were unable to ambulate on their own, two staff members were needed to operate the lift that would get the resident out of bed.

498.    On days when the facility was short-staffed, Unit Manager L recalled that resident needs, including using the restroom, could not be met when these should have been met. In other words, many residents relied upon a lift (use of which required adequate staffing) to use the restroom.

499.    When it came to meals, some residents were forced to eat cold meals because there were not enough staff members to help feed them.

500.    Moreover, although residents were expected to receive at least two showers a week, due to understaffing, the staff members would resort to not providing the required showers or doing bed baths as a substitute.

501.    Unit Manager L reported these issues to the facility's DON and Administrator regularly during daily staff meetings. During one two-week period, the Unit Manager reported concerns almost every day. Also sometimes present at these meetings was the RDO from Corporate.

502.    Unit Manager L stated that the facility has "to stop admissions. We have to do something because we don't have the staff."

503.    Unit Manager L spoke to the Pottstown DON, who responded that she had relayed the concerns "to corporate." The DON later told Unit Manager L that there was no response from Corporate and "this is what we got." When Unit Manager L again voiced concerns that admissions had to stop, the DON responded that she could not do that because the facility needed "heads in the beds." That is, the facility needed to "fill the beds," which impacted the facility's revenue.

504.    Even after Unit Manager L again warned the DON that resident admissions needed to stop, the DON replied, "we're not allowed to. We've got to keep taking [residents] if corporate says we got to keep taking them."

505.    Unit Manager L acknowledged that the staff was unable to meet the residents' needs in multiple ways: For example, (a) Residents were not repositioned every two hours; (b) medication was not provided in a timely manner; (c) meals could not be served on time and therefore became cold; (d) residents were forced to sit in bed the entire day because the staff were unavailable to assist them; and (e) residents were not toileted every two hours or as needed. Residents would complain, demanding that staff members "get me up, get me up," but Unit Manager L or a social worker had to explain to the residents that there was an insufficient number of staff members present to assist them.

506.    Unit Manager L described the understaffing at her facility to be "chronic" and "continuous" during her tenure at the facility.

507.    The DON directed Unit Manager L to fill out blank MARs and TARs, but Unit Manager L refused.

508.    According to Unit Manager L, the facility "absolutely" knew or had a general sense of when the surveyors would be inspecting the facility, and this was communicated to the staff members. Although the facility did not know the exact date, it was close enough (within a week or a couple days) for the facility to ensure that there was a sufficient number of staff working on these "survey days." On these days, "I would have all the CNAs that we should have. We would have all the nurses that we should have," according to Unit Manager L.

509.    The surveys would generally last three to five days, and, on these days, the facility would be "fully staffed." Yet, once the survey concluded and the State Surveyors had departed the facility, "it [went] back to not enough staff."

510.    Unit Manager L ultimately left Pottstown because it was an unsafe situation. She believed that the facility was trying to mislead inspectors regarding staff and was attempting to create a "fake image" on those days: "[I]f those surveyors had walked in and seen what we did on a daily basis as far as understaffing, I would hope that, you know, they would have just shut it down."

**Unit Manager LD**

511.    LD worked as a Unit Manager at Pottstown for approximately six months, from January 2017 through June 2017. She felt that her unit was frequently understaffed when it came to nurses, especially due to call outs, which were an almost daily occurrence.

512.     Another issue was staff turnover resulting from overwork. Unit Managers were overworked because they had to fill in for other nurses who called out. For example, Unit Manager LD would often come home after completing one shift, but after only a three-hour break, she would be called back to Pottstown for another eight or twelve-hour shift.

513.     In her opinion, the understaffing at Pottstown was chronic and continuous during her six months at the facility.

514.     Pottstown failed to staff the facility based on acuity. For example, her unit and shift always had the same number of staff, regardless of whether there were residents with higher acuity who required more care and attention from staff members. In other words, based on her observations, Pottstown did not make staffing decisions based on the needs of residents.

515.     Unit Manager LD overheard CNAs complain about being underpaid at the facility.

516.     Unit Manager LD recalled the issue of staffing being raised regularly at least once a week during the daily morning "Eagle Room" meetings, during which time Unit Managers, Department Heads, the DON, and the Administrator would discuss any issues.

517.     After Unit Manager LD left Pottstown, she worked with patients who were former residents of Pottstown who stated, words to the effect of, "I would never go to [Pottstown]. They you know, treat animals better."

**DON LG**

518.     LG served as the Pottstown DON from 2015 to November 2020.

519.     When it came to staffing, it was "HCR ManorCare" Corporate actors above the facility who established the HPPD for Pottstown. As a result, "HCR ManorCare" Corporate tasked DON LG and the Pottstown Administrator with meeting the budgeted HPPD every day

and every week. If the facility failed to meet the budgeted HPPD, this had to be reported to the facility's RDO and further up the corporate chain of command.

520.    During the relevant period, Pottstown residents complained about the staffing issues at Pottstown. During a resident council meeting on November 24, 2017, DON LG, in response to concerns raised by residents, said that she expected five new CNAs to join the facility.

521.    But Pottstown could not implement an admissions ban or otherwise stop admitting residents. According to DON LG, this was "something out of my control" and this decision had to come "from corporate."

522.    For example, in 2019 and during the PHE, staff members complained to DON LG about their inability to provide the appropriate level of care and other ADLs, such as bathing, showering, and helping bed-bound residents out of bed because of understaffing. These concerns were conveyed to LG by several individuals "once every couple weeks," perhaps "once every two weeks."

523.    For instance, Pottstown policy was to shower its residents at least twice a week. But towards the end of her tenure, DON LG stated that several times a week—due to understaffing—the facility failed to provide residents with two showers a week, even when residents requested showers.

524.    Staffing was challenging at Pottstown because, according to DON LG, Pottstown paid less than their neighboring competition, so Pottstown would lose lots of staff to their three neighboring competitors.

525.    As for surveys and audits, Regional and corporate employees would help Pottstown prepare for upcoming surveys. For example, regional consultants would physically

come to Pottstown, conduct a mock walkthrough and mock survey, scrutinizing the same records and reviewing the same procedures that a State Surveyor would for an actual survey. Such mock surveys could last several days, during which time the RDO would be present as well.

**Administrator BK**

526.    Administrator BK worked as the Administrator for Pottstown from 2010 through October 2019. Her direct supervisor was the RDO, with whom she communicated several times a week, usually by email or phone, and in person. She had recurring weekly conference calls and quarterly meetings with her RDO.

527.    As the facility's Administrator, BK would also participate in monthly meetings where quality assurance and resident care issues were generally discussed. Her RDO and other corporate actors from her region would attend.

528.    When it came to staffing, corporate actors at "HCR ManorCare" determined the budgeted HPPD for that specific facility. The Administrator, DON, Scheduler, and HR Manager would review the facility's HPPD every day. If the Administrator believed that she was going to exceed her budgeted HPPD for a particular month, she would consult with her RDO.

529.    There were times when, after consulting with the Scheduler, the Administrator realized that this would result in the facility exceeding its budgeted HPPD. On some occasions, Administrator BK directed the Scheduler to adjust the schedule (that is, she would tell staff members not to report to work) so that the daily HPPD would fall within the budgeted daily HPPD.

530.    When it came to her annual bonus, Administrator BK recalled that there were four to five different categories to her annual bonus, and based on her performance on each category, she would receive a percentage or full amount for each category.

531.    Based on her recollection, the facility's census impacted her annual bonus in that a higher occupancy percentage yielded a higher bonus.

532.    Moreover, if the facility used any agency staff, the Administrator's bonus decreased.

533.    The Administrator was evaluated by the RDO, who provided regular evaluations. Those evaluations factored in the facility's performance, in terms of census and revenue. The RDO and Corporate actors had the ability to regularly track Pottstown's admissions and census, and if it was low, the Administrator would participate in meetings and conference calls in attempts to figure out the issue and how it could be corrected.

534.    This was done primarily through the monthly Profit and Loss Report ("P&L Report"). Administrator BK would regularly email the P&L Report to her RDO and would review it regularly with her RDO and Regional Admissions Director. The P&L Report would indicate whether the facility made a profit that month.

535.    Pottstown was in competition with neighboring nursing homes. To increase admissions, the Administrator and sometimes the RDO would physically go to hospitals and other referrals sources, also meeting with the Chief Executive Officer or Chief Financial Officer to come up ways to "expedite the admission process."

536.    The annual budget for a facility was developed at the annual "budget meeting." Individuals at the Corporate level (that is, at a level above each individual nursing facility) developed the budget based on input from the Administrator. Administrator BK would have to fill out a worksheet with current information about the nursing home, such as the census, revenue, expenses (that is, wages and salaries), and staffing. She would then send this

information to corporate actors at the regional level, including the RDO, Regional Admissions Coordinator, Regional HR, and Regional Finance Representative.

537.    Administrator BK recalls receiving complaints from staff members about needing more staff members. Administrator BK did not have the authority to stop the admissions of residents by putting in place what was known as an admissions ban in the event of understaffing. For an admissions ban, she needed to consult with her RDO and obtain his approval.

538.    The same applied for declining individual resident admissions. The Administrator and DON did not have the authority to decline individual cases, and Administrator BK was expected to consult with her RDO and Regional Admissions Director if she declined a resident referral.

539.    There was also a Regional Clinical Consultant assigned to Pottstown, but this individual was responsible for overseeing multiple nursing homes in the region. This individual would physically be at Pottstown several times a month and even participate in weekly staff meetings.

540.    A representative from "HCR ManorCare," Barb DeSantis, a Regional Case Mix Specialist, would conduct audits and educate Pottstown's staff on the MDS process and was at the facility on a monthly basis.

**<u>Resident Falls</u>**

541.    According to the Pottstown fall log, which kept track of resident falls, falls were an issue at Pottstown.

- Between April 2016 and November 2018, one resident fell 54 times.

- Between March 2017 and June 2018, a second resident fell 21 times.

- Between April 2017 and December 2018, a third resident fell 19 times.

542.    Yet, despite this reoccurring issue, according to former Unit Manager S, Pottstown did not have a fall prevention plan during his tenure, from 2012 through 2019.

c)  **Specific Examples of Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care at Pottstown**

543.    The following are examples of Medicare and/or Medicaid beneficiaries who received grossly substandard or nonexistent care, and/or care that otherwise failed to comply with the requirements set forth in the NHRA during the relevant period.

**Resident FK**

544.    A Medicaid beneficiary, Resident FK was 89 when he was admitted on March 1, 2017 from the hospital where he was treated for a urinary tract infection. He lived at the facility until his death on September 16, 2017. Resident FK was unable to complete ADLs independently due to dementia. At times, Resident FK was continent, and at other times he was incontinent. While he was a resident at Pottstown, the facility failed to provide him assistance with ADLs, failed to provide appropriate psychological support, failed to provide supervision and assistance to protect him from falling, and failed to adequately treat pain.

545.    Staff failed to provide Resident FK with adequate assistance with ADLs. Toileting was inconsistent. At times there were 12 to 14 hour gaps between toiletings. During the month of March, he received one shower and no tub baths; in April, he received four showers; in May, he received two showers in June, he received four showers; in July, he received three showers; and, in August, it is documented that he received one shower.

546.    Staff failed to provide Resident FK with adequate psychological support. Resident FK spoke of his depression and the effect it was having on his sleep. Medical care was provided by various professionals employed/contracted by Suburban Geriatrics. On March 15, 2017, a "psych" consult was ordered. On May 10, 2017, there was a note documenting that Resident FK

was being followed by "Psych." The care plan for depression documented three interventions for Resident FK's depression: to attempt to involve Resident FK in activities; to evaluate the effectiveness and side effects of medications; and to provide reassurance as needed. There is an activity assessment and an activity care plan. There is one note related to activities. On June 30, 2017, it is documented that "Staff helped to clean up and transfer to w/c come out into hallway and attend activities." Despite these documented issues, there was no evidence that a psychiatric or a psychological professional saw Resident FK

547.    Pottstown failed to treat Resident FK's pain adequately. When Resident FK returned from the emergency room on August 29, 2017, after receiving treatment for a fall-related head injury, he had a prescription for "Lortab 4/325 q6h prn pain x 3 days." However, Pottstown nursing notes reflected that the NP "[did] not want to order Lortab at the present," and the prescription was not filled. A nursing note from August 31, 2017, indicated that Resident FK was complaining of headache and left shoulder pain, rated six out of ten on a pain scale. He was given Tylenol, but it was only partially effective, as his pain after administration of Tylenol was a three out of ten on a pain scale. Additionally, physical therapy notes on August 30, 2017, and September 1, 2017, document that he was suffering from significant headaches from his fall-related head injury. The physical therapist's September 1, 2017, note stated, in part, "Pain Lt side of my face, nobody knows how much it hurts." Yet, there is no indication that Resident FK's physician was informed that Tylenol was not adequately controlling his pain. Similarly, after Resident FK sustained a torn rotator cuff during an August 23, 2017, fall, Pottstown did not develop a care plan to address either this injury or the pain that commonly accompanies such an injury.

548.    Resident FK sustained at least nine documented falls while at Pottstown. During his confinement, the facility failed to develop an individualized fall prevention care plan, failed to provide adequate supervision, failed to identify his evening dose of Lasix as a possible contributing factor to his multiple nightly trips to the bathroom until August 23, 2017, failed to move Resident FK closer to the nurses' desk for closer supervision until August 30, 2017, and failed to provide timely assistance to the toilet.

549.    Many falls occurred while Resident FK tried to toilet himself. Staff noted that Resident FK "becomes impatient when his call bell is not answered right away and he is wet from being incontinent." On August 7, 2017, after a fall, staff documented, "Resident continued to call for assistance to bathroom several times this shift. Only voids a small amount each time…. Resident refuses to do without oxygen." On August 9, 2017, there is a nursing progress note: "Rings call bell for assistance to bathroom. Able to ambulate to bathroom without assistance but often needs walker on the way back to bed." After a fall on August 23, 2017, his family expressed concern about the bed not being low enough and voiced a desire for floor mats. The nurse explained that they didn't use floor mats at the facility. Resident FK's final fall occurred on September 1, 2017, at 5:30 p.m., when he was found lying on the floor in his bathroom. He was sent to the hospital, where he was diagnosed with intracranial hemorrhage on his left side, an acute avulsion fracture of the right occipital condyle, a fracture of skull base with intracranial hemorrhage, a fracture of sphenoid bone, a complex left facial laceration, and contusions to the left knee and left upper extremity and face. He was discharged from the hospital and readmitted to the facility on September 10, 2017. On September 12, 2017, he was admitted to hospice. He died on September 16, 2017.

**Resident MG**

550.    A Medicaid beneficiary, Resident MG was a 59 year-old male resident at Pottstown from March 11, 2016, to November 24, 2018. At the time he was admitted, his diagnoses included muscle weakness and schizophrenia, and he was at risk for falls. Assessments of his mental status throughout his stay at Pottstown generally reflected moderate impairment. Pottstown failed to develop, implement, and update an effective care plan to address Resident MG's fall risk and failed to maintain a clean, comfortable and homelike environment.

551.    During Resident MG's stay at Pottstown, he fell approximately 65 times. Pottstown did not develop and implement individualized updates to his care plan after each fall. For example, Resident MG fell at least three times attempting to use the bathroom (April 24, 2016, May 3, 2016, and June 1, 2016) before Pottstown addressed toileting in his fall risk care plan, adding "bedside commode offered" as an intervention on June 5, 2016. Further, although the frequency of Resident MG's toileting-related falls appeared to decrease after the bedside commode was offered, he did continue to suffer falls that suggested that additional elimination/toileting-related interventions should be explored. It was not until April 5, 2017, however, that Pottstown finally developed "bladder diary to evaluate toileting needs" as an intervention.

552.    On June 8, 2017, Pottstown added the following intervention to Resident MG's falls risk care plan: "Make sure resident urinal is checked frequently and emptied promptly to prevent possible spillage and slipping in urine." In a survey on March 30, 2018, however, Pottstown was issued a deficiency for failure to provide a safe, clean, comfortable and homelike environment. The survey findings stated that the "[o]bservation on March 27, 2018 at 9:41 a.m., 10:16 a.m., and 10:45 a.m. revealed that the resident's opened filled urinal was on the windowsill

of his room. In an interview on March 27, 2018, at 9:41 a.m., the resident stated that he used his

urinal approximately 1 to 2 hours earlier."

553.    As a result of Pottstown's failure to develop, implement, and update an

individualized care plan to address MG's fall risk, he sustained multiple fall-related injuries,

including but not necessarily limited to the following:

     a.  June 24, 2016: bloody nose;
     b.  December 4, 2016: approximately one cm cut to the crown of his head;
     c.  December 12, 2016: one cm laceration on right side of his head;
     d.  April 18, 2017: one-half cm by one-half cm abrasion above his right eye, bleeding;
     e.  June 2, 2017: two cm laceration to forehead;
     f.  June 7, 2017: blood dripping from his right forehead;
     g.  August 19, 2017: bleeding from left side of forehead, with blood dripping to the floor. He was sent to the emergency room and sutures were placed;
     h.  September 9, 2017: small superficial cut to his right forehead;
     i.  September 11, 2017: three cm laceration in the middle of his forehead, dripping blood;
     j.  January 16, 2018: small cut above his right ear;
     k.  January 21, 2018: six cm by one-half cm deep laceration to the top of his head. He was sent to the emergency room and staples were placed;
     l.  January 21, 2018: laceration on right forehead, steri strips applied;
     m.  March 10, 2018: small laceration above his right eye;
     n.  March 29, 2018: quarter-sized lump with a small laceration to the back of his head;
     o.  June 25, 2018: three cm by one cm U-shaped laceration on the front right side of his head and a bleeding laceration on his right elbow.

## VI.    GREENVILLE EAST, SOUTH CAROLINA

### a)    Greenville was Aware of General Care Deficiencies

554.    Greenville was aware that there were serious problems with the care it provided to

its residents and its failure to care for its residents in such a manner and in such an environment

that would promote maintenance or enhancement of the quality of life of each resident. Among

other issues, the facility had recurring and substantial problems, including the following: (a)

failure to create and follow individualized written care plans for each resident; (b) failure to care for the nutritional needs of residents; (c)failure to assist residents with their ADLs such that ability to move worsened under Greenville's care; (d) failure to provide medications as ordered; (e) depriving its residents of their dignity and significantly reducing the residents' quality of life; (f) and failure follow appropriate resident fall protocols. As a result, in some cases, the facility failed to treat residents with dignity and respect and care for them in a manner and in an environment that promoted the enhancement of the quality of life.

555.    Notwithstanding this knowledge during the relevant time period, the facility continued to provide care that was grossly substandard, nonexistent, and/or otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA.

b)  **Former Employees Corroborate Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care.**

**Former Administrator AC**

556.    AC was the Administrator for Heartland of Greenville from August 2012 through August 2017.

557.    HCR Delaware owned and operated another nursing home nearby called Heartland of Greenville West.

558.    Her supervisor would encourage unproductive competition between the two facilities, and AC felt pressured to keep her facility at full capacity. Her performance evaluation included financial indicators, including how much revenue the facility generated and how full she kept the nursing home.

559.    Even as the facility's Administrator, AC could not decline a potential resident admission.

560.    Rather, if she wanted to decline a resident because she did not believe her facility could handle the resident, Administrator AC was required to report her reasoning for rejecting an admission to her RDO.

561.    An employee from the facility's marketing department also reviewed referrals and any rejections. This employee would also notify her RDO if a referral was ever declined.

562.    The RDO had unrealistic expectations and regularly wanted Administrator AC to admit residents that she was uncomfortable with admitting into her facility because the facility could not handle the residents and their needs.

563.    Administrator AC was concerned about her Nursing Home Administrator's License, and her DON was worried about her Nursing License if there was a negative outcome for a resident that the facility was not equipped to handle.

564.    Administrator AC and the facility's DON frequently disagreed with their RDO about which residents should be admitted. Even though Administrator AC would raise arguments against admitting a resident into the facility if she believed it was dangerous or ill-advised, her RDO overrode her most of the time and required her to admit the resident into the facility.

565.    In one instance, the facility accepted a resident with severe psychiatric and behavior problems. Administrator AC and her DON were uncomfortable with accepting the resident because they did not believe the facility had adequate resources. Despite these concerns, her RDO ordered them to admit the resident into the facility.

566.    Once admitted to the facility, this resident pushed another resident, who fell and broke her hip.

567.    There was another instance when Administrator AC did not want to admit a resident because, according to the medical records, the resident needed to be suctioned every two hours, but there were not enough staff members to cover the need.

568.    When she told her RDO of her concerns, the RDO responded, "[w]ho says they have to be suctioned every two hours," dismissing her concerns.

569.    Based on the census of each facility, a daily labor report was generated. This report permitted a certain amount of labor costs (for example, number of staff members) per day based on the census.

570.    The RDO also tightly controlled staffing and each facility's labor budget. For example, Administrator AC had to submit a daily report to her RDO because the RDO wanted to ensure she did not exceed the permitted labor costs that "HCR ManorCare" Corporate actors had predetermined and required her to abide by.

571.    Administrator AC could receive a negative evaluation or otherwise disciplined if her facility exceeded the predetermined labor budget set by corporate.

572.    Because Administrator AC was required to admit residents over her objections, and she could not exceed the predetermined labor budget set by her superiors, her facility suffered from a shortage of staff members. Administrator AC tried to meet the need by having non-clinical staff members supervise residents when other staff members were unavailable.

**Unit Manager B**

573.    Unit Manager B was an RN and Nurse Supervisor at Greenville for several months in 2019. He described his tenure at the location as an absolute "nightmare" and that the conditions at the nursing home were "absolutely terrible."

574.    According to Unit Manager B, staff members were required to help residents with their ADLs, but, due to understaffing, the staff simply left the residents lying in bed all day. As a result of understaffing, the facility's staff failed to assist residents out of bed and help them groom themselves.

575.    Many of the facility's residents were incontinent and immobile. For these residents, according to Unit Manager B, "you have to worry about skin breakdown, nutrition, bathing, and [providing] proper medication [on time]." Furthermore, these residents had to be turned and repositioned every two hours to avoid pressure sores.

576.    But due to the lack of staffing, the facility's staff members were not fulfilling their duties. For example, medication would regularly be provided to residents two to three hours late. Further, residents were not being bathed in accordance with their care plans or consistently changed out of dirty clothes or sheets.

577.    Due to understaffing, some residents who required help from staff members to feed themselves did not receive the necessary help with eating.

578.    The facility lacked accountability over their employees. According to Unit Manager B, staff members "came and went as they pleased."

579.    After his first week at the facility, Unit Manager B threatened to quit but was promised by a supervisor that the staffing situation would improve. From that moment on, Unit Manager B worried about his Nursing License on a daily basis. When he asked the facility's management what was being done to address the issue, they would respond that they were "working on" on improving the situation.

580.    Yet, once the staffing situation failed to improve, Unit Manager B decided to quit, believing that his Nursing License would be at risk if he remained at the facility.

**CNA M**

581.    CNA M worked at the Greenville facility for six months, from October 2018 through March 2019, and, before becoming an employee, was a volunteer at the facility for around a year. She would never recommend the facility to a friend or permit a loved one to be a resident there.

582.    According to CNA M, understaffing was a pervasive issue and was discussed by nurses, residents, and family members. She described the staff shortages as continuous and overwhelming.

583.    Understaffing negatively impacted resident care. For example, residents developed pressure sores as a result of not being changed as needed or being cleaned properly. She recalled two male residents who suffered from extreme pressure sores. One resident had a pressure sore that tunneled down his back to the top of his tail bone. When he was first admitted to the facility, he was able to walk to the restroom on his own. But, because he developed an extreme pressure sore during his residency at the facility, he ended up needing a catheter.

584.    The second resident had initially been admitted to the facility for short term care following a hip replacement. But he contracted a severe bed sore while at the facility, which resulted in him becoming a long-term resident.

585.    Because of understaffing, there was not enough time for staff members to provide a shower or bath for every resident. Rather, showers and bathes were provided when the staff "had time." For example, residents were sometimes awakened at 2:00 a.m. for a shower because that was when the staff "had time."

586. Understaffing at the facility also caused other issues. At times, staff members failed to properly clean the resident or the resident's bedsheets. CNA M observed residents laying in soiled sheets that appeared as though they had never been changed.

587. Residents who needed assistance eating were rushed by staff members because staff members did not have time to sit and feed them. This resulted in some residents not being able to properly eat.

588. Because staff members could not regularly check in on residents, the residents would utilize the call bell to request assistance from staff members.

589. CNA M recalls that staff members would sometimes disable (unplug) or place a call bell out of reach of a resident because they did not want to be summoned regularly by certain residents.

**HR Director G**

590. Ms. G was the HR Director for the Greenville facility from June 2016 through August 2017. According to Ms. G, the facility was always understaffed, and the issue was regularly discussed at the daily morning meetings. Management from HCR ManorCare would be present at these meetings if they were already at the facility for other purposes.

591. One reason why Greenville had trouble with hiring and retaining staff was inadequate pay. Moreover, the lack of staff meant the employees were assigned more residents and tasks, which also negatively impacted staff retention.

592. According to Ms. G, management conducted a market analysis of its pay compared to neighboring facilities, and Greenville paid less than neighboring nursing homes.

593.     Due to understaffing, HR Director G, who was not certified to provide direct care at the time, recalls having to complete resident care tasks outside her assigned job duties. She would help turn a resident, change their diapers, or provide water to residents.

594.     During State Surveys, the facility used a "code" to notify staff members that inspectors were in the building. Because these inspections occurred over the course of several days, the facility would require staff members to change shifts and work with residents when inspectors were present. This was done to impress surveyors and give the impression that the facility was adequately staffed.

595.     Yet, when State Surveyors concluded their inspection and departed the facility, staffing levels decreased and remained inadequate.

596.     Ms. G would never permit a loved one to be a resident at Greenville she had worked at and stated that the "facility needs to be closed down."

c)   **Greenville Knew that it Had Care Quality Problems Based on its Surveys During the Relevant Time Period.**

597.     The facility, in some cases, also failed to treat residents with dignity and respect and care for them in a manner and in an environment that promoted the enhancement of the quality of life.

598.     In a survey completed on September 26, 2018, South Carolina Health Inspectors determined that the facility failed to address the Resident Council concerns related to food for seven of the eight residents in the Resident Council. The residents stated that meals had been a significant concern for several months, as there were concerns related to food going back to at least May 2018.

599.     An interview with the Resident Council on September 24, 2018, revealed that issues with the food related to the following: bland taste; hard meat; substitutions which were

often not given when requested; inaccurate menus not reflecting what was actually served; and that, when prior concerns were raised, the dietary staff simply responded that they were "understaffed."

600.    The Activities Director was interviewed on September 25, 2018. When asked why the prior complaint from July 2018 was never addressed, the Activities Director responded that there was no management, that the dietary unit was understaffed, and could not confirm if the dietary concerns were ever addressed.

601.    Relatedly, the facility failed to provide sufficient support personnel to safely and effectively carry out the functions of the food and nutrition service. For example, on September 24, 2018, South Carolina Health Inspectors observed that there were only two dietary staffers present in the main kitchen. One staff member indicated that there was no Dietary Manager, and that the Administrator was acting as the Dietary Manager, also noting that there had been a shortage of kitchen staff for some time now.

602.    A random observation the same day revealed that residents were transported to the dining room at 11:20 a.m. because lunch was supposed to be served at 11:40 a.m. Multiple residents were seated in the dining room waiting to be served. The food carts were finally delivered to the dining room at approximately 12:15 p.m.

603.    The next day, on September 25, 2018, South Carolina Health Inspectors again observed lunch being served late. At noon, inspectors observed thirteen residents seated in the dining room, still waiting to be served. A resident that had earlier left the dining room was observed being ambulated back to the dining room when the resident asked, "When are we going to eat?"

604.    On September 26, 2018, South Carolina Health Inspectors observed that residents had waited over an hour and thirty minutes to be served breakfast. Specifically, the meal schedule indicated that breakfast would be served at 7:40 a.m., but at 8:44 a.m., the residents were seated in the dining room still waiting to be served. At 8:45 a.m., a Dietary Consultant informed a CNA that the meals were late because there were just two dietary staff members in the kitchen. At 9:02 A.M., a Dietary Consultant confirmed that the preparation was indeed taking long because there were only two kitchen staff members, and the staff had been without help for months. At 9:11 A.M., the breakfast food carts were finally delivered to the residents—over an hour and a half after the scheduled time.

605.    The Activity Director confirmed that the residents had expressed unhappiness with the lack of dietary staff for "some time now," including how the food was coming out late.

606.    Not only was the food late, but the facility failed to ensure the food was palatable, attractive, and at a safe and appetizing temperature.

607.    For example, Resident #91 told South Carolina Health Inspectors that their meal did not taste or look good and that the bread roll was often soaked by fluids from other foods. The meat was so hard that they could not cut it.

608.    According to Resident #72, the meat on the lunch tray was too hard and the biscuit on the breakfast tray was also too hard. Resident #54 confirmed that the biscuit that morning had been hard.

609.    The Resident Council voiced similar concerns. According to multiple residents, the meat was hard and difficult to chew.

610.    As a result of these concerns, South Carolina Health Inspectors requested a test tray to sample the meat. The inspector chopped the pork into various sizes, and it was not tender and took some time to chew.

611.    When South Carolina Health Inspectors returned in January 2020, it was determined that the facility failed to ensure that the residents were provided meals that were palatable, attractive, and at a safe and appetizing temperature.

612.    Based on interviews and personal observations, Health Inspectors determined that the facility failed to serve food at appetizing temperature for all units. Residents and the Resident Council shared several concerns regarding the food, including that food meant to be hot or warm was often served cold.

613.    An interview with Resident #34 revealed several concerns regarding the meals, including that hot foods were served cold. Another resident, Resident #83, also said that hot foods would often be served cold.

614.    On direct observation through a test tray, South Carolina Health Inspectors confirmed that the temperature of the food was lukewarm and unappetizing.

615.    Besides unpalatable meals, Health Inspectors also determined in a September 2021 survey that the facility failed to accommodate Resident #3's food preferences, in that a resident was served foods multiple times despite documentation stating the resident disliked those particular foods. For example, on September 15, 2021, South Carolina Health Inspectors observed that Resident #3 ate only half her meal, not eating any of the peas that were served. When asked about her meal, Resident #3 responded that, despite her meal ticket stating that she does not like peas, she was served peas. The resident told the health inspectors that she is frequently served items that she does not like.

616.    On September 16, 2021, Resident #3 was again served an item despite her meal ticket stating she did not like certain foods. Resident #3's meal ticket, which was physical on the tray, indicated that the resident did not like carrots. Yet South Carolina Health Inspectors observed that Resident #3 was served carrots, and she did not eat them.

617.    At the South Carolina Health Inspector's request, Cook #1 came into Resident #3's room and confirmed that the resident had been served carrots, despite carrots being listed under "dislikes" for the resident. Cook #1 apologized to Resident #3 and stated that that should not have happened.

618.    The Certified Dietary Manager ("CDM") stated the facility had a process for verifying that resident meals were free of items residents disliked or have allergies to. The CDM indicated that a staff member is supposed to review each meal ticket and inform the cook of any dislikes or allergies while the meal trays are being prepared. The CDM also stated that a second staff member is also supposed to review the trays for accuracy before being to residents. The CDM admitted that this was an error by the kitchen staff and said it would be fixed.

619.    In addition to the above failures, the facility also failed to ensure residents had reasonable access to and privacy in their use of communications. Based on an interview with the Resident Council and the Activities Director, it was determined by South Carolina Health Inspectors that the facility would regularly open the mail of its residents without permission. The Activities Director confirmed to the health inspectors that the facility business office would "sometimes" open the mail addressed to residents to see "if it was something [for the resident] or something that needs to go to the insurance company instead of the resident."

620.    The facility also failed to provide treatment and services to increase the range of motion and prevent further decrease in range of motion for Resident #70, whose care plan called for intervention, under the focus areas of ADLs, for his right hand.

621.    Yet, during the multi-day survey, South Carolina Health Inspectors observed a palm guard in place on the wrong hand (Resident #70's left hand) for all days of the survey. There was no palm guard in place on the resident's right hand, as was required by his care plan.

622.    Moreover, a review of Resident #70's medical record revealed no orders for treatment and services to prevent decline in range of motion or to maintain the resident's current level of range of motion. Over the past four months, there was no treatment provided or requested for physical or occupational therapy, or restorative nursing to address the resident's range of motion. The DON confirmed that the resident would have been a good candidate for a restorative nursing program, but that the facility no longer had such a program. The DON also confirmed that the resident had not received physical or occupational therapy since April 2017— over seventeen months prior.

623.    In a survey completed on January 9, 2020, South Carolina Health Inspectors determined that the facility failed to honor a resident's right to request, refuse, and/or refuse treatment and to formulate an advance directive. Resident #51 was diagnosed with Parkinson's disease, dementia, and muscle weakness. State Health Inspectors reviewed the resident's medical record and discovered that the resident did not sign their Do Not Resuscitate ("DNR") form. The facility could not provide any form or documentation regarding the resident's inability to make end of life decisions, such as a physician's determination that the resident was incompetent to make such decisions.

624.    The facility's lackadaisical protocol for completing DNR forms and honoring a resident's desires had fatal consequences just four months later. On a survey completed May 19, 2020, South Carolina Health Inspectors determined that the facility failed to provide basic life support, including cardiopulmonary resuscitation ("CPR") to Resident #1, who was found unresponsive with no pulse nor respirations.

625.    Resident #1's progress note indicated that the resident's code status was Full Code, meaning that the resident desired to be provided CPR in the event of respiratory or cardiac arrest.

626.    But when Resident #1 was discovered unresponsive by a CNA, the LPN erroneously instructed the CNA that Resident #1 had a DNR in her paper medical chart, therefore instructing the CNA that CPR should not be provided. This was wrong. The DNR in Resident #1's paper medical chart was blank and never signed by Resident #1.

627.    As a direct result of this error, after an investigation, all resident paper charts were reviewed and any blank DNR forms were removed from the chart.

628.    When interviewed, Resident #1's Nurse Practitioner responded that CPR should have been provided to Resident #1. The resident was found unresponsive, with no pulse or respirations, and had a status of Full Code.

629.    In a survey completed on December 3, 2021, South Carolina Health Inspectors determined that the facility failed to complete accurate MDS Assessments for two residents. By failing to conduct an accurate assessment, this resulted in the facility failing to develop an accurate plan of care for the residents.

630.    In a survey completed by South Carolina Health Inspectors on December 3, 2021, it was determined that the facility did not develop and implement a complete care plan for all multiple residents and their individual needs.

631.    Resident #57's clinical record revealed several diagnoses, including dementia without behavior disturbance, cognitive communication deficit, major depressive disorder, disorder of muscle, and atrial fibrillation. The resident's care plan listed various interventions the staff could utilize to avoid resident falls.

632.    Despite the care plan, it was revealed that Resident #57 had fallen eight times between January 3, 2021, and April 4, 2021, and a total of twenty-eight times in 2021. Because the facility failed to consistently follow the resident's care plan, Resident #57 suffered two forehead lacerations, one of which required stitching, the other requiring to be glued closed. The facility's own fall investigations lacked evidence that the facility provided the interventions as planned.

633.    For example, on February 1, 2021, Resident #57 was found on the floor of their bathroom, sustaining a minor head trauma to the back head. The fall occurred because the staff did not assist the resident to the bathroom as the care plan required.

634.    The facility also failed to follow the care plan for Resident #98. This resident's care plan required the facility to assist the resident with bathing and showering as needed at least twice a week, or as needed.

635.    Yet when South Carolina Health Inspectors reviewed the shower documentation provided by the facility, they discovered that, between October 3, 2021, and December 2, 2021, Resident #98 only received six showers—even though the resident should have received at least 17 showers.

144

636.    An interview with multiple facility staff members confirmed that the facility's protocol was to provide residents with two showers per week.

637.    But facility staff members admitted to South Carolina Health Inspectors that the facility frequently did not provide residents with showers.

638.    When interviewed by health inspectors on December 3, 2021, CNA #14 stated that residents who were supposed to receive assistance with showers "were not always provided a shower," admitting that "residents should be getting showers just like you and me when scheduled but it wasn't always happening."

639.    CNA #15 admitted the same on December 3, 2021. CNA #15 stated that residents scheduled for showers in Resident #98's unit "frequently" did not receive their showers.

640.    In the same survey completed on December 3, 2021, South Carolina Health Inspectors also determined that the facility failed to complete accurate MDS Assessments for two residents. By failing to complete an accurate assessment, this could cause the facility to not develop an accurate plan of care for the resident.

641.    The facility completed Resident #57's MDS Assessment as if the resident had not fallen since the assessment was completed on January 3, 2021. This was wrong. Review of the resident's clinical record revealed that, in reality, the resident had fallen eight times during the relevant time period, demonstrating that the staff did not accurately complete the resident's MDS Assessment on April 4, 2021.

642.    South Carolina Health Inspectors interviewed the MDS Coordinator on December 3, 2021, who stated they did not know why the assessment was coded incorrectly.

643.    The facility also failed to complete an accurate MDS Assessment for Resident #68, whose Admission MDS Assessment documented that the resident had no pressure ulcers on admission. Again, this was incorrect.

644.    In reality, Resident #68 had two unstageable pressure ulcers, both of which were present on admission. The MDS Coordinator could not explain why the MDS Assessment forms were wrong.

645.    The facility even had cognitively impaired residents enter into binding arbitration agreements, even though these residents lacked the ability to understand the information being presented and were unable to make an informed decision as to whether they wished to enter into the agreement.

646.    In a survey completed on May 31, 2023, South Carolina Health Inspectors discovered that the facility had Residents #207 and #209 sign binding arbitration agreements—even though both residents were mentally impaired and lacked the ability to make an informed decision.

647.    The arbitration agreement the facility had the residents sign stated, in part, that "[t]his arbitration agreement governs important legal rights. Please read the agreement in its entirety before signing. Each party is waiving the right to a trial by jury. Disputes must be resolved exclusively through binding arbitration. I acknowledge that my signature below indicates that this agreement has been explained to me and that I understand it."

648.    Resident #207 suffered from a moderate cognitive impairment. When South Carolina Health Inspectors observed Resident #207, she was sitting in a wheelchair and had been placed at the nurse's station due to her confusion. During an attempted interview with Resident

#207, health inspectors observed that the resident was confused and unable to answer any questions.

649.    When Resident #207 was first admitted to the facility, she was interviewed by the Social Services Director ("SSD"). Part of the SSD's initial assessment is to determine if the resident has the capacity to make decisions. In the SSD's evaluation for Resident #207, it stated that Resident #207 did not make her own decisions, and her husband was listed as the person who made decisions for the resident.

650.    During an interview with the Administrator on May 31, 2023, the Administrator confirmed that Resident #207 was cognitively impaired and therefore could not understand the arbitration agreement that she signed with the facility.

651.    This issue also impacted Resident #209. In an arbitration agreement dated May 25, 2023, Resident #209's signature was on the form, but there was no signature of a responsible party or guardian.

652.    Yet Resident #209 lacked the cognitive ability to understand the agreement. On May 29, 2023, South Carolina Health Inspectors observed Resident #209 press the call bell. When a staff member responded, Resident #209 stated that he was trying to get a ride home, but he later also said that he thought he was already home. The health inspectors then spoke with Resident #209, who responded that he did not know what a binding arbitration agreement was, and he did not recall signing an arbitration agreement a few days earlier. The facility's Administrator confirmed that Resident #209 neither recalled nor understood what binding arbitration was.

d) **Examples of Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care Provided to Medicare and/or Medicaid Beneficiaries at Greenville.**

653.    The following are examples of Medicare and/or Medicaid beneficiaries who received grossly substandard or nonexistent care, and/or care that otherwise failed to comply with the quality of care and/or quality of life requirements set forth in the NHRA during the relevant period.

654.    ***Resident D.R.*** was a sixty-nine-year-old of Greenville from January 7, 2020, to January 21, 2020. Staff noted that she was expected to be discharged to her "prior setting." She was continent of both bowel and bladder, and she was alert and oriented. She received oxygen and required a Bipap (ventilation device used to assist with breathing) while sleeping. She had selected Full Code as her advance directive should either her heart or breathing cease. Greenville staff did not monitor her condition and report increasing changes in condition to her physician. Greenville did not follow her physician's orders, nor did they honor her advance directive.

655.    Greenville failed to implement her physician's orders to monitor her pain, monitor her amounts of fluid for a fluid restriction of 1800 ml every 24 hours, monitor edema, or weigh her daily for three days after admission. Greenville also failed to document the medications administered to Resident D.R.

656.    On January 1, 2020, an occupational therapist noted that Resident D.R. was "functioning below her baseline due to her decreased ability to participate in Activities of Daily Living, bed mobility, sitting tolerance/balance, and overall endurance." On January 14, 2020, it was noted that she was "currently more short of breath. Associated with bilateral crackles, edema and hypoxia with O2 sat of 78-81%." On January 15, 2020, Resident D.R. told her physician that her breathing was maybe "a little worse." On January 20, 2020, the physician noted some "cognitive slowness."

657.    Despite other disciplines noting her decline, there are no nursing observations from January 18, 2020, at 2:00 p.m. until January 21, 2020, at 1:45 a.m., when she was found "deceased." The nursing observation's author noted that she was a DNR, despite her directive for full resuscitation. Staff did not intervene to perform code procedures.

658.    **Resident T.W.** was a sixty-nine-year-old resident admitted to Greenville on July 1, 2021. She resided at Greenville until her death on February 19, 2022. She was admitted with a percutaneous endoscopic gastrostomy tube for feeding for dysphagia and was to receive nothing by mouth. She was dependent on staff for all ADLs, and she suffered from dementia and hallucinations, which were thought to be secondary to ETHOL abuse. Greenville failed to provide treatment to prevent and treat pressure injuries, incorrectly documented the MDS Assessment, failed to develop an individualized focused care plan to address behavioral symptoms, and failed to follow physician's orders to not provide food or drink by mouth, unless by or under the supervision of a speech therapist.

659.    On admission, Resident T.W. was free from pressure injuries. On July 1, 2021, the use of the Braden Scoring System revealed that she was at moderate risk for development of pressure ulcers. Seven days later, she was documented as being at high risk for the development of pressure ulcers. Despite this knowledge, the original care plan did not include the amount of assistance needed to offload pressure, nor was the care plan changed as her risk increased. Aides did not consistently change her position to relieve pressure according to documentation for the months of July, August and September of 2021.

660.    On July 14, 2021, staff documented that Resident T.W. was on a pressure relief mattress. After wounds were discovered on both feet, her left elbow, and her sacrum on

September 9, 2021, staff documented that the regular mattress was exchanged for an air mattress. The wound on her left heel was covered with black eschar.

661.    The MDS coordinator incorrectly documented on September 15, 2021, and September 20, 2021, that Resident T.W. had two unstageable deep pressure injuries present on admission. It was not until December 2, 2021, after surveyors brought attention to these errors, that a corrected MDS Assessment was submitted to CMS for both errors.

662.    Per the physician's orders, Resident T.W. was not to be offered oral feedings. However, the documentation revealed that CNAs were offering oral feedings. This placed Resident T.W. at risk for development of aspiration pneumonia.

**Other Resident Examples of Grossly Substandard, Nonexistent, and/or Non-NHRA Compliant Care.**

663.    The United States has, and will develop through discovery and further analysis, including expert analysis, additional evidence of Defendants' false or fraudulent claims, representations and certifications, and the United States' resulting damages.

## VII.    THE DEFENDANTS' FALSE CLAIMS WERE MATERIAL

664.    The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

665.    Under this definition, the Defendants' false claims were material, because the truth about their grossly substandard, nonexistent, and/or non-NHRA-compliant care would have had a natural tendency to influence the payment of their Medicare and Medicaid claims.

666.    Indeed, a reasonable person would not pay for a good or service that was grossly substandard, nonexistent, and/or non-NHRA compliant. A reasonable person would similarly not

agree to pay the claims that Riverview, Imperial, Greenville, and Pottstown submitted for grossly substandard, nonexistent, and/or non-NHRA compliant resident care.

667.    The NHRA also directly links grossly substandard care with federal payment for nursing home services. As outlined above, if CMS or a state finds that a facility has not met an applicable NHRA requirement relating to the provision of services, resident rights, facility administration, or other matters, CMS can deny payments to the facility or issue civil penalties. 42 U.S.C. §§ 1395i-3(h)(2)(a) and (b). And if a state survey determined that a nursing home violated the NHRA and the facility is still not in substantial compliance three months later, then CMS must deny payments for new admissions to the facility. 42 U.S.C. § 1395i-3(h)(2)(d); 42 C.F.R. § 488.412(c); 42 C.F.R. § 488.417(b)(1). Moreover, if a facility has not obtained substantial compliance by six months after the last date of the survey, then CMS must either terminate the facility's provider agreement with Medicare or discontinue federal payments to the facility for Medicare and Medicaid. 42 C.F.R. § 450(d). Finally, if a nursing home is "found to have provided substandard quality of care" in three consecutive standard inspection surveys, CMS is likewise obligated to deny all payments until the facility satisfactorily demonstrates its compliance. 42 U.S.C. § 1395i-3(h)(2)(e); 42 C.F.R. § 488.414(a); 42 C.F.R. § 488.417(b)(1).

668.    Here, the Four Defendant Facilities are alleged to have been consistently noncompliant with the NHRA during the relevant periods at issue for each nursing home. In addition, the above allegations are replete with NHRA violations that were not remedied three or even six months later.

669.    Yet CMS did not know, beyond the deficiencies found in state surveys, that Riverview, Imperial, Greenville, and Pottstown repeatedly:

- Subjected their residents to grossly substandard care, in general;

- Failed to follow proper infection control protocols;

- Provided inadequate and untrained staff;

- Failed to implement interventions to prevent and address pressure ulcers and falls

- Failed to create and maintain resident care plans and assessments;

- Failed to provide residents with needed psychiatric care; and

- Failed to protect and respect residents' dignity

670.    If CMS had known that these facilities had such longstanding, serious care deficiencies, it would have had no choice but to deny payments under the NHRA's mandatory sanction provisions. And, even if the mandatory sanction provisions did not exist, the Four Defendant Facilities' NHRA violations were, at a minimum, widespread deficiencies that posed the potential for more than minimal harm or isolated deficiencies that constituted actual harm. Accordingly, these NHRA violations were of sufficient severity to require CMS to deny payments or issue civil monetary penalties under 42 C.F.R. § 488.408(d).

671.    In short, if CMS (or a reasonable person) had known, beyond what was uncovered during the state surveys, about the grossly substandard care that was regularly provided at these facilities during all relevant times, those circumstances would have affected future payment decisions, including whether the Four Defendant Facilities could continue to participate in the Medicare and Medicaid programs.

## SUMMARY OF THE UNITED STATES' CLAIMS

672.    As described in the allegations above, Defendants, through their related conduct in the operation of the Four Defendant Facilities, knowingly submitted or caused to be submitted false or fraudulent claims to the Medicare and Medicaid programs for services that were (a) nonexistent or grossly substandard; and/or (b) provided in violation of the requirements and

obligations set forth in the NHRA. Specifically, ProMedica, PES, and HCR Ohio caused false claims to be submitted, while Imperial, Riverview, Greenville, and Pottstown submitted the false claims. Because of the ownership and pervasive control that ProMedica, PES, and HCR Ohio exerted over the Four Defendant Facilities, ProMedica and HCR Ohio are also liable for the false claims submitted by these Four Defendant Facilities. PES is liable as co-employers of facility staff members and individuals at ProMedica Senior Care.

673.    As a result of state surveys, internal audits, and informal and formal complaints, and their own internal communications, the Defendants knew that resident care at these facilities was nonexistent, grossly substandard, and failed to comport with the NHRA, and that residents suffered or risked suffering physical and mental harm as a result. Yet rather than correct the care deficiencies that placed residents at risk and caused actual harm, the Defendants allowed the problems to persist and submitted thousands of claims to Medicare and Medicaid for the services at issue. The United States is entitled to recover its damages under the False Claims Act for these false claims for payment.

674.    For services rendered during the periods at issue, the Four Defendant Facilities received millions of dollars in reimbursement from Medicare and Medicaid. Had CMS known the true nature of the care provided at the facilities, it would have denied a substantial portion, if not all, of the federal payments, either through the mandatory remedy for persistent care deficiencies or the discretionary remedy for substantial NHRA violations. Instead, the Medicare and Medicaid programs mistakenly paid for the grossly substandard or nonexistent services the Defendants provided to their residents.

675.    The Defendants were also unjustly enriched by their receipt of money that they knowingly received when circumstances made and make it inequitable for them to retain these

funds. In equity, fairness, and good conscience, the Defendants should be required to account for and disgorge these unjustly obtained amounts.

## CLAIMS FOR RELIEF

676.    For ProMedica, PES, and HCR Ohio, the following counts are for services rendered from January 1, 2017, to December 31, 2023. For Imperial, the counts are for services rendered from at least January 1, 2017, to February 1, 2023); for Riverview, from at least January 1, 2017, to December 31, 2023; for Greenville, from at least January 1, 2017, to December 31, 2023; and for Pottstown, from at least January 1, 2017, to November 11, 2022.

### Count I: False Claims Act, 31 U.S.C. 3729(a)(1)(A)

677.    The United States restates and incorporates by reference paragraphs 1 through 675 as if fully set forth herein.

678.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Medicaid and Medicare programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

679.    Pursuant to the FCA, Defendants are jointly and severally liable to the United States for its damages resulting from such false claims, in an amount to be determined at trial, trebled, plus civil penalties of between $14,308 and $28,619 for each violation.

### Count II: False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

680.    The United States restates and incorporates by reference paragraphs 1 through 675 as if fully set forth herein.

681.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, § 3729(a)(1)(B), including false Minimum Data Sets.

682.    Pursuant to the FCA, Defendants are jointly and severally liable to the United States for its damages resulting from such false records and statements, in an amount to be determined at trial, trebled, plus civil penalties of between $14,308 and $28,619 for each violation.

### Count III: Payment by Mistake

683.    The United States restates and incorporates by reference paragraphs 1 through 675 as if fully set forth herein.

684.    This is a claim for the recovery of monies paid by the United States and to Defendants for their benefit and the benefit of the other Defendants, as the result of mistaken understandings of fact. The false claims that Defendants submitted or caused to be submitted to the Medicaid and Medicare programs were paid based upon mistaken or erroneous understandings of material fact.

685.    The Medicaid and Medicare programs, without knowledge of the falsity of the claims, representations and certifications that defendants made, or caused to be made, mistakenly paid Defendants certain sums of federal and state monies to which Defendants were not entitled.

686.    Defendants are liable to account for and to repay such amounts to the United States, in an amount to be determined at trial.

### Count IV: Unjust Enrichment

687.    The United States restates and incorporated by reference paragraphs 1 through 675 as if fully set forth herein.

688.    Defendants wrongfully received and retained the benefit of federal and state monies paid from the Medicaid and Medicare programs for nursing home services provided to the Four Defendant Facilities' residents that were nonexistent, grossly substandard, and/or

noncompliant with the NHRA and resulted in serious physical and emotional harm to such vulnerable, elderly, disabled and low-income residents.

689.    Defendants were unjustly enriched with federal and state monies from the Medicaid and Medicare programs, which Defendants should not in equity and good conscience be permitted to retain, and which Defendants should account for and disgorge to the United States, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that judgment be entered in its favor as follows:

A.    On Counts I and II under the False Claims Act against the Defendants, jointly and severally, for the amount of the United States' damages to be established at trial, plus civil penalties of between $14,308 and $28,619 for each violation, as well as all such further relief the Court deems just and proper;

B.    On Count III for payment by mistake against the Defendants, jointly and severally, for the amount of the United States' damages to be established at trial, as well as all such further relief the Court deems just and proper; and

C.    On Count IV for unjust enrichment against the Defendants, jointly and severally, for the amount of the United States' damages to be established at trial, as well as all such further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

Dated: August 28, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DAVID METCALF
United States Attorney

BY:    /s/ Robbin O. Lee
JAMIE A. YAVELBERG
ANDY J. MAO
SUSAN C. LYNCH
ROBBIN O. LEE
SAMUEL P. ROBINS
U.S. Department of Justice
Civil Division
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-7171
susan.lynch@usdoj.gov
Tel: (202) 305-4213
robbin.o.lee@usdoj.gov
Tel: (202) 307-0806
samuel.p.robins2@usdoj.gov

GREGORY B. DAVID
CHARLENE KELLER FULLMER
DAVID A. DEGNAN
GERALD B. SULLIVAN
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 861-8522 (Degnan)
david.degnan@usdoj.gov
Tel: (215) 861-8786 (Sullivan)
gerald.sullivan@usdoj.gov
Fax: 215-861-8618

*Attorneys for the United States of America*