**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TEXAS, STATE OF WASHINGTON and COMMONWEATH OF VIRGINIA, | Case No. 16-cv-851 KSM |
| Plaintiffs, *Ex rel.* | |
| LUVETTA COMPTON and JAMES BONNER | |
| Plaintiffs-Relators, | |
| v. | |
| HCR MANORCARE, INC.; MANOR CARE, INC.; HCR-MANOR CARE SERVICES, LLC; MANOR CARE HEALTH SERVICES, INC.; HEARTLAND EMPLOYMENT SERVICES, LLC; and THEIR SUCCESSORS AND ASSIGNS PROMEDICA HEALTH SYSTEM, INC. and PROMEDICA EMPLOYMENT SERVICES, LLC | |
| Defendants. | |

**PLAINTIFF-RELATORS' CONSOLIDATED AMENDED COMPLAINT
FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 ET SEQ.**

## Table of Contents

I.    INTRODUCTION ................................................................................ 3

II.   JURISDICTION AND VENUE ........................................................ 13

III.  THE PARTIES .................................................................................. 14

  A.   Relators ............................................................................................ 14

  B.   Defendants ....................................................................................... 37

IV.   THE PRINCIPAL PURCHASER OF DEFENDANTS' NURSING HOME
     SERVICES: FEDERAL AND STATE GOVERNMENTS .......................... 44

V.    DEFENDANTS PACKED THEIR NURSING HOMES WITH DEPENDENT AND
     DISABLED MEDICARE AND MEDICAID RESIDENTS ........................ 46

VI.   DEFENDANTS' DEPENDENT AND DISABLED RESIDENTS RELIED UPON
     NURSING HOME STAFF FOR THE CARE PAID FOR BY THE GOVERNMENT
     ................................................................................................... 50

VII.  DEFENDANTS' SCHEME TO DEFRAUD MEDICARE ......................... 51

  A.   The Submission for Payment and RUG Billing Codes ....................................... 51

  B.   Medicare Claims for Payment Must Be Supported by Resident MDS Assessments ......... 60

  C.   Medicare Claims for Payment Must Be Supported by Underlying Medical Records ....... 67

  D.   The Scheme to Defraud Medicare by Upcoding/Inflating RUGs and Submitting Legally
      False Claims ................................................................................... 72

VIII. DEFENDANTS' SCHEME TO OBTAIN PAYMENT FROM MEDICAID AND
     MEDICARE BY SYSTEMATICALLY SUBMITTING CLAIMS FOR EXCLUDED,
     NON-COVERED, AND GROSSLY SUBSTANDARD AND/OR NON-EXISTENT
     SERVICES ...................................................................................... 76

  A.   Coverage Requirements Under the Medicaid and Medicare Insurance Programs ............ 76

  B.   DEFENDANTS' Scheme to Obtain Payment from Medicaid and Medicare for Non-
      Covered Services ............................................................................. 81

IX.   SCIENTER ...................................................................................... 87

  A.   DEFENDANTS' Knowing Submission of False Claims ....................................... 87

  B.   DEFENDANTS Knew They Were Submitting False Claims .................................. 156

i

C.  DEFENDANTS' Subterfuge and Manipulation of Records to Hide Their False Claims
    Schemes ........................................................................................................................ 157

X.    MATERIALITY ............................................................................................................ 160

XI.   DEFENDANTS DIRECTLY PARTICIPATED IN FALSE CLAIMS, OPERATED
      AS AN ALTER EGO AND/OR JOINT VENTURE, AND KNOWINGLY
      RATIFIED THE CONDUCT ........................................................................................ 161

XII.   COUNTS ...................................................................................................................... 165

XIII.  REQUEST FOR TRIAL BY JURY AND PRAYER .................................................... 186

This action is brought by relators, Luvetta Compton ("Relator Compton" or "Compton") and James Bonner ("Relator Bonner" or "Bonner") (collectively, "Relators"), by and through the undersigned attorneys on behalf of the United States of America and states of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Washington, and the Commonwealth of Virginia, against Defendants, HCR ManorCare, Inc.; Manor Care, Inc.; HCR-Manor Care Services, LLC; Manor Care Health Services, Inc.; and Heartland Employment Services, LLC, (collectively, "MANORCARE") and their successors and assigns ProMedica Health System, Inc. and ProMedica Employment Services, LLC ("PROMEDICA"),[1] to recover damages and civil penalties pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, and various state false claims acts[2] for tens of thousands of false claims presented or caused to be presented for

---

[1]For purposes of this Consolidated Amended Complaint ("Complaint"):

    a.    Defendants HCR ManorCare, Inc., Manor Care, Inc., HCR-Manor Care Services, LLC, Manor Care Health Services, Inc., and Heartland Employment Services, LLC, are collectively referred to as "MANORCARE";

    b.    ProMedica Health Systems, Inc. and ProMedica Employment Services, LLC are collectively referred to as "PROMEDICA"; and

    c.    "DEFENDANTS" shall mean all MANORCARE and PROMEDICA defendants collectively.

[2]The state false claims acts invoked for purpose of this case include, *inter alia*: California (California False Claims Act, Government Code §§12650-12656), Colorado (Colorado False Claims Act, § 25.5-4-303.5, *et seq.*), Delaware (Delaware False Claims Act, 6 Del. C. §1201, *et seq.*), Florida (Florida False Claims Act, F.S. § 68.081-68.09), Georgia (Georgia Taxpayer Protection False Claims Act, codified at §§ 23-3-120 to 23-3-127 and State False Medicaid Claims Act, §§ 49-4-168 to 49-4-168.6), Illinois (Illinois False Claims Act, 740 ILCS § 175/1, *et seq.*), Indiana (Indiana False Claims and Whistleblower Protection Act, IC § 5-11-5.5, *et seq.*), Iowa (Iowa False Claims Act, Title XV, Subtitle 5, Chapter 685.3), Maryland (Maryland False Health Claims Act § 2-604), Michigan (Michigan Medicaid False Claims Act, MCL § 400.610a), Minnesota (Minnesota False Claims Act § 15C.05), Nevada (Nevada – Submission of False Claims to State or Local Government, NRS § 357.010, *et seq.*), New Jersey (New Jersey False Claims Act, NJSA:32-5b), New Hampshire (New Hampshire False Claims Act, § 167:61-B, *et seq.*), North Carolina (North Carolina False Claims Act, § 1-605, *et seq.*), Oklahoma (Oklahoma

payment or approval to Medicare and Medicaid by DEFENDANTS for care purportedly provided to dependent and disabled residents in the nursing home identified in *Exhibit 1*[3] and *Exhibit 2*,[4] attached hereto.  DEFENDANTS' legal responsibility and liability for this conduct grows out the following basic facts and timeline:

a.   MANORCARE owned and operated the nursing homes identified in *Exhibits 1* and *2* during the time frame of June 1, 2012 to July 26, 2018;

b.   By acquiring MANORCARE on or about July 26, 2018, PROMEDICA assumed legal responsibility and liability for the nursing homes identified in *Exhibits 1* and *2* during the time frame of June 1, 2012 to July 26, 2018; and

c.   After July 26, 2018, PROMEDICA and MANORCARE jointly owned and operated the nursing homes identified in *Exhibits 1* and *2*.

---

False Claims Act, 63 OS § 5053, et seq.), Texas (Texas False Claims Act, THRC Ch. 36), Virginia (Virginia Fraud Against Taxpayers Act, § 8.01-216.1, *et seq.*), and Washington (Washington State Medicaid Fraud False Claims Act, RCW §74.66.005, *et seq.*).

[3]*Exhibit 1* identifies 233 nursing homes where DEFENDANTS presented, caused to be presented or assumed responsibility for presenting legally or factually false claims to Medicare.  *Exhibit 1* lists the (a) name, (b) provider number, (c) address, (d) dates that MANORCARE or PROMEDICA owned or operated said facilities or were legally responsible for the same, and (e) wholly-owned corporate subsidiary through which DEFENDANTS operated each facility ***during all or a portion of*** the time frame of **June 1, 2012 to September 30, 2019** (subject to any divestiture by MANORCARE or PROMEDICA of a particular listed facility).  As set below, Relators allege that the facilities listed in *Exhibit 1* engaged in a routine pattern and practice of presenting false claims, or causing the same to be presented, to federal government for Medicare claims that were not supported by the underlying medical records or were based on false medical records during the aforementioned timeframe.

[4]*Exhibit 2* identifies 24 nursing homes for which DEFENDANTS presented, caused to be presented, or assumed responsibility for, Medicare or Medicaid claims for grossly substandard and/or non-existent services.  *Exhibit 2* lists (a) the name, (b) provider number, (c) address, (d) dates that MANORCARE or PROMEDICA owned or operated said facilities or were legally responsible for the same, and (e) the wholly-owned corporate subsidiaries through which DEFENDANTS operated each facility ***during all or a portion of*** the time frame of **June 1, 2012 to the present** (subject to any divestiture by MANORCARE or PROMEDICA of a particular listed facility).  As set forth below, Relators allege that the facilities listed in *Exhibit 2* engaged in a routine pattern and practice of presenting false claims, or causing the same to be presented, to federal and state governments for grossly substandard and/or non-existent services during the aforementioned timeframe.

## I.     INTRODUCTION

1.     This case involves a nationwide false claim scheme[5] by DEFENDANTS to defraud the Medicare and Medicaid programs of hundreds of millions of dollars by submitting tens of thousands of claims for payment to the federal and state government for care related services that they did not provide.  As a result, DEFENDANTS overbilled Medicare and Medicaid day after day, resident after resident, at their nursing homes over the course of many years.

2.     <u>DEFENDANTS' Nursing Home Business</u>: At all material times, DEFENDANTS were in the business of operating nursing homes throughout the United States.  DEFENDANTS provided nursing and rehabilitation care to vulnerable, dependent, and disabled nursing home residents who, because of their loss of physical or cognitive function, were unable to care for themselves and, as a result, were admitted into DEFENDANTS' nursing homes. DEFENDANTS' claims for services provided to these vulnerable residents generated billions of dollars of revenue, primarily from two principal sources—Medicare and Medicaid.

3.     Medicare is a federal health insurance program principally for individuals who are age 65 and older.  Medicare covers nursing and rehabilitative care in "skilled nursing facilities" ("SNFs") for a fixed period for those who need skilled nursing services following discharge from a qualifying hospital stay.  42 U.S.C. § 1395i-3.  Under Medicare, the more nursing and rehabilitation care a nursing home provided to a Medicare resident, the more money the nursing home was paid.  More specifically, on a monthly basis, SNFs enrolled in the Medicare program submitted claims for payment to Medicare for each day during the month that a Medicare

---

[5]For purposes of this Complaint, "scheme" means that DEFENDANTS knowingly engaged and participated in, consented to, authorized, approved, and/or ratified the conduct described herein.

resident was provided nursing and rehabilitation care and certified that the claims were true and accurate.  DEFENDANTS, as providers of Medicare services and recipients of Medicare payments for many years, understood that the amount of money they were paid by Medicare depended on the specific billing code they submitted for each resident who received Medicare services.  The billing code submitted to Medicare identified the specific amount and level of nursing and rehabilitation care that a nursing home ***claimed*** to have provided a resident. DEFENDANTS also understood that Medicare paid significantly more money for certain billing codes than for others.

4.      Medicaid is a joint state and federal government health insurance program that principally covers low-income individuals.  Medicaid covers long term care in a "nursing facility" ("NF") for those who are medically qualified for such care and dependent on staff for nursing care services.  42 U.S.C. § 1396a.  Each month, NFs, including DEFENDANTS' NFs, enrolled in the Medicaid program submit claims for payment based on the number of days each resident was provided Medicaid services during that month.  Under Medicaid, the state and federal government pays a flat daily fee per resident to nursing homes such as those operated by DEFENDANTS for Medicaid care services.  DEFENDANTS knew that the flat daily fee paid for Medicaid residents was significantly less that the rate that Medicare paid for Medicare residents.[6]

---

[6]Since each of DEFENDANTS' facilities typically serves residents in both the Medicare and Medicaid programs, the term "nursing home" will refer to a facility with both Medicare and Medicaid residents.  The Social Security Act, §§ 1810 and 1919, and 42 C.F.R. § 483, *et seq*., refer to a nursing home patient as a "resident."  The terms "patient" and "resident" are used interchangeably herein.

5.      Unsatisfied with the earnings they generated from the Medicare and Medicaid programs,[7] DEFENDANTS knew there were only two ways they could squeeze more profits from their nursing home operations: (1) increase revenues or (2) decrease the cost of care. DEFENDANTS did both.  Realizing that the Medicare and Medicaid programs were ripe for fraud that likely would not be detected by the federal and state payors, DEFENDANTS engaged in a two-pronged scheme to defraud Medicare and Medicaid to accomplish their financial objectives.  More specifically, DEFENDANTS routinely, systematically, and knowingly:

   a.      Engaged in a scheme to increase their Medicare revenues by submitting factually and legally false claims for payment to Medicare that were inflated, not supported by resident medical records, and overcharged the federal government for services that were not provided; and

   b.      Engaged in a scheme to decrease its cost of providing Medicaid and Medicare services by cutting essential staffing so severely as to cause vulnerable, dependent, and disabled nursing home residents to be routinely subjected to (1) grossly substandard and/or non-existent nursing home services, (2) services that were professionally unacceptable and below the required standard of care (in terms of the lack of quantity and duration of care), and (3) unreasonable risk of physical and mental harm.

6.      At all times material to this case, the federal and state agencies responsible for the Medicare and Medicaid programs were unaware of DEFENDANTS' schemes to submit false claims for payment.

7.      <u>DEFENDANTS' Scheme to Systematically Overbill Medicare by Upcoding /Inflating the Billing Codes</u>: DEFENDANTS engaged in a pattern and practice of upcoding, inflating and submitting claims for payment to Medicare that were factually and legally false.

---

[7]During the time frame of 2008 to 2019, DEFENDANTS' nursing home business generated gross patient revenues in excess of $37 billion.  Payment for this care came from primarily two principal sources, Medicare and Medicaid.

By repeatedly making small changes to increase billing codes that were buried in detailed, complex bureaucratic billing forms and were nearly impossible to detect, DEFENDANTS received millions upon millions of dollars in overpayments without Medicare detecting their fraudulent activities.  More specifically, DEFENDANTS engaged in the routine practice of submitting claims for payment to Medicare for nursing services that were not supported by resident medical records or were based on false medical records.[8]  Such claims constituted factually and legally false claims.

8.    In furtherance of this scheme, DEFENDANTS engaged in a pattern and practice of falsely certifying the accuracy of their Medicare claims for payment for nursing services and its resident assessments upon which those claims were based at their nursing homes identified in *Exhibit 1*.

9.    DEFENDANTS' Scheme to Obtain Payment from Medicaid and Medicare by Systematically Submitting Claims for Excluded, Non-Covered, and Grossly Substandard and/or Non-Existent Services: Under federal law, DEFENDANTS' payments under both Medicaid and Medicare insurance programs were conditioned on the services (which they claimed to provide) being ***reasonable and of sufficient duration and quantity*** ("covered services").[9]

---

[8]Under the Medicare program, every claim for payment for nursing home services must be supported by each resident's underlying medical record which justifies and validates the amount and extent of billed services provided.  *See Medicare Benefit Policy Manual*, § 30.2.2.1; *Medicare Claims Processing Manual*, § 30.2.2; CMS's publication "*Complying with Medical Record Documentation Requirements*"; and *Ruckh v. Salus Rehabilitation,* 963 F.3d 1089, 1104 (11th Cir. 2020).  At all times material hereto, DEFENDANTS were aware that their claims for Medicare payment were required to be supported by medical record documentation that justified and validated the level of services for which it billed.

[9]*See* 42 U.S.C. § 1395y(a)(l)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services ... which ... are not ***reasonable*** and necessary for the diagnosis or treatment of illness or injury . . .") (emphasis added); *Medicare Benefit Policy Manual*, Ch. 8, § 30 ("The services must also

10.    The importance of the services being ***reasonable and sufficient in terms of duration and quantity*** was magnified by the vulnerable, dependent, and disabled nature of Medicaid and Medicare nursing home residents.  At the nursing homes identified in *Exhibits 1* and *2*, the recruitment of high-acuity/heavy-care residents was critical to DEFENDANTS' business plan and revenue generation.  More specifically, DEFENDANTS continually admitted residents who depended on nursing staff for their most fundamental care needs, rehabilitative care, nursing treatments, and specialized services.  By reason of their loss of physical function and cognitive decline, both Medicaid and Medicare residents at the subject nursing homes needed assistance with one or more activities of daily living ("ADLs"), including (1) toileting assistance, (2) incontinent care and changing of wet and soiled clothing and linen, (3) assistance transferring to chair and back, (4) assistance with dressing, (5) assistance with bathing and personal hygiene, (6) assistance with turning and repositioning immobile residents, (7) feeding assistance, (8) a.m. and p.m. care, and (9) exercise or range of motion for debilitated residents. A significant percentage of DEFENDANTS' residents were so dependent on staff that they required the assistance of two or more staff members to perform these ADLs.  Further, Medicare residents at the subject nursing homes required rehabilitative care, such as physical therapy, speech therapy or occupational therapy, and specialized nursing treatments and services (like tracheostomy care, I.V. medications and fluids, and isolation protocols).

11.    In order to provide services that are ***reasonable*** in terms of ***duration and quantity*** to vulnerable, dependent, and disabled nursing home residents, it is undeniable that a certain

---

be ***reasonable in terms of duration and quantity***.") (emphasis added); 42 C.F.R. § 440.230 (Medicaid – "Each service must be ***sufficient in amount, duration, and scope to reasonably achieve its purpose***.") (emphasis added).

level of staff time is required.  It is also axiomatic that under federal law ***some*** level of staffing

and time is required to deliver care services needed by residents who depend on the nursing

home to provide those services.[10]  Obviously, if no staff are provided by a nursing home, no care

services can be provided to its residents.  Accordingly, there is necessarily a staffing level that is

so ***extremely low, severe, and unsafe*** that it prevents the proper provision of the services

forming the basis of the contract between a nursing home and Medicaid and Medicare.  More

specifically, staffing levels in a nursing home can be so ***extremely low, severe, and unsafe*** as to

(1) make it ***physically and mathematically impossible*** for a nursing home to provide care

services that are ***reasonable in duration and quantity****,* (2) place vulnerable, dependent, and

disabled residents at risk of physical and mental harm, and (3) routinely subject residents to

grossly substandard and/or nonexistent nursing home services.  Unsurprisingly, such grossly

substandard and/or nonexistent services are excluded from coverage and payment under the

Medicaid and Medicare program.

12.    In order to decrease costs and increase their profit margins, DEFENDANTS

engaged in a dangerous practice of cutting the staffing in their nursing homes identified in

*Exhibit 2* to the bare minimum.  DEFENDANTS deliberately and routinely limited the number

of staff and the amount of staff time allowed to ***extremely low, severe, and unsafe*** levels while

simultaneously increasing resident census and care loads beyond the tipping point such that

resident care needs greatly exceeded the maximum care capacity of staff.  DEFENDANTS'

practices (1) made it physically and mathematically impossible to deliver care services at these

facilities that were ***reasonable in duration and quantity***, (2) placed vulnerable, dependent, and

---

[10]*See* 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); and 42 C.F.R. § 483.30
(effective December 27, 2005); and 42 C.F.R. § 483.35 (effective October 4, 2016).

disabled residents at risk for physical and mental harm, and (3) routinely subjected residents to grossly substandard and/or non-existent nursing home services.

13.     Further, DEFENDANTS' executives, employees and/or agents regularly demanded that their facilities increase resident census, while also mandating that each facility stay within a labor budget that was determined by DEFENDANTS' executives and/or agents without regard to resident acuity.  This approach tied the hands of leadership at each individual facility; who were forced to care for residents without the means to adequately staff each shift.

14.     Accordingly, DEFENDANTS falsely submitted claims for payment for the nursing homes identified in *Exhibit 2* for services that were excluded/non-covered and grossly substandard and/or non-existent under Medicaid[11] and Medicare.[12]

15.     At all material times, DEFENDANTS knew that neither the Medicare nor the Medicaid programs (including state and federal nursing home surveyors/inspectors) had the manpower or means: (1) to audit the millions of claims for payments they submitted to the federal and state government to ensure that the amount of services billed for were accurate and validated/supported by the residents' underlying medical records, and (2) to determine the amount of essential care that was ***physically and mathematically impossible*** for their nursing homes to deliver to vulnerable, dependent, and disabled residents as a consequence of their extremely low, severe, and unsafe staffing practices.  Moreover, to conceal their blatant violations of the FCA and state equivalents, DEFENDANTS routinely:

---

[11]*See* 42 C.F.R. § 440.230 ("Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.")
[12]*See* 42 U.S.C. § 1395y(a)(l)(A); *Medicare Benefit Policy Manual*, Ch. 8, § 30.

      a.      Falsified Minimum Data Set ("MDS") assessments[13] that formed the basis of claims for payment;

      b.      Falsified certifications as to the truthfulness and accuracy of MDSs and payment claims;

      c.      Falsified certifications that services which their facilities provided complied with federal and state laws; and

      d.      Deliberately misled the Government by manipulating the nursing home survey process and under-reporting Quality Measures ("QMs")[14] that their nursing homes were required to report to the Government.

16.     Accordingly, DEFENDANTS had no fear that their monthly submission of false claims for payment to Medicare and Medicaid would be detected by these governmental payors.  Not only did DEFENDANTS realize that they could get away with systematically overbilling the Medicare program by inflating service claims and billing codes and charging for nursing and rehabilitation care that was not provided, DEFENDANTS also knew that they could get away with routinely providing services that were so grossly substandard and/or non-existent that they: (1) were not "covered" by Medicare and Medicaid insurance programs (unreasonable in terms of quantity and duration), and (2) subjected vulnerable, dependent, and disabled residents to unreasonable risk of physical and mental harm.

17.     <u>Relators' Independent Knowledge</u>: By reason of their employment at MANORCARE, as well as the investigation undertaken in this case on behalf of Relator

---

[13]Federal law required (and requires) DEFENDANTS to perform comprehensive and periodic assessments of each resident's individualized care needs and functional capacities.  These assessments were (and are) required to be documented in an MDS assessment.  42 U.S.C. § 1395i–3.

[14]CMS developed a list of QMs in nursing homes consisting of specific care-related outcomes that are associated with quality care (example: pressure sores).

Compton,[15] Relators have independent knowledge of (1) DEFENDANTS' scheme to submit

claims for payment to Medicare that were inflated and not supported by resident medical records

and (2) DEFENDANTS' scheme to obtain payment from Medicaid and Medicare for routine and

ongoing grossly substandard and/or non-existent services that were insufficient in duration and

quantity to meet the health and safety needs of disabled and dependent residents and subjected

them to unreasonable risk of physical and mental harm.

18.     Further, Relators have direct and independent knowledge of the care needs and

clinical conditions of residents in the MANORCARE nursing homes where Relators worked

(ManorcCare-Northwest and ManorCare-Pottstown), as well as their MDS assessments that were

required for Medicare and Medicaid payment and the underlying medical records at those

nursing homes.  Additionally, Relators have direct and independent knowledge of the extremely

low, severe, and unsafe staffing levels mandated by MANORCARE in the MANORCARE

nursing homes where Relators which caused the grossly substandard and/or non-existent services

discussed herein.

19.     <u>DEFENDANTS Knowingly Submitted or Caused to Be Submitted False and</u>

<u>Fraudulent Claims</u>: DEFENDANTS knowingly submitted or caused to be submitted (a) false and

fraudulent Medicare claims for services that were inflated, not supported by resident medical

records, or based on false medical records, and (b) false and fraudulent Medicare and Medicaid

claims for services that were either grossly substandard and/or non-existent in violation of the

standards of care set forth in the Nursing Home Reform Act ("NHRA") and its implementing

---

[15]Whenever it alleged within this complaint that MANORCARE or PROMEDICA engaged in a
scheme, practices, or conduct that forms the basis of this lawsuit, Relators' knowledge of the
same is based on their personal observations and experiences while working for MANORCARE,
as well as the investigation undertaken in this case on behalf of Relator Compton.

regulations, 42 U.S.C. §§ 1395i-3, 1396r *et seq*.; and 42 C.F.R. §§ 483.1-483.95.  By reason of

the scope of DEFENDANTS' routine practices, the United States suffered millions of dollars in

damages for false and fraudulent claims paid by the Medicare and Medicaid programs.

20.     The False Claims Act: The FCA establishes liability for knowingly making,

submitting, or causing false or fraudulent claims for federal funds.  31 U.S.C. § 3729(a)(1)(A).

21.     Under the FCA, "knowingly" means that a person has actual knowledge that

information is false, acts in deliberate ignorance of the truth or falsity of the information, or acts

in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).

22.     No proof of specific intent to defraud is required to show that a person (or entity)

acted knowingly under the FCA.  31 U.S.C. § 3729(b)(1)(B).

23.     Courts have held that only "material" false claims are actionable under the FCA.

The FCA defines the term "material" as "having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

24.     The FCA provides for a recovery of three times the damages sustained by the

United States, plus a civil penalty for each violation of the FCA.  31 U.S.C. § 3729(a)(1).[16]

---

[16]The FCA states that a civil penalty for a violation which occurred prior to November 2, 2015,
is to be not less than $5,500 and not more than $11,000.  31 U.S.C. § 3729(a)(1).  These
penalties, however, are to be adjusted in accordance with the inflation adjustment procedures set
forth in Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law
101-410.  *See* 28 C.F.R. § 85.3(a)(9).  For all FCA violations occurring after November 2, 2015,
the penalties are calculated based on the date that they are assessed and are adjusted annually for
inflation.  As of July 3, 2025, the minimum penalty is $14,308 and the maximum penalty is
$28,619.

25.    By reason of the conduct describe above and detailed within the remainder of this Complaint, Relators bring causes of action against DEFENDANTS for violations of the FCA and state law equivalents for:

(A)    knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

* * *

(G)    knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.

*See* 31 U.S.C. § 3729(a)(l)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(l)(A)-(B) (West 2010), and state law equivalents identified herein.

## II.    JURISDICTION AND VENUE

26.    Relators bring this action individually and on behalf of the United States for DEFENDANTS' violations of the FCA, and on behalf of the states of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Washington, and the Commonwealth of Virginia, for violations of their respective State False Claims Acts (the states are collectively referred to as the "*Qui Tam* States").

27.    This Court has both subject matter and personal jurisdiction under 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law causes of action, as well as claims brought under the respective State False Claims Acts under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

28.     Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because at the time of the filing of this suit one or more of DEFENDANTS were (1) found in, (2) residing in, and/or (3) transacting business in this District, and because acts proscribed by 31 U.S.C § 3729 occurred in this District.  For example, DEFENDANTS owned, operated, and managed the ManorCare Health Services-Easton (provider number #395540) in Easton, Northampton County, Pennsylvania.  Further, acts proscribed by 31 U.S.C § 3729 occurred at the ManorCare Health Services-Easton facility.

29.     There has been no public disclosure of the allegations herein.  To the extent that there has been a public disclosure unknown to the Relators, they remain the "original source" under 31 U.S.C. § 3730(e)(4) and similar state laws.  Relators have independent knowledge of the information on which the allegations are based and that knowledge materially adds to any publicly disclosed allegations or transactions.  Relators voluntarily provided their information to the United States prior to filing an action under the FCA.

## III.    THE PARTIES

### A.    **Relators**

30.     Relators are both citizens of the United States and have standing to bring this action under the FCA and the various state False Claims Acts.

31.     Relators have voluntarily provided information to the Government before filing this action based on this information and have complied with all procedural requirements of the laws under which this case is brought.

32.     Relators' claims and this Complaint are not based upon allegations or transactions which are the subject of another civil suit or another administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

33.     Relators bring this action based on their direct and independent knowledge and, where indicated, on information and belief.  Relators are the original source of the information upon which this Complaint is based, and the facts alleged herein, as that phrase is used in the FCA and other laws at issue in this Complaint.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).

34.     Relators both have experience working at nursing homes owned and operated by MANORCARE.

35.     Between January 2008 and October 2014, Relator Compton was employed by MANORCARE as an Interim Director of Nurses, Assistant Director of Nurses, and/or registered nurse at ManorCare-Northwest, a nursing home in Oklahoma City, Oklahoma.

36.     Between March 23, 2015 and  February 22, 2017, Relator Bonner was employed by MANORCARE as the Human Resources Director at ManorCare-Pottstown, a nursing home in Pottstown, Pennsylvania.

37.     Despite being employed in separate MANORCARE nursing homes located 1,354 miles apart, Relators Compton and Bonner discovered and observed the same routine and ongoing pattern and practice of medical record falsification, unsafe staffing levels, grossly substandard and/or non-existent care to dependent and disabled residents, and resulting false claims.

38.     Although ManorCare-Northwest and ManorCare-Pottstown were located 1,354 miles apart, they were both a part of the nationwide MANORCARE chain that tightly controlled resident admissions, resident acuity, facility staffing levels, care policies and practices, budgets, and financial targets.  ManorCare-Northwest and ManorCare-Pottstown, like the other MANORCARE nursing homes identified in *Exhibits 1* and *2*, were deliberately filled with

dependent, disabled, and high acuity Medicare and Medicaid residents who depended on nursing

home staff to meet their heavy care needs.  Like other facilities in the MANORCARE chain, the

vast majority of the revenue generated by ManorCare-Northwest and ManorCare-Pottstown were

derived from Government payment sources—Medicare and Medicaid.  And like other facilities

in the MANORCARE chain, MANORCARE controlled and dictated that ManorCare-Northwest

and ManorCare-Pottstown be staffed at similar caregiver staffing levels, use similar care policies

and practices, abide by similar budgets, and hit similar financial targets.

39.    Based on their personal observations and the extensive investigation conducted on

their behalf, Relators have reason to believe that the routine and ongoing pattern and practice of

medical record falsification, unsafe understaffing, grossly substandard and/or non-existent care

to dependent and disabled residents, and false claims that they respectively discovered and

observed was the product of the control exercised by MANORCARE over ManorCare-

Northwest and ManorCare-Pottstown, as well as over each of the facilities in MANORCARE's

chain nationwide (discussed below), which control continued under PROMEDICA.

40.    **Luvetta Compton**: Relator Compton holds (1) a Bachelor of Science degree in

Nursing (2005-2007),[17] (2) a Master's Degree in Gerontology (2012-2014), (3) a Master's

Degree in Nursing Education/Leadership (2019-2021), and (4) a Doctorate in Nursing Home

Administration (2021-2022).  Further, Relator Compton was certified as a long-term care

administrator by the University of Central Oklahoma in 2016 and was licensed by the State of

Oklahoma as a nursing home administrator in 2021.

---

[17]Relator Compton also holds an Associate Nurse Science degree (2004) and Associate Degree in
Psychology (2003).

41.     From June 1, 2012 to October 2014, Relator Compton served as the Interim Director of Nurses ("IDON") and/or the Assistant Director of Nurses ("ADON") at ManorCare-Northwest.

42.     As IDON and ADON for ManorCare-Northwest, Compton's job responsibilities included:

- Making daily rounds to ensure resident care standards were met and nursing personnel performance was within accepted practice standards;

- Analyzing and evaluating the adequacy and continuity of resident care;

- Analyzing and evaluating medical record documentation and reporting on a consistent basis;

- Conducting chart audits and studies of resident medical records to evaluate the adequacy of nursing services delivered to residents;

- Identify, evaluating, and monitoring significant trends in resident outcomes, care issues, substandard practices, and QA reviews;

- Monitoring the implementation of each resident's comprehensive plan of care on a consistent basis;

- Determining the number of staff members necessary to meet the care needs of residents;

- Ensuring that nurse staffing levels complied with MANORCARE's prescribed staffing numbers and budget;

- Reviewing staff schedules and assigning nursing staff in the facility;

- Instituting a communication process between all levels of nursing staff to promote care delivery and continuity;

- Communicate resident care issues and concerns with the administrator, other departmental heads, family members, and/or corporate consultants;

- Formulating a plan of correction and action steps to address concerns and trends regarding resident care issues and/or substandard practices;

- Conducting nursing department staff meetings regarding resident care on a daily and periodic basis;

- Participating in facility management, departmental, and corporate meetings on a regular basis;

- Completing and responding to all requests for HCR reports, logs, tracking tools, and other requests made by corporate;

- Supervising and managing nursing staff;

- Reviewing and investigating complaints and grievances from residents, family, and staff concerning care issues;

- Participating in investigations about quality of care issues, incidents, and substandard care practices;

- Responding to family questions, concerns, and issues regarding nursing care;

- Directing nursing staff and overseeing the care delivered to residents in the facility;

- Participating in and completing performance reviews and disciplinary actions regarding nursing staff; and

- Working with MANORCARE corporate and facility leadership to meet resident admission goals, nursing department budgets, and financial goals.

43.     By reason of her job responsibilities at ManorCare-Northwest, Relator Compton has direct and independent knowledge of the facts and circumstances giving rise to the causes of action set forth herein, as well as the routine pattern and practices forming the basis of this lawsuit.

44.     More particularly, from at least June 1, 2012 to October 2014, Relator Compton acquired direct and independent knowledge of the pervasive pattern and routine practice of medical record falsification occurring at ManorCare-Northwest (including the ongoing falsification of Late Loss ADL flowsheets and MDS assessments). These Late Loss ADLs and MDSs contained critical documentation that was required to support MANORCARE's claims for payment to the Government for Medicare and Medicaid services.

45.     In conducting and monitoring the audits of resident medical records in her

18

capacity as IDON and/or ADON, Relator Compton became aware that Late Loss ADL

flowsheets (involving toileting, bed mobility, transfer, and eating) were routinely being falsified.

46.    As part of this audit process, Relator Compton routinely discovered and observed

that staff assistance with Late Loss ADLs (toileting, bed mobility, transfer, and eating) was being

falsely documented as having been provided when, in fact, such care had not been provided to

dependent or disabled residents.  Relator Compton commonly found that Late Loss ADL

documentation at ManorCare-Northwest was being completed (1) by staff members who were

not assigned to the resident or involved in the individual resident's care, (2) who were not on

duty at the time such care was purportedly provided, or (3) when a resident was not even in the

nursing home.  In short, resident ADL flowsheets were regularly "parrot-charted" by nurse aides

who routinely filled in the blanks in a resident's medical record by mimicking previous care

entries, in an attempt to make it appear that care services were provided by the staff member

when in fact they were not.[18]

47.    Relator Compton also commonly found that Late Loss ADL documentation for

residents was filled with gaps, with no ADLs documented, or was missing altogether.

48.    Relator Compton discovered that the reason for this routine parrot charting,

missing charting, and gaps in the ADL flowsheets was because staff at ManorCare-Northwest

simply did not have time to deliver all required basic ADL care to residents due to the impossible

care loads imposed upon staff by MANORCARE.  Those care loads made it physically

---

[18]Examples of "parrot charting" include staff placing their initials in medical record flow sheets
for all care services required by a resident on days when they were not even in the building, or, if
working, filling in all possible blanks in a single sitting at (1) the beginning of a shift before the
care was required or could have been delivered, or (2) at the end of a shift before going off duty,
falsely representing that they had delivered such care, when they had not.

impossible to perform the required tasks.

49.    Also, the medical records often falsely reflected that ManorCare-Northwest staff had provided one personal physical assist or two+ persons physical assists with ADLs to totally dependent or extensively dependent residents, when the truth was that this care was not provided because there were not enough staff members to do the work.

50.    Due to the critically low and unsafe levels of staffing at ManorCare-Northwest, dependent and disabled residents were not provided the ADL care services they needed, and the accuracy of the medical record documentation was severely compromised.

51.    Relator Compton routinely found false and conflicting resident medical record documentation that (1) did not represent the actual care required by and delivered to residents as set forth in MDSs and resident care plans, and (2) was inconsistent with residents' actual condition and needs.  The underlying ADL documentation upon which the MDS assessments were supposed to be based was commonly inaccurate or non-existent.

52.    During the timeframe of June 1, 2012 to October 2014, Relator Compton repeatedly communicated her concerns to facility management that the ADL care documented for dependent and disabled residents was routinely false and/or that the underlying medical records did not support the representations documented in the MDS assessments.

53.    Despite being made aware of Relator Compton's numerous and repeated concerns about falsified medical records, MANORCARE did nothing to correct the rampant falsification of records at ManorCare-Northwest and continued to demand that the facility fill in all the holes in the records, particularly the Late Loss ADL flow sheets.  MANORCARE ignored Relator Compton's concerns.

54.     Relator Compton routinely discovered, observed, and communicated to facility management that ManorCare-Northwest was grossly understaffed and that staff members were either unable to provide needed care to residents or that the care provided was not provided in accordance with professional standards.

55.     <u>Grossly Substandard and/or Non-Existent Care</u>: As a result of the unsafe staffing levels at ManorCare-Northwest that Relator Compton discovered and observed, the care services provided to dependent and disabled Medicare and Medicaid residents routinely and as a matter of practice violated accepted standards of medical and nursing practice, were not reasonable in terms of quantity and duration, and were grossly substandard and/or non-existent (as discussed in more detail below). The grossly substandard care, non-existent services, and violations of professional standards of quality at ManorCare-Northwest were systemic and widespread and caused inhumane neglect of dependent and disabled residents.

56.     More specifically, as a result of the unsafe staffing levels at ManorCare-Northwest discovered and observed by Relator Compton, the care services provided to dependent and disabled Medicare and Medicaid residents were dangerously deficient and professionally unacceptable, and residents were, *inter alia*:

a.      Routinely deprived of/denied essential care services (including ordered medications, treatments, interventions, clinical care, and basic assistance with ADLs) required to maintain their health and safety in gross violation of acceptable standards of medical practice;

b.      Routinely deprived of/denied care required by their individualized care plans in violation of professional standards;

c.      Routinely subjected to inhumane, undignified, and repugnant treatment that placed them at unreasonable risk for physical and mental harm, including:

i.      Resorting to soiling their beds and clothes instead of being assisted to the toilet by staff;

21

    ii.    Prolonged exposure to their own waste, with urine staining linens and/or feces hardening on their skin;

    iii.    Infrequent bathing, sometimes ***going weeks*** without baths or showers despite incontinence issues;

    iv.    Failure to turn and reposition residents while in bed or sitting in a chair, for extended periods to avoid skin breakdown and pressure sores;

    v.    Failure to provide assistance with feeding to avoid weight loss and malnutrition;

    vi.    Failure to provide sufficient fluids to avoid dehydration;

    vii.    Failure to provide bowel and/or bladder training programs;

    viii.    Leaving residents in bed and in pajamas all day without opportunities to get up;

    ix.    Persistent odors of bodily waste and neglect, with unaddressed hygiene and grooming needs;

    x.    Unanswered cries or calls for help, even after activating call lights; and

    xi.    Failure to manage and control pain; and

d.    Routinely subjected to grossly substandard and/or non-existent care that placed them at unreasonable risk for physical and mental harm, including causing these resident to suffer/develop avoidable (1) pressure sores, (2) malnutrition and weight loss, (3) dehydration, (4) contractures, (5) falls and fractures, (6) infections, (7) unnecessary deterioration of underlying medical diagnoses, and (8) premature death.

57.    Moreover, the care at ManorCare-Northwest routinely violated quality of care requirements set forth in 42 C.F.R. § 483.25.

58.    Furthermore, the unsafe staffing levels at ManorCare-Northwest routinely caused violations of residents' rights to be free from abuse.  42 U.S.C. § 1395i-3(c)(1)(A)(ii).

59.    Relator Compton repeatedly placed MANORCARE on notice that (1) its staffing levels were unsafe; (2) its staffing did not take into account the high acuity of the resident

population at ManorCare-Northwest; (3) that residents were being deprived of basic care known by the nursing and medical profession to prevent pressure sores, falls and fractures, malnutrition, dehydration, infections, pain, and known and treatable complications of acute and chronic conditions; and (4) its critically low staffing levels made it physically impossible for staff to deliver basic care and resulted in grossly substandard and/or non-existent care.

60. Despite being made aware of Relator Compton's concerns about unsafe understaffing, rather than increasing staff, MANORCARE continued to pressure and demand ManorCare-Northwest to limit its nurse staffing levels to unreasonably and dangerously low levels. More specifically, MANORCARE continually pressured ManorCare-Northwest to hit critically low staffing targets which it dictated, even demanding that the facility stay below the corporate budgeted staffing levels it mandated. Rather than halting new admissions and decreasing the resident census in order to give the limited staff available more time to provide resident care, MANORCARE relentlessly recruited even more high acuity residents who further increased caregivers' impossible workloads.

61. During her employment, Relator Compton discovered and observed the broken nature of the nursing process at ManorCare-Northwest caused by understaffing. Due to unsafe and dangerously low caregiver staffing levels, (1) assessments and medical record documentation of the care needs, the care services that residents required, and their condition were regularly inaccurate, missing, and/or falsified; (2) individualized care plans for residents were not created, evaluated, revised/updated, and followed; and (3) most unfortunately, the care that residents needed was routinely not provided.

62. **James Bonner**: In or about 2015, Relator Bonner - a recent college graduate and aspiring human resources professional - interviewed for a position as Director of Human

Resources at a MANORCARE nursing home in Pottstown, Pennsylvania named ManorCare-Pottstown.

63.     On March 4, 2015, Relator Bonner was offered the position of Director of Human Resources at ManorCare-Pottstown by HCR ManorCare, Inc.  Notably, this job offer came from HCR ManorCare, Inc. rather than from ManorCare-Pottstown.  *See Exhibit 3*.  After accepting the job, Relator Bonner was trained by MANORCARE regarding his job duties and responsibilities, and he was provided human resources policies and procedures created by MANORCARE and access to the MANORCARE intranet, which contained numerous corporate created forms and documents that he was required by MANORCARE to follow and use.

64.     Relator Bonner's training occurred not at ManorCare-Pottstown, but was conducted by corporate staff at another MANORCARE facility.

65.     As Director of Human Resources at ManorCare-Pottstown, Relator Bonner's job responsibilities included, but were not limited to, the following:

- Addressing employee concerns, grievances, and conflicts, fostering a supportive workplace culture;

- Performing post-employment and exit interviews;

- Maintaining accurate employee records and documentation;

- Participating in staff recruitment, interviews, and onboarding;

- Analyzing staff turnover and retention trends (and reasons for same);

- Participating in performance evaluations and assessments of employee performance;

- Attending daily staff meetings regarding facility operations, staffing, complaints, and issues;

- Investigating work-related injuries and incidents and notifying the corporate office of same;

- Maintaining awareness of the employee morale climate and providing programs to ensure good morale levels;

- Assisting in keeping the Kronos payroll system up-to-date, including changes in schedules and timekeepers and that current work schedules were maintained in the Kronos system;

- Working with other departments to set goals, address performance issues, and develop improvement plans;

- Advising department heads and supervisors about disciplinary actions, including terminations, in compliance with corporate standards;

- Preparing HR-related reports, such as turnover rates, staffing levels, or training completion, for leadership or regulatory bodies;

- Preparing staff for federal, state, and local Government inspections; and

- Assisting with pre-survey preparations, call light response time audits, and medical record chart audits.

66.    In his capacity as Director of Human Resources at ManorCare-Pottstown, Relator Bonner discovered and observed that MANORCARE controlled, directed, determined, and oversaw all operational decisions having any fiscal impact at ManorCare-Pottstown, including staffing levels, supply purchases, and resident admission practices. The administrator, director of nursing, and other local departmental managers at ManorCare-Pottstown were merely figureheads—with all actual control of the facility occurring at the corporate level.

67.    His role as Director of Human Resources positioned Bonner to hear directly from staff who expressed concerns about routine falsification of medical record documentation and inadequate care driven by MANORCARE corporate mandates.

68.    Although Relator Bonner did not discover the ongoing medical record falsification until approximately January 2017, soon after becoming employed at ManorCare-Pottstown, he became aware of the chronic and dangerously low staffing levels at the facility and

pressure by corporate to admit more residents with high acuity and heavy care needs.  By reason

of these two practices, there was routinely a huge gap between the care that residents required

and the care that was humanly possible for staff to provide.  One of the fallouts of these practices

was that staff did not have the time (1) to provide needed nursing care and (2) to document that

care in resident medical records.  Relator Bonner subsequently discovered MANORCARE's

solution for the lack of supporting documentation—falsification.

69.     Although there were hints and clues about the falsification practices that were

occurring at ManorCare-Pottstown during the early phase of his employment (for example, the

Director of Nursing ("DON") Lisa Gray ("DON Gray") stated to Bonner on several occasions

that she "needed to go do my CNA charting"), Relator Bonner did not fully grasp the seriousness

of the falsification practices until approximately January 2017.

70.     In or about January 2017, Relator Bonner was approached by a nurse aide at

ManorCare-Pottstown and was told that DON Gray was falsely charting services for residents

that were not provided, including filling in holes in the CNA charting.  More specifically, Relator

Bonner was told that DON Gray was charting in resident medical records that assistance with

ADLs, including transferring, toileting, bed mobility, eating, showers, and PM Care, had been

provided to residents, even though she (DON Gray) had not performed such services.  Upon

information and belief, such services were never performed by any staff member at ManorCare-

Pottstown.

71.     As soon as Relator Bonner learned that DON Gray was charting for services

she did not provide, he immediately contacted Marlene Briel ("Ms. Briel"), the MDS

Coordinator, and Cindy Stroble ("Ms. Stroble"), the Assessment Coordinator.  Both Ms.

Briel and Ms. Stroble were involved in the submission of, tracking, and compliance for

26

Medicare and Medicaid reimbursements.

72.    Relator Bonner contacted Ms. Briel and Ms. Stroble to ensure that DON Gray's fraudulent activities were not affecting Medicare and Medicaid reimbursements. Relator Bonner learned that reimbursements were being affected by this longstanding and widespread practice of medical record falsification.

73.    Further, both Ms. Briel and Ms. Stroble acknowledged that they were already aware of questionable charting activities by DON Gray.  Ms. Briel and Ms. Stroble noted that they had often seen that in the minutes prior to the close of a shift, the computerized nursing charts would all be "magically" completed.  Those computerized nursing charts were empty of any documentation regarding ADLs (including transferring, toileting, bed mobility, eating, showers, and PM Care) immediately prior to the end of the nursing shift. However, those charts would then be completed minutes before the nursing shift closed out, and the computerized records locked.  In those instances, the author of the computerized medical charts would be DON Gray - even when she was out of town or at home.

74.    Upon information and belief, DON Gray completed the computerized medical charts while at her home and did so without any knowledge as to what direct care services were provided, or whether any direct care services had been provided  at all.

75.    DON Gray's falsification grew out of the fact that the medical records were incomplete and filled with holes.  The facility's routine and severe understaffing, and the fact that staff did not have time to provide the care residents needed or to document it, caused the medical records to be incomplete, full of holes, and false.

76.    Accordingly, DON Gray's entry of unsubstantiated and false representations of direct care services being provided to residents resulted in the completion and submission of

inaccurate and false MDS forms.

77.    Within a week of reporting this fraudulent charting to Ms. Briel and Ms. Stroble, Relator Bonner was placed on a performance improvement plan by his supervisor, Administrator Betty Kutner ("Ms. Kutner"), and the ManorCare Regional Human Resources Manager, Christine Bry ("Ms. Bry").

78.    Prior to his discussion with Ms. Briel and Ms. Stroble, neither Ms. Kutner nor Ms. Bry had expressed any concern with Relator Bonner's performance.  Before Relator Bonner reported this fraud, his job performance throughout his employment at ManorCare-Pottstown had been consistently praised, with only minor feedback.  Moreover, Relator Bonner disputed that his performance was deficient.  Indeed, Bonner was regularly told prior to this "performance plan" that he was doing an exceptional job, especially considering the understaffing in the facility. Despite this history of positive job performance reviews, Ms. Bry and Ms. Kutner told Relator Bonner that if he did not sign the performance improvement plan, he would be terminated.

79.    Shortly after initially discussing DON Gray's fraudulent charting with Ms. Briel and Ms. Stroble, Relator Bonner was approached by a certified nursing assistant ("CNA"), Amanda Reitnauer at ManorCare-Pottstown ("CNA Reitnauer"), who corroborated his knowledge of and provided additional examples of fraudulent charting by DON Gray.  CNA Reitnauer informed Relater Bonner that DON Gray was filling out the medical charts online, *from home*.  CNA Reitnauer discovered that her own medical charts were being completed by DON Gray.  CNA Reitnauer was extremely upset by this and stated to Relator Bonner that the charting "was not accurate."  CNA Reitnauer proceeded to question how DON Gray could know what services had been provided, stating that "it's just not right that she's doing this." CNA Reitnauer further stated that she knew that the residents were not getting many of the ADL

services that DON Gray was falsely documenting because residents routinely told her that other CNAs *never* provided the ADL care they needed.

80.     Within weeks of first learning about the fraudulent charting, Relater Bonner again met with Ms. Briel and Ms. Stroble to discuss DON Gray's actions.  Ms. Briel and Ms. Stroble had reviewed numerous pages of medical records and documents from multiple residents stating that ADL services were provided to residents when in fact they knew that such services were not provided.  Ms. Briel and Ms. Stroble presented these documents to Relater Bonner for his review as well.

81.     Upon reviewing these medical records and documents, Relater Bonner discovered that DON Gray had electronically completed charts on October 18, 2016 through October 21, 2016, while she was attending a PADONA conference 150 miles away in Hershey, Pennsylvania.  Despite the fact she was 150 miles away from ManorCare-Pottstown, DON Gray continued to fill out charts documenting services provided, physical assessments, and other charting responsibilities.  DON Gray would have *no way* to know about any of the information she was recording on those dates, thus demonstrating that she was engaged in fraudulent charting.

82.     Like the falsified ADL and other medical records discovered and observed by Relator Compton at ManorCare-Northwest, the falsified ADLs and other medical records discovered and observed by Relator Bonner at ManorCare-Pottstown (1) were the basis for MDS forms that impacted payment and (2) enabled MANORCARE to fraudulently claim reimbursements for unprovided care.

83.     As stated above, during his employment at ManorCare-Pottstown, Relator Bonner discovered and observed that the facility was dangerously understaffed and routinely

failed to maintain sufficient personnel on a 24-hour basis. Relator Bonner discovered that
the reason for the incomplete, missing charting, and gaps in the ADL flowsheets and other
medical records that support the MDSs and claims for payment was because staff at
ManorCare-Pottstown simply did not have time to deliver all required basic ADL care and
nursing services due to impossible care loads imposed by MANORCARE. Consequently,
the resident MDS assessments contained false information that was not supported by the
facility's medical records.

84.    Moreover, not only was the facility woefully understaffed, ManorCare-
Pottstown was pressured by "corporate" to recruit and continually accepted new patients -
despite not having the minimum staff necessary for the current patients - in order to increase
its reimbursements and profits. Indeed, ManorCare-Pottstown specifically accepted patients
with diagnoses that the facility could not care for or address simply to increase profits.

85.    <u>Grossly Substandard and/or Non-Existent Care</u>: As a consequence of this
unsafe understaffing, Relator Bonner discovered and observed specific instances at
ManorCare-Pottstown when Medicare resident received worthless services, grossly
substandard and/or non-existent care, and suffered harm. For example, Relator Bonner
witnessed residents not receiving medically necessary activities that were marked as
"completed" on the schedule. Relator Bonner also witnessed residents being precluded from
such medically necessary activities because staff were unable to, or refused to, get residents
out of bed, dressed, or transported to the activity, despite the resident's wishes.

86.    Further, Relator Bonner discovered and observed staff members at
ManorCare-Pottstown actively ignoring resident call bells and call lights because of
MANORCARE's failure to appropriately staff the facility. As a result, ***residents would***

***often scream for help*** and ultimately soil themselves.

87. Residents reported to Relator Bonner that they were often left sitting for hours in their own urine and feces. Relator Bonner was also aware that ManorCare-Pottstown residents routinely failed to receive showers. Additionally, Relator Bonner received reports from staff that they were so understaffed that they could not weigh residents - which is necessary to ensure that the correct medical services are provided, including correct medication dosages and appropriate interventions – and, as a result, were simply not doing so, despite marking weight measurements in the medical records. Further, one nurse even reported to Relator Bonner that she was not able to routinely replace IV bags on feeding tubes as a result of the understaffing.

88. Moreover, nursing staff noted on a regular basis that residents were denied nursing services, despite records stating such services were provided. By way of example, one staff member noted that a resident with a tracheotomy tube had not had it changed in days, despite false documentation stating it had been changed. The tube was crusted over and filled with mucus.

89. Similarly, staff would often over-medicate patients to keep them docile and compliant. One such resident was suffering from mental impairment. Staff would overmedicate him with Ativan so they "wouldn't have to deal with him."

90. Further, staff routinely failed to turn and reposition residents with pressure sores, despite filling out charts showing this assistance had been provided. Those residents suffered immense pain from inflamed and spreading pressure sores.

91. Accordingly, as set forth herein, the services for which MANORCARE submitted claims for payment to Medicare and Medicaid were of such grossly substandard quality that

MANORCARE's provision of those services ceased to be compensable by Medicare and Medicaid.

92.    <u>Retaliation and Termination</u>: Between January and February 2017, MANORCARE's retaliation of Relator Bonner (discussed above) escalated and resulted in his ultimate termination on February 22, 2017.  During that period, Ms. Kutner forced Relator Bonner to sign additional performance plans under threat of termination, refusing him copies of the documents.  Despite meeting all goals, Relator Bonner was terminated on February 22, 2017, in a clear act of retaliation for exposing rampant fraud.

93.    The February 22, 2017 termination letter ("Termination Letter") stated that "this letter serves to inform you that your employment with **HCR Manor Care** has been terminated …You are not eligible for re-hire with **any Manor Care affiliate."** *See Exhibit 4*.

94.    After learning of his termination, Ms. Stroble, the Assessment Coordinator, called Relator Bonner.  At the outset of the conversation, Ms. Stroble expressed disbelief that ManorCare-Pottstown continued to submit claims to Medicare and Medicaid for reimbursement when it knew that DON Gray had fraudulently filled out the supporting documentation.  Ms. Stroble also told Relator Bonner that she told Ms. Kutner that she and Bonner were concerned about the fraudulent billing activity and that she hoped "that's not the reason they fired you."

95.    Accordingly, immediately prior to Relater Bonner's termination, Ms. Kutner learned that Relator Bonner had informed the MDS Coordinator and the Assessment Coordinator of serious concerns regarding the truthfulness and accuracy of the resident medical charts, the MDS forms, and other claims for reimbursement  under Medicare and Medicaid.

96.    Despite the fact that Relator Bonner had surpassed  all of his "performance improvement objectives," he was terminated.  Based on the facts recited herein, it is clear that

Relator Bonner was terminated in retaliation for his reporting of DON Gray's unlawful practices.

97.     MANORCARE fired Relator Bonner for investigating and reporting that DON Gray was inputting false information in medical charts and other records for services that were not provided.  The inaccurate charting resulted in false information being recorded on the MDS forms required for Medicare reimbursement.

98.     Moreover, MANORCARE engaged in retaliatory tactics and fired employees, including Relator Bonner, who complained  about staffing and supply shortages in an effort to silence those employees and bury their concerns.

99.     **Relator Compton's Investigation Uncovered Evidence of a Widespread and Systemic Scheme of False Claims at Other MANORCARE/PROMEDICA Nursing Homes Similar to ManorCare-Northwest**: Furthermore, as described below, Relator Compton, through an investigation conducted by her attorneys and experts, uncovered widespread evidence that the subject nursing homes identified in *Exhibits 1* and *2* routinely submitted false MDS assessment records and false claims for payment.

100.    More specifically, the investigation revealed that the Late Loss ADL care and nursing services that DEFENDANTS claimed they provided to residents of the nursing homes identified in *Exhibits 1 and 2* vastly exceeded the physical work capacity of the skeletal staff DEFENDANTS permitted to work at these facilities, resulting in the underlying medical records (that were required to support MDSs and UB-04 claims for payment) being routinely false, full of holes, and not accurately reflective of the skilled services provided to dependent residents.

101.    Based on the investigation of the subject nursing homes that Relator Compton caused to be undertaken by nursing home workload[19] experts, database experts, computer simulation experts, industrial engineers, medical experts in geriatrics, and MDS certified nurse auditors, Relator Compton has determined that the ADL care claimed to have been provided to residents in the subject facilities identified in *Exhibits 1* and *2* was **both mathematically and physically impossible** to have been performed by the staff at those facilities.

102.    Moreover, as a result of this investigation and evidence, Relator Compton has reason to believe that DEFENDANTS engaged in a pattern and practice of submitting false and unsupported claims for payment throughout the MANORCARE/PROMEDICA chain.

103.    This evidence of DEFENDANTS' pattern and practice was found by Relator Compton's experts, including her database experts, computer simulation experts, and industrial engineers who determined that it was possible using simulation analytics[20] and generally-accepted industrial engineering principles to quantify:

    a.    the minimum amount of labor time or staff resources required in the subject nursing homes identified in *Exhibits 1* and *2* to perform all ADL care tasks on a daily basis;

---

[19]The term "workload" means the total amount of ADL care required to be performed for all residents in a single facility in a 24-hour period by nursing home staff.

[20]CMS has long recognized that:

> "[S]imulation models do not create data to predict theoretical outcomes nor are they based on theoretical 'unknowns.' On the contrary, they take what is known and use these 'givens' to **mathematically predict outcomes, usually with a high degree of accuracy**."

> Using simulation analytic strategies, **labor-intensity data can be converted mathematically** into estimates of minimum staffing ratios needed."

Phase II Final Report to Congress, Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes, CMS, 2001 (emphasis added). This is particularly true when repetitive tasks such as the delivery of ADLs to nursing home residents are involved.

     b.     the maximum work capacity of staff on duty based on the numbers of staff and total hours worked on a daily basis at the subject nursing homes identified in *Exhibits 1* and *2* (i.e., the maximum number/amount of care services that can be performed by a precise number of workers in a day); and

     c.     the quantity of tasks (care services), if any, that cannot possibly be performed on a daily basis by a set number/hours of staff at the subject nursing homes identified in *Exhibits 1* and *2,* due to workload exceeding maximum work capacity.

104.     Relator Compton, through her experts and counsel, uncovered evidence that the residents at the subject nursing homes identified in *Exhibits 1* and *2* required the same types of repetitive, basic ADL care services as the residents at ManorCare-Northwest required.  These basic ADL care services included (1) toileting assistance, (2) incontinent care and changing of wet and soiled clothing and linen, (3) assistance transferring to chair and back, (4) assistance with dressing, (5) assistance with bathing and personal hygiene, (6) assistance with turning and repositioning immobile residents, (7) feeding assistance, (8) a.m. and p.m. care, and (9) exercise or range of motion for debilitated residents.  These ADL care tasks have been extensively studied by expert nurses and nursing home workload experts who have scientifically measured and determined the minimum amount of staff time required, the usual or mode amount of time required, and the maximum amount of time required to perform each care task.  Based on these known task times for each basic ADL care service and how often these services are required to be provided each day, Relator Compton, through her experts and counsel, was able to quantify, based on their MDS assessments and ADL flowsheets, the precise amount of nursing home staff time residents require to have their needs met.

105.     Gathering and using immense data sets from each of the nursing homes listed in *Exhibits 1* and *2* that included resident MDS data, resident ADL data, resident acuity data, daily

staffing hours, and ADL task time data, Relator Compton's experts employed generally-accepted industrial engineering analytic tools and computational software to determine the ***quantity and duration*** of ADL care that was mathematically and physically ***possible and impossible*** to have been provided at those nursing homes.

106.    The analytic tools and computational software used to conduct the analysis in this case are taught in engineering schools throughout the country and are used and relied upon by the U.S. military, manufacturing and service industries, and healthcare institutions across the United States to test and determine if (a) it is mathematically and physically possible for the number of workers scheduled on a job to handle the assigned workload (i.e., complete every task required to be performed), and (b) what quantity of work can and cannot be performed when different numbers of workers (or resources) are allocated to a job.

107.    Based on the investigation and analysis performed by these experts, it is clear that ManorCare-Northwest and the subject facilities listed in *Exhibit 1* and *Exhibit 2* were dangerously understaffed.  The common and massive disparity between staff (hours of actual time available to deliver care) and resident care workload (hours of required time to deliver care) was so large that it was mathematically and physically impossible for DEFENDANTS to deliver all care and services they routinely claimed they provided to dependent and disabled residents in the subject facilities listed in *Exhibits 1* and *2*.  Consequently, the claims that DEFENDANTS submitted to Medicare and Medicaid for payment for dependent and disabled residents at ManorCare-Northwest and the other subject facilities were factually and legally false.

108.    Further, the investigation conducted by Relator Compton's experts revealed that the subject facilities listed in *Exhibit 2* (including ManorCare-Northwest and ManorCare-Pottstown) engaged in a routine pattern and practice of providing dependent and disabled

Medicare and Medicaid residents (1) grossly substandard and/or non-existent care, (2) care that was medically unreasonable in *quantity and duration*, and (3) care that subjected them to unreasonable risk of physical and mental harm.

    B.    **Defendants**

    109.    **MANORCARE Defendants:** Between June 1, 2012 and July 26, 2018, MANORCARE was one of the largest nursing home chains in the country.[21]

    110.    According to Provider Magazine, the monthly publication of the American Health Care Association and the National Center for Assisted Living, in 2015, MANORCARE was the second largest nursing facility company in the United States, boasting some 280 nursing homes with more than 38,000 beds in 24 states.

    111.    As one of the largest providers of nursing home services in the United States, MANORCARE consistently pumped out significant revenues, a substantial portion of which were (and are) derived through Medicaid and Medicare funding paid to MANORCARE's nursing home operations (skilled nursing facilities and nursing facilities), as discussed below.

    112.    HCR ManorCare, Inc. is an Ohio corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.  HCR ManorCare, Inc.'s sole member is ProMedica Health System, Inc., an Ohio corporation.  ProMedica has no parent corporation and no publicly held corporation owns 10% or more of its stock.

    113.    Defendant Manor Care, Inc. is a Delaware corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

---

[21]MANORCARE also owned and operated more than 200 other healthcare facilities, including assisted living facilities, memory care facilities, outpatient rehabilitation clinics, hospice agencies, and home health care agencies.

114.    Defendant HCR Manor Care Services, LLC is an Ohio limited liability corporation with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.  Defendant HCR Manor Care Services, LLC's sole member is HCR Healthcare, LLC. The sole member of HCR Healthcare, LLC is HCR ManorCare.

115.    Defendant Manor Care Health Services, Inc. is a corporation located at 724 N. Charlotte Street, Pottstown, Pennsylvania 19464.  This entity operates Manor Care Health Services Pottstown, the facility where Relator Bonner worked.

116.    Heartland Employment Services, LLC n/k/a ProMedica Employment Services, LLC, is an Ohio limited liability company with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.  Its sole member is Defendant HCR Healthcare, LLC, a Delaware limited liability corporation.  Defendant HCR Healthcare, LLC's sole member is HCR ManorCare.  Since at least June 1, 2012, Heartland Employment Services, LLC served as a co-employer of the staff at MANORCARE nursing facilities, including Administrators, DONs, ADONs, RNs, LPNs, CNAs, Marketing Directors, Human Resources Directors, Admission Coordinators and MDS Nurses, as well as Regional and Corporate executives, employees and/or agents.[22]

117.    As set forth above, at times material to this case, MANORCARE owned, operated, and was legally responsible for the nursing homes identified in *Exhibits 1* and *2*.

---

[22]In December 2021, Heartland Employment Services, LLC changed its name to ProMedica Employment Services, LLC ("ProMedica Employment Services" or "PES").

118.    **PROMEDICA Defendants:** Defendant ProMedica Health System, Inc. is an Ohio corporation with its current headquarters and principal place of business at 100 Madison Ave., Toledo, Ohio.

119.    On April 25, 2018, PROMEDICA announced it would enter into a Joint Venture with Welltower, Inc., a private equity firm, to acquire MANORCARE.  In July 2018, PROMEDICA acquired MANORCARE, including 218 skilled nursing facilities.

120.    Beginning on or about July 26, 2018, PROMEDICA controlled, managed, and/or directed strategy and operations MANORCARE's nursing homes through PROMEDICA's Regional and Corporate executives, employees and/or agents and/or agents affiliated with "ProMedica Senior Care" and through PROMEDICA's wholly-owned subsidiary, HCR ManorCare, Inc., incorporated in Ohio.[23]

121.    The 2019 tax records for both HCR ManorCare, Inc. (Ohio) and PROMEDICA revealed that the two entities shared the same telephone number (i.e., 419-252-5772) and listed the same name and address for the entity's principal officer (i.e., Steven M. Cavanaugh, 100 Madison Avenue, Toledo, Ohio 43604).

122.    Since July 2018, through its wholly-owned subsidiaries and PROMEDICA's officers, directors, agents, and/or employees, PROMEDICA owned, supervised, led, exerted financial control over, oversaw, and directed the management, strategy and/or operations of 218 SNFs across the United States.  PROMEDICA also does business under the tradenames of "ProMedica Senior Care" and "HCR Manor Care, Inc."

---

[23]Consequently, with respect to those nursing homes identified in *Exhibits 1* and *2* that had not been divested prior to July 26, 2018, PROMEDICA and its wholly-owned subsidiary, MANORCARE, owned and operated these facilities from July 26, 2018 to the present (or until such date as PROMEDICA subsequently divested these facilities).

123.    Based on information and belief, PROMEDICA is a successor in interest and assignee of liability of MANORCARE, having thereby assumed the liabilities of those facilities identified in *Exhibits 1* and *2* for conduct by MANORCARE for the timeframe of June 1, 2012 to July 26, 2018.

124.    ProMedica Health System, Inc. is the sole member of HCR ManorCare, which is the sole member of HCR Healthcare, LLC.  HCR Healthcare, LLC is the sole member of HCR II Healthcare, LLC.  HCR II Healthcare, LLC is the sole member of HCR III Healthcare, LLC. HCR III Healthcare, LLC is the sole member HCR IV Healthcare, LLC.

125.    According to PROMEDICA's press release dated October 2, 2020, PROMEDICA announced "that its division, HCR ManorCare, has been renamed ProMedica Senior Care. The rebrand is part of an evolving journey to unite two organizations, which began with PROMEDICA's acquisition of HCR ManorCare in 2018.  Over the next 18 months, facility names and physical sign changes will be rolled out at ProMedica Senior Care facilities across the nation. The brands that will be changing include Heartland, ManorCare and Arden Courts."

126.    ProMedica Senior Care is a "provider" of care at skilled nursing facilities.  In PROMEDICA's Quarterly Disclosures for the Period Ended June 30, 2022, PROMEDICA boasted about how its Senior Care division "is a leading provider of short-term, post-hospital services and long-term care with decades of experience helping patients, residents, and their families.  Quality care is provided through a network of 332 skilled nursing and rehabilitation centers, assisted living facilities, and hospice and home health care agencies in 26 states."

127.    As discussed above, Defendant, ProMedica Employment Services, LLC, ("PES") is an Ohio limited liability company with its principal place of business located at 333 North Summit Street Toledo, Ohio 43604.

128.    PROMEDICA and PES' FCA liability arises as follows:

a.    PROMEDICA's assumption of MANORCARE's liabilities;[24] and

b.    PROMEDICA's executives' and employees' actions, or actions by individuals acting as a representative of or otherwise acting on behalf of PROMEDICA and PES.

129.    More specifically, with respect to PROMEDICA's post July 26, 2018 conduct resulting in liability, PROMEDICA's and PES' officers, directors, co-agents, and/or co-employees directly participated in, or were directly involved with knowingly submitting, or causing the submission of, (1) factually and legally false claims for skilled nursing facility services that were upcoded or inflated and (2) false claims for services that were grossly substandard and/or non-existent, for the nursing homes identified in *Exhibits 1* and *2*.

130.    After the July 2018 acquisition, PROMEDICA and PES employed, co-employed, and/or otherwise formed an agency relationship with: (1) staff members who provided direct resident care (registered nurses, licensed practical/vocation nurses, and certified nurse aides); (2) management officials for the individual nursing homes (i.e., Admission Directors, Administrators, and DONs); and (3) regional and corporate executives and employees overseeing each nursing facility's operations and adherence to corporate mandates during the relevant

---

[24]PROMEDICA assumed the liabilities of the HCR ManorCare, Inc.; Manor Care, Inc.; HCR-Manor Care Services, LLC; Manor Care Health Services, Inc.; and Heartland Employment Services, LLC, as well as the facilities identified in *Exhibits 1* and *2*.  Based on information and belief, PROMEDICA is a successor-in-interest and assignee of liability for these above MANORCARE branded entities.  Thus, liability for factually and legally false claims from June 1, 2012 to July 26, 2018, for SNF services that were upcoded or inflated and false claims for grossly substandard and/or non-existent care provided at the nursing homes identified in *Exhibits 1* and *2*, rests not only with HCR ManorCare, Inc.; Manor Care, Inc.; HCR-Manor Care Services, LLC; Manor Care Health Services, Inc.; Heartland Employment Services, LLC; and facilities identified in *Exhibits 1* and *2*, but also rests on liability **assumed by PROMEDICA.**

timeframe (i.e., Regional Directors of Operations, General Managers, Vice Presidents, Executives, and even the President of ProMedica Senior Care).

131.    PROMEDICA co-employed many of the corporate (Administrators, DONs, Admission Officers, and Regional Director of Operations) and clinical individuals above through its subsidiary, PES.  PROMEDICA is liable for the actions of HCR ManorCare, Inc. and HCR ManorCare executives, employees, and agents from July 2018 to December 2023, because these individuals were also PROMEDICA employees and/or agents and there existed a lawful agency relationship between the individuals and PROMEDICA, and/or PROMEDICA jointly employed and/or controlled these individuals.

132.    After the PROMEDICA acquisition in 2018, the President of HCR ManorCare, Inc. reported directly to the CEO and President of PROMEDICA.

133.    Further, each PROMEDICA SNF, entered into agreements with PES in which the facility engaged PES "to provide professional employer services, as well as certain employment-related advisory and administrative services," so that the facility: (i) obtained access to PES's resources and expertise, (ii) reduced its administrative burdens, and (iii) and obtained PES's advice and assistance with respect to the facility's employment-related compliance.

134.    The post-July 26, 2018 actions of the subject nursing homes and their employees are attributable to PROMEDICA because there existed a lawful agency relationship in which the DONs, Administrators, Regional Directors of Operations, and others staff members were employed or co-employed by PROMEDICA, or acted as representatives of or otherwise acted on behalf of PROMEDICA and directed the actions of the facilities.

135.    PROMEDICA had the power to change MANORCARE's management and dangerous corporate mandates, directives, bonus structures, and policies and procedures at each

subject facility, but nonetheless continued, approved, adopted, and ratified these policies and practices, including (1) prioritizing policies that rewarded decisionmakers for increasing resident admissions and limiting staffing, (2) pressuring the facilities to increase resident admissions to generate revenue, (3) prohibiting the implementation of any admissions ban, (4) imposing hours per patient day ("PPD") staffing limitations, (5) ignoring negative survey results and complaints of understaffing, and (6) failing to adequately train and compensate its employees.  And by continuing to prioritize profits over residents, PROMEDICA acted with actual knowledge, deliberate ignorance, and/or reckless disregard that the claims being submitted were false.  By reason thereof, PROMEDICA participated in the widespread submission of false claims.

136.    The Subject Nursing Homes Owned and Operated by DEFENDANTS: Of particular relevance to this case are the nursing homes that DEFENDANTS owned, operated, managed, and/or maintained that are listed in *Exhibits 1* and *2* by name, address, and provider number.  These nursing homes are both "skilled nursing facilities" and "nursing facilities" as such are defined by Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r, as well as by state laws and regulations governing the operation of nursing facilities.

137.    With respect to each of the nursing homes listed in *Exhibit 1* and *Exhibit 2,* DEFENDANTS entered into provider agreements with Medicaid and Medicare and systematically presented false claims for Government payment under each facility's unique provider number in violation of 31 U.S. § 3729, as described in more detail below.

138.    Also, as described in more detail below, the facilities listed in *Exhibit 1* and *Exhibit 2* were not only owned, operated, controlled, managed, and dominated by

DEFENDANTS,[25] but were also mere agents, instrumentalities, or conduits through which DEFENDANTS did business.  DEFENDANTS managed, operated, obtained licenses, and distributed the revenues, profits and assets for a national network of nursing homes, including the facilities listed in *Exhibits 1* and *2*.  By reason of the conduct described herein, DEFENDANTS and the subject nursing homes directly participated in the FCA violations described herein and were the alter egos of one another, there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.

139.    As set forth in more detail below, at all pertinent times, DEFENDANTS acted as alter egos of each other, as an integrated enterprise and as a single conduit through which DEFENDANTS operated.

## IV.    THE PRINCIPAL PURCHASER OF DEFENDANTS' NURSING HOME SERVICES: FEDERAL AND STATE GOVERNMENTS

140.    The federal and state governments are the principal purchasers of nursing home services, primarily through their Medicaid and Medicare programs.[26]

141.    From 2008 to 2019, DEFENDANTS' nursing home operations generated revenues well in excess of $37 billion, based on a volume of over 95 million resident days.  By far, the largest purchaser of nursing home care from DEFENDANTS was the Government, with approximately 71 million (over 74%) of all DEFENDANTS patient days being billed to Medicaid and Medicare.

---

[25]Upon information and belief, DEFENDANTS meticulously tracked and controlled the census, the payor mix, the staffing levels, labor budget, and nurse agency staff usage at each of the facilities identified in *Exhibits 1* and *2*.

[26]DEFENDANTS' facilities that are the subject of this lawsuit were each dually certified as both SNFs under Medicare and NFs under Medicaid.

142.    The Medicare Program: Medicare is a federal government health program primarily benefiting the elderly and disabled that is administered by CMS.  Medicare pays for short-term post-acute nursing home care that includes SNFs.  Medicare pays for up to 100 days of nursing home services per episode of illness after a qualifying inpatient hospital stay.  Medicare's payments to SNFs are for the provision of skilled nursing services, therapies, and ADL assistance needed by the Medicare beneficiary.

143.    The Social Security Amendments of 1965 established the Medicare program, which provides federally funded health insurance to eligible elderly and disabled persons.  *See* 42 U.S.C. §§ 1395 *et seq.*  Medicare Part A pays SNFs a daily rate for the routine services they provide to each resident.  42 U.S.C. § 1395yy; 42 C.F.R. § 413.335.  Medicare bases its payment amount in part on information provided to it by the nursing homes.  42 C.F.R. § 413.343.

144.    The Medicaid Program: Similarly, the Medicaid program was established by the Social Security Act of 1965.  *See* 42 U.S.C. §§ 1396 *et seq.*  Medicaid, which is jointly financed by the federal and state governments and administered by the states, helps states provide medical assistance to low-income persons.  42 C.F.R. § 430.0.  The federal Government also separately matches certain state expenses incurred in administering the Medicaid program.  States pay service providers directly, subject to broad federal rules, and receive partial reimbursement from the federal Government for their Medicaid expenses.  *Id.*; 42 U.S.C. §§ 1396b(a), 1396d(b).  Medicaid pays for long term care in nursing facilities, including ADLs, for those who are medically qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.

145.    Unlike Medicare's fee-for-service model, the Medicaid programs in Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Virginia, and Washington reimburse nursing facilities a flat

daily rate based on the facility's case mix index ("CMI").[27]  The CMI measures the average

intensity of care required by residents in a facility, based on a numeric score assigned to each

resident's Resource Utilization Group ("RUG") classification.[28]  The higher the case mix weight,

the greater the resource requirements for the residents and the greater the daily Medicaid rate

paid.

146.    Significantly, at all times material to this case, DEFENDANTS understood that

the fees for services that Medicare paid were significantly higher than the flat rates paid by

Medicaid.

## V.    DEFENDANTS PACKED THEIR NURSING HOMES WITH DEPENDENT AND DISABLED MEDICARE AND MEDICAID RESIDENTS

147.    Relator Compton has direct and independent knowledge of the medical and

clinical conditions of MANORCARE residents and the care they required ("resident acuity").

Relator Compton's knowledge of resident acuity derived from the fact that Relator routinely: (1)

assessed the condition and care needs of facility residents (after their admission and during their

residency), (2) monitored the nursing and rehabilitation care they received, and (3) reviewed

medical record documentation that the facility was required by law and accepted medical

practice standards to maintain for each resident.  Routinely, during Relator Compton's

employment with MANORCARE, the level of resident acuity and the care workload was

extremely high.  More specifically, throughout Compton's tenure, MANORCARE targeted and

---

[27]While the Medicaid program in California does not *per se* use a case-mix index, it has requirements that are functionally equivalent to the other states at issue and is premised upon patient acuity.

[28]Medicare used the RUG billing codes to determine a nursing home's payment for Medicare services from 2008 to September 30, 2019.  For purposes of this Complaint, Relators' claims that MANORCARE knowingly submitted factually and legally false claims for payment based on RUG billing codes is limited to claims submitted from June 1, 2012 to September 30, 2019.

aggressively recruited medically complex residents with trachs, feeding tubes, and left

ventricular assist devices ("LVADs"), post-stroke complications, spinal injuries, hemiplegia,

paraplegia, and orthopedic surgeries, and who required specialized cardiac rehabilitation.  At all

material times, MANORCARE knew that Medicare paid more for these medically complex

residents.

148.    Further, at the MANORCARE facilities where Relators worked, ManorCare-

Northwest and ManorCare-Pottstown, virtually all of the resident populations were dependent on

staff for help with (1) toileting or incontinent care, (2) bathing, and (3) dressing and grooming.

Almost half the resident population was so dependent on staff that the residents required the

assistance of two or more staff members for ADLs, including toileting, turning and repositioning,

and/or transfers from bed to chair or chair to bed.  Adding to the workload of staff, one out of

every three residents in the population suffered from Alzheimer's disease or another form of

dementia.

149.    Due to the extensive functional disabilities and the medical complexities of the

resident population, the daily quantity of care services required to meet residents' medical and

nursing needs at this facility was overwhelming and routinely exceeded the capacity of staff and

the time available to provide this care.  Due to the extreme quantity of essential care services

required each day by MANORCARE residents at the facilities where Relators worked, it was

essential that the facility have sufficient staff time to meet these resident care needs.

150.    Relator Compton has firsthand knowledge of the top-down pressure that

MANORCARE continually exerted to aggressively recruit high-acuity residents who required

labor-intensive care services.  As part of her job responsibilities, Relator Compton attended daily

standup meetings with the Administrator and Admission Coordinator, as well as participated in

daily conference calls with the Corporate Regional Director of Operations ("RDO") regarding: (1) target facility census, (2) reduction of facility vacancies, (3) recruitment of Medicare and medically-complex residents (such as residents with trachs, feeding tubes, and LVADs, and who had post-stroke complications, hip replacement surgeries, spinal injuries, hemiplegia, and paraplegia, and who required cardiac rehab), and (4) census variance (the difference between the actual census and the budgeted census).  The MANORCARE Corporate RDO set the agenda for these meetings and continuously pressured Relator Compton to (1) recruit and admit more Medicare patients ("M$^2$" patients—which is what MANORCARE called them) due to their significantly higher reimbursement rates and (2) increase the overall census (i.e., the number of residents in a facility).  The census targets and Medicare targets came from MANORCARE's corporate headquarters, were set in stone and were the focus of numerous calls and meetings.

151.    MANORCARE's nationwide focus on increasing revenues by aggressively recruiting high-acuity residents such as those described above is evident from its boasts in 2015,[29] wherein it touted that in a single year its SNFs treated 43,257 orthopedic patients, 12,105 stroke and neurological patients, 23,885 cardiac patients, and 12,751 pulmonary patients. MANORCARE further boasted that 97.9% of its Medicare patients received at least one form of rehabilitation therapy.  Due to their medical complexities and care needs, a significant portion of these residents required ADL services for which Medicare and other Government programs were billed at higher RUG levels.

152.    MANORCARE's aggressive recruitment/admission policies not only resulted in

---

[29]*See* MANORCARE Quality Report 2015, https://promedicaseniorcare.org/media/4771/2015-quality-report.pdf, last visited August 10, 2023.

high numbers of medically complex residents who had significant rehabilitation care needs but also in high acuity residents who had labor-intensive nursing and basic human care needs.  More particularly, the nursing and basic human care needs of the resident population in the facilities where Relators worked mirrored that of the populations in the subject nursing homes listed in *Exhibits 1* and *2*.  For example, at both ManorCare-Northwest and ManorCare-Pottstown:

a.  Over 90% of the residents needed some level of assistance[30] from staff for toileting or incontinent care;

b.  Over 50% did not have control of bladder and/or bowel (incontinent);

c.  Over 60% of the residents needed some level of assistance from staff for eating;

d.  Over 65% of the residents were in wheelchairs; and

e.  Nearly half the residents needed the assistance of two staff members for one or more of activities of daily living (ADLs), including toileting, turning and repositioning, and transfers from bed to chair or chair to bed.

153.  Additionally, one in three of MANORCARE's residents in its nursing homes nationwide had dementia or Alzheimer's disease.  Such cognitive impairments dramatically increased not only residents' dependency levels but also the staff time required to assist residents with even the most basic tasks.

154.  Such policies and practices of MANORCARE were adopted, approved, ratified, and continued by PROMEDICA after the July 26, 2018 acquisition.

---

[30]"Some level of assistance" includes supervision and cueing, limited assistance with staff providing guiding maneuvering of limbs or other non-weight-bearing assistance, extensive assistance with staff providing weight-bearing support, and total dependence with full staff performance.

VI.  **DEFENDANTS' DEPENDENT AND DISABLED RESIDENTS RELIED UPON NURSING HOME STAFF FOR THE CARE PAID FOR BY THE GOVERNMENT**

155.    The residents at ManorCare-Northwest, ManorCare-Pottstown, and other nursing homes identified in *Exhibits 1* and *2* depended on nursing home staff for their care.  More specifically, the dependent and disabled residents of DEFENDANTS' nursing homes could not receive the essential care they required and which the Government paid for if there was not enough nursing staff to deliver these services.

156.    Under federal law, DEFENDANTS' nursing homes were required to ***have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident***, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility resident population in accordance with the facility assessment required at § 483.70(e)") (emphasis added).  42 C.F.R. § 483.35 (effective October 4, 2016).

157.    DEFENDANTS engaged in a dangerous, systemic, and centralized policy and practice of staffing at ***extremely low, severe, and unsafe*** levels of nurses and nurse aides at ManorCare-Northwest, ManorCare-Pottstown, and other nursing homes identified in *Exhibits 1* and *2*, where DEFENDANTS cut staff to the bone.

158.    As a consequence of the critically low understaffing, dependent and disabled residents of the subject nursing homes did not receive the essential care they required, care that DEFENDANTS claimed they provided to residents and for which the Government paid DEFENDANTS.

50

159.    The false claims described herein are the result of DEFENDANTS' dangerous and unsafe staffing practices.

**VII.    DEFENDANTS' SCHEME TO DEFRAUD MEDICARE**

160.    In order to understand DEFENDANTS' scheme to defraud Medicare, it is necessary to first understand the mechanism by which a nursing home submits claims for payment for nursing services and the rules that govern the payment of such claims.

A.    <u>The Submission for Payment and RUG Billing Codes</u>

161.    In order to receive payment for care provided to Medicare residents, nursing homes such as those operated by DEFENDANTS had to submit a claim for payment to Medicare.  If the resident was covered by Medicare, then the facility - which was providing SNF services and seeking reimbursement for the same – submitted a claim using a standardized universal billing form known as a UB-04, an exemplar of which is set forth below.



*UB-04 Claims Form (CMS-1450)*

162.    At all times material, DEFENDANTS submitted UB-04s to Medicare for payment either electronically using the 837I form or on paper by using a CMS-1450 standardized form. Both the electronic and paper UB-04 contain the same data fields.

163.    In pertinent part, this universal billing UB-04 form (which included 80 possible fields of data) contained the following information: (1) the name of the facility, (2) the facility's

national provider identifier (NPI) number, (3) the name of the resident, (4) date of birth of the

resident, (5) payor information, (6) Medicare/insurance number, (7) **the resident's RUG level**,

(8) the dates of services claimed at each RUG level, (9) the total days billed at each RUG level,

and (10) total amount of the claim. DEFENDANTS submitted this UB-04 claim form data on at

least a monthly basis to Medicare for every Medicare resident for whom services were claimed

to have been provided.

164.    Additionally, each UB-04 required providers to certify that the billing information

was true, accurate, and complete. This certification appears on the back of the paper UB-04:

> The submitter of this form understands that **misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties** and assessments and may upon conviction include **fines and/or imprisonment** under federal and/or state law(s).
> ***
> **Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.** That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

(emphasis added).

165.    Accordingly, at all times material herein, DEFENDANTS knew that each UB-04

they submitted to Medicare for payment was required to be true, accurate, and complete.

Furthermore, DEFENDANTS certified, falsely, that the UB-04s they submitted to Medicare for

payment—which included the RUG billing codes and dates of services that determined the

amount of payment—were true, accurate, and complete and did not knowingly or recklessly

disregard or misrepresent or conceal material facts.

166.    <u>Relationship Between the Amount of Medicare Payment and RUG Billing Codes</u>:

The daily prospective payment system ("PPS")/per diem rates that Medicare paid

DEFENDANTS and other SNFs were calculated based on the RUG nursing and rehabilitative billing codes that were reported in the UB-04s for each Medicare resident. Each distinct RUG billing code was intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries (*i.e.,* residents) with similar characteristics or resource needs. The more nursing services a resident required and was provided, the more money Medicare paid.

167.    At all times materials herein, there were eight major RUG classification categories: (1) Rehabilitation Plus Extensive Services; (2) Rehabilitation; (3) Extensive Services; (4) Special Care High; (5) Special Care Low; (6) Clinically Complex; (7) Behavioral Symptoms and Cognitive Performance Problems; and (8) Reduced Physical Function. All eight major categories, except for Extensive Services ("ES"), are further subdivided based on the resident's "Late Loss ADL score" which enables Medicare (and/or a Medicaid program) to distinguish those nursing home residents requiring more care and therefore requiring more resources.[31]

168.    During the relevant time, the RUG billing code consisted of a three-letter code. Each letter of the code is significant for billing and payment purposes. The first letter of the three-letter RUG billing code indicated the major resource category into which each resident fell. For example, the first letter of the billing code for Medicare residents who required and were provided rehabilitation therapy services started with the letter "R."

169.    Importantly, the second and the third letters of the three-letter RUG billing codes

---

[31]Additionally, the Special Care High, Special Care Low, and Clinically Complex categories are also divided by the presence of depression. Finally, the Behavioral Symptoms and Cognitive Performance Problems and the Reduced Physical Function categories are divided by the provision of restorative nursing services. CMS's *RAI Version 3.0 Manual*, Chapter 6.3, *Resource Utilization Groups Version IV (RUG-IV)*.

represented the amount of rehabilitation therapy, ADL care, and extensive nursing services claimed to have been provided to a resident and determined the amount of money DEFENDANTS were paid on a per day basis for their Medicare residents.

170.    The Second Letter of the Three-Letter RUG Code Determined the Amount Medicare Paid for Therapy Services: The second letter of the three-letter RUG code informed Medicare regarding the number of minutes of therapy services the nursing home claimed to have provided to a resident during a seven-day look-back period[32] and determined the amount of money Medicare paid for those services.

171.    The Third Letter of the Three-Letter RUG Code Determined the Amount Medicare Paid for Nursing Services: The third letter of the RUG billing codes told Medicare how much ADL care and complex clinical care the resident required.  There were three possible letters ("A," "B," or "C") that a nursing home could claim for ADL nursing services based on a resident's "Late Loss ADL score."

172.    Each resident's Late Loss ADL score was calculated based on the resident's level of dependency and the amount of staff assistance required for the four ADLs that are frequently lost late in a person's life - (1) toileting, (2) bed mobility, (3) transferring from or to wheelchair or bed, and (4) eating.  A Medicare claim for payment that contained the letter "A" in the third letter of the RUG billing code (such as "RUA") represented that the resident had a Late Loss ADL score of 0 to 5 and therefore required the lowest level of ADL care.  A Medicare claim for payment that contained the letter "B" in the third letter (such as "RUB") represented that the resident had a Late Loss ADL score of 6 to 10 and therefore required a medium level of ADL

---

[32]This seven-day look back period controlled the daily rate Medicare paid to the nursing home for the resident in question until the next assessment was required to be performed.

care.  A Medicare claim for payment that contained the letter "C" in the third letter (such as "RUC") represented that the resident had a Late Loss ADL score of 11 to 16 and required the highest level of ADL care.

173.    Further, the third letter of the billing code could represent that a Medicare resident required, and was provided, "extensive services" (i.e., tracheostomy, ventilator/respirator, or infection isolation nursing services).

174.    A Medicare claim for payment that contained the letter "L" in the third letter of the RUG billing code (such as "RUL") represented that the resident had complex clinical care needs (requiring "extensive services"), including tracheostomy care, ventilator/respirator, and/or infection isolation and had a Late Loss ADL score of 2 to 10.  A Medicare claim for payment that contained the letter "X" in the third letter (such as "RUX") represented that the resident had complex clinical care needs (requiring "extensive services"), including tracheostomy care, ventilator/respirator, and/or infection isolation and had a Late Loss ADL score of 11 to 16.

175.    To illustrate the impact of these RUG billing codes, the table below contains the 2013-2014 RUG rates paid by Medicare for nursing homes operated in rural areas.  Medicare makes annual adjustments to RUG rates based on locality and wage index.  *See* 42 U.S.C § 1395yy(e)(4)(E)(ii)(IV).  An adjusted chart similar to that found below (Table 4) is available for each county in the United States where a facility is operated.  The first column in Table 4 below identifies each of the eight major RUG Categories (identified above) that are associated with a rehabilitation level or clinical needs grouping.  The second column provides an abbreviated description of the rehabilitation or clinical basis for the RUG grouping.  The third column provides the minimum number of therapy minutes (physical, occupation, and speech therapy

combined) provided to a resident during the seven-day look-back period.[33]  The fourth column

provides the range of Late Loss ADL scores for each RUG billing code.  The fifth column

provides the specific RUG billing code which is determined by the nursing and therapy services

claimed to have been provided in the second, and third and fourth columns.  The sixth and final

column provides the corresponding per diem Medicare payment rate associated with each RUG

billing code.

| Major RUG Category | RUG Description | Minimum Therapy Minutes | MDS Late Loss ADL Scores | RUG Billing Code | Rural RUG Daily Rate |
|---|---|---|---|---|---|
| 1 | RU (Rehab Ultra-High) + Extensive Services | 720 | 11 to 16 | RUX | $778.44 |
| | RU (Rehab Ultra-High) + Extensive Services | 720 | 2 to 10 | RUL | $762.60 |
| 2 | RU (Rehab Ultra-High) | 720 | 11 to 16 | RUC | $602.61 |
| | RU (Rehab Ultra-High) | 720 | 6 to 10 | RUB | $602.61 |
| | RU (Rehab Ultra-High) | 720 | 0 to 5 | RUA | $512.32 |
| | RV (Rehab Very High) + Extensive Services | 500 | 11 to 16 | RVX | $683.97 |
| | RV (Rehab Very High) + Extensive Services | 500 | 2 to 10 | RVL | $617.44 |
| | RV (Rehab Very High) | 500 | 11 to 16 | RVC | $509.72 |
| | RV (Rehab Very High) | 500 | 6 to 10 | RVB | $446.36 |
| | RV (Rehab Very High) | 500 | 0 to 5 | RVA | $444.77 |
| | RH (Rehab High) + Extensive Services | 325 | 11 to 16 | RHX | $612.55 |
| | RH (Rehab High) + Extensive Services | 325 | 2 to 10 | RHL | $549.18 |
| | RH (Rehab High) | 325 | 11 to 16 | RHC | $438.29 |
| | RH (Rehab High) | 325 | 6 to 10 | RHB | $397.11 |
| | RH (Rehab High) | 325 | 0 to 5 | RHA | $352.75 |
| | RM (Rehab Medium) + Extensive Services | 150 | 11 to 16 | RMX | $556.67 |

[33]Relators do not assert a claim for falsification of therapy minutes, which are set forth in the third column of this chart and represented in the second letter of the RUG code.  Rather, Relators' false RUG claim focuses on the third letter of the RUG code.

| Major RUG Category | RUG Description | Minimum Therapy Minutes | MDS Late Loss ADL Scores | RUG Billing Code | Rural RUG Daily Rate |
|---|---|---|---|---|---|
| | RM (Rehab Medium) + Extensive Services | 150 | 2 to 10 | RML | $512.32 |
| | RM (Rehab Medium) | 150 | 11 to 16 | RMC | $380.84 |
| | RM (Rehab Medium) | 150 | 6 to 10 | RMB | $358.66 |
| | RM (Rehab Medium) | 150 | 0 to 5 | RMA | $298.46 |
| | RL (Rehab Low) + Extensive Services | 45 | 2 to 16 | RLX | $484.52 |
| | RL (Rehab Low) | 45 | 11 to 16 | RLB | $364.13 |
| | RL (Rehab Low) | 45 | 0 to 10 | RLA | $238.98 |
| 3 | ES (Extensive Services) | 0 | 2 to 16 | ES3 | $670.87 |
| | ES (Extensive Services) | 0 | 2 to 16 | ES2 | $526.71 |
| | ES (Extensive Services) | 0 | 2 to 16 | ES1 | $471.27 |
| 4 | (Special Care High) | 0 | 15 to 16 | HE2 | $455.43 |
| | (Special Care High) | 0 | 11 to 14 | HD2 | $426.92 |
| | (Special Care High) | 0 | 6 to 10 | HC2 | $403.15 |
| | (Special Care High) | 0 | 2 to 5 | HB2 | $398.40 |
| | (Special Care High) | 0 | 15 to 16 | HE1 | $379.39 |
| | (Special Care High) | 0 | 11 to 14 | HD1 | $357.22 |
| | (Special Care High) | 0 | 6 to 10 | HC1 | $338.21 |
| | (Special Care High) | 0 | 2 to 5 | HB1 | $335.04 |
| 5 | (Special Care Low) | 0 | 15 to 16 | LE2 | $414.24 |
| | (Special Care Low) | 0 | 11 to 14 | LD2 | $398.40 |
| | (Special Care Low) | 0 | 6 to 10 | LC2 | $350.88 |
| | (Special Care Low) | 0 | 2 to 5 | LB2 | $333.45 |
| | (Special Care Low) | 0 | 15 to 16 | LE1 | $347.71 |
| | (Special Care Low) | 0 | 11 to 14 | LD1 | $335.04 |
| | (Special Care Low) | 0 | 6 to 10 | LC1 | $297.02 |
| | (Special Care Low) | 0 | 2 to 5 | LB1 | $284.35 |
| 6 | (Clinically Complex) | 0 | 15 to 16 | CE2 | $369.89 |
| | (Clinically Complex) | 0 | 11 to 14 | CD2 | $350.88 |
| | (Clinically Complex) | 0 | 6 to 10 | CC2 | $308.11 |
| | (Clinically Complex) | 0 | 2 to 5 | CB2 | $285.93 |
| | (Clinically Complex) | 0 | 0 to 1 | CA2 | $243.16 |
| | (Clinically Complex) | 0 | 15 to 16 | CE1 | $341.38 |
| | (Clinically Complex) | 0 | 11 to 14 | CD1 | $322.37 |

| Major RUG Category | RUG Description | Minimum Therapy Minutes | MDS Late Loss ADL Scores | RUG Billing Code | Rural RUG Daily Rate |
|---|---|---|---|---|---|
| | (Clinically Complex) | 0 | 6 to 10 | CC1 | $285.93 |
| | (Clinically Complex) | 0 | 2 to 5 | CB1 | $265.34 |
| | (Clinically Complex) | 0 | 0 to 1 | CA1 | $227.32 |
| 7 | (Behavior Symptoms and Cognitive Performance) | 0 | 2 to 5 | BB2 | $257.42 |
| | (Behavior Symptoms and Cognitive Performance) | 0 | 0 to 1 | BA2 | $214.65 |
| | (Behavior Symptoms and Cognitive Performance) | 0 | 2 to 5 | BB1 | $246.33 |
| | (Behavior Symptoms and Cognitive Performance) | 0 | 0 to 1 | BA1 | $205.14 |
| 8 | (Reduced Physical Functioning) | 0 | 15 to 16 | PE2 | $341.38 |
| | (Reduced Physical Functioning) | 0 | 11 to 14 | PD2 | $322.37 |
| | (Reduced Physical Functioning) | 0 | 6 to 10 | PC2 | $278.01 |
| | (Reduced Physical Functioning) | 0 | 2 to 5 | PB2 | $236.82 |
| | (Reduced Physical Functioning) | 0 | 0 to 1 | PA2 | $197.22 |
| | (Reduced Physical Functioning) | 0 | 15 to 16 | PE1 | $325.53 |
| | (Reduced Physical Functioning) | 0 | 11 to 14 | PD1 | $306.52 |
| | (Reduced Physical Functioning) | 0 | 6 to 10 | PC1 | $265.34 |
| | (Reduced Physical Functioning) | 0 | 2 to 5 | PB1 | $227.32 |
| | (Reduced Physical Functioning) | 0 | 0 to 1 | PA1 | $189.30 |

*Rural RUG Rates for 2013-2014 (unadjusted for location)*

176.    Importantly, the third letter of the three-letter RUG billing codes identified in the

"RUG Billing Code" column of the RUG rates table above, represented the amount of ADL care

and extensive nursing services claimed to have been provided to a resident and determined the amount of money DEFENDANTS were paid on a per day basis for their Medicare residents.

177.    At all times material, DEFENDANTS knew that the amount of money they were paid by Medicare was directly impacted by the third letter of the three-letter RUG billing codes. The higher the Late Loss ADL score claimed for a resident, the more Medicare paid; and the more complex clinical care needs/extensive nursing services were claimed to have been provided, the more Medicare paid.

B.    Medicare Claims for Payment Must Be Supported by Resident MDS Assessments

178.    At all material times, DEFENDANTS also knew that each resident's MDS assessment was the *source* of, and had to support, the RUG billing codes that determined the amount of money Medicare paid to DEFENDANTS.

179.    MDS Assessment: Federal law required DEFENDANTS to perform comprehensive and periodic assessments of each resident's individualized care needs and functional capacities and document the same in an MDS assessment.[34] 42 U.S.C. § 1395i–3. This list of needs is reported in the MDS assessment[35] for every resident in the nursing home regardless of the resident's age, diagnosis, length of stay, or payment category (*i.e.*, Medicaid, Medicare, or private insurance).  42 C.F.R. § 483.20.

---

[34]Medicare requires nursing homes such as those operated by MANORCARE to "conduct initially and periodically a comprehensive, *accurate*, standardized, reproducible assessment of each resident's functional capacity" for each resident.  42 C.F.R. § 483.20 (emphasis added); *see also* 42 U.S.C. § 1395i-3(b)(3).  These MDS assessments must also address resident's cognitive patterns, psychological well-being, disease diagnoses and health conditions, medications, and special treatments or procedures.  42 C.F.R. § 483.20(b)(1).

[35]The MDS form is "both a billing document and a care assessment certification for Medicare…" *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (Aug. 20, 2014, 7th Cir.).

180.    The subject nursing homes identified in *Exhibits 1* and *2* were required to

complete and submit these detailed MDS assessments at regular intervals.  42 U.S.C. § 1395i-

3(b)(3)(C); 42 U.S.C. 1396r(b)(3)(C); 42 C.F.R. §§ 413.343, 483.20(b)(2).

181.    Medicare's assessment schedule includes five-day, 14-day, 30-day, 60-day, and

90-day scheduled assessments.[36]  Failure to comply with the assessment schedule carries

consequences: "CMS pays a default rate for the Federal rate . . . for the days of a patient's care

for which the SNF is not in compliance with the assessment schedule."  42 C.F.R. § 413.343(c).

182.    At all times material, DEFENDANTS knew that the timing of the MDS

assessments, the look-back periods, and how they applied the grace period in their selection of

the ARD dates impacted the amount of their Medicare billing.

183.    The Accuracy of MDS Assessments Was Critical to the Amount of Money

Medicare Paid SNFs: The accuracy of MDS assessments was critical to payment by Medicare

because under the RUG model,[37] Medicare tied the amount of its payments to SNFs to RUG

billing codes derived from MDS assessments.[38]  With respect to each MDS submitted in support

of a claim for Medicare payment, the subject nursing homes and other SNFs were required by

the federal Government to certify the truth and accuracy of the MDS.  More specifically, each

time DEFENDANTS submitted an MDS to Medicare, they made the following certification:

> I certify that the accompanying information accurately reflects resident
> assessment information for this resident and that I collected or coordinated
> collection of this information on the dates specified.  To the best of my
> knowledge, this information was collected in accordance with applicable

[36]The MDS assessment looks back over a seven-day period, the final day of which is referred to as the "assessment reference date" or "ARD."

[37]In October 2019, CMS shifted from the RUG model to a patient-driven payment model ("PDPM").  Relators' cause of action for Medicare fraud arising out of upcoding/inflating of claims for Medicare payment are limited to the RUG model, as more specifically defined below.

[38]*See Ruckh,* 963 F.3d 1089 at 1095 (11th Cir. 2020).

Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and as a basis for payment from federal funds.  ***I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information***, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information.  I also certify that I am authorized to submit this information by this facility on its behalf. (emphasis added).

184.    Further, each MDS assessment must be conducted or coordinated and certified as complete by a registered professional nurse ("RN").  42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1).  Each individual who completes a portion of the assessment must sign and certify the accuracy of that portion.  42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(2).

185.    <u>RUG Billing Codes Must Be Supported by MDS Assessment Sections G, O, and Z</u>: DEFENDANTS knew that the RUG billing codes they submitted in their UB-04 claims for payment to Medicare were determined by three specific sections of the MDS assessment form, Sections G, O, and Z.

186.    <u>MDS Section G</u>: Section G of the MDS pertains to the resident's ability to perform ADLs and the amount of staff support provided to the resident for these activities.  More particularly, in Section G, DEFENDANTS entered the resident's dependency level and the corresponding amount of staff support provided for each of 11 ADLs.[39]  As stated above, four of these ADLs (toileting, bed mobility, transferring to/from bed or wheelchair, and eating—referred to as "Late Loss ADLs") were used to calculate a resident's Late Loss ADL score based on the

---

[39]The 11 ADLs set forth in Section G of the MDS include: (§A) Bed Mobility, (§B) Transfer, (§C) Walk in Room, (§D) Walk in Corridor, (§E) Locomotion on Unit, (§F) Locomotion off Unit, (§G) Dressing, (§H) Eating, (§I) Toilet Use, (§J) Personal Hygiene, and (G0120) Bathing.

resident's dependency level and the amount of staff support provided.  This Late Loss ADL score determined the third letter of the RUG billing code and the amount Medicare paid for ADL nursing services.[40]

187.    An example of Section G of the MDS is set forth below:

---

[40] As discussed below, to support its specific MDS claims regarding the ADL care required and provided to residents, DEFENDANTS created medical record documentation of the ADL needs and care provided each resident.

## Section G    Functional Status

**G0110. Activities of Daily Living (ADL) Assistance**
Refer to the ADL flow chart in the RAI manual to facilitate accurate coding

**Instructions for Rule of 3**
- When an activity occurs three times at any one given level, code that level.
- When an activity occurs three times at multiple levels, code the most dependent, exceptions are total dependence (4), activity must require full assist every time, and activity did not occur (8), activity must not have occurred at all. Example, three times extensive assistance (3) and three times limited assistance (2), code extensive assistance (3).
- When an activity occurs at various levels, but not three times at any given level, apply the following:
  ○ When there is a combination of full staff performance, and extensive assistance, code extensive assistance.
  ○ When there is a combination of full staff performance, weight bearing assistance and/or non-weight bearing assistance code limited assistance (2).

If none of the above are met, code supervision.

**1.  ADL Self-Performance**
Code for **resident's performance** over all shifts - not including setup.  If the ADL activity occurred 3 or more times at various levels of assistance, code the most dependent - except for total dependence, which requires full staff performance every time

Coding:

_Activity Occurred 3 or More Times_
0.  **Independent** - no help or staff oversight at any time
1.  **Supervision** - oversight, encouragement or cueing
2.  **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
3.  **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
4.  **Total dependence** - full staff performance every time during entire 7-day period

_Activity Occurred 2 or Fewer Times_
7.  **Activity occurred only once or twice** - activity did occur but only once or twice
8.  **Activity did not occur** - activity (or any part of the ADL) was not performed by resident or staff at all over the entire 7-day period

**2.  ADL Support Provided**
Code for **most support provided** over all shifts; code regardless of resident's self-performance classification

Coding:
0.  **No** setup or physical help from staff
1.  **Setup** help only
2.  **One** person physical assist
3.  **Two+** persons physical assist
8.  ADL activity itself **did not occur** during entire period

| | 1. Self-Performance | 2. Support |
|---|---|---|
| | ↓ Enter Codes in Boxes ↓ | |
| **A.  Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | 3 | 3 |
| **B.  Transfer** - how resident moves between surfaces including to or from: bed, chair, wheelchair, standing position (**excludes** to/from bath/toilet) | 3 | 3 |
| **C.  Walk in room** - how resident walks between locations in his/her room | 8 | 8 |
| **D.  Walk in corridor** - how resident walks in corridor on unit | 8 | 8 |
| **E.  Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor.  If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **F.  Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments).  **If facility has only one floor,** how resident moves to and from distant areas on the floor.  If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **G.  Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose.  Dressing includes putting on and changing pajamas and housedresses | 3 | 2 |
| **H.  Eating** - how resident eats and drinks, regardless of skill.  Do not include eating/drinking during medication pass.  Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | 1 | 2 |
| **I.  Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes.  Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | 3 | 3 |
| **J.  Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (**excludes** baths and showers) | 2 | 2 |

**G0120. Bathing**

How resident takes full-body bath/shower, sponge bath, and transfers in/out of tub/shower (**excludes** washing of back and hair).  Code for **most dependent** in self-performance and support

| Enter Code | A.  Self-performance |
|---|---|
| 3 | 0.  **Independent** - no help provided<br>1.  **Supervision** - oversight help only<br>2.  **Physical help limited to transfer only**<br>3.  **Physical help in part of bathing activity**<br>4.  **Total dependence**<br>8.  **Activity itself did not occur** during the entire period |
| Enter Code | B.  Support provided |
| 3 | (Bathing support codes are as defined in item **G0110 column 2, ADL Support Provided**, above) |

*Example: MDS 3.0 Section G*

188.    Every nursing home operated by DEFENDANTS was required to accurately assess and code each resident's ability to perform each of the above-listed ADLs under the "Self-Performance" column (Column 1), and the level of assistance and support provided to each resident by nursing home staff for each of the above-listed ADLs under "Support" column (Column 2).  In the example above, the use of code "3" in the "Self-Performance" column to describe the resident's ability to perform basic ADL functions indicated the resident had minimal ability to perform these basic functions and was highly dependent on nursing home staff for the same.  Further, by coding a "3" in various "staff support" boxes under the "Support" column, the nursing home in this example claimed that the resident required and was provided physical assistance by *two or more nursing home staff* for each of those specific ADL functions.  Thus, the example above indicated the resident required (and was provided) the assistance of two or more nursing home staff members in connection with moving in her bed (Bed Mobility), transfers to and from her bed (Transfer), and the use of toilet (Toileting).

189.    The specific Late Loss ADLs (toileting, bed mobility, transferring from or to wheelchair or bed, and eating) that are used to calculate the Late Loss ADL score[41] for purposes of determining the third letter of the RUG billing code, are found in Section G of the MDS.  The more assistance a resident needed with these four Late Loss ADLs and the more assistance the

---

[41]Under MDS 2.0 which was in effect until October 1, 2010, the possible Late Loss ADL scoring ranged from 4 to 18.  Under MDS 3.0, the Late Loss ADL scoring ranged from 0 to16.  For example, under MDS 3.0, a very dependent resident who (1) could not toilet, change position in bed, or transfer without assistance and (2) was provided 2-person staff support would receive the maximum Late Loss ADL score of 4 for each of these three Late Loss ADLs or a total Late Loss score of 12 (not including feeding).  This Late Loss ADL score would dictate the third level of the RUG score.

facility claimed to have provided that resident with those Late Loss ADLs, the more DEFENDANTS were paid by Medicare.

190.    <u>MDS Section O</u>: Furthermore, in Section O of each MDS, DEFENDANTS provided the Government (1) the specific number of claimed therapy minutes provided for each type of therapy and identified (2) *any complex clinical care needs (requiring "extensive services")*, including tracheostomy care, ventilator/respirator, and/or infection isolation.  In addition to the number of therapy minutes DEFENDANTS claimed within Section O of the MDS, the resident's need for complex clinical care/extensive services *also impacted the third letter of the RUG billing code*, as discussed above.

191.    <u>MDS Section Z</u>: Finally, in Section Z of each MDS, DEFENDANTS identified the specific RUG billing code (which included third letters described above) they claimed they were entitled to receive based on the certified MDS and underlying medical records.  As discussed above, this RUG billing code dictated how much Medicare paid.

192.    At all times material, DEFENDANTS knew that the amount of money they were paid by Medicare was directly impacted by the coding contained within MDS Sections G, O, and Z, as these sections determine the RUG billing code for the resident.  The higher the Late Loss ADL score claimed in Section G of the MDS, the more Medicare paid; the more complex clinical care needs/extensive nursing services were claimed to have been provided in Section O of the MDS, the more Medicare paid.  The higher the RUG billing code claimed in Section Z of the MDS, the more Medicare paid.

193.    To receive Medicare reimbursement, the subject nursing homes were required to electronically transmit the MDS assessment to the CMS within 14 days of completion.  *Ruckh,* 963 F.3d at 1095 (11th Cir. 2020), *citing* 42 C.F.R. § 483.20(f)(3).

C.     Medicare Claims for Payment Must Be Supported by Underlying Medical
       Records

194.    Not only must a claim for payment to Medicare be supported by an accurate

MDS, it must also be supported by accurate medical records.  A nursing home that represents to

Medicare that it provided a greater number of therapy minutes or more extensive nursing

(including ADLs and skilled nursing) services than were reflected in its residents' medical

records violates the FCA.  *Ruckh,* 963 F.3d at 1104-1106.

195.    In concluding that the evidence permitted a reasonable jury to find that defendants

committed Medicare fraud, the Eleventh Circuit in *Ruckh* stated:

> "In the context of this case, upcoding involves submitting bills to Medicare with
> elevated RUG codes.  Evidence presented at trial indicated the defendants
> inflated their RUG codes in two ways.  First, the defendants exaggerated the
> second letter of the code, representing to Medicare that they provided a greater
> number of therapy minutes than were reflected in their residents' medical
> records.  And second, the defendants elevated the ***third letter*** of the code,
> indicating they provided ***more extensive nursing services than reflected in their
> residents' medical records***."

*Id*. at 1104 (emphasis added).

196.    Per the Eleventh Circuit in *Ruckh*, the submission of RUG billing codes that were

inflated and not supported by the medical records is considered to be ***material*** to Medicare

payments.  *Id*. at 1105 ("This plain and obvious materiality went to the heart of the SNF's ability

to obtain reimbursement from Medicare.")

197.    All nursing homes are required to keep such records as are necessary to fully

disclose the extent of the services provided to Medicare residents.[42]  More specifically, SNFs,

---

[42]42 U.S.C. § 1395g(a); *Medicare Benefit Policy Manual*, § 30 (2014); CMS's *Complying with
Medical Record Documentation Requirements* (November 2014); *Medicare Claims Processing
Manual*, § 30.2.2-.3; U.S. Department of Health and Human Services, Office of Inspector
General - *"Inappropriate Payments to Skilled Nursing Facilities Cost Medicare More than a*

including those operated by DEFENDANTS, were required to keep and maintain medical

records to support and prove that the claims for payment submitted to Medicare were accurate.

198.    Pursuant to 42 C.F.R. § 483.70(i), at all material times, DEFENDANTS were

required to keep complete and accurate medical records documenting the services they provided:

(1)    In accordance with accepted professional standards and practices, the
facility must maintain medical records on each resident that are –
(i)    Complete;
(ii)    Accurately documented;
(iii)    Readily accessible; and
(iv)    Systematically organized.

* * *

(5)    ***The medical record must contain*** -

(i)    Sufficient information to identify the resident;
(ii)    A record of the resident's assessments;
(iii)    The comprehensive plan of care <u>and</u> services provided;
(iv)    The results of any preadmission screening and resident review
evaluations and determinations conducted by the State;
(v)    Physician's, nurse's, and other licensed professional's progress
notes; and
(vi)    Laboratory, radiology and other diagnostic services reports as
required under § 483.50.

42 C.F.R. § 483.70(i) (emphasis added).[43]

---

*Billion Dollars in 2009*" (November 2012); 42 C.F.R. § 483.70(i) *originally found in* 42 C.F.R.
483.75(l)(2) (1991).

[43]In addition to requiring nursing homes to maintain medical records, federal law obligates
nursing homes to "***safeguard*** medical record information against loss, destruction, or
unauthorized use" and to ***retain*** medical records for the "period of time required by State law" or
"Five years from the date of discharge when there is no requirement in State law."  42 C.F.R. §
483.70(i)(3) and (4) (emphasis added).

199.    Further, pursuant to the *Medicare Benefit Policy Manual*, at all material times,

DEFENDANTS were required to accurately document in each Medicare resident's medical

record the skilled services provided and the complexity of those services:

> Therefore, the patient's medical record must document as appropriate:
>
> - The history and physical exam pertinent to the patient's care, (including the response or changes in behavior to previously administered skilled services);
> - The skilled services provided;
> - The patient's response to the skilled services provided during the current visit;
> - The plan for future care based on the rationale of prior results.
> - A detailed rationale that explains the need for the skilled service in light of the patient's overall medical condition and experiences;
> - The complexity of the service to be performed; and
> - Any other pertinent characteristics of the beneficiary.
>
> The documentation in the patient's medical record must be accurate and avoid vague or subjective descriptions of the patient's care that would not be sufficient to indicate the need for skilled care.

*Medicare Benefit Policy Manual*, § 30 (Rev. 179, Issued: 01-14-14, Effective: 01-07-14,

Implementation: 01-07-14).

200.    The importance of keeping accurate medical records that support the level and

quantity of services billed for is further underscored in the CMS publication entitled "*Complying*

*with Medical Record Documentation Requirements*," wherein CMS set forth its long-recognized

rule that insufficient medical record documentation will not support payment:

> Reviewers determine that claims have insufficient documentation errors when the medical documentation submitted is inadequate to support payment for the services billed (that is, the reviewer ***could not conclude*** that some of the allowed services were actually provided, were provided at the level billed, or were medically necessary). Reviewers also place claims into this category when a specific documentation element that is required as a condition of payment is missing, such as a physician signature on an order, or a form that is required to be completed in its entirety.

Insufficient documentation errors identified by the CERT RC may include:

- Incomplete progress notes (for example, unsigned, undated, insufficient detail)
- Unauthenticated medical records (for example, no provider signature, no supervising signature, illegible signatures without a signature log or attestation to identify the signer, an electronic signature without the electronic record protocol or policy that documents the process for electronic signatures)
- No documentation of intent to order services and procedures (for example, incomplete or missing signed order or progress note describing intent for services to be provided)

*See* CMS's *Complying with Medical Record Documentation Requirements* (January 2021),

https://web.archive.org/web/20141210020217/https://www.cms.gov/Outreach-and-

Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/CERTMedRecDoc-

FactSheet-ICN909160.pdf (November 2014) (emphasis added).

201.    The significance of medical record support for claims is additionally emphasized

by the *Medicare Claims Processing Manual,* which provides:

> The healthcare provider or supplier is also accountable for information contained in the beneficiary's medical records, such as the beneficiary's medical chart, attending physicians' notes, or similar records. When the medical records clearly show that the beneficiary received only non-covered services as described in the Medicare Benefit Policy Manual, the healthcare provider or supplier will be presumed to have knowledge of non-coverage.  .  .  .
>
> When an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied.

*Medicare Claims Processing Manual*, § 30.2.2-.3 (Rev.: 4197; Issued: 01-11-19; Effective: 04-

15-19; Implementation: 04-15-19).

202.    At all times relevant to this lawsuit, DEFENDANTS knew they were required to

keep ***specific*** medical record documentation that supported the extent and quantity of the nursing

services that it claimed to provide Medicare residents.  *See* Office of Inspector General -

"*Importance of Documentation*," January 25, 2012[44] ("Accurate documentation ensures the

Federal health care programs pay the right amount – not too much and not too little –to the right

people."); and U.S. Department of Health and Human Services, Office of Inspector General -

*"Inappropriate Payments to Skilled Nursing Facilities Cost Medicare More than a Billion*

*Dollars in 2009"* (November 2012).

203.    <u>Specific Nursing Records/Proof Required to Support Third Letter of RUG</u>:

Further, DEFENDANTS knew that ADL flowsheets/documentary proof containing daily and per

shift ADL services was essential to support their **Late Loss ADL scoring** reported in Section G

of the MDS and reflected in the third letter of the RUG billing code (related to ADL services) in

MDS Sections Z.[45]

204.    <u>Specific Proof Required to Support Extensive Nursing Services (Third Letter of</u>

<u>RUG)</u>: Further, DEFENDANTS knew that the following medical records/documentary proof

was essential to support the **extensive nursing services** (provided during the 14-day look-back

period) reported in Section O of the MDS and reflected in the third letter of the RUG billing code

(related to extensive services) and MDS Section Z:

    a.    The same **ADL flowsheet records that supported the Late Loss ADL
        scoring** discussed immediately above, and

    b.    Medication Records, Nurse Notes, Treatment Records, MD
        Orders/Progress Notes, Activity Progress Notes, and Therapy
        Documentation that provide evidence that the extensive services—
        tracheostomy care, ventilator or respirator, or isolation or quarantine for
        active infectious disease—were provided.

---

[44]*See* https://oig.hhs.gov/newsroom/videos/importance-documentation/

[45]If the ADL flowsheets were unavailable, then the nurse notes and therapy records were
required to support the level of ADL dependency and nursing services provided during the look-
back period.

205.   At all times relevant to this lawsuit, DEFENDANTS knew they were required to keep medical record documentation that supported the extent and quantity of the services they claimed to provide residents.  DEFENDANTS also knew that these supporting medical records, in conjunction with the UB-04s and MDSs, formed a material basis for payment under the Medicare program.  Even though these supporting medical records were material to payment, DEFENDANTS knew that CMS did not have the manpower and means to audit the huge volume of supporting medical records to ensure that the claims for payment were accurate.  In short, DEFENDANTS knew that the Government would not detect their scheme to increase their Medicare revenues by submitting false claims for payment that were not supported by medical records.

206.   At all times material to this case, CMS was unaware of DEFENDANTS' schemes to submit false claims for payment to Medicare for inflated RUGs that were not supported by resident medical records.

D.   The Scheme to Defraud Medicare by Upcoding/Inflating RUGs and Submitting Legally False Claims

207.   The two primary instruments at the heart of DEFENDANTS' scheme to defraud Medicare were the UB-04 billing claims they presented for payment and the supporting MDS assessments they submitted to CMS.

208.   DEFENDANTS' Submission of Factually and Legally False UB-04s: By reason of those matters set forth above, DEFENDANTS knowingly and routinely presented, or caused to be presented, false or fraudulent UB-04 claims for payment by or approval of Medicare at ManorCare-Northwest, ManorCare-Pottstown, and other MANORCARE/PROMEDICA nursing homes identified in *Exhibit 1,* in violation of 31 U.S.C. § 3729(a)(l)(A).

209.    DEFENDANTS knew the UB-04s they submitted to Medicare (1) were a material condition of payment; (2) were the basis of payment from federal funds and determined the amount of that payment; and (3) knew that such UB-04 claims were required to be accurate and truthful as expressly certified.[46]

210.    Significantly, DEFENDANTS knew (1) that the Late Loss ADL care and nursing services required for the dependent and disabled residents they targeted and aggressively recruited for admission vastly exceeded the physical work capacity of the skeletal staff DEFENDANTS permitted to work at their facilities; (2) that underlying documentation required to support MDSs and UB-04 claims for payment were routinely false, full of holes, and not accurately reflective of the ADL care and skilled services provided to dependent residents; and (3) that the reason this care was not provided and documented at the nursing homes identified in *Exhibit 1* was the ***dangerous and extreme understaffing*** which was uncovered by Relator Compton's experts, as discussed above.

211.    Despite this knowledge, DEFENDANTS knowingly and routinely submitted UB-04s that falsely certified Late Loss ADL care and nursing services were provided to residents which had not been provided.

---

[46]*See United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *7 (S.D. Fla. Jan. 29, 2007) (recognizing that the United States has a common-law right to recover Medicare overpayments); *United States v. Life Care Centers of America, Inc.*, https://www.justice.gov/opa/pr/life-care-centers-america-inc-agrees-pay-145-million-resolve-false-claims-act-allegations (October 24, 2016) (in which Life Care Centers of America, Inc. and its sole shareholder, Forrest L. Preston, agreed to pay $145 million to resolve FCA allegations that they engaged in a systematic effort to increase Medicare and TRICARE therapy billings, submitted claims for therapy services that were not reasonable, necessary, or skilled and that the owner was unjustly enriched as a result of these schemes).

212.    More specifically, within the UB-04 claims submitted to Medicare for ManorCare-Northwest, ManorCare-Pottstown, and other subject nursing homes identified in *Exhibit 1*, Relators allege that DEFENDANTS routinely submitting RUG billing codes where the third letter related to Late Loss ADL scores and complex clinical care needs (requiring "extensive services") were not supported by the medical records or were based on false medical records.[47]

213.    <u>DEFENDANTS' Submission of Factually and Legally False MDSs</u>: By reason of those matters set forth above, DEFENDANTS knowingly and routinely made, used, or caused to made and used, false MDS records and statements material to false or fraudulent claims for payment to Medicare at ManorCare-Northwest, ManorCare-Pottstown, and other MANORCARE/PROMEDICA nursing homes identified in *Exhibit 1* in violation of 31 U.S.C. § 3729(a)(l)(A) and (B).

214.    DEFENDANTS submitted MDSs that falsely certified nursing care and basic ADL assistance was provided to residents which had not been provided and that was not supported by the medical records.

215.    More specifically, Relators allege that ManorCare-Northwest, ManorCare-Pottstown, and other subject nursing homes identified *in Exhibit 1* knowingly engaged in a routine practice of falsely upcoding/inflating (1) the Late Loss ADL scores in Section G of the MDS, (2) the complex clinical care needs (requiring "extensive services") in Section O of the

---

[47] Relators' cause of action (regarding the subject facilities identified in *Exhibit 1*) for submitting factually and legally false claims based on inflating Late Loss ADL scores (third letter) is limited to the timeframe of June 1, 2012 to September 30, 2019, during which time the RUG model was in effect.

MDS, and (3) the RUG billing code supported by the resident MDS assessments in Section Z of the MDS.

216.    DEFENDANTS knew that the core skilled services required for the disabled and dependent residents and documented in the MDSs vastly exceeded the physical work capacity of the skeletal staff they employed to work at their facilities, resulting in the underlying medical records being routinely false, full of holes, and not accurately reflective of the skilled services provided to dependent residents.

217.    DEFENDANTS' Submission of Factually and Legally False Claims for Payment That Were Not Supported by the Underlying Medical Records: By reason of those matters set forth above, DEFENDANTS knowingly and routinely submitted factually and legally false claims for payment to Medicare that were not supported by medical records or were based on false medical records and factually and legally false MDS assessments that were material to payment under Medicare and material to DEFENDANTS' false claims for payment. Accordingly, DEFENDANTS knowingly made, used, or caused to made and used, false records and statements material to false or fraudulent claims for payment to Medicare in violation of 31 U.S.C. § 3729(a)(l)(B).

218.    More specifically, Relators allege that, with respect at ManorCare-Northwest, ManorCare-Pottstown, and other subject nursing homes identified in *Exhibit 1,* DEFENDANTS knowingly engaged in a routine pattern and practice of submitting claims for payment to Medicare that were not supported by the underlying medical records and MDS assessments.

219.    For those reasons set forth above, the underlying medical records and MDS assessments routinely did not support or validate the third letter of the RUG codes related to Late Loss ADL scores and complex clinical care needs (requiring "extensive services") that

75

DEFENDANTS billed to Medicare.  Additionally, Relators allege that the underlying medical records and MDS assessments routinely did not meet conditions for payment that were material to Medicare.

## VIII.    DEFENDANTS' SCHEME TO OBTAIN PAYMENT FROM MEDICAID AND MEDICARE BY SYSTEMATICALLY SUBMITTING CLAIMS FOR EXCLUDED, NON-COVERED, AND GROSSLY SUBSTANDARD AND/OR NON-EXISTENT SERVICES

A.    <u>Coverage Requirements Under the Medicaid and Medicare Insurance Programs</u>

220.    In order to understand DEFENDANTS' scheme to defraud Medicaid and Medicare through submission of claims for excluded, non-covered, and grossly substandard and/or non-existent services, it is necessary to first understand the fundamental insurance coverage provided by Medicaid and Medicare.

221.    Pursuant to the CMS 1561 Form, a Health Insurance Benefit Agreement used by providers to enroll in the Medicare programs, DEFENDANTS expressly agreed that ***"[i]n order to receive payment*** under title XVIII of the Social Security Act, [MANORCARE/PROMEDICA], as the provider of services agrees to conform to the provision of section of 1866 of the Social Security Act and applicable provision in 42 C.F.R.."  CMS-1561 (emphasis added).

222.    42 C.F.R. 483 specifically sets forth the minimum requirements an SNF is required to meet to participate in, and ultimately receive payment under, Medicare and Medicaid.  *See* 42 C.F.R. 483.1.

223.    These requirements include that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the [facility's] comprehensive assessment and plan of care."  42 C.F.R. § 483.24.

224.    The NHRA regulations further state, "[q]uality of life is a fundamental principle that applies to all care and services provided to facility residents." *Id.*

225.    The services provided by DEFENDANTS' nursing homes must "meet professional standards of quality" and be provided by a sufficient number of qualified personnel. 42 U.S.C. §§ 1395i-3(b)(4)(A) and (b).

226.    The federal requirements also provide that residents of nursing home facilities not be allowed to develop pressure sores unless the patient's clinical condition is such that they are unavoidable and not simply the result of neglect; that residents are free of any significant medication errors, and otherwise receive the necessary services to meet any special needs they may have and also to maintain "good nutrition, grooming and personal and oral hygiene." 42 C.F.R. §§ 483.25(b), (c), (k) and (m).

227.    Accordingly, by submitting their claims for payment, DEFENDANTS agreed that payment for services was conditioned on compliance with 42 C.F.R.§ 483.1, *et seq.*

228.    As a result, any request for payment made while the requirements under 42 C.F.R. § 483.1, *et seq,* were not met constitutes a false claim for payment.

229.    Moreover, both Medicaid and Medicare define what services they are willing to pay nursing homes to provide. If the services fall outside of the definition of what is covered, such services are excluded from insurance coverage, and neither program will pay for them.

230.    The Medicaid program coverage requirements applicable to all states required: "***Each service must be sufficient in amount, duration, and scope*** to reasonably achieve its purpose." 42 C.F.R. § 440.230 (effective September 30, 1981) (emphasis added).

231.    The *Medicare Benefit Policy Manual* provides that services in an SNF are excluded from Medicare insurance coverage if services were ***unreasonable in terms of duration***

*and quantity*.  More specifically, services are "covered" under Medicare only if *all of the following four conditions* are met:

- The patient requires skilled nursing services or skilled rehabilitation services, i.e., services that must be performed by or under the supervision of professional or technical personnel (*see* §§30.2 -30.4); are ordered by a physician and the services are rendered for a condition for which the resident received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services; [and]

- The patient requires these skilled services on a daily basis (*see* §30.6); [and]

- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF (*see* §30.7.); and

- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are ***consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and*** <u>***accepted standards of medical practice***</u>***. The services must also be*** <u>***reasonable in terms of duration and quantity***</u>.

   ***If any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered.***  For example, payment for a SNF level of care could not be made if a resident needs an intermittent rather than daily skilled service.

*Medicare Benefit Policy Manual*, Ch. 8, § 30 (emphasis added).[48]

    232.    The critical importance of the Medicare services being covered (i.e., reasonable in terms of duration and quantity and consistent with accepted standards of medical practice) is amplified in the *Medicare Claims Processing Manual,* which provides:

   The healthcare provider or supplier is also accountable for information contained in the beneficiary's medical records, such as the beneficiary's medical chart,

---

[48]Under Medicare, "***[N]o payment may be made*** under part A or part B of this subchapter for any expenses incurred ***for items or services*** . . . ***which . . . are not reasonable*** and necessary for the diagnosis or treatment of illness or injury…"  42 U.S.C. § 1395y(a)(l)(A) (emphasis added).

attending physicians' notes, or similar records. When the medical records clearly show that the beneficiary received only non-covered services as described in the Medicare Benefit Policy Manual, the healthcare provider or supplier will be presumed to have knowledge of non-coverage.

*Medicare Claims Processing Manual*, § 30.2.2 (Rev.: 4197; Issued: 01-11-19; Effective: 04-15-19; Implementation: 04-15-19).

233.    It is clear from the *Medicare Claims Processing Manual* that services that do not meet locally accepted standards of practice are not covered and payment for those substandard services should be denied:

> When an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied. Because healthcare provider and supplier licensure is premised on the assumption that they are knowledgeable about locally acceptable standards of practice, healthcare providers and suppliers are presumed to have knowledge about locally acceptable standards of practice for liability determinations. No other evidence of knowledge of local medical standards of practice is necessary.
>
> In order to determine what "acceptable standards of practice" exist within the local medical community, Medicare contractors will rely on the following:
>
> - published medical literature;
> - a consensus of expert medical opinion; and
> - consultations with their medical staff, medical associations, including local medical societies, and other health experts.

*Medicare Claims Processing Manual*, § 30.2.3 (Rev.: 4197; Issued: 01-11-19; Effective: 04-15-19; Implementation: 04-15-19).

234.    According to the U.S. Health and Human Services, Office of Inspector General:

- "In cases that involve *failure of care on a systemic and widespread basis, the nursing facility may be liable for submitting false claims for reimbursement to the Government under the Federal False Claims Act,* the Civil Monetary Penalties Law (CMPL), or other authorities that address false and fraudulent claims or statements made to the Government. Thus, compliance with applicable quality of care standards and regulations is essential for the lawful behavior and success of nursing

facilities." OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832, 56836 (9/30/2008) (emphasis added).

- "When a nursing facility submits a claim to Medicare or Medicaid for reimbursement, the claim submission form includes certifications that the claimed services were provided in compliance with all applicable statutes, regulations, and rules. ***If a nursing facility fails to meet its obligations regarding the provision of care in accordance with professional standards of quality, or regarding the provision of services in an environment that promotes quality of life, claims for reimbursement may be considered false.***" OIG Nursing Facility Industry Segment-Specific Compliance Program Guidance, p. 11 (November 2024), https://oig.hhs.gov/documents/compliance/10038/nursing-facility-icpg.pdf (emphasis added).

235.    Moreover, it is clear that nursing homes shall ***not*** provide care that is grossly substandard and/or non-existent under 42 C.F.R. § 483.25, which states that "Quality of care is a ***fundamental*** principle that applies to all treatment and care provided to facility residents. ***Based on the comprehensive assessment of a resident, the facility must ensure that residents receive treatment and care in accordance with professional standards of practice***, the comprehensive person-centered care plan, and the resident's choices . . ." (emphasis added).

236.    Accordingly, at all material times, DEFENDANTS knew that Medicaid would not pay them for services that were not sufficient in amount, duration, and scope. Further, DEFENDANTS knew that Medicare would not pay them for non-covered services that were: (1) not reasonable both in terms of duration and quantity and (2) not consistent with accepted standards of medical practice. Although DEFENDANTS fully understood that the provision of the requisite quantity and duration of services was material to payment from these Government programs, they also understood that CMS (Medicaid/Medicare agencies and their inspectors, surveyors, and personnel) did not have the capacity, manpower, or means to monitor and determine the duration and quantity of the services delivered for each of the claims for payment

that DEFENDANTS submitted.  In short, DEFENDANTS knew they could get away with submitting claims for payment for non-covered services.

> B.    DEFENDANTS' Scheme to Obtain Payment from Medicaid and Medicare for Non-Covered Services

237.    With respect to those nursing homes identified in *Exhibit 2,* DEFENDANTS engaged in a scheme to obtain payment from Medicaid and Medicare by knowingly submitting[49] false claims for payment for services that were excluded/non-covered under the Medicaid/Medicare insurance programs.[50]  Because DEFENDANTS were confident that CMS would not detect these false claims at the facilities, they brazenly and routinely submitted claims for non-covered, excluded services that were not of the requisite quantity and duration without concern for the consequences to their vulnerable, dependent, and disabled residents.

238.    At all times material to this case, CMS was unaware of DEFENDANTS' scheme to submit false claims to Medicaid and Medicare for payment for excluded, non-covered, and grossly substandard and/or non-existent services at the nursing homes identified in *Exhibit 2.* Moreover, CMS did not know and could not quantify the extent and severity of DEFENDANTS' understaffing on a per-day, per-shift, and per wing/unit basis, nor did it know or was it able to quantify the extent and severity of the care deprivations suffered by residents on a per-day, per-shift, and per wing/unit basis.

---

[49]The same universal billing UB-04 form used to submit claims under Medicare is also used to submit claims to Medicaid for flat-rate payment.

[50]Relators' causes of action for submitting false claims for payment of services that (1) were excluded/non-covered, (2) were insufficient or unreasonable in amount, duration, and scope in violation of acceptable standards of medical practice, (3) placed vulnerable, dependent, and disabled residents at unreasonable risk for physical and mental harm, and (4) routinely subjected residents to non-existent/grossly substandard care include the timeframe of June 1, 2012, to the present.

239.    DEFENDANTS knew that covered services could not be delivered in the nursing homes identified in *Exhibit 2* without adequate staff.

240.    Due to the high acuity, disabled and dependent nature of the residents at the nursing homes identified in *Exhibit 2*, DEFENDANTS' ability to provide the covered services under Medicaid and Medicare hinged upon them providing enough staff to deliver the requisite quantity and duration of services.  Not only did DEFENDANTS understand the critical relationship between covered services and sufficient staffing, but they further understood that staffing costs money.  Staffing was the number one expense in DEFENDANTS' nursing homes, and DEFENDANTS were focused on cutting that expense, to the significant detriment of their vulnerable patients.

241.    In order to decrease its staffing costs, DEFENDANTS engaged in a dangerous, systemic, and centralized policy and practice of cutting the staffing in the nursing homes identified in *Exhibit 2* to the bone, deliberately and routinely limiting the number of staff and the amount of staff time allowed to ***extremely low, severe, and unsafe*** levels that (1) made it physically and mathematically impossible to deliver care services that were covered under the Medicaid and Medicare programs (i.e., sufficient in amount, duration, and scope; reasonable in duration and quantity; and in accordance with acceptable standards of medical practice), (2) placed vulnerable, dependent, and disabled residents at unreasonable risk for physical and mental harm, and (3) routinely subjected residents to grossly substandard and/or non-existent care.

242.    More specifically, Relators have personal knowledge that DEFENDANTS demanded such critically low, severe, and unsafe staffing at their nursing homes that vulnerable, dependent, and disabled residents were:

a.     Routinely deprived of/denied essential care services (including ordered medications, treatments, interventions, clinical care, and basic assistance with ADLs) required to maintain their health and safety, in gross violation of acceptable standards of medical practice;

b.     Routinely deprived of/denied care required by the residents' individualized care plans, in violation of professional standards;

c.     Routinely subjected to inhumane, undignified, and repugnant treatment that placed them at unreasonable risk for physical and mental harm, including:

    i.     Instead of being assisted to the toilet by staff, having to resort to soiling their beds and clothes;

    ii.     Prolonged exposure to their own waste, with urine staining linens and/or feces hardening on their skin;

    iii.     Infrequent bathing, sometimes going weeks without baths or showers despite incontinence issues;

    iv.     Failure to turn and reposition residents while in bed or sitting in a chair, for extended periods to avoid skin breakdown and pressure sores;

    v.     Failure to provide assistance with feeding to avoid weight loss and malnutrition;

    vi.     Failure to provide sufficient fluids to avoid dehydration;

    vii.     Failure to provide bowel and bladder training programs;

    viii.     Leaving residents in bed and in pajamas all day without opportunities to get up;

    ix.     Persistent odors of bodily waste and neglect, with unaddressed hygiene and grooming needs;

    x.     Unanswered cries or calls for help, even after activating call lights;

    xi.     Failure to manage and control pain; and

d.     Routinely subjected to grossly substandard and/or non-existent care that placed residents at unreasonable risk for physical and mental harm, including causing these resident to suffer/develop avoidable (1) pressure

sores, (2) malnutrition and weight loss, (3) dehydration, (4) contractures, (5) falls and fractures, (6) infections, (7) unnecessary deterioration of underlying medical diagnoses, and (8) premature death.[51]

243.   Furthermore, based on the investigation of the subject nursing homes that Relator Compton caused to be undertaken by nursing home workload experts, database experts, computer simulation experts, industrial engineers, medical experts in geriatrics, and MDS certified nurse auditors, Relator Compton has reason to believe that the ADL care provided to residents in the subject facilities identified in *Exhibit 2* was ***both mathematically and physically impossible and constituted grossly substandard and/or non-existent care***.

244.   Relator Compton, through her experts, has quantified[52] the extent to which DEFENDANTS deprived residents of the basic ADL care that was required and that DEFENDANTS claimed was provided at each subject nursing home.

245.   Using discrete event simulation and generally-accepted industrial engineering principles, these industrial engineering and simulation experts translated raw innocuous facility data obtained from CMS for each resident at each subject nursing home into the number of labor

---

[51]*See United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC,* 135 F.Supp.3d 944, 964-65 (D. Minn. 2015) (*quoting* government's statement that it "cannot be the case and it is not the law" that "a nursing home is entitled to payment for doing nothing more than housing an elderly person and providing her with just enough bread and water for short-term survival, even in conditions of filth, mold and insect infestation; and even if it consistently provides her too little medication, or too much, or the wrong medication, contrary to her physician's orders; and even if it allows her to develop horrific pressure ulcers infected by feces and urine to the point that amputations are required; and even if it permits her to suffers falls and fractures; and even it allows her to asphyxiate on her own fluids due to inadequate resources to properly attend to her worsening condition").

[52]Relators do not merely claim that MANORCARE failed to comply with federal staffing laws and regulations and that such failure amount to false claims. Rather, Relator Compton's experts have quantified the extent to which ADL care was ***mathematically and physically impossible*** due to MANORCARE staffing and based on the specific ADL omission rate in each subject facility, MANORCARE failed to deliver essential ADL care that was reasonable in quantity and duration. Consequently, MANORCARE's claims for payment and certifications were not only false but outside of coverage.

hours *required* (per day) to provide the aggregate ADL services that DEFENDANTS claimed to the federal and state governments that were needed by and provided to every resident in the subject nursing homes.  In short, but for this in-depth analysis and investigation, the Government/CMS did not know and would not have been able to quantify the daily amount of labor time required to deliver these combinations of ADL care needed by every resident or the amount of ADL care that was mathematically impossible.

246.    These simulation experts scientifically tested and measured the amount of ADL care that was possible and impossible in each MANORCARE/PROMEDICA facility.  To accomplish this testing, Relator Compton's simulation experts conducted ***failure analyses*** to determine the maximum capacity of known numbers of staff in each subject nursing home to meet resident ADL workload demands.  More specifically, these simulation experts generated and ran tens of thousands of discrete event nursing home staffing simulation tests to: (a) understand, synthesize, and properly analyze the operations of the subject nursing homes given their specific workloads and actual staffing levels and (b) confirm the scope and quantity of systemic staffing failures identified by Relator Compton.  Based on the failure analyses performed for the nursing homes identified in *Exhibit 2*, on average, the daily omitted care time percentage at these facilities ranged ***between 40% and 50%***.

247.    The investigation undertaken by experts on behalf of Relator Compton and the ***specific failure analyses and findings*** of these simulation experts, described above, have not been publicly disclosed.

248.    In sum, but for the failure analyses performed by Relator Compton's industrial engineering and simulation experts, the Government/CMS would not have been alerted to the fact that it was mathematically and physically impossible for the subject nursing homes

85

identified in *Exhibit 2* (as well as *Exhibit 1*) to have delivered the required ADL care that was reasonable in quantity and duration. ***Indeed, it is the ability to mathematically calculate the daily ADL care that was physically possible or impossible at the MANORCARE/PROMEDICA facilities in question that distinguishes this case from garden-variety assertions of understaffing.***

249.    DEFENDANTS' Refusal to Staff Based on Resident Acuity: DEFENDANTS' deliberate and ongoing refusals to comply with federal acuity-based staffing requirements[53] were not just "garden-variety" violations in which their facilities' staffing periodically fell short because of unexpected turnover or bad luck. Instead, DEFENDANTS' intentional and systemic understaffing was a core feature of their scheme to game Medicaid and Medicare, and they subjected residents in their network of nursing homes to grossly substandard and/or non-existent care that placed residents at unreasonable risk for physical and mental harm.

250.    More specifically, DEFENDANTS' dangerous understaffing and systemic violations of law requiring them to staff based on resident acuity are evident from the failure analysis performed by industrial engineering and simulation experts (discussed above).

---

[53] 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. § 483.30 (effective December 27, 2005); 42 C.F.R. § 483.35 (effective October 4, 2016) ("The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and ***considering the number, acuity and diagnoses of the facility resident population*** in accordance with the facility assessment required at § 483.70(e)") (emphasis added).

251. Moreover, the grossly substandard and/or non-existent care at the nursing homes listed in *Exhibit 2* was (1) known to DEFENDANTS, (2) intentionally caused by DEFENDANTS, and (3) recklessly tolerated by DEFENDANTS.

252. Accordingly, Relators allege that, with respect to the subject nursing homes identified in *Exhibit 2*, DEFENDANTS ***knowingly*** and routinely submitted claims for payment for services that were excluded, non-covered, grossly substandard and/or non-existent.

## IX.    SCIENTER

253. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

254. Knowledge is an essential element of a relator's claim under the FCA. *See* 31 U.S.C. § 3729(a)(l)(A)-(B). The FCA defines "knowing" as "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)-(iii). "Proof of specific intent to defraud" is not required. *Id.* § 3729(b)(1)(B). Moreover, under Rule 9(b), "allegations of knowledge may be alleged generally and need not be pled with particularity." *United States v. Exec. Health Res*., 196 F.Supp.3d 477, 503 (E.D. Pa. 2016).

### A.    DEFENDANTS' Knowing Submission of False Claims

255. As stated above, with respect to the nursing homes identified in *Exhibit 1*, DEFENDANTS knowingly and routinely submitted UB-04s that falsely certified that Late Loss ADL care and extensive nursing services were provided to residents which had not been provided. DEFENDANTS knew the UB-04s they submitted to Medicare that were factually and legally false (1) were a material condition of payment; (2) were the basis of payment from

federal Government funds and determined the amount of that payment; and (3) knew that such UB-04 claims were required to be accurate and truthful, as expressly certified.

256.   DEFENDANTS knowingly and routinely made, used, or caused to made and used, false MDS records and statements material to false or fraudulent claims for payment to Medicare in violation of 31 U.S.C. § 3729(a)(l)(A) and (B).  DEFENDANTS submitted MDSs that falsely certified that Late Loss ADL care and extensive nursing services were provided to residents which had not been provided and that was not supported by the medical records.

257.   DEFENDANTS knowingly and routinely submitted factually and legally false claims for payment to Medicare that were not supported by medical records and MDS assessments that were material to payment under Medicare and material to DEFENDANTS' false claims for payment.  Accordingly, DEFENDANTS knowingly made, used, or caused to made and used, false records and statements material to false or fraudulent claims for payment to Medicare, in violation of 31 U.S.C. § 3729(a)(l)(B).

258.   The scope and extent of DEFENDANTS' pattern and practices discussed hereinabove provide corroborating evidence that DEFENDANTS *knowingly*, as that term is defined in 31 U.S.C § 3729(b)(1)(A)(i)-(iii), submitted factually and legally false claims for payment to Medicare relating to the nursing homes identified in *Exhibit 1*.

259.   With respect to the nursing homes identified in *Exhibit 2,* DEFENDANTS knowingly and routinely submitted claims for payment to Medicaid and Medicare for services that were excluded, non-covered, and grossly substandard and/or non-existent.  Furthermore, DEFENDANTS knew that the staffing levels they mandated and enforced at their nursing homes made it impossible to provide services that were (1) sufficient in amount, duration, and scope, as

required for Medicaid coverage; (2) reasonable in duration and quantity, as required for

Medicare coverage; and (3) in accordance with locally accepted standards of practice.

260.    DEFENDANTS' grossly substandard and/or non-existent care is not only evident

from the direct and independent knowledge of Relators and the failure analysis performed by

Relator Compton's industrial engineering and simulation experts but is further corroborated by

the following routine practices, continuing course of conduct, and complaints that were ***known to

and recklessly tolerated by*** DEFENDANTS at the below nursing homes identified in *Exhibit 2*:

261.    **ManorCare Health Services-Imperial**: With respect to ManorCare Health

Services-Imperial (provider # 495283) in Richmond, Virginia, DEFENDANTS routinely staffed

this facility at dangerously low ***CNA staffing levels that averaged 1.74 hours per patient per

day*** over a six-year period from 2017 to 2022 (based on the daily Payroll Based Journal ("PBJ")

staffing data[54] submitted to CMS by ManorCare Health Services-Imperial).[55]  These average

staffing level are more than ***an hour less per patient*** than the minimum 2.8 hours per patient

CNA staffing level needed for nursing home populations with low acuity residents as determined

by and published in CMS's 2001 Phase II Report to Congress, *Appropriateness of Minimum

Nurse Staffing Ratios in Nursing Homes*, the 2004 Institute of Medicine ("IOM") report which

---

[54]CMS required PBJ staffing hours data be submitted by nursing homes beginning January 1,
2017.  The requirement that PBJ staffing be submitted was implemented by CMS due, in part, to
concerns that the 671 survey staffing data was being manipulated and inflated and did not
accurately reflect timecard/payroll-based staffing data.
[55]Further, between Q2 2012 and Q2 2017, ManorCare Health Services-Imperial's CNA staffing
level averaged 1.78 hours per patient per day based on the limited 671 staffing data periodically
self-reported to surveyors as part of the survey process for the two-week window prior to the
survey.

was adopted by the American Nurse Association ("ANA") and the Coalition of Geriatric Nurse

Organizations ("CGNO") in 2014.[56]

262.    These dangerously low staffing levels at ManorCare Health Services-Imperial

ignored the exceptionally high care needs of this facility's resident population.  Based on the

MDS data submitted by ManorCare Health Services-Imperial to CMS from January 1, 2013 to

September 30, 2022:

    a.    An average of 72.7% of the resident population at ManorCare Health
          Services-Imperial required extensive assistance or was totally dependent
          on staff for toileting;

    b.    An average of 69.6% of the resident population required extensive
          assistance or was totally dependent on staff for bed mobility (turning and
          repositioning);

---

[56]DEFENDANTS knew their staffing levels were significantly below the levels that were
scientifically determined to be required based on resident acuity in CMS's Phase II Final Report
to Congress: *The Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes* which
found: (a) In even low workload nursing homes, *2.8 CNA hours per patient day were minimally
required to meet the core care needs of residents as defined by their MDS assessments*.  Phase
II Final Report at 3-31; (b) CNA staffing levels of 1:8 on day shift, 1:10 on evening shift, and
1:20 on night shift were determined to cause *very long waits for services and no assistance
during meals for many residents*, even when staff worked hard.  Phase II Final Report at 3-28;
(c) Staffing at *2.2 CNA hours per patient day was predicted to result in long waits for* service
*and inconsistent implementation of care even when staff worked at unrealistically high
productivity levels*.  Phase II Final Report at 1-7; and (d) Staffing at the CNA levels
MANORCARE dictated and enforced were determined to cause *2-3 hour waits for changes of
diapers and wet linens*, as well as high rates of omitted care and missed or late food service.
Phase II Final Report at 3-25, 26.
The Institute of Medicine in its 2004 report entitled, *Keeping Patients Safe,* recommended a
minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for
every 18 patients (1.3 hours per resident day), and *one nurse assistant for every 8.5 patients (2.8
hours per resident day*)." (emphasis added).  DEFENDANTS also knew or should have known
that the CNA staffing levels they imposed upon this facility were woefully below the minimum
nursing home staffing levels that were recommended by the IOM, ANA, and CGNO.
DEFENDANTS' staffing levels at the *Exhibit 2* facilities were routinely well-below the
minimum staffing levels imposed by federal law (42 C.F.R. § 483.35, effective May 10, 2024
which requires *2.45 CNA hours per patient day and 3.48 hours of total caregiver staff per
patient day*) as a minimum threshold for unsafe and non-harmful care.

  c.  An average of 55.6% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 35.0% of residents required the assistance of two or more staff for transfers;

  d.  An average of 67.2% of the resident population required extensive assistance or was totally dependent on staff for dressing;

  e.  An average of 75.1% of the resident population required physical help from staff or was totally dependent on staff for bathing;

  f.  An average of 58.4% of the resident population was frequently or always incontinent of bladder and 59.3% was frequently or always incontinent of bowel;

  g.  An average of 79.5% of the resident population had a wheelchair for mobility.

263. Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Imperial in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to September 2022, there were at least 25 one-star reviews of ManorCare Health Services-Imperial publicly posted on-line, which included:

  a.  "Don't send your loved ones to this facility because ***the care is non existent***."

  b.  "If you care for your loved one's Health & Well Being at all, especially if for Hospice care, DO NOT put them in this facility.  It offends me deeply that I must give them at least one star to complete the review, as they are unworthy of it in my opinion.  The way they treated my 92 year old father in law upset me so badly, I pulled him out of there, took him back to his apartment and took care of him myself the last month of his life.  The indifference to the value of human life was evident every time he was ignored or overlooked.  3 times I came in at 8-9am, I was able to walk in unchallenged or acknowledged to find him laying in soiled linens, call buzzer UNDER the bed, out of his reach, etc.  The care (not that you could call it that) my relative received there was HORRIFIC."

      c.      "*Too many patients not enough staff.* Overcrowding creates overworked staff. The patent suffers from poor management of this facility! If you can't give yourself a shower, you won't get one."

      d.      "WORST FACILITY EVER! *OBVIOUSLY MONEY WAS MORE IMPORTANT THAN THE PATIENTS*!!"

      e.      "My aunt was 'warehoused' at Manor Care for 6 days. ***Her care was nonexistent***, and my family couldn't get her out of there fast enough. She was never bathed, her teeth were never brushed, hair wasn't combed, and she was repeatedly found soaked with urine. And that is what we know about - I can't imagine what we didn't see. I wouldn't put a dog in this 'care' facility. We are now at a lovely facility that is cleaner, brighter, more attentive, friendly, and less expensive as well. Do your research."

264.    **ManorCare Health Services-Fair Oaks:** With respect to ManorCare Health Services-Fair Oaks (a/k/a Fair Oaks Health and Rehab) (provider # 495217) in Fairfax, Virginia, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.65 hours per patient per day*** over a six-year period from 2017 to 2022 (based on the daily PBJ staffing data ManorCare Health Services-Fair Oaks submitted to CMS).[57]

      a.      In 2019, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Fair Oaks had the 11th lowest average CNA hours per patient day in Virginia (out of 297 facilities)—an average of only 1.56 CNA hours per patient day;

      b.      In 2018, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Fair Oaks had the 13th lowest average CNA hours per patient day in Virginia (out of 297 facilities)—an average of only 1.61 CNA hours per patient day; and

      c.      In 2017, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Fair Oaks had the 9th lowest average CNA hours per patient day in Virginia (out of 297 facilities)—an average of only 1.54 CNA hours per patient day.

---

[57]Further, between Q1 2011 and Q1 2017, ManorCare Health Services-Fair Oaks' CNA staffing level averaged 1.86 hours per patient per day based on the limited 671 staffing data periodically submitted to surveyors as part of the survey process for the two weeks prior to the survey.

265. These dangerously low staffing levels at ManorCare Health Services-Fair Oaks ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by ManorCare Health Services-Fair Oaks to CMS from January 1, 2013 to September 30, 2022:

a. An average of 78.6% of the resident population at ManorCare Health Services-Fair Oaks required extensive assistance or was totally dependent on staff for toileting;

b. An average of 74.5% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning);

c. An average of 64.8% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 35.5% of residents required the assistance of two or more staff for transfers;

d. An average of 72.2% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e. An average of 81.1% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f. An average of 65.5% of the resident population was frequently or always incontinent of bladder and 74.5% was frequently or always incontinent of bowel;

g. An average of 42.2% of the resident population had severe cognitive deficit, with 47.4% having dementia or Alzheimer's; and

h. An average of 79.0% of the resident population had a wheelchair for mobility.

266. Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of caregivers, outside service providers, and family members who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Fair Oaks in order to warn other consumers about the dangerous practices at this facility. During the time frame of

93

2018 to January 2023, ManorCare Health Services-Fair Oaks there were at least 57 one-star

reviews of ManorCare Health Services-Fair Oaks publicly posted on-line, which included:

a.   "My mother moved there in June after spending 4 years at a facility in
Charlottesville to be closer to home and family. She was dead in 5 months.
The neglect at this place is unbelievable.  If you don't have the time to
have family and friends there in a regular basis, expect your loved one to
not be cared for.  I complained several times and all the people at the top
assured me they were a top notch facility with bad apples, but they weed
them out pretty quickly.  *The State should be more diligent in where they
send funds* and have unannounced visits to these places.  How does one
become dehydrated in a place with 24-hour care.  My loved one became
septic from a UTI and was admitted to the hospital with a temperature of
105.  She needed help with feeding and lost a great amount of weight from
not being fed.  No assistance was offered. Don't be fooled by the initial
kindness and attention to detail when you first move to the facility. It
quickly wanes.  I've taken photos of the CNAs on their phones or no
chaperone at all and nowhere to be found.  My mom was assaulted by
another residence while unaccompanied in the common area and police
intervened.  .  .  I'd I could give a negative 100 stars I would. I hope this
helps someone."

b.   "My mom stayed at this facility for just over a week and the care, if you
can even call it that, she received was atrocious.  The staff was completely
unresponsive.  *Any time a patient pressed their call button it took on
average two hours, one hour at minimum, before they received any sort of
assistance*.  During my mom's stay, a patient fell and was yelling for help
*for over an hour*.  My mom amongst other residents pressed their call
buttons to try and get the staffs' attention.  However despite everyone's
efforts, the staff failed to respond and the patient who fell *was forced to
call 911* to receive the medical assistance he was denied at this facility.  .  .
.  Every time I visited, multiple residents stopped me to BEG for my
assistance in getting them out of this facility because the staff did not care
for their wellbeing.  Not only did they name the nurses, but they also
stated that it was evident the director did not care about any of the patients
in that place.  The amount of times I heard a patient desperately yell for
help was heartbreaking because the staff showed no urgency nor any
intention to provide these patients with even the basic level of care.  There
was even a patient outside in a wheelchair at the end of their sidewalk,
with no supervision, in the freezing rain and the staff didn't even know the
patient was missing. I know this is lengthy, but this facility needs to be
shut down before any other patient is injured or worse. If i could give less
than 1 star I would. Bottom line, at ALL costs, DO NOT send your loved
ones here!

c.  "DO NOT GO HERE! DO NOT SEND ANYONE HERE! AVOID THIS PLACE AT ALL COSTS! THE FACILITY IS POOR! THE CARE IS POOR! THIS PLACE SHOULD BE SHUT DOWN! YOU WOULD GET BETTER CARE LAYING IN A BOX IN AN ALLEY NEXT TO A DUMPSTER FULL OF RATS!"

d.  "I would NEVER work here again! They expect over worked and exhausted employees to give more than, humanly, possible!"

e.  "Death Trap. Avoid !!!!!!!!  I was forced to select a rating but I would not give this place a zero!!"

f.  "Never return phone calls, non responsive to patients, ring call buttons and no one responds for hours. I just can/t with these people."

g.  "If you have a choice... do not use this facility.  The reviews you see are a fair representation of this "health" facility.  I unfortunate did not think of yelp when choosing a center for my elderly father.  He was sent here to recover and almost died.  His state went from unsteady on feet to near death and was sent by an ambulance back to hospital after I called to check on him.  *Non verbal patient get the least amount of care.  **The staff is too busy to provide reasonable care and the absolute minimum is done even if it means death.**  I am not exaggerating.  My dad was near death and was told he was resting! Eventually he did pass away but we transferred him to Fairfax nursing. Avoid this place like the plague!"

h.  "In my line of work I interact with both residents at Manor care and their employees. I have never had a good experience dealing with the employees.  It is very obvious from the state of the people they "care" for that little care is done.  *Residents who rely on others for 100% of their care are neglected, left to sit in layers of soiled sheets and diapers, not bathed, or teeth brushed in weeks!*  The patients that can speak for themselves are ignored, neglected, and have their call bell taken away so they have no way to communicate their needs.  When I have to communicate with the staff, the language barrier is so great that my message is always lost! They don't know basic medical terms for treatment.  There have been many times I have tried to call the facility and can not get anyone to answer the phone.  I even had to call Fairfax County Police once to go do a well being check at the facility after not getting any staff to answer a phone for hours!!  Family members have cried to me about how bad they feel for sending their loved ones to this rehab facility. Others try to spend as many hours as possible there because they see the under staffing, unsafe heavy patient load, and neglect."

    i.     "I will not say negative, only my experience for one months stay; ***Call bell always took about one hour for first response, then add two more hours to get fecal matter diaper changed.*** *Record six hours waiting for diaper change.* Need water (?), wait one hour for call bell, then whenever the lone CNA to 20-40 patients is doing that function for all."

267.    **Heartland Health Care Center-Allen Park:** With respect to Heartland Health Care Center-Allen Park (provider # 235439) in Allen Park, Michigan, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.86 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data Heartland Health Care Center-Allen Park submitted to CMS).[58]

268.    These dangerously low staffing levels at Heartland Health Care Center-Allen Park ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by Heartland Health Care Center-Allen Park to CMS from January 1, 2013 to September 30, 2022:

    a.    An average of 77.9% of the resident population at Heartland Health Care Center-Allen Park required extensive assistance or was totally dependent on staff for toileting, and an average of 49.7% of residents required the assistance of two or more staff for toileting;

    b.    An average of 76.2% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 62.5% of residents required the assistance of two or more staff for bed mobility;

    c.    An average of 60.5% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 51.8% of residents required the assistance of two or more staff for transfers;

---

[58]Further, between Q3 2011 and Q1 2017, Heartland Health Care Center-Allen Park's CNA staffing level averaged 1.99 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for the two weeks prior to the survey.

d.   An average of 77.4% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.   An average of 67.0% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.   An average of 54.1% of the resident population was frequently or always incontinent of bladder and 54.4% was frequently or always incontinent of bowel;

g.   An average of 33.1% of the resident population had severe cognitive deficit, with 35.7% having dementia or Alzheimer's; and

h.   An average of 77.9% of the resident population had a wheelchair for mobility.

269.   Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of former employees and family members who publicly posted their complaints about grossly substandard care at Heartland Health Care Center-Allen Park in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2019 to 2023, there were at least 53 one-star reviews of Heartland Health Care Center-Allen Park publicly posted on-line, which included:

a.   "Horrible place my aunt is here and they refused to come in her room & even check on her.  She needs to be cleaned I called them and they still won't come in.  It's been over 3 hours and still no one is even came in to check on her.  This place is beyond horrible I don't recommend it to no one. They need to be shut down or hire new staff."

b.   "I worked here for years and they don't care about their employees or their residents.  I stayed for so long breaking my back over and over because I felt bad for those residents.  It broke my heart watching so many become long term and instantly declining in our care.  *Aides would have 30-40 on afternoons and 50-65 residents on midnights.*  I would work 16 hour shifts almost daily and have hardly any help and I knew I wasn't able to do the very most I could for those residents with having as many as I did. . . . The long term patients almost never get out of bed, there's just no time to get them all up when you have 40 patients which means almost everyone has bedsores. . . *The worst day was when I came in there was two of us in the entire building working. We each had 80 residents.*  This

97

place should be shut down.  I have worked at lots of different nursing homes since leaving here and nothing compares to how bad this one is."

c.  "*They let you sit in a pee soaked bed with both blankets soaked too!!  They give you 2 baths in 5 weeks* but only after being asked to.  They set you on the side of the bed and leave you alone and you fall off the bed and bust you head open.  6 stitches later at the ER after one week they wouldn't take out the stitches.  Once I finally got the Dr. to tell them they needed to be taken out, they only removed 3, I had to again request the other 3 be removed.  Put her in bed in her clothing that was covered in food from lunch. . . . Get there at 2pm, they are never dressed, in bed and left there for the rest of the day. . . I WOULDN'T TAKE MY DOG TO THIS PLACE!  Both the ER and the EMS told me that this place is not the best place to take anyone!!!!"

d.  "They don't feed patients enough food or at the times they need it, they don't check on them, they neglect them, they don't clean them."

270.  **ManorCare Health Services-Pottsville:** With respect to ManorCare Health Services-Pottsville (a/k/a Pottsville Rehabilitation and Nursing Center) (provider # 395344) in Pottsville, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.79 hours per patient per day*** over a five year period from 2017 to 2021 (based on the daily PBJ staffing data ManorCare Health Services-Pottsville submitted to CMS).[59]

271.  These dangerously low staffing levels at ManorCare Health Services-Pottsville ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Pottsville to CMS from January 1, 2013 to May 30, 2021:

a.  An average of 67.8% of the resident population at ManorCare Health Services-Pottsville required extensive assistance or was totally dependent

---

[59]Further, between Q4 2011 and Q3 2017, ManorCare Health Services-Pottsville's CNA staffing level averaged 1.92 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for the two-week window prior to the survey.

on staff for toileting, and an average of 54.6% of residents required the assistance of two or more staff for toileting;

b.    An average of 59.0% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 51.3% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 50.9% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 40.1% of residents required the assistance of two or more staff for transfers;

d.    An average of 66.7% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 79.9% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 44.7% of the resident population was frequently or always incontinent of bladder and 37.6% was frequently or always incontinent of bowel;

g.    An average of 37.6% of the resident population had severe cognitive deficit, with 49.0% having dementia or Alzheimer's; and

h.    An average of 59.5% of the resident population had a wheelchair for mobility.

272.    DEFENDANTS knew, or should have known, of their extreme and dangerously low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS:

a.    Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Pottsville had 70 months with overall one-star ratings by Medicare.gov—such one-star ratings (on a scale of 1 to 5) are an indication that they are among the worst performing facilities in the United States;

b.    Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Pottsville had 61 months with health inspection one-star ratings by Medicare.gov;

99

      c.      Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Pottsville had 52 months with all caregiver staffing one-star ratings by Medicare.gov; and

      d.      Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Pottsville had 47 months with RN staffing one-star ratings by Medicare.gov.

273.    DEFENDANTS were also placed on notice of repeatedly causing ***actual harm*** to residents at ManorCare Health Services-Pottsville during their ownership and management of this facility.  More specifically, ManorCare Health Services-Pottsville was cited by state surveyors at least ***nine times for causing actual harm*** to residents (or even more severe deficiencies).

274.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints on-line about grossly substandard care at ManorCare Health Services-Pottsville in order to warn other consumers about the dangerous practices at this facility.  For example:

      a.      "This place is horrible do not and I repeat do not put your loved ones here. The nurses are horrible to patients.  ***They neglect them on every level. They will sit in feces all day***. Set your loved ones food in front of them and will not assist them if they have trouble feeding themselves.  ***They will leave them unattended for hours at a time***. Please check on your loved ones unannounced if they do live at this facility."

      b.      "This is the worst place ever. Manor care staff don't care about the patients.  .  . I wouldn't recommend taken your family here to this nursing home.  They don't have hardly anyone working their. So something should be done. Maybe that's why no one stays."

275.    **ManorCare Health Services-Rossville:** With respect to ManorCare Health Services-Rossville (a/k/a Rossville Rehabilitation and Nursing Center) (provider # 215109) in Baltimore, Maryland, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.59 hours per patient per day*** over a seven-year period from 2017

to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Rossville submitted to

CMS).[60]

a.  In 2023, ManorCare Health Services-Rossville had the 3rd lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—***an average of only 2.82 hours per patient day***;[61]

b.  In 2023, ManorCare Health Services-Rossville had the 7th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.53 CNA hours per patient day***;

c.  In 2021, ManorCare Health Services-Rossville had the 5th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—***an average of only 2.96 hours per patient day***;

d.  In 2021, ManorCare Health Services-Rossville had the 3rd lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.40 CNA hours per patient day***;

e.  In 2020, ManorCare Health Services-Rossville had the 4th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—***an average of only 3.0 hours per patient day***;

f.  In 2020, ManorCare Health Services-Rossville had the 2nd lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.46 CNA hours per patient day***;

g.  In 2019, ManorCare Health Services-Rossville had the 3rd lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.62 CNA hours per patient day***;

h.  In 2018, ManorCare Health Services-Rossville had the 5th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—***an average of only 3.23 hours per patient day***;

---

[60]Further, between Q2 2013Q2 and Q4 2017, ManorCare Health Services-Rossville's CNA staffing level averaged 1.89 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for the two-week window prior to the survey.

[61]This total care staff PPD level is ***two hours below*** the IOM recommended total care staff level of 4.85 hours per patient per day.  The Institute of Medicine, in its 2004 report entitled, *Keeping Patients Safe* (p.11)*,* recommended a minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for every 18 patients (1.3 hours per resident day), and ***one nurse assistant for every 8.5 patients (2.8 hours per resident day)***." (emphasis added).

i.   In 2018, ManorCare Health Services-Rossville had the 4th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.69 CNA hours per patient day***; and

j.   In 2017, ManorCare Health Services-Rossville had the 6th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.75 CNA hours per patient day***.

276.   These dangerously low staffing levels at ManorCare Health Services-Rossville ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by ManorCare Health Services-Rossville to CMS from January 1, 2013 to September 30, 2022:

a.   An average of 71.9% of the resident population at ManorCare Health Services-Rossville required extensive assistance or was totally dependent on staff for toileting, and an average of 32.7% of residents required the assistance of two or more staff for toileting;

b.   An average of 69.5% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 42.0% of residents required the assistance of two or more staff for bed mobility;

c.   An average of 63.0% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 53.9% of residents required the assistance of two or more staff for transfers;

d.   An average of 66.5% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.   An average of 68.7% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.   An average of 61.4% of the resident population was frequently or always incontinent of bladder and 66.2% was frequently or always incontinent of bowel;

g.   An average of 30.1 % of the resident population had severe cognitive deficit, with 32.5% having dementia or Alzheimer's; and

      h.     An average of 75.9% of the resident population had a wheelchair for mobility.

277.    DEFENDANTS knew or should have known of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS.  Based on the 121 months of available monthly ratings data from January 2014 to July 2024, ManorCare Health Services-Rossville had 50 months with one-star health inspection ratings by Medicare.gov.

278.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of residents and family members who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Rossville in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2019 to 2022, there were at least 30 one-star reviews of ManorCare Health Services-Rossville publicly posted on-line, which included:

      a.     "I wish I could give a zero.  These are the most incompetent, uncaring, non responsive people in the world.  My dad was there less than three days when he fell out of the bed.  I told them he needed rails.  But oh no they know so much more than I do.  Stitches in his head and arm due to the fall.  I asked for pain meds.  Two hours later they arrived.  If my dad isn't dead in the morning I will be bringing him home.  This is horrible.  If you love your family member and they need full care, please don't bring them here."

      b.     "I have a one as there is not an option for zero.  Please do not send your family, friend or worse enemy to this place.  I knew their reputation but sadly it was our only option.  We begged for her to go somewhere else.  The liaison from the hospital tried to build this place up and promised me it was different now, but they were all lies.  My mother was here briefly.  They treated her horribly.  *They did not answer bells.* The food was inedible.  They didn't even speak to her when coming in the room.  She was a fall risk and they would leave her sitting on the side of the bed alone and leave.  She had to call me to call them for anything.  She was on isolation so we were not able to visit in her room.  She called me gasping she needed help.  I had to call the desk and tell them to send her out 911

now.  I wasn't even there and knew! .  .  . ***it took them 45 min to call 911***!!!!! My mom is now .  .  . fighting for her life!! This place should be shut down."

c.      "[I] am currently a resident for rehab at manor care rossville facility after having open heart surger[y]. I had an incident with two aides at the facility being that I am in here for rehab they refuse to assist me and in their failure to assist me I fell in the bathroom this is not my first fall in the bathroom it's my second because of lack of adequate staffing and the lack of two aides that just don't care."

d.      "Absolute horrible staff and the way they treat the patients.. TERRIBLE .. i will do whatever i can to get my family member out of this hole"

e.      "If I could give negative stars I would. If given the chance to cut my left arm off, or go to this rehab, you could have both arms and even a foot. They're so beyond awful. .  .  If you care at all about your loved ones DO NOT SEND THEM HERE!"

f.      "This nursing home is a terrible place.  The people who work there are rude, disrespectful, incompetent, lazy and liars just to name a few.  They don't have a concerning heart to deal with elderly people.  The staffing is always short never enough staff they have a large amount of patients to handle.  The patients don't get bathed often as they should the place has an odor and the rooms are not cleaned.  If you have an issue you can't go to the managers cause they don't care they try to brush it under the rug and tell you they gonna check into it never . Somewhere or something has to change .  .  ."

g.      "I ONLY GAVE ONE STAR BECAUSE I HAD TO!!! They need to close this place down!! Its short staffed with a bunch of lazy, heartless, arrogant people from the administration department to the nurses.

h.      "Absolutely horrible! DO NOT send your loved one here! *The staff will not take care of them.* My grandfather was sent here after leaving the hospital and they constantly neglected him. ***He would go days without getting a shower, they wouldn't check on him for hours***, they even actually stole the clothes we would buy him!  He has a horrible fall one time and the man who shared the room with him told me they didn't even get him up for hours. This place should be shut down. I can't stress enough, do not send your loved ones here! The worst decision we've ever made."

279.    **ManorCare Health Services-Adelphi:** With respect to ManorCare Health Services-Adelphi (a/k/a Adelphi Nursing and Rehabilitation Center) (provider # 215064) in Adelphi, Maryland, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.83 hours per patient per day*** over a three-year period from 2017 to December 2019[62] (based on the daily PBJ staffing data ManorCare Health Services-Adelphi submitted to CMS).[63]

280.    These dangerously low staffing levels at ManorCare Health Services-Adelphi ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Adelphi to CMS from January 1, 2013 to February 29, 2020:

   a.    An average of 81.6% of the resident population at ManorCare Health Services-Adelphi required extensive assistance or was totally dependent on staff for toileting, and an average of 42.2% of residents required the assistance of two or more staff for toileting;

   b.    An average of 76.4% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 58.0% of residents required the assistance of two or more staff for bed mobility;

   c.    An average of 78.1% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 72.7% of residents required the assistance of two or more staff for transfers;

   d.    An average of 81.1% of the resident population required extensive assistance or was totally dependent on staff for dressing;

---

[62]MANORCARE divested ManorCare Health Services-Adelphi on February 29, 2020.

[63]Further, between Q3 2011 and Q3 2017, ManorCare Health Services-Adelphi's CNA staffing level averaged 1.89 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for the two-week window prior to the survey.

e.    An average of 84.1% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 63.3% of the resident population was frequently or always incontinent of bladder and 74.6% was frequently or always incontinent of bowel;

g.    An average of 35.0% of the resident population had severe cognitive deficit, with 23.8% having dementia or Alzheimer's; and

h.    An average of 94.1% of the resident population had a wheelchair for mobility.

281.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Adelphi in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2022, there were at least seven one-star reviews of ManorCare Health Services-Adelphi publicly posted on-line, which included:

a.    "Please do not leave your love one here! It would not be fit for my fur babies."

b.    "If you love your family members do not send them here. The place stinks, the nurses do not care, the food is like prison meals, the rooms are small, it is infested with bugs, they always lose patients belongings, they're not clean, the nurses are rude and incompetent. My mother in law was here from April until she passed in January 2019. The whole time she was there she stayed with an infection, bed sore, and some other type of cold.  When she passed she had pneumonia. This place is a prison and the people here are forgot about. Roaches crawl in patients rooms and beds. If you send your family here your sick."

c.    "I could not post my true star rating because even zero stars are too many. I wish I could give negative stars.  My mother, 83 years old, a vulnerable wheelchair-bound woman was a resident there from October 2017 until May 2018.  Their neglect did not succeed in killing her and now my mother lives in a safe nursing home which is not a part of the HCR ManorCare system.  I documented her "care" at *ManorCareless* for the time she was there and *I believe this facility is definitely giving the*

> *shareholders of the parent companies (Welltower, REIT, and ProMedica Health Systems) a good return on their investment by not investing in quality staff (unanswered call bells, leaving stool on the sacrum that had an open wound) and by maintaining barebones staffing levels.*"

282.    **ManorCare Health Services-Carlisle:** With respect to ManorCare Health Services-Carlisle (a/k/a Carlisle Skilled Nursing and Rehabilitation Center) (provider # 395746) in Carlisle, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.74 hours per patient per day*** over a six-year period from 2017 to 2022 (based on the daily PBJ staffing data ManorCare Health Services-Carlisle submitted to CMS.  Further, between Q4 2011 and Q4 2016, this facility's ***CNA staffing level averaged 1.81 hours per patient per day*** based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

  a.    In 2017, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Carlisle had the 11th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Pennsylvania (out of 711 facilities)—***an average of only 2.95 hours per patient day*** (nearly 2 hours less than the IOM recommended level of 4.85 hours per patient per day); and

  b.    In 2014, based on the 671 staffing data it provided to surveyors as part of the annual survey process, ManorCare Health Services-Carlisle had the 8th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Pennsylvania (out of 711 facilities)—***an average of only 3.02 hours per patient day***.

283.    These dangerously low staffing levels at ManorCare Health Services-Carlisle ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Carlisle to CMS from January 1, 2013 to September 30, 2022:

  a.    An average of 79.1% of the resident population at ManorCare Health Services-Carlisle required extensive assistance or was totally dependent on

107

staff for toileting, and an average of 55.6% of residents required the assistance of two or more staff for toileting;

b.    An average of 67.4% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 51.4% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 57.9% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 48.9% of residents required the assistance of two or more staff for transfers;

d.    An average of 72.1% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 72.0% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 54.2% of the resident population was frequently or always incontinent of bladder and 45.1% was frequently or always incontinent of bowel;

g.    An average of 33.5% of the resident population had severe cognitive deficit, with 45.1% having dementia or Alzheimer's; and

h.    An average of 78.6% of the resident population had a wheelchair for mobility.

284.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Carlisle in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2020 to 2022, there were at least 11 one-star reviews of ManorCare Health Services-Carlisle publicly posted on-line, which included:

a.    "I understand they are short staffed, but in the 4 days my mother was there (flagged as a fall risk) she fell three times.  The first one a visitor was there and not warned of her state, but she was there, at least and was eased down. The second night she had cuts and bruises on her face, and the last

one, she broke her hip.  Their solution to the fall risk was to keep her at the nursing station in a wheel chair, which she couldn't handle for long and needed to be in bed.  It'd take them 30 minutes to answer a call button, and *when she broke her hip, it took them 10 hours to get an xray* to determine it, all the while only giving her Tylenol, which clearly did not work.  I know they're understaffed. But the greed in taking on more patients than your staff can support is despicable!"

b.  "I honestly don't want to give any stars.....the service is poor.....***they make the patients wait or should I say don't answer the call button***.....the staff steals and administration staff goes through patients drawers.....they don't take care of patients.....I would not even allow my dog to stay at a place like this....do not take anyone to this facility ...you will regret it."

285.  **ManorCare Health Services-Kingston:** With respect to ManorCare Health Services-Kingston (a/k/a Kingston Rehabilitation and Nursing Center) (provider # 395397) in Kingston, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 2.10 hours per patient per day*** over a five year period from 2017 to 2021 (based on the daily PBJ staffing data ManorCare Health Services-Kingston submitted to CMS).[64]

286.  These dangerously low staffing levels at ManorCare Health Services-Kingston ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Kingston to CMS from January 1, 2013 to May 30, 2021:

a.  An average of 79.0% of the resident population at ManorCare Health Services-Kingston required extensive assistance or was totally dependent on staff for toileting, and an average of 57.6% of residents required the assistance of two or more staff for toileting;

---

[64] Further, between Q4 2013 and Q4 2016, ManorCare Health Services-Kingston's CNA staffing level averaged 1.95 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

b.      An average of 70.1% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 60.7% of residents required the assistance of two or more staff for bed mobility;

c.      An average of 61.4% of the resident population of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 51.6% of residents required the assistance of two or more staff for transfers;

d.      An average of 69.6% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.      An average of 78.8% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.      An average of 54.6% of the resident population was frequently or always incontinent of bladder and 47.6% was frequently or always incontinent of bowel;

g.      An average of 45.1% of the resident population had severe cognitive deficit, with 38.7% having dementia or Alzheimer's; and

h.      An average of 74.5% of the resident population had a wheelchair for mobility.

287.    DEFENDANTS knew, or should have known, of their extreme and dangerous

low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility

received from CMS:

a.      Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Kingston had 59 months with overall one-star ratings by Medicare.gov;

b.      Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Kingston had 81 months with one-star health inspection ratings by Medicare.gov; and

c.      Based on the 86 months of available monthly ratings data from January 2014 to May 2021, ManorCare Health Services-Kingston had 45 months with general caregiver staffing one-star ratings by Medicare.gov.

288.    DEFENDANTS were also placed on notice of repeatedly causing **actual harm** to residents at ManorCare Health Services-Kingston during their ownership and management. More specifically, ManorCare Health Services-Kingston was cited by state surveyors **14 times for causing actual harm** to residents (or even more severe deficiencies).

289.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Kingston in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2020, there were at least 13 one-star reviews of ManorCare Health Services-Kingston publicly posted on-line, which included:

a.    "Horrible place stay far far away I contracted various infections due to the filthy environment set my recovery back so far trust me this place isn't suitable for an animal.  All they care about are their profits when they get in trouble with the state they just change their name and continue operating their totally unfit business with horribly untrained staff."

b.    "Grandfather's here & had to use the bathroom, *everytime we push the button it takes 45 minutes for them to get in the room* while they stand at the desk texting on their phones. I would just take him to the bathroom alone but it takes two people. *This place is god awful with assistance*. Not to mention their rude when you finally had enough & tell them you need someone to help NOW."

c.    "The nurse that is working today is lazy we have been here 2 1/2 hours and have not seen her once **a patient rang for her an hour and a half ago and no response**."

d.    "How could you treat human beings so poorly. I pray you get shut down or you make this right. You are responsible for the lives of others and you take that for granted because they are old and may not have the best memory. Shame on you!"

e.    "The fact they " forget " to give memory care patients their medications in the morning from time to time ( adding up to an entire month ) met with the lead nurse had my phone on video/voice record however that gets you

nowhere when you aren't making it aware they are being recorded that they neglected a patient even though they admitted it, well I will forever have the video/voice recording for anyone that ever wants to see it or anyone insane enough to consider this place as an option for a loved one ... The state etc might not want to do anything but the proof is in the pudding and I will forever save it ! *This rat hole isn't suitable for cockroaches !*"

f.    "Terrible terrible terrible.  I wouldn't send a dog there if I had one.  my mother is a patient there and it's been nothing but problems with that place. I think the government should shut it down."

290.    **ManorCare Health Services-Waterloo:** With respect to ManorCare Health Services-Waterloo (provider # 165034) in Waterloo, Iowa, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.71 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Waterloo submitted to CMS).[65]

a.    In 2022, ManorCare Health Services-Waterloo had the 13th lowest average CNA hours per patient day in Iowa (out of 463 facilities)—***an average of only 1.59 CNA hours per patient day***;

b.    In 2021, ManorCare Health Services-Waterloo had the 9th lowest average CNA hours per patient day in Iowa (out of 463 facilities)—***an average of only 1.60 CNA hours per patient day***;

c.    In 2020, ManorCare Health Services-Waterloo had the 7th lowest average CNA hours per patient day in Iowa (out of 463 facilities)—***an average of only 1.63 CNA hours per patient day***; and

d.    In 2019, ManorCare Health Services-Waterloo had the 13th lowest average CNA hours per patient day in Iowa (out of 463 facilities)—***an average of only 1.66 CNA hours per patient day***.

---

[65]Further, between Q2 2011 and Q4 2016, ManorCare Health Services-Waterloo's CNA staffing level averaged 1.95 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

291.    These dangerously low staffing levels at ManorCare Health Services-Waterloo ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Waterloo to CMS from January 1, 2013 to September 30, 2022:

a.    An average of 67.9% of the resident population at ManorCare Health Services-Waterloo required extensive assistance or was totally dependent on staff for toileting, and an average of 46.6% of residents required the assistance of two or more staff for toileting;

b.    An average of 63.5% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 49.9% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 58.3% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 45.9% of residents required the assistance of two or more staff for transfers.

d.    An average of 61.3% of the resident population required extensive assistance or was totally dependent on staff for dressing, and an average of 33.0% of residents required the assistance of two or more staff for dressing;

e.    An average of 68.6% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 37.4% of the resident population was frequently or always incontinent of bladder and 41.8% was frequently or always incontinent of bowel;

g.    An average of 27.8% of the resident population had severe cognitive deficit, with 29.7% having dementia or Alzheimer's; and

h.    An average of 75.9% of the resident population had a wheelchair for mobility.

292.    DEFENDANTS knew, or should have known, of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS:

a.    Based on the 106 months of available monthly ratings data from January 2014 to March 2023, ManorCare Health Services-Waterloo had 57 months with overall one-star ratings by Medicare.gov; and

b.    Based on the 106 months of available monthly ratings data from 2014 to March 2023, ManorCare Health Services-Waterloo had 82 months with health inspection one-star ratings by Medicare.gov.

293.    DEFENDANTS were also placed on notice of repeatedly causing *actual harm* to residents at ManorCare Health Services-Waterloo during their ownership and management of the facility.  More specifically, ManorCare Health Services-Waterloo was cited by state surveyors *14 times for causing actual harm* to residents (or even more severe deficiencies).

294.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Waterloo in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2023, there were at least 20 one-star reviews of ManorCare Health Services-Waterloo publicly posted on-line, which included:

a.    "ProMedica is understaffed and negligent. In 2 weeks my mom got ONE sponge bath. They would wake her up in the middle of the night for the most absurd tests. (Who needs a TB test at 2am?!). My mom has a zero weight restriction for her leg and required help using the bathroom. *She was left in the bathroom for FORTY FIVE minutes and only got assistance when she started to pound on the walls.* Her sheets were never changed unless a family member did it."

b.    "My father was there for three weeks. He was given the wrong medication and dosage several times. *After pushing the help button, it would take 30 minutes to an hour for someone to respond*. The food was terrible. They

114

kept giving him food he was allergic to. It wasn't until the last day he finally got a shower. His doctor was furious when he found out my father was at Manor care. The doctor said none of his surgery patients are to go to Manor care. Please, do not send your loved ones here!"

c.  "My mom spent just one week here and hated it so much she begged to not be sent back there.  I went to go visit and walked in on her in an absolute panic saying she couldn't breath.  The CNA walked out of the room to get someone to help and I reassured my mom that help was on the way.  I followed the CNA to the front nurses station and I observed the woman talking to a nurse and saying that the patient (my mom) couldn't breath; in which the nurse rolled her eyes and annoyingly said &"okay??&" And just walked away.  They nurse took several minutes to finally show up and my mother was taken my ambulance to the hospital. My mom was also in an Afib attack which she stated was going on since the night before??!  Like why wasn't it addressed sooner? *To add insult to injury because of staffing or whatever reason my mom was put in a diaper instead of being helped to the bathroom.*  Her shirt was wet with urine and the strong urine smell from her diaper and bed just overwhelmed me.. she has a horrible bedsore which she had before coming but I would assume that it wouldn't be helping to be sitting in a dirty diaper for long periods of time.  *My mom said that she would have to wait upwards of 45 minutes after pressing the help button.  In some instances she had to call my father to have him call the front desk to have someone actually come assist her.* My mom stated that some staff were nice while others were mean to her. It breaks my heart to see my mom in this state.. she came there to be helped and taken care of.  I know that there is understaffed issues throughout the Healthcare industry but it just seems like it's negligence and that lack of empathy shown by some of the staff is appalling."

295.  **ManorCare Health Services-Livonia:** With respect to ManorCare Health Services-Livonia (a/k/a Heartland of Livonia) (provider # 235057) in Livonia, Michigan, DEFENDANTS routinely staffed this facility at dangerously low *CNA staffing levels that averaged 1.71 hours per patient per day* over a five-year period from 2017 to 2021 (based on the daily PBJ staffing data ManorCare Health Services-Livonia submitted to CMS).[66]

---

[66]Further, between Q2 2013 and Q1 2017, ManorCare Health Services-Livonia's CNA staffing level averaged 1.96 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

296.    These dangerously low staffing levels at ManorCare Health Services-Livonia ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Livonia to CMS from January 1, 2013 to June 30, 2021:

a.    An average of 82.2% of the resident population at ManorCare Health Services-Livonia required extensive assistance or was totally dependent on staff for toileting, and an average of 50.7% of residents required the assistance of two or more staff for toileting;

b.    An average of 81.9% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 56.8% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 62.9% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 55.3% of residents required the assistance of two or more staff for transfers;

d.    An average of 76.7% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 70.3% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 63.6% of the resident population was frequently or always incontinent of bladder and 70.6% was frequently or always incontinent of bowel;

g.    An average of 32.0% of the resident population had severe cognitive deficit, with 42.6% having dementia or Alzheimer's; and

h.    An average of 81.2% of the resident population had a wheelchair for mobility.

297.    DEFENDANTS knew, or should have known, of their extreme and dangerously low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS.  Based on the 87 months of available monthly ratings data from January

116

2014 to June 2021, ManorCare Health Services-Livonia had 43 months with overall one-star ratings by Medicare.gov.

298.    DEFENDANTS were also placed on notice of repeatedly causing **actual harm** to residents at ManorCare Health Services-Livonia during their ownership and management.  More specifically, ManorCare Health Services-Livonia was cited by state surveyors **17 times for causing actual harm** to residents (or even more severe deficiencies).

299.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Livonia in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2021, there were at least 19 one-star reviews of ManorCare Health Services-Livonia publicly posted on-line, which included:

    a.    "This facility doesn't even deserve 1 star!!! They were totally negligent in my aunts case. She was only there 10 1/2 days!!! If we wouldn't have visited her there on July 29th she would be dead. We found my aunt sitting in a wheelchair in the hallway. Per her roommate's daughter, *she had been out there for a while. Her eyes were open but she was unresponsive. She was trembling.  Her mouth looked as if she had a stroke or seizure.  A white substance was coming out of her mouth.  We insisted that they call 911.*  The manager Liz first comment to us was that my aunt hadn't participated in physical therapy.  How appalling and unprofessional to bring up physical therapy when clearly my aunt was in an emergency situation.  She is a poor excuse for a manager & nurse. She should be fired!!  Once we finally get my aunt transported to the hospital her body temperature was 32 degrees freezing level.  They had to warm up her body. My Aunt began having seizures.  She was in septic shock and diagnosed with pneumonia.  She ended up on the ventilator and in ICU for 7 days in which 4 of the days she wouldn't wake up.  Doctors said if they hadn't put her on the ventilator she would have died.  This ordeal has caused her dementia to progress.  Heartland of Livonia should be shut down. Please do not put your family members in Heartland because they are heartless!!!!"

117

b.    "Your lack of good care caused the death of my loved one Donnell D. Foster on January 24, 2019.  If anyone want more information contact the Livonia, Michigan Police Department.  *I've filed a Police Report* in addition to filing a report with the State of Michigan licensing, which overseas Nursing Homes and Hospital.  Think hard before placing your love ones at Heartland Healthcare."

c.    "This place is a mess. ***you ring the bell in it take hours for someone to come***. in the afternoon and weekend the halls smell from patients not being changed."

d.    "***My mother has to wait hours for someone to help so she can use the bathroom.*** It's not right and it's not ok.  So hopefully someone researches before sending a loved one here and reads my review.  Don't send your family here.  I wouldn't give a single star but as you know ya gotta give something."

e.    "After more than 6 months of taking care of my mother at home and having her inpatient in Hospice with no skin breakdown I had my mother in here for less than 2 days and she developed a deep tissue injury on her coccyx. *She was unresponsive with 103 temp and they didn't realize it until 11 o'clock that morning. Obviously they did not move her or check on her.* This is supposedly a five star facility?  Out of how many stars, 100?  Very disappointed."

f.    "While visiting a family member, their roommate requested help for over an hour to be placed in their bed. At one point, I had to go to the nurse's station and request help again...still nothing.  It wasn't until I yelled that the patient had fallen on the floor did anyone come to assist.  I don't know if they were injured, but I would hate for this to happen...again to someone's loved one.  This place has a history of negligence and I will be looking immediately to have my loved one moved."

300.    **ManorCare Health Services-Monroeville:** With respect to ManorCare Health Services-Monroeville (provider # 396003) in Monroeville, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.63 hours per patient per day*** over a six-year period from 2017 to 2022 (based on the daily PBJ staffing data ManorCare Health Services-Monroeville submitted to CMS). Further, between Q1 2011 and Q1 2017, ManorCare Health Services-*Monroeville's **CNA staffing level averaged 1.66***

*hours per patient per day* based on the limited 671 staffing data periodically self-reported to

surveyors as part of the survey process for a two-week window prior to the survey.

      a.      In 2019, ManorCare Health Services-Monroeville had the 11th lowest average CNA hours per patient day in Pennsylvania (out of 711 facilities)—*an average of only 1.64 CNA hours per patient day*;

      b.      In 2018, ManorCare Health Services-Monroeville had the 11th lowest average CNA hours per patient day in Pennsylvania (out of 711 facilities)—*an average of only 1.58 CNA hours per patient day*;

      c.      In 2016, based on the 671 staffing data it provided to surveyors as part of the annual survey process, ManorCare Health Services-Monroeville had the 5th lowest average CNA staff hours (s) per patient day in Pennsylvania (out of 711 facilities)—*an average of only 1.43 hours per patient day*; and

      d.      In 2015, based on the 671 staffing data it provided to surveyors as part of the annual survey process, ManorCare Health Services-Monroeville had the 3rd lowest average CNA staff hours (s) per patient day in Pennsylvania (out of 711 facilities)—*an average of only 1.56 hours per patient day*.

    301.    These dangerously low staffing levels at ManorCare Health Services-Monroeville

ignored the exceptionally high care needs of this facility's resident population.  Based on the

MDS data submitted by ManorCare Health Services-Monroeville to CMS from January 1, 2013

to September 30, 2022:

      a.      An average of 74.5% of the resident population at ManorCare Health Services-Monroeville required extensive assistance or was totally dependent on staff for toileting;

      b.      An average of 75.1% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 56.8% of residents required the assistance of two or more staff for bed mobility;

      c.      An average of 65.8% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 51.9% of residents required the assistance of two or more staff for transfers;

      d.      An average of 73.5% of the resident population required extensive assistance or was totally dependent on staff for dressing;

      e.      An average of 82.1% of the resident population required physical help from staff or was totally dependent on staff for bathing;

      f.      An average of 54.5% of the resident population was frequently or always incontinent of bladder and 57.2% was frequently or always incontinent of bowel;

      g.      An average of 31.6 % of the resident population had severe cognitive deficit, with 27.1% having dementia or Alzheimer's; and

      h.      An average of 85.3% of the resident population had a wheelchair for mobility.

302.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Monroeville in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2022, there were at least 24 one-star reviews of ManorCare Health Services-Monroeville publicly posted on-line, which included:

      a.      "My experience at promedica was the worst experience I have ever had. *Nurses never come on time when you call them.  **It takes sometime an hour to get what you want from them.**  Do not send anyone there they were awful.*"

      b.      "My Aunt has been at this place for two years and things have rapidly gone downhill since covid to the point of abuse.  She has cerebral palsy and has been left for ***over 3 weeks with NO SHOWER***!  They will not wipe her mouth after she eats at times and when she comes home for a visit she will have food caked all over her face!  We have made complaints to administrator and the main office, but will be contacting the health department next and an attorney.  ***Last week they left her in soiled sheets all night after she was sick.***  She can't use her hands to feed or wipe herself. We understand the place is understaffed, but this is abuse and we have records of all the neglect. I would give zero stars if possible to still give a review."

        c.       "***The call light was on from 6 pm until 10 pm & no one bothered to answer the call.*** In that amount of time the patient could be DEAD.  This patient has extremely soft bones & could've fallen & broken a bone & been lying in the floor for HOURS.  The signs that say "Don't fall, call." is a joke at this institution.  They obviously don't have enough staff.  I wouldn't recommend this place for any of my family members. Never again, ever."

        d.       "I took my wife there july 17th she was ok and doing well but she wasn't getting taking care off according to her and she died july 30th and i hold manor Care responsible for her death because of the things i saw and witnessed i made a mistake by taking her there and i lost my Love of my Life for 30 years."

        e.       "It's Christmas and just found my mother on the floor. *Yelled for help, nurses came but did nothing.  Said they had to wait to call for help, needed permission.  I had to call 911 myself.  Mom is septic.  Her lips and tongue are black!*  How could they missed that something was wrong with her. Have an open case with APS! Do Not send your love one here."

303.    **Heartland of West Ashley Rehab and Nursing Center:** With respect to Heartland of West Ashley Rehab and Nursing Center (provider # 425362) in Charleston, South Carolina, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.92 hours per patient per day*** over a five-year period from 2017 to 2021 (based on the daily PBJ staffing data for Heartland of West Ashley submitted to CMS).

        a.       In 2021, based on the daily PBJ staffing data it submitted to CMS, Heartland of West Ashley reported to CMS had ***the lowest*** average CNA hours per patient day in South Carolina (out of 192 facilities)—***an average of only 0.98 CNA hours per patient day***;

        b.       In 2020, based on the daily PBJ staffing data it submitted to CMS, Heartland of West Ashley had the 8th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in South Carolina (out of 192 facilities)—***an average of only 3.11 hours per patient day***; and

        c.       In 2020, based on the daily PBJ staffing data it submitted to CMS, Heartland of West Ashley had the 5th lowest average CNA hours per patient day in South Carolina (out of 192 facilities)—***an average of only 1.63 CNA hours per patient day***.

304.    These dangerously low staffing levels at Heartland of West Ashley ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by Heartland of West Ashley to CMS from January 1, 2013 to August 15, 2021:

a.    An average of 78.7% of the resident population at Heartland of West Ashley required ***extensive assistance or was totally dependent*** on staff for toileting, and an average of 46.2% of residents required the assistance of two or more staff for toileting;

b.    An average of 71.8% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 52.5% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 65.8% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 50.3% of residents required the assistance of two or more staff for transfers;

d.    An average of 76.6% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 85.8% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 49.8 % of the resident population was frequently or always incontinent of bladder and 57.0% was frequently or always incontinent of bowel;

g.    An average of 37.8% of the resident population had severe cognitive deficit, with 35.0% having dementia or Alzheimer's; and

h.    An average of 85.5% of the resident population had a wheelchair for mobility.

305.    DEFENDANTS knew, or should have known, of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS:

       a.     Based on the 89 months of available monthly ratings data from January 2014 to August 2021, Heartland of West Ashley had 41 months with overall one-star ratings by Medicare.gov; and

       b.     Based on the 89 months of available monthly ratings data from January 2014 to August 2021, Heartland of West Ashley had 45 months with one-star health inspection ratings by Medicare.gov.

306.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at Heartland of West Ashley in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2021, there were at least 12 one-star reviews of Heartland of West Ashley publicly posted on-line, which included:

       a.     "My friend spent two weeks at Heartland for so-called rehab but failed to give him pain killers just before PT as required.  *Nurses kept him in diapers when he could go by himself in a urinal.*  One weekend he fell three times, the last time leaving a deep gash on his forehead which never received sutures he needed.  Attendants are surly lazy and fail to show to work making the understaffing even worse.  I would NEVER recommend this place to my worst enemy!"

       b.     "Worst care. After multiple meetings and calls with staff, administration and doctors.  The same things keep happening.  Patient abuse and neglect.  Wrong meds not on time, nurses refusing to help, dirty sheets for days, sent to appts no breakfast, taking food to reheat and never come back, unchecked wound for weeks, arrived to an appointment in an emergent state from the facility and had to be rushed to the hospital.  This is unacceptable but the standard of care here."

307.   **ManorCare Health Services-Anderson:** With respect to ManorCare Health Services-Anderson (a/k/a Beaumont Rehabilitation and Healthcare Center) (provider # 155005) in Anderson, Indiana, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.84 hours per patient per day*** over a seven-year period from 2017

to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Anderson submitted to

CMS).[67]

308.    These dangerously low staffing levels at ManorCare Health Services-Anderson

ignored the exceptionally high care needs of this facility's resident population.  Based on the

MDS data submitted by ManorCare Health Services-Anderson to CMS from January 1, 2013 to

September 30, 2022:

a.    An average of 65.0% of the resident population at ManorCare Health
Services-Anderson required extensive assistance or was totally dependent
on staff for toileting;

b.    An average of 57.9% of the resident population required extensive
assistance or was totally dependent on staff for bed mobility (turning and
repositioning), and an average of 34.6% of residents required the
assistance of two or more staff for bed mobility;

c.    An average of 52.1% of the resident population required extensive
assistance or was totally dependent on staff for transfers, and an average
of 35.5% of residents required the assistance of two or more staff for
transfers;

d.    An average of 63.1% of the resident population required extensive
assistance or was totally dependent on staff for dressing;

e.    An average of 78.4% of the resident population required physical help
from staff or was totally dependent on staff for bathing;

f.    An average of 49.4% of the resident population was frequently or always
incontinent of bladder and 54.3% was frequently or always incontinent of
bowel;

g.    An average of 48.4% of the resident population had severe cognitive
deficit, with 71.3% having dementia or Alzheimer's; and

---

[67]Further, between Q4 2011 and Q2 2017, ManorCare Health Services-Anderson's CNA staffing
level averaged 1.84 hours per patient per day based on the limited 671 staffing data periodically
self-reported to surveyors as part of the survey process for a two-week window prior to the
survey.

  h. An average of 65.6% of the resident population had a wheelchair for mobility.

 309. DEFENDANTS knew, or should have known, of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS:

  i. Based on the 121 months of available monthly ratings data from January 2014 to July 2024, ManorCare Health Services-Anderson had 57 months with overall one-star ratings by Medicare.gov;

  ii. Based on the 121 months of available monthly ratings data from January 2014 to July 2024, ManorCare Health Services-Anderson had 76 months with health inspection one-star ratings by Medicare.gov; and

  iii. Based on the 121 months of available monthly ratings data from January 2014 to July 2024, ManorCare Health Services-Anderson had 54 months with general caregiver staffing one-star ratings by Medicare.gov.

 310. DEFENDANTS were also placed on notice of repeatedly causing *actual harm* to residents at ManorCare Health Services-Anderson during their ownership and management of the facility.  More specifically, ManorCare Health Services-Anderson was cited by state surveyors *13 times for causing actual harm* to residents (or even more severe deficiencies).

 311. Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints on-line about grossly substandard care at ManorCare Health Services-Anderson in order to warn other consumers about the dangerous practices at this facility.  For example:

  a. "I would not recommend this place at all. My grandmother and grandfather were both there.  Let's just say they starved my grandma, *they were supposed to sit and feed her.  Never happened.*  They forgot to give her pain medicine.  I questioned them and they blamed it on hospice. I could go on and on, just save your loved one and don't go there."

312.    **ManorCare Health Services-Ruxton:** With respect to ManorCare Health Services-Ruxton (provider # 215077) in Towson, Maryland, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.73 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Ruxton submitted to CMS).[68]

   a.    In 2021, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 12th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.61 CNA hours per patient day***;

   b.    In 2020, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 9th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—an average of only 3.17 hours per patient day (nearly ***1.5 hours less*** than the IOM recommended level of 4.85 hours per patient per day);

   c.    In 2020, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 6th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.56 CNA hours per patient day***;

   d.    In 2019, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 12th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.79 CNA hours per patient day***;

   e.    In 2018, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 12th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.82 CNA hours per patient day***; and

   f.    In 2017, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Ruxton had the 10th lowest average CNA

---

[68]Further, between Q3 2011 and Q1 2017, ManorCare Health Services-Ruxton's CNA staffing level averaged 1.83 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.80 CNA hours per patient day***.

313.    These dangerously low staffing levels at ManorCare Health Services-Ruxton ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Ruxton to CMS from January 1, 2013 to September 30, 2022:

    a.    An average of 74.3% of the resident population at ManorCare Health Services-Ruxton required extensive assistance or was totally dependent on staff for toileting;

    b.    An average of 70.0% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 44.7% of residents required the assistance of two or more staff for bed mobility;

    c.    An average of 61.2% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 43.2% of residents required the assistance of two or more staff for transfers;

    d.    An average of 72.8% of the resident population required extensive assistance or was totally dependent on staff for dressing;

    e.    An average of 84.3% of the resident population required physical help from staff or was totally dependent on staff for bathing;

    f.    An average of 58.2% of the resident population was frequently or always incontinent of bladder and 68.6% was frequently or always incontinent of bowel;

    g.    An average of 38.2% of the resident population had severe cognitive deficit, with 56.3% having dementia or Alzheimer's; and

    h.    An average of 73.2% of the resident population had a wheelchair for mobility.

314.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of residents and family members who publicly posted their complaints about grossly

substandard care at ManorCare Health Services-Ruxton in order to warn other consumers about the dangerous practices at this facility. During the time frame of 2018 and 2022, there were at least 28 one-star reviews of ManorCare Health Services-Ruxton publicly posted on-line, which included:

a. "If you really care about your loved one, this is NOT the facility for you. There's so much I can say about the horrific experience my family has had with this place. Just take my advice and do not place your loved one in this facility. Not even for the shortest amount of time."

b. "My mother was here. She tried to get out of bed to sit in the chair next to her bed and fell. Knowing she was and tagged as a fall risk, there was no fall protection. She ended up in a hospital and with many stitches. When I questioned them about fall protection on her bed and a out of bed alarm. They said we moved the chair. We couldn't get her out of there fast enough for her safety and our peace of mind!!"

c. "The facility care for patients by the staff is awful. We tried to get my mother released as soon as we could get Dr to approve. *Lack of attention was staggering* and we had family there more than most patients. Can't imagine if you have a loved one there who does not have family to visit and monitor. Just awful."

d. "I have been in the hospital for 52 days before being transferred to Manor Care, to wait till I have a high risk surgery on 08/02. I have been here for less then 12 hrs and have ever in my entire life been treated with such little disrespect. *I woke up in a **soaking wet and soiled bed and rang my call bell ?? only to have to wait one and a half hours till someone finally came** and cleaned me up. I have since needed something done and rang my call ?? only to have to wait over a hour.* The management staff are the worst and most disrespectful people I have ever met. My room is so unbelievably hot that I feel like I am suffocating. But know one seems to give a hoot. The whole situation is pitiful."

e. "*This place killed my uncle*, my uncle was admitted to the medical ICU at GBMC he was severely dehydrated and he had a UTI that had been left untreated which damaged his heart to the point his quality of life would have been severely diminished. ***He had bedsores on his legs and a sore on his butt in the shape of a bedpan where he had been left on it so long it caused the sore.*** YOU WANT YOUR LOVED ONE TO DIE THEN PLACE THEM HERE BUT IF YOU CARE ABOUT THEM STAY FAR AWAY FROM HERE !!"

128

    f.    "Just seeking basic care such as pain medications takes upwards of 6 hours. I am not making this up."

315.    **ManorCare Health Services-Sunbury:** With respect to ManorCare Health Services-Sunbury (a/k/a Sunbury Skilled Nursing and Rehabilitation Center) (provider # 395512) in Sunbury, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.88 hours per patient per day*** over a six-year period from 2017 to 2022 (based on the daily PBJ staffing data ManorCare Health Services-Sunbury submitted to CMS). Further, between Q1 2013 and Q4 2016, this facility's ***CNA staffing level averaged 1.90 hours per patient per day*** based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey as follows:

    i.    In 2015, based on the 671 staffing data it provided to surveyors as part of the annual survey process, ManorCare Health Services-Sunbury had the 6th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Pennsylvania (out of 711 facilities)—***an average of only 2.90 hours per patient day*** (nearly ***two hours less*** than the IOM recommended level of 4.85 hours per patient per day); and

    ii.    In 2014, based on the 671 staffing data it provided to surveyors as part of the annual survey process, ManorCare Health Services-Sunbury had the 9th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Pennsylvania (out of 711 facilities)—***an average of only 3.05 hours per patient day***.

316.    These dangerously low staffing levels at ManorCare Health Services-Sunbury ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by ManorCare Health Services-Sunbury to CMS from January 1, 2013 to September 30, 2022:

    a.    An average of 76.4% of the resident population at ManorCare Health Services-Sunbury required extensive assistance or was totally dependent

129

on staff for toileting, and an average of 64.4% of residents required the assistance of two or more staff for toileting;

b.    An average of 68.1% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 64.6% of residents required the assistance of two or more staff for;

c.    An average of 62.7% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 55.9% of residents required the assistance of two or more staff for transfers;

d.    An average of 74.8% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 84.6% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 54.1% of the resident population was frequently or always incontinent of bladder and 43.6% was frequently or always incontinent of bowel;

g.    An average of 39.9% of the resident population had severe cognitive deficit, with 49.4% having dementia or Alzheimer's; and

h.    An average of 62.7% of the resident population had a wheelchair for mobility.

317.    DEFENDANTS knew, or should have known, of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS.  Based on the 104 months of available monthly ratings data from January 2014 to January 2023, ManorCare Health Services-Sunbury had 44 months with general caregiver staffing one-star ratings by Medicare.gov.

318.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Sunbury in order to warn other consumers about

the dangerous practices at this facility. During the time frame of 2018 and 2021, there were at

least eight one-star reviews of ManorCare Health Services-Sunbury publicly posted on-line,

which included:

> a. "My dad lived here for about two years on the 'mental care' floor. . . he was rarely allowed out of his bed, which just led to more rapid progression of his disease. They said they didn't have enough staff to get him out of bed for anything other than meals. Other than meal times and when family visited he was alone all the time, except for his roommate who could also only lay in bed all day and other residents who would randomly wander into his room and stress him out."

> b. "My father in law arrived at this facility with a pressure ulcer nearly healed (largest recorded measurement was 1.9cm), and one week later his entire intragluteal area is ***red/sore with necrosis developing in an ulcer the size of a dinner plate***. *This facility ignored direct orders from admitting hospital to roll and reposition every 2 hours, around the clock.* They ***administered no care*** to the affected area, and never informed the family of the severity of his condition. It was not discovered until he was moved to another (much better) facility. If you have loved ones here, or are trying to find a home for a loved one....GET THEM FAR AWAY FROM HERE! If I could rate this place less than 1, I totally would. Disgusting."

319. **ManorCare Health Services-Yeadon:** With respect to ManorCare Health

Services-Yeadon (a/k/a Yeadon Skilled Rehabilitation and Nursing Center) (provider # 395374)

in Yeadon, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low ***CNA***

***staffing levels that averaged 1.76 hours per patient per day*** over a five-year period from 2017 to

2021 (based on the daily PBJ staffing data ManorCare Health Services-Yeadon submitted to

CMS).[69]

---

[69]Further, between Q3 2011 and Q4 2017, ManorCare Health Services-Yeadon's CNA staffing level averaged 1.90 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

320.    These dangerously low staffing levels at ManorCare Health Services-Yeadon ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Yeadon to CMS from January 1, 2013 to May 30, 2021:

a.    An average of 75.2% of the resident population at ManorCare Health Services-Yeadon required extensive assistance or was totally dependent on staff for toileting, and an average of 36.2% of residents required the assistance of two or more staff for toileting;

b.    An average of 67.4% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 47.1% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 59.3% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 44.0% of residents required the assistance of two or more staff for transfers;

d.    An average of 70.3% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 66.5% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 61.3% of the resident population was frequently or always incontinent of bladder and 61.8% was frequently or always incontinent of bowel;

g.    An average of 45.3% of the resident population had severe cognitive deficit, with 38.0% having dementia or Alzheimer's; and

h.    An average of 73.8% of the resident population had a wheelchair for mobility.

321.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of residents and family members who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Yeadon in order to warn other consumers about

the dangerous practices at this facility. During the time frame from 2018 to 2021, there were at least 10 one-star reviews of ManorCare Health Services-Yeadon publicly posted on-line, which included:

a.  "No stars!!! I am a temporary resident currently and cannot wait to be discharge. The *care is non existent* except for maybe two Nurses who are good. The food is disgusting I have to order out every night which has been very costly. They treat the residents like prisoners. I have been here since early February and am only allowed out for Doctor appointment. They refuse to let anyone out to get some sun and fresh air which is needed! I spoke to the Social worker about letting us out several times to which I've been told that they are working on it. Yeah right! Please do not ever send your loved one here to Manor Care also the permanent long time residents are being robbed of their money here which is a disgrace! It's also dirty and there is roaches and mice everywhere."

b.  "Horrible! My husband was there for 3 weeks and developed a bedsore so deep and infected he had to be hospitalized, (everytime they had to clean my husband up they told me I had to leave the room) then had the audacity to try to get me to send him when he got out of the hospital! I wouldn't trust them to take care of my dog, much less my husband. They need to be investigated."

322.    **Heartland of Riverview:** With respect to Heartland of Riverview (provider # 365620) in Southpoint, Ohio, DEFENDANTS routinely staffed this facility at dangerously low *CNA staffing levels that averaged 1.95 hours per patient per day* over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data Heartland of Riverview submitted to CMS).[70]

323.    These dangerously low staffing levels at Heartland of Riverview ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by Heartland of Riverview to CMS from January 1, 2013 to September 30, 2022:

---

[70]Further, between 2011Q4 and 2017Q1, Heartland of Riverview's CNA staffing level averaged 1.89 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

a.    An average of 77.7% of the resident population at Heartland of Riverview required extensive assistance or was totally dependent on staff for toileting, and an average of 63.6% of residents required the assistance of two or more staff for toileting;

b.    An average of 75.7% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 67.7% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 64.3% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 59.6% of residents required the assistance of two or more staff for transfers;

d.    An average of 76.1% of the resident population required extensive assistance or was totally dependent on staff for dressing, and an average of 47.2% of residents required the assistance of two or more staff for dressing;

e.    An average of 79.6% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 52.4% of the resident population was frequently or always incontinent of bladder and 52.9% was frequently or always incontinent of bowel;

g.    An average of 43.1% of the resident population had severe cognitive deficit, with 49.0% having dementia or Alzheimer's; and

h.    An average of 76.0% of the resident population had a wheelchair for mobility.

324.    DEFENDANTS knew, or should have known, of their extreme and dangerous low staffing by virtue of the frequent one-star ratings (the worst rating possible) this facility received from CMS:

a.    Based on the 107 months of available monthly ratings data from January 2014 to April 2023, Heartland of Riverview had 52 months with overall one-star ratings by Medicare.gov;

      b.      Based on the 107 months of available monthly ratings data from January 2014 to April 2023, Heartland of Riverview had 43 months with one-star health inspection ratings by Medicare.gov; and

      c.      Based on the 107 months of available monthly ratings data from January 2014 to April 2023, Heartland of Riverview had 55 months with general caregiver staffing one-star ratings by Medicare.gov.

325.    DEFENDANTS were also placed on notice of repeatedly causing **actual harm** to residents at Heartland of Riverview during their ownership and management.  More specifically, Heartland of Riverview was cited by state surveyors ***nine times for causing actual harm*** to residents (or even more severe deficiencies).

326.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at Heartland of Riverview in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2022, there were at least nine one-star reviews of Heartland of Riverview publicly posted on-line, which included:

      a.      "This place is horrible. My mother is in this place currently. As of right now at 6:17 PM they still have not given her, her pain medicine that was due at 3:00PM. ***When she hits her nurse call button it sometimes takes them up to two hours or longer to come check on her.*** She is bed fast by the way.  I have in person myself witnessed her hitting her call button needing to use the restroom. *They wait and let her use it on herself then lay in it up to an hour at a time before changing her to where if they would answer the button and bring her a bed pan it could be avoided*."

      b.      "Do not send your family member here. My mom was there for 2 weeks for rehab after surgery. The worst. The physical therapist were great. The facility was not. *They did not do what they were supposed to do in regard of everyday taking care of a person dependent on help."*

      c.      "Place is pathetic! Patient's waiting 6 hours on a dinner tray that looks like cat food!"

327.    **Heartland Health Care Center-Greenville East**: With respect to Heartland Health Care Center-Greenville East (provider # 425106) in Greenville, South Carolina, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.81 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data Heartland Health Care Center—Greenville East submitted to CMS).[71]

     i.     In 2022, based on the daily PBJ staffing data it submitted to CMS, Heartland Health Care Center—Greenville East had the 12th lowest average CNA hours per patient day in South Carolina (out of 192 facilities)—***an average of only 1.75 CNA hours per patient day***;

     ii.     In 2021, based on the daily PBJ staffing data it submitted to CMS, Heartland Health Care Center-Greenville East had the 4th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in South Carolina (out of 192 facilities)—***an average of only 2.8 hours per patient day*** (***2 hours less*** than the IOM recommended level of 4.85 hours per patient per day);

     iii.     In 2021, based on the daily PBJ staffing data it submitted to CMS, Heartland Health Care Center—Greenville East had the 2nd lowest average CNA hours per patient day in South Carolina (out of 192 facilities)—***an average of only 1.45 CNA hours per patient day***; and

     iv.     In 2017, based on the daily PBJ staffing data it submitted to CMS, Heartland Health Care Center—Greenville East had the 9th lowest average CNA hours per patient day in South Carolina (out of 192 facilities)—***an average of only 1.88 CNA hours per patient day***.

328.    These dangerously low staffing levels at Heartland Health Care Center—Greenville East ignored the exceptionally high care needs of this facility's resident population.

---

[71]Further, between Q2 2011 and Q2 2017, Heartland Health Care Center—Greenville East's CNA staffing level averaged 2.08 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

Based on the MDS data submitted by Heartland Heart Care Center—Greenville East to CMS from January 1, 2013 to September 30, 2022:

<ol type="a">
<li>An average of 76.1% of the resident population at Heartland Health Care Center—Greenville East required extensive assistance or was totally dependent on staff for toileting;</li>

<li>An average of 72.8% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning);</li>

<li>An average of 59.8% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 42.7% of residents required the assistance of two or more staff for transfers;</li>

<li>An average of 68.5% of the resident population required extensive assistance or was totally dependent on staff for dressing;</li>

<li>An average of 67.7% of the resident population required physical help from staff or was totally dependent on staff for bathing;</li>

<li>An average of 60.0% of the resident population was frequently or always incontinent of bladder and 62.7% was frequently or always incontinent of bowel;</li>

<li>An average of 33.4% of the resident population had severe cognitive deficit, with 40.7% having dementia or Alzheimer's; and</li>

<li>An average of 92.3% of the resident population had a wheelchair for mobility.</li>
</ol>

329.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of residents, staff members, CNAs, and family members who publicly posted their complaints about grossly substandard care at Heartland—Greenville East in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2020 to 2024, there were at least 27 one-star reviews of Heartland—Greenville East publicly posted on-line, which included:

a.  "I thank God I had the ability to check myself out.  I was non weight bearing after a car accident, surgery at Greenville Memorial and needed more training on how to use a slide board to transfer myself from bed to wheelchair during Covid 2021.  *I stayed in my own feces for hours, left in a wheelchair for 4 hours before anyone checked on me, given medication incorrectly*, clothes washed never returned, bare wiring on control to raise and lower bed, never saw the physical therapy room until my last morning, bathroom used to flush waste from other patients or floor, verbally abused especially when they found out I was leaving, and the list goes on.  One administrator, a few nurses helped some and the food was good.  I pray they take better care of their patients because many of them cannot communicate clearly what their needs are.  May this place become what it should be: Do unto others as you would have it done unto you!  I forgive but can't forget."

b.  "Heartland East is the most unprofessional patient care facility i have ever been in.  My first visit, my brother was sitting in urine, with a wet towel on the floor his feet wet and ***had been sitting there in urine for five hours***.  Heartland ran out of his pain meds for 3 days, ran out of his Insulin for 2 day.  when using the call button to ask for help they *would take 2 to 3 hour to check on him.  He would call me telling me how they let him sit in feces 3 and 4 hours.* my brother is unable to walk, they would wait so long to come help him, he fell a couple of times.  The last time he fell **he had to call 911 cause they would not check on him.**  DO NOT SEND YOU FAMILY MEMBER HERE IF THEY ARE NO MOBLE.  Heartland are short staffed as with everyone else, but they hire these uncareing young assistants."

c.  "Wouldn't recommend this place to anyone majority of the time there's hardly enough staff to take care of the residents. I was on the schedule by myself called the DON was told to not ever call her phone.  Office staff shows no concerns with staff shortages."

d.  "I was admitted to Heartland on Friday around 2pm for rehab. I was told when my vitals were taken & four hours later when my husband came to visit I still had no oxygen.  ***I was left ALL DAY the next day without ever being cleaned up as I am incontinent.***  I asked 4x for help with this & was told by the CNA she would get help & never came back.  Even when I told the charge nurse that Thorne Transport would be coming to take me home she never attempted to help me get cleaned up.  The EMTs that came to help transport me demanded the staff clean me up & finally they did.  I would never send anyone to this place.  I was told by a staff member that the CNA that worked with me Saturday documented that she changed my bed twice.  She never did.  Sad."

138

e.    "They don't deserve 1 star.  My Mother has been there a week and they left her *leg dressing unchanged for an entire week*.  They should have their license pulled.  I have pictures to prove it!  DO NOT USE THIS FACILITY.  I wouldn't send my worst enemy there!!!!!"

f.    "I worked as a CNA there for 3 years.  Basically, the worst experience I've ever had at any nursing home.  I was overworked and was not given the pay I was promised.  I once had the Noro virus and begged to be sent home, as I couldn't leave voluntarily due to fear of having abandonment on my record.  After exposing the virus to multiple residents (which can cause death), and proving I was sick by throwing up while giving care, I was finally sent home 6 hours later.  I was sickened by how poorly the residents were treated behind closed doors.  There's a stigma that every nurse and CNA share, if you act concerned or take the residents side, basically you were shunned.  No one would help give care.  If a CNA would go on lunch break, don't expect another CNA to pick up your call lights if they go off.  If you ever complain about treatment or another shift and how they left the residents for your shift, don't expect anything happen.  No solution will be made.  Management doesn't care, as they always complain about their overloaded duties to begin with.  There's so much more that I could write a book about.  Don't send your loved ones here please.  You will regret it. This is my honest experience."

330.    **ManorCare Health Services-Pottstown**: With respect to ManorCare Health Services-Pottstown (a/k/a Pottstown Skilled Nursing and Rehabilitation Center) (provider # 395402) in Pottstown, Pennsylvania, DEFENDANTS routinely staffed this facility at dangerously low *CNA staffing levels that averaged 1.84 hours per patient per day* over a six-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Pottstown submitted to CMS.  Moreover, based on Relator Bonner's personal knowledge, staffing at ManorCare Health Services-Pottstown was routinely unsafe and dangerously low, causing care to be grossly substandard and/or non-existent.

331.    Further, between 2011Q1 and 2017Q1, this facility's *CNA staffing level averaged 1.78 hours per patient per day* based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

    i.        In 2015, based on the 671 staffing data it self-reported, ManorCare Health Services-Pottstown had the 5th lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Pennsylvania (out of 711 facilities)—an average of only 2.87 hours per patient day (*2 hours less* than the IOM recommended level of 4.85 hours per patient per day).

332.    These dangerously low staffing levels at ManorCare Health Services-Pottstown ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Pottstown to CMS from January 1, 2013 to September 30, 2022:

    a.        An average of 60.1% of the resident population at ManorCare Health Services-Pottstown required extensive assistance or was totally dependent on staff for toileting, and an average of 48.3% of residents required the assistance of two or more staff for toileting;

    b.        An average of 52.4% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 48.6% of residents required the assistance of two or more staff for bed mobility;

    c.        An average of 39.0% of the resident population required extensive assistance or was totally dependent on staff for transfers, yet an average of 40.6% of residents required the assistance of two or more staff for transfers;

    d.        An average of 57.9% of the resident population required extensive assistance or was totally dependent on staff for dressing;

    e.        An average of 60.7% of the resident population required physical help from staff or was totally dependent on staff for bathing;

    f.        An average of 46.1% of the resident population was frequently or always incontinent of bladder and 45.6% was frequently or always incontinent of bowel;

    g.        An average of 31.2% of the resident population had severe cognitive deficit, with 40.6% having dementia or Alzheimer's; and

    h.        An average of 68.2% of the resident population had a wheelchair for mobility.

333.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Pottstown in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2020 to 2023, there were at least 17 one-star reviews of ManorCare Health Services-Pottstown publicly posted on-line, which included:

     a.    "My sister was there for 4 months.  My daughter and I would go in every day and feed her because she couldn't do it at the time and the food sat there and no one had tried to feed her.  Also she never had water near her and had been sent to the hospital, dehydrated. I asked if they weren't afraid that she'd get dehydrated again and they said no, she's fine.  The next morning we got a call and she was in the hospital where the doctor said that she was severely dehydrated!!  When she was being released, we would NOT let her be sent back there.  We live in Pottstown but there were no openings here so she was sent to Spruce Manor in Reading.  We were glad to travel to Reading every day because she got great care there, started eating, and talking and getting better!  She didn't talk anymore at Manor Care!!  We would NEVER send anyone there!!"

334.    **Heartland Health Care Center-Sterling Heights:** With respect to Heartland Health Care Center-Sterling Heights (provider # 235665) in Sterling Heights, Michigan, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.94 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data Heartland Health Care Center-Sterling Heights submitted to CMS).

335.    These dangerously low staffing levels at Heartland Health Services-Sterling Heights ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by Heartland Health Care Center-Sterling Heights to CMS from January 1, 2013 to September 30, 2022:

     a.    An average of 84.3% of the resident population at ManorCare Health Services-Sterling Heights required extensive assistance or was totally

141

dependent on staff for toileting, and an average of 42.8% of residents required the assistance of two or more staff for toileting;

b.    An average of 82.4% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 48.1% of residents required the assistance of two or more staff for bed mobility;

c.    An average of 79.6% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 50.4% of residents required the assistance of two or more staff for transfers;

d.    An average of 75.8% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 65.0% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 33.4% of the resident population was frequently or always incontinent of bladder and 37.5% was frequently or always incontinent of bowel;

g.    An average of 41.3% of the resident population had severe cognitive deficit, with 12.9% having dementia or Alzheimer's; and

h.    An average of 90.2% of the resident population had a wheelchair for mobility.

336.    DEFENDANTS were also placed on notice of repeatedly causing ***actual harm*** to residents at Heartland Health Care Center-Sterling Heights during their ownership and management.  More specifically, Heartland Health Care Center-Sterling Heights was cited by state surveyors ***13 times for causing actual harm*** to residents (or even more severe deficiencies).

337.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at Heartland Health Care Center-Sterling Heights in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2023.

142

there were **_at least 89 one-star reviews_** of Heartland Health Care Center-Sterling Heights

publicly posted on-line, which included:

    a.    "**_This place is the definition of going to hell_**."

    b.    "This is a place where despite the lovely look of the facility, your beloved family member will be lucky if anyone looks in on them or cares for their needs. My father had multiple serious issues and no one came to see to his needs, change him, etc. We absolutely feared for him when he was there alone at night. Staff is outright dismissive and rude of any family questions or concerns regarding the low or lack of care given. Actually put the phone down and spoke derisively of my sister with a supervisor when she had called to ask about our father's status - didn't have the decency to actually put her on hold then hung up on her and when she called back and said she overheard the conversation they hung up on her again. ***This is a place where if your family member needs more attention than a sprained ankle they could easily die."

    c.    "This place is NOT GOOD unless the person going in either has someone there all the time to make sure things get done, or they can get around on their own. _If you're bed ridden they neglect you_. We pulled our father out after 3 days."

    d.    "My mother has been at this facility for less than a week. In that time, she has fallen out of the bed, the s**_taff has left her for hours without assistance to the bathroom, resulting in her sitting in urine and feces for hours_**."

    e.    "If I could give a negative rating, it would be -10. This facility neglected our mother to the extent of putting her into septic shock. They ignore low blood pressure, took 12 hours to get urine sample and forgot to record begin antibiotics for 4 days. When calling for help, it took an hour, several times. **_Patients sit in feces, while staff stands around talking about nails and issues with friends_**. Some were very rude when asking a question. If we were not persistent to call for an ambulance, mom would have died. Also, another patient in ER from same facility had identical issues. The only good part of facility was the outside ascetics and the rehabilitation program. STAY AWAY FROM THIS PLACE."

    f.    "While it looks good from the street, it is truly one of the worst places for anyone you love. My father almost died at this place! They are so chronically understaffed that it should be a crime to operate! The floor was supposed to have 10 staff members but only had 4 due to the employee turnover. No one answered the phone most the time and the

*alert bells that the patients rang for help are constantly going off because the staff ignores them.* **Great place to put your folks if you are looking to kill your parents off quick for their money**, otherwise still clear of this place!"

338.   **ManorCare Health Services-Northwest:** With respect to ManorCare Health Services-Northwest (provider # 375042) in Oklahoma City, Oklahoma, MANORCARE routinely staffed this facility at dangerously low *CNA staffing levels that averaged 2.04 hours per patient per day* from Q2 2011 to Q1 2014 according to the 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey. Moreover, based on Relator Compton's personal knowledge, staffing at ManorCare Health Services-Northwest was routinely unsafe and dangerously low, causing care to be grossly substandard and/or non-existent.

339.   These dangerously low staffing levels at ManorCare Health Services-Northwest ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by ManorCare Health Services-Northwest to CMS from April 1, 2012 to October 20, 2014:

    a.   An average of 69.5% of the resident population at ManorCare Health Services-Northwest required extensive assistance or was totally dependent on staff for toileting and an average of 45.8% of residents required the assistance of two or more staff for toileting;

    b.   An average of 64.9% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 48.3% of residents required the assistance of two or more staff for bed mobility;

    c.   An average of 55.7% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 45.0% of residents required the assistance of two or more staff for transfers;

d. An average of 59.2% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e. An average of 66.4% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f. An average of 53.4% of the resident population was frequently or always incontinent of bladder and 58.1% was frequently or always incontinent of bowel;

g. An average of 39.4% of the resident population had severe cognitive deficit, with 32.3% having dementia or Alzheimer's; and

h. An average of 78.2% of the resident population had a wheelchair for mobility.

340. **ManorCare Health Services-Barberton**: With respect to ManorCare Health Services-Barberton (provider # 365340) in Barberton, Ohio, DEFENDANTS routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.55 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare Health Services-Barberton submitted to CMS).[72]

 i. In 2023, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Barberton had an average of only 1.54 CNA hours per patient day and only 2.81 total care staff hours (CNAs, LPNs, and RNs) per patient day (***two hours less*** than the IOM recommended level of 4.85 total care staff hours per patient per day);

 ii. In 2022, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Barberton had an average of only 1.48 CNA hours per patient day and only 2.86 total care staff hours (CNAs, LPNs, and RNs) per patient day;

 iii. In 2021, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Barberton had an average of only 1.45 CNA

---

[72]Further, between Q3 2011 and Q2 2016, ManorCare Health Services-Barberton's CNA staffing level averaged 1.89 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

hours per patient day and only 2.77 total care staff hours (CNAs, LPNs, and RNs) per patient day;

iv.    In 2020, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Barberton had an average of only 1.5 CNA hours per patient day and only 2.81 total care staff hours (CNAs, LPNs, and RNs) per patient day; and

v.    In 2019, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Barberton had an average of only 1.57 CNA hours per patient day and only 2.86 total care staff hours (CNAs, LPNs, and RNs) per patient day.

341.    These dangerously low staffing levels at ManorCare Health Services-Barberton ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare Health Services-Barberton to CMS from January 1, 2013 to September 30, 2022:

a.    An average of 66.0% of the resident population at ManorCare Health Services-Barberton required extensive assistance or was totally dependent on staff for toileting, and an average of 45.7% of residents required the assistance of two or more staff for toileting;

b.    An average of 62.3% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 52.3% of residents required the assistance of two or more staff for;

c.    An average of 57.4% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 47.4% of residents required the assistance of two or more staff for transfers;

d.    An average of 62.7% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.    An average of 70.4% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.    An average of 51.1% of the resident population was frequently or always incontinent of bladder and 46.2% was frequently or always incontinent of bowel;

146

g.      An average of 29.3% of the resident population had severe cognitive deficit, with 28.2% having dementia or Alzheimer's; and

h.      An average of 72.3% have a wheelchair for mobility.

342.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident and staff family members who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Barberton in order to warn other consumers about the dangerous practices at this facility. During the time frame of 2018 to 2022, there were at least 13 one-star reviews of ManorCare Health Services-Barberton publicly posted on-line, which included:

a.      "This place does not give a rats behind about their patients! They are not staffed! I don't know how many times my loved one called in tears."

b.      "This place is totally out of control!!! This facility accepted a patient they knew they didn't have the capabilities to house him. Not only that as soon as you pull into the driveway you smell old piss!!!! How is the piss smell stronger than the outside elements!?!? They have a bug problem as well. My uncle had ants all in his room. Such a shame."

c.      "Do NOT put your loved ones in this home if you want them properly cared for! My 70 year old mother-in-law just quit her job there because management over worked her & left her to care for WAY too many residents without any help. **This place is way understaffed** & the staff is very rude & uncaring. ??"

343.    **ManorCare Health Services-Wheaton:** With respect to ManorCare Health Services-Wheaton (provider # 215048) in Wheaton, Maryland, DEFENDANTS routinely staffed this facility at dangerously low *CNA staffing levels that averaged 1.56 hours per patient per*

*day* over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare

Health Services-Wheaton submitted to CMS).[73]

     i.     In 2023, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 2nd lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.29 CNA hours per patient day***;

     ii.     In 2023, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 2nd lowest average total care staff hours (CNAs, LPNs, and RNs) per patient day in Maryland (out of 233 facilities)—an average of only 2.8 hours per patient day (***more than two hours less*** than the IOM recommended level of 4.85 hours per patient per day);

     iii.     In 2022, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 9th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.57 CNA hours per patient day***;

     iv.     In 2021, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 6th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.47 CNA hours per patient day***;

     v.     In 2020, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 4th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—an average of only 1.52 CNA hours per patient day;

     vi.     In 2019, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 7th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—***an average of only 1.72 CNA hours per patient day***;

     vii.     In 2018, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 11th lowest average CNA

---

[73]Further, between Q2 2011 and Q3 2017, ManorCare Health Services-Wheaton's CNA staffing level averaged 1.84 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

hours per patient day in Maryland (out of 233 facilities)—*an average of only 1.81 CNA hours per patient day*; and

    viii.    In 2017, based on the daily PBJ staffing data it submitted to CMS, ManorCare Health Services-Wheaton had the 4th lowest average CNA hours per patient day in Maryland (out of 233 facilities)—*an average of only 1.72 CNA hours per patient day*.

344. These dangerously low staffing levels at ManorCare Health Services-Wheaton ignored the exceptionally high care needs of this facility's resident population. Based on the MDS data submitted by ManorCare Health Services-Wheaton to CMS from January 1, 2013 to September 30, 2022:

    a.    An average of 76.6% of the resident population at ManorCare Health Services-Wheaton required extensive assistance or was totally dependent on staff for toileting;

    b.    An average of 73.6% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning);

    c.    An average of 65.0% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 47.0% of residents required the assistance of two or more staff for transfers;

    d.    An average of 73.1% of the resident population required extensive assistance or was totally dependent on staff for dressing;

    e.    An average of 73.6% of the resident population required physical help from staff or was totally dependent on staff for bathing;

    f.    An average of 60.2% of the resident population was frequently or always incontinent of bladder and 70.1% was frequently or always incontinent of bowel;

    g.    An average of 32.9% of the resident population had severe cognitive deficit, with 32.7% having dementia or Alzheimer's; and

    h.    An average of 86.2% of the resident population have a wheelchair for mobility.

345.    Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare Health Services-Wheaton in order to warn other consumers about the dangerous practices at this facility.  During the time frame of 2018 to 2023, there were at least 33 one-star reviews of ManorCare Health Services-Wheaton publicly posted on-line, which included:

      a.    "DO NOT send your family member there.  No care.  No communication from the staff.  Less than a week and our family member was back in the ER.  Then they had the nerve to call us and ask us for an update."

      b.    "This place is an absolute joke, the care they give is ridiculous."

      c.    "So very unprofessional here.  ***When I first arrived by ambulance I was in a room for over 4 hours before anyone made contact with me.***  They had totally ignored the doctors orders and gave me a baby aspirin after having surgery 3 days earlier.  ***When I put the call light on I always waited at least one hour each time.***"

      d.    "Do not go near this place!  I use a vital piece of medical equipment called a CPAP machine.  They didn't have any and I ended up in a local hospital in Cong. Heart Failure!  Weekend *I told the nurse I was having trouble breathing, they just walked away.  **I ended up calling 911*** and the paramedics walked in they didn't even flinch ! I can go on and on!"

      e.    "Listen up!  if you Love & Care for your Loved ones, DO NOT SEND THEM TO THIS MANOR CARE LOCATED IN WHEATON, MD!!  Our 75 year old Mother just had to have Emergency Brain Surgery on December 27th, 2019, at 1:30 in the morning due to Bleeding on her brain the stemmed from her (what we've been told by the doctors at the Hospital she is currently in) 2nd fall while she was supposed to be cared for at this Horrible, trifling facility at Manor Care in Wheaton, Md.  Our Mother had to have blood drained from her head from 2 different locations due to her falling or God forbid, getting hit in her head TWICE, as far as we know.  Our Mother lost a lot of weight due to not eating, because of the Pain from the blood squeezing her brain on both sides!!  The Staff at This Manor Care NEVER CALLED ANY of her children to inform us of her condition.  *WE had to have them call the doctor and insist she be seen by outside EMT's.*  Glad we did, our Mother had to have Emergency Brain Surgery, IMMEDIATLEY!!  This place needs to be closed down all

together!  What type of people are cool with watching other human beings just suffer and don't do anything to prevent or help alleviate the pain?  Unless you're physically coming up to the facility and checking in on your loved ones regularly, like 2 times or more a week, Trust Me, don't send them to this facility!!  It's a Shame, but the people that work there will actually sit back and not give a damn about your loved ones at all!!  No one should have to see their 75 year old mother lying up in the hospital with all these stitches in her head, tubes down her throat, IV's in her arms and more.  This is a nightmare, all because the workers up there obviously only come to work for lil check, nothing more!!  They DO NOT give a damn about your loved one's well being at the Manor Care located at 11901 Georgia Ave, Wheaton, Md.  WE also feel that there should be female nurses present to change all female patients, some of the male nurses are just too rough and aggressive, they handled our Mother too rough.  Older patients need to be handled with Care and gentle movements.  This one Male nurse almost got knocked out because he was handling our mother much too aggressively for her 75 year old body.  There are patients just wandering the halls, it has an unclean, unkept smell and we see that no one comes in to check on your loved ones til it's time to feed them and even that's suspect if your loved one happens to need assistance eating.  Please take heed and Do Not send your loved ones to this place. Peace."

f.     "*My cousin complained that she was suffering from diarrhea and no one would come when she called to help her to the bathroom, and that no one was cleaning her*.  When we questioned the nurses about this, we were told that my cousin was confused and that she had no diarrhea.  Then we received a call two days later from another nurse to discuss the ongoing diarrhea that my cousin had been having for the last week...this after the other nurses insisted the diarrhea was nonexistent. We would get calls from one person telling us that my cousin was not eating. Then when we would show up and ask her nurse for that shift if her eating had improved, they would look at us like we were crazy and claim nothing was wrong with her eating.  Then a day later someone would call to discuss her lack of eating and weight loss.  There is absolutely no coordination of care at this facility, no communication about the patients in their charge, and the staff could not be less bothered if they tried.  *My cousin complained about her back being sore and **that no one was cleaning her after she soiled herself**, which the staff denied up and down and kept trying to make her sound like she was losing her sense of reality.*  Her health deteriorated and she ended up back at a hospital, where it was discovered that **she was completely caked in old dried on feces and the filth had literally eaten a hole in her back**.  It took two nurses at the hospital to get her cleaned up and debrided and we were informed in no uncertain terms that there was no way that the staff at this facility had been cleaning her appropriately.  A

meeting with the caregivers at this facility was pointless.  We took a family friend, who was a nurse and had been witness to some of this nonsense.  The MC nurse that attended the meeting strutted into the room late with an attitude like her precious time was being wasted, doubled down on the fact that the care my cousin had been given was adequate and laughably asserted that the caked on feces and filthy hole in her back must have been the fault of the hospital (even though it was discovered within moments of her arrival there via ambulance from this Manor Care hellhole!).  Our friend the nurse attempted to ask the MC nurse questions, but she would only repeat the mantra of nothing being wrong and any fault must be at the hospital.  That was her story and she was sticking to it.  Needless to say, my cousin did not return to this place.  In my experience, the staff here is poorly trained, indifferent and often negligent.  I am even more incensed that they spent more time in trying to convince us that my cousin was imagining things (such as her diarrhea, them not cleaning her and the hole being eaten in her back) in efforts to cover their own backsides, then doing their darn jobs. This facility is inexcusable.  I would strongly advise anyone to avoid these Manor Care facilities like the plague."

346.    **ManorCare of Homewood:** With respect to ManorCare of Homewood (provider # 145684) in Homewood, Illinois, MANORCARE routinely staffed this facility at dangerously low ***CNA staffing levels that averaged 1.62 hours per patient per day*** over a seven-year period from 2017 to 2023 (based on the daily PBJ staffing data ManorCare of Homewood submitted to CMS).[74]

347.    These dangerously low staffing levels at ManorCare of Homewood ignored the exceptionally high care needs of this facility's resident population.  Based on the MDS data submitted by ManorCare of Homewood to CMS from January 1, 2013 to September 30, 2022:

    a.    An average of 79.2% of the resident population at ManorCare of Homewood required extensive assistance or was totally dependent on staff for toileting, and an average of 30.3% of residents required the assistance of two or more staff for toileting;

---

[74]Further, between Q2 2011 and Q2 2017, ManorCare of Homewood's CNA staffing level averaged 1.87 hours per patient per day based on the limited 671 staffing data periodically self-reported to surveyors as part of the survey process for a two-week window prior to the survey.

b.　　An average of 76.8% of the resident population required extensive assistance or was totally dependent on staff for bed mobility (turning and repositioning), and an average of 31.6% of residents required the assistance of two or more staff for bed mobility;

c.　　An average of 60.2% of the resident population required extensive assistance or was totally dependent on staff for transfers, and an average of 45.0% of residents required the assistance of two or more staff for transfers;

d.　　An average of 73.9% of the resident population required extensive assistance or was totally dependent on staff for dressing;

e.　　An average of 66.9% of the resident population required physical help from staff or was totally dependent on staff for bathing;

f.　　An average of 57.7% of the resident population was frequently or always incontinent of bladder and 65.2% was frequently or always incontinent of bowel;

g.　　An average of 34.9% of the resident population had severe cognitive deficit, with 46.5% having dementia or Alzheimer's; and

h.　　An average of 79.0% of the resident population have a wheelchair for mobility.

348.　DEFENDANTS were also placed on notice of repeatedly causing **actual harm** to residents at ManorCare of Homewood during their ownership and management.  More specifically, ManorCare of Homewood was cited by state surveyors **11 times for causing actual harm** to residents (or even more severe deficiencies).

349.　Furthermore, DEFENDANTS were, or should have been, fully aware of the outrage of resident family members, who publicly posted their complaints about grossly substandard care at ManorCare of Homewood in order to warn other consumers about the dangerous practices at this facility.  During the time frame of ManorCare of Homewood, there were at least 37 one-star reviews of ManorCare of Homewood publicly posted on-line, which included:

153

a.  "Do not put your family here!  Please don't they are the worst!  And I promise as god is my witness!  Those people don't care about your loved ones!  They are only there for money!  GOD WILL DEAL WITH THEM"

b.  "Purposely block communication to loved ones.  Neglect patient needs.  My grandmother didn't receive all meals, never answered call lights.  *Forced to walk on her own so she won't soil herself because no one would answer her call light*."

c.  "This is the worst place that you could put someone in. This horrible place has short staff, and some really don't have compassionate for others."

d.  "Horrible place.  My 95-year old mom went here for short-term rehab following a urinary tract infection and hospital stay.  I visited her on a Sunday, and she seemed okay.  I then had to work four nights of 10-hour night shifts, so I couldn't visit her again until Friday.  When I went into her room, my mom was in respiratory distress, her arms and legs were swollen, and she was gasping for breath.  I asked the fat nurse who was sitting at the nurse's station, literally 10 feet outside my mom's door, what was going on, and she said, "This just started happening."  But when they took my mom's temperature, she had a high fever.  They had to call the paramedics to rush her to the hospital, and it turned out she had a severe case of double pneumonia, most likely aspiration pneumonia, from not being sufficiently elevated in bed while being fed through her PEG tube.  As a result of the pneumonia, she also had a lot of fluid in her lungs and extremities. The pneumonia and fever didn't "just happen" minutes before I entered her room, as they claimed.  *My mom was neglected, and this illness developed over the course of four days, with no one noticing or caring*. Do not take your loved ones here."

e.  "Skilled nursing? Ha. A baboon could take better care of someone. This place was a nightmare for my mother who was admitted for rehab for a broken hip.  My family and I had to take shifts going to visit her daily in order to ensure she was being taken care of.  Unfortunately, since we could not be there overnight, that is when she was treated the worst."

f.  "If anyone you love is sent here for care and need any type of assistance please don't allow them to be admitted in this facility.  They should never be left alone.

1.  *It takes them hours to answer call lights*.
2.  The rooms are filthy
3.  *The techs are over worked having 15+ patients to attend to.*
4.  *They are understaffed* and hire help from agency's

154

5.     The agency help don't know anything and are unable help properly.

6.     They are unsanitary. Using unsterilized sizers.

7.     They leave contaminated waste in a patients isolated room and not removing it when they leave out.

8.     ***The allow patients to sit in Uriah for over and hour.***

9.     The nurses will not assisted with wound vacs. If the Wound Vac nurse isn't available they don't know what to do.

10.    The housekeeping department never mop, sweep, clean toilets and only replace paper towels and soup if you keep asking for it.

11.    The front of the facility is clean, neat and presentable. The place where patients stay is dirty, smells like urine.

12.    The doors are suppose to be locked at 8 pm but the alarm system has been broke for some time now so the alarm goes off all night and the doors are never locked.

13.    The facility is one level. Someone can step in the window. The window in my moms room wasn't locked when I checked it. This place isn't safe for your loved ones.

I will be filing a formal complaint and I will do everything in my power to have this facility shut down. No human should have to be subjected to this type of treatment because it definitely isn't care!"

g.     "My step dad staying here and staff is hardly present. *They take 45 minutes to an hour or sometimes more to answer the patient call button.* When they finally come they take another half an hour to get what's needed. They leave other patients hours waiting for the bathroom."

h.     "If anyone is looking for a facility for their loved ones do not send them to Manor care **what dignity my father had left is gone**. I was there for an hour and press the nurses button and no one ever came no one ever had answers they put my father in a diaper when he was well able to get up and use the restroom himself but they're too lazy to take time out when a patient pushes the button to go in and help their patients use the restroom."

350.    Further, DEFENDANTS' knowledge that covered services were not being provided was compounded by an avalanche of family complaints/grievances and staff complaints/grievances that were made to facility management. By reason thereof, DEFENDANTS knew their policies of maximizing workload levels, while minimizing labor levels created a dangerous gap between the amount of time required by caregivers to provide the

necessary care versus the amount of time available to provide such care. The fallout from such policies inundated DEFENDANTS with a continuous stream of complaints and grievances by families of residents and DEFENDANTS' own employees regarding essential care needed for the health, safety, and dignity of residents being omitted, unreasonable in duration and quantity, and grossly substandard and/or non-existent.

351. Additionally, at all times material hereto, DEFENDANTS knowingly refused to comply with federal laws[75] that required them to staff based on the acuity and nursing needs of their residents. Accordingly, DEFENDANTS knew that the core care services required for the vulnerable, dependent, and disabled residents they targeted and aggressively recruited for admission vastly exceeded the physical work capacity of the skeletal staff they permitted to work at their facilities.

B.    DEFENDANTS Knew They Were Submitting False Claims

352. Moreover, with respect to Relators' claims that DEFENDANTS engaged in a scheme to defraud Medicare, DEFENDANTS are presumed to have knowledge of their submission of false claims for services that were not covered by the Medicare program:

> When an item and/or service furnished do not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied. ***Because healthcare provider and supplier licensure is premised on the assumption that they are knowledgeable about***

---

[75] 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. § 483.30 (effective December 27, 2005); 42 C.F.R. § 483.35 (effective October 4, 2016) ("The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and ***considering the number, acuity and diagnoses of the facility resident population*** in accordance with the facility assessment required at § 483.70(e)") (emphasis added).

***locally acceptable standards of practice, healthcare providers and suppliers are presumed to have knowledge about locally acceptable standards of practice for liability determinations***. No other evidence of knowledge of local medical standards of practice is necessary.

In order to determine what "acceptable standards of practice" exist within the local medical community, Medicare contractors will rely on the following:

- published medical literature;
- a consensus of expert medical opinion; and
- consultations with their medical staff, medical associations, including local medical societies, and other health experts.

Medicare Claims Processing Manual, § 30.2.3 (Rev.: 4197; Issued: 01-11-19; Effective: 04-15-19; Implementation: 04-15-19) (emphasis added).

353.    DEFENDANTS knew and were warned repeatedly through ongoing peer-reviewed journal articles that resultant repugnant level of services provided to vulnerable, dependent, and disabled residents (discussed above) violated accepted standards of practice.

C.    DEFENDANTS' Subterfuge and Manipulation of Records to Hide Their False Claims Schemes

354.    DEFENDANTS' scienter is further evident from its attempts to cover up their false claims schemes.  DEFENDANTS deliberately attempted to hide their schemes to defraud Medicare and Medicaid by misleading the Government into believing that not only were their claims for payment and services provided to residents true and accurate,[76] but also that these underlying services were provided in compliance with federal and state laws.  More specifically, DEFENDANTS repeatedly and expressly certified to the Government that, at all times material, they had complied with the laws applicable to the operations of their nursing homes.[77]

---

[76]*See* certifications of true and accurate UB-04 claims for payment and MDS assessments, above.

[77]Each state requires that nursing homes that participate in Medicaid enter into Provider Agreements.  While these various state Medicaid Provider Agreements have differences, they all

355.    Regardless of whether DEFENDANTS' certifications of compliance with law (including certifications that payments by Medicaid and Medicare were conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions) constituted a condition of payment or a condition of participation, these certifications were relevant to DEFENDANTS' ongoing deception.

---

include the requirement that the facility **must be in compliance** with the federal and state requirements (including 42 C.F.R. Part 483, Subpart B).  The CMS's State Operations Manual regarding Medicaid states, "[s]killed nursing facilities and nursing facilities **must be in compliance** with the requirements in 42 C.F.R. Part 483, Subpart B **to receive payment under Medicare or Medicaid.**  *See* State Operations Manual, Chapter 7 - Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, pp. 23-24, (Rev. December 13, 2013) (emphasis added).
Similarly, as to Medicare, when MANORCARE filed applications for each of its nursing homes to participate in the Medicare program in agreed to comply with federal and state requirements (including 42 C.F.R. Part 483, Subpart B).  Each MANORCARE nursing home completed a *Medicare Enrollment Application for Institutional Providers* (CMS-855A), certifying and affirming on an ongoing basis that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor.

> I understand that **payment of a claim** by *Medicare is* **conditioned** *upon* the claim and the **underlying transaction complying with such laws, regulations**, *and program instructions* (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the *provider's compliance* with all applicable conditions of participation in Medicare.

> My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. (emphasis added).

Further, in order to qualify for Medicare payments, MANORCARE's nursing homes were required to sign and did, in fact, execute Health Insurance Benefit Agreements (CMS-1561) under 42 U.S.C. § 1395cc, conditioning payment on compliance with federal long term care regulations, including those referenced above.  Specifically, these Agreements state: "In order to **receive payment** under [Medicare]," the nursing home, "as the provider of services, agrees to conform to the ... applicable provisions in 42 C.F.R.."  (emphasis added).

158

356.    DEFENDANTS knew the Government heavily relied on their certifications of truth and accuracy within the UB-04s and MDSs themselves, as well as their certifications of compliance with federal and state law due to the fact that the Government did not have the capacity to audit this volume of claims submitted by DEFENDANTS.

357.    In order to hide their schemes, DEFENDANTS also knowingly and intentionally engaged in an ongoing practice of pressuring staff to falsify resident medical records to make it appear that their nursing homes had provided care when they had not, and to make it appear that they had provided sufficient care to justify UB-04 and MDS coding.

358.    To conceal their provision of grossly substandard and/or non-existent care, DEFENDANTS' staff routinely and falsely documented in resident medical records that care and services were provided to residents, when such services were not provided.

359.    Furthermore, DEFENDANTS knew that the government had limited capacity to conduct nursing home surveys/inspections for the purpose of determining compliance with federal and state laws and accepted professional standards.  DEFENDANTS also knew these surveys/inspections were infrequent in nature and limited in scope due to the limited number of inspection days and the limited number of surveyors/inspectors.  Additionally, DEFENDANTS knew that the nursing home surveyors/inspectors did not conduct on-site audits of the accuracy of UB-04 claims.

360.    In order to mislead the Government, DEFENDANTS attempted to manipulate the results of the nursing home survey/inspection process[78] to make it appear that residents were

---

[78]The limitations of the survey process and the likelihood that surveys significantly understate care issues at nursing homes are well known and well documented.  A 2008 study done by the United States Government Accountability Office described widespread, nationwide patterns of state surveys failing to identify deficiencies; 70% of state surveys missed one or more

receiving more care during the short and infrequent window of the inspection than was normally provided. Routinely, during surveys/inspections, DEFENDANTS brought in additional staff to increase the amount of care that could be provided and to make the nursing home appear to be in compliance with federal and state laws. After the surveyors/inspectors left, staffing and service levels at the subject nursing homes would go back to "normal."

361. Additionally, DEFENDANTS attempted to cover up their false claims schemes by manipulating the QMs that were derived from their certified-as-accurate MDS assessments. More specifically, DEFENDANTS deliberately under-reported occurrences and conditions (such as falls and pressure sores) that were required to be reported to the Government and which DEFENDANTS knew would impact their QMs. DEFENDANTS knew[79] that if a nursing home's QMs were poor, they would likely receive more frequent and more comprehensive inspections.

362. Through its subterfuge and record manipulations, DEFENDANTS covered up their schemes forming the basis of this lawsuit and successfully kept the Government in the dark.

363. Accordingly, by reason of the facts set forth above, at all times material, DEFENDANTS had the requisite scienter under the FCA and state equivalents.

## X.    MATERIALITY

364. Each of DEFENDANTS' false claims and false certifications described above were material to the Government's payment decision.

---

deficiencies. The ***most frequently missed type of deficiency*** *identified in these resurveys* ***was poor quality of care***, including things like failing to ensure proper nutrition and hydration and failing to prevent pressure sores.

[79]DEFENDANTS also knew that by manipulating their Quality Measure ("QM") and Quality Indicator ("QI") scores it could falsely represent the care outcomes at its facilities in an effort to attract more Medicare residents and game the system.

365.    As discussed above, the submission of RUG billing codes that were inflated and not supported by the medical records is clearly considered *material* to Medicare payment. *Ruckh,* 963 F.3d at 1105 (11th Cir. 2020) ("This plain and obvious materiality went to the heart of the SNF's ability to obtain reimbursement from Medicare.")

366.    Further, as previously discussed, the provision of care services that are sufficient in amount, duration, and scope is material to payment under Medicaid and Medicare.  42 C.F.R. § 440.230 (effective September 30, 1981); *Medicare Benefit Policy Manual*, Ch. 8, § 30.  The federal Government has deemed that (1) grossly substandard or non-existent nursing home services, (2) nursing home services that are professionally unacceptable and below the required standard of care (in terms of the lack of quantity and duration of care), and (3) nursing home services that subject dependent and disabled residents to unreasonable risk of physical and mental harm are material to payment.

## XI.    DEFENDANTS DIRECTLY PARTICIPATED IN FALSE CLAIMS, OPERATED AS AN ALTER EGO AND/OR JOINT VENTURE, AND KNOWINGLY RATIFIED THE CONDUCT

367.    For purposes of this section, Relators reallege and incorporate herein the above paragraphs of this Complaint.

368.    <u>Direct Participation</u>: DEFENDANTS *directly participated* in the false claim violations described above at the subject nursing homes by:

      a.    Exercising centralized control[80] over the submission of claims for payment to Medicaid and Medicare;

---

[80]MANORCARE operated and maintained a Central Billing Office in Toledo, Ohio, that billed Medicare and Medicaid on behalf of its nursing homes.  The Central Billing Office was staffed by employees of Heartland Employment Services, LLC, who managed MANORCARE's centralized billing system.  Employees of the Central Billing Office regularly corresponded with MANORCARE's nursing homes from "@hcr-manorcare.com" email addresses, often with "HCR ManorCare" and "Central Billing Office" in the signature block.

b.    Pressuring and causing the subject nursing homes to submit claims for payment that were not supported by the medical record;

c.    Pressuring and causing the subject nursing homes to submit claims for payment that were not supported by resident MDSs;

d.    Pressuring and causing the subject nursing homes to submit claims for payment for services that (1) were excluded/non-covered; (2) were insufficient or unreasonable in amount, duration, and scope in violation of acceptable standards of medical practice; (3) placed vulnerable, dependent, and disabled residents at unreasonable risk for physical and mental harm; and (4) routinely subjected residents to grossly substandard and/or non-existent care;

e.    Pressuring and causing the staffing levels at each subject nursing home to be so severely low, extreme, and unsafe that it was mathematically and physically impossible for their nursing homes to provide services that were sufficient and reasonable in amount, duration, and scope in accordance with acceptable standards of medical practice (covered services);

f.    Pressuring and causing the staffing levels at each subject nursing home to be so severely low, extreme, and unsafe that vulnerable, dependent, and disabled residents were placed at unreasonable risk for physical and mental harm and routinely subjected residents to grossly substandard and/or non-existent care;

g.    Determining and controlling at each subject nursing home (1) the numbers of staff and hours of labor at each facility, (2) the expenditures for labor, (3) the revenue targets, census targets and payor-mix targets, and (4) resident recruitment strategies and discharge practices;

h.    Directing subject nursing homes to: (1) recruit and admit high acuity residents and increase resident and (2) retain residents whose needs exceeded the qualifications and care capabilities of the nursing home staff;

i.    Overriding the decisions of nursing home administrators, department heads and licensed nursing staff charged with the responsibility for determining the staffing necessary to meet the needs of residents;

j.    Pressuring and causing the subject nursing homes to increase staffing during surveys/inspections to mask their false claims schemes;

k.    Pressuring and causing the subject nursing homes to falsify medical records and QM/QI reports to mask their false claims schemes; and

162

l.      Controlling how the revenues of each nursing home were spent.

369.    <u>Alter Ego</u>: Additionally, DEFENDANTS and the nursing homes that are the subject of this lawsuit were the alter egos of one another, each forming a part of a single entity. DEFENDANTS exerted pervasive and continual control over their nursing homes such that the nursing homes were mere agents, instrumentalities, and conduits through which DEFENDANTS did business.

370.    Furthermore, at all times material hereto, DEFENDANTS treated the funds of one entity as the funds of another.  DEFENDANTS collected, distributed and shared the revenues, profits, and assets of their nursing homes.  DEFENDANTS also continually siphoned all the revenues from each of their nursing homes into a centralized master account.  Additionally, DEFENDANTS diverted revenues away from nursing homes to related business entities. Without control of their revenues and with no significant assets, the subject nursing homes were entirely dependent on DEFENDANTS for their continued existence and ongoing operations.

371.    Rather than using such revenues and assets to provide care to meet the needs of their residents, DEFENDANTS reallocated and repurposed these resources to fund DEFENDANTS':

a.      Bloated corporate overhead and home office;

b.      Self-dealing through their related-party subsidiaries and internal corporate charges; and

c.      Lavish compensation and performance bonuses paid to the top senior executives despite the fact that DEFENDANTS' revenue stream primarily derived from Government funding.

372.    Nursing homes are explicitly required to be properly administered and to use their resources (money) to ensure that residents receive proper care and that there are staff members

available to provide care to the residents.  The Social Security Act (42 U.S.C. § 1395i-3(d)(1)(A)

and 42 U.S.C. § 1396r(d)(1)(A)) provides:

> A skilled nursing facility (and "non-skilled" nursing facility) must be
> administered in a manner that enables it to use its resources effectively and
> efficiently to attain or maintain the highest practicable physical, mental, and
> psychosocial well-being of each resident.

*See also*, 42 C.F.R. § 483.70, 42 C.F.R. § 483.24.

373.    Each of the subject nursing homes were grossly undercapitalized with essentially

all cash generated by the nursing home's operations swept into accounts controlled by

DEFENDANTS.  DEFENDANTS collected and managed all revenues created by operations of

their nursing homes and controlled all of their expenditures.

374.    DEFENDANTS and the nursing homes portrayed themselves as a single entity,

publicly promoting themselves as a unified nation-wide operation through brochures, marketing

materials, websites, communications with the media, as well as correspondence to state licensing

and certification agencies.  MANORCARE is a vertically integrated company that uses

"ManorCare" or "Heartland" or "ProMedica" as a brand, often branding its facilities by using

"ManorCare" or "Heartland" or "ProMedica" in their name and inserting a "ManorCare" or

"Heartland" or "ProMedica" logo throughout facility policies, procedures, and forms, as well as

the medical records of residents.  MANORCARE holds the trademark for the "ManorCare" or

"Heartland" logos that are found on virtually all its nursing homes' signs, advertisements,

medical records, policies, contracts, and websites.  Further, ProMedica Health System, Inc. holds

the trademark for the "ProMedica" logos found on the rebranded nursing homes' signs,

advertisements, medical records, policies, contracts, and websites.

375.    <u>Joint Enterprise</u>: Accordingly, there is and was sufficient unity of interest and ownership among and between each defendant and the subject nursing homes, such that the acts of one were for the benefit of and could be imputed to all others.  Further, at all times herein mentioned, each defendant acted as the agent and partner of, conspired and participated in a joint venture/joint enterprise with the remaining Defendants.

376.    <u>Ratification</u>: Furthermore, in engaging in the conduct described herein, DEFENDANTS acted with the express or implied knowledge and knowingly consented, authorized, approved, and/or ratified the conduct of the nursing homes identified in *Exhibits 1* and *2* and the conduct of their co-Defendants.

## XII.    COUNTS

### COUNT ONE
Submission of Inflated RUG Billing Codes
Not Supported by the Medical Record (Medicare)
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

377.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

378.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

379.    By virtue of the conduct described above (presenting to Medicare inflated RUGs billing codes within UB-04s claims for payment and MDSs that were not supported by the medical record), DEFENDANTS knowingly, deliberately, and/or in reckless disregard of the truth presented, or caused to be presented, false or fraudulent claims for the improper payment or approval of nursing home services to Medicare and other Government-funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government.

380.    These false claims were material to payment.  More specifically, the United States and its contractors, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be presented, paid for claims that otherwise would not have been allowed nor paid at the claimed rates.

381.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWO**
Submission of Inflated RUG Billing Codes
Not Supported by the Medical Record (Medicare)
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

382.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

383.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

384.    By virtue of the conduct described above ((presenting to Medicare inflated RUGs billing codes within UB-04s claims for payment and MDSs that were not supported by the medical record), DEFENDANTS knowingly made, used, or caused to be made or used, false records or statements (in MDSs, medical records, and/or certifications discussed above) material to false or fraudulent claims that were presented to Medicare and other Government-funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government.

385.    The false claims were material to payment.  More specifically, the United States and its contractors, unaware of the falsity of the records or statements made, used, or caused to be made or used, that were material to false or fraudulent claims that were presented by

DEFENDANTS, paid for claims that otherwise would not have been allowed nor paid at the claimed rates.

386.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## **COUNT THREE**
False Claims for Excluded/Non-Covered Services (Medicaid and Medicare)
Federal False Claims Act, 31 U.S.C. § 3729

387.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

388.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729.

389.    By virtue of the conduct described above (presenting to Medicaid and Medicare UB-04 claims for payment for services excluded/not covered due to those services being of unreasonable quantity and duration and in violation of accepted standards of practice), DEFENDANTS knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented false or fraudulent claims for the improper payment or approval of nursing home services to Medicaid, Medicare, and other Government-funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government.

390.    The false claims were material to payment.  More specifically, the United States and its contractors, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be presented, paid for claims that otherwise would not have been allowed nor paid at the claimed rates.

391.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.  Further, by reason of the prohibited conduct described herein, DEFENDANTS have been unjustly enriched.

## COUNT FOUR

False Claims for Grossly Substandard and/or Non-Existent Services
That Subjected Residents to
Unreasonable Risk of Physical and Mental Harm (Medicaid and Medicare)
Federal False Claims Act, 31 U.S.C. § 3729

392.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

393.    By virtue of the conduct described above (presenting to Medicaid and Medicare UB-04 claims for payment for grossly substandard and/or non-existent services that subjected vulnerable, dependent, and disabled nursing home residents to an unreasonable risk for physical and mental harm), DEFENDANTS knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented false or fraudulent claims for the improper payment or approval of nursing home services to Medicaid, Medicare, and other Government-funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government.

394.    The false claims were material to payment.  More specifically, the United States and its contractors, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be presented, paid for claims that otherwise would not have been allowed nor paid at the claimed rates.

395.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.  Further, by reason of the prohibited conduct described herein, DEFENDANTS have been unjustly enriched.

## COUNT FIVE

False Claims for Grossly Substandard and/or Non-Existent Services
(Medicaid and Medicare)
Federal False Claims Act, 31 U.S.C. § 3729

396.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

397.    By virtue of the conduct described above (presenting to Medicaid and Medicare UB-04 claims for payment for services that were for grossly substandard and/or non-existent services), DEFENDANTS knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented false or fraudulent claims for the improper payment or approval of nursing home services to Medicaid, Medicare, and other Government-funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government.

398.    The false claims were material to payment.  More specifically, the United States and its contractors, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be presented, paid for claims that otherwise would not have been allowed nor paid at the claimed rates.

399.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.  Further, by reason of the prohibited conduct described herein, DEFENDANTS have been unjustly enriched.

## COUNT SIX

California False Claims Act, Cal. Gov't Code § 12651(a)(1) and § 12651(a)(2)

400.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

401.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12650(a)(1), *et seq*.

402.    By virtue of conduct described above, DEFENDANTS knowingly presented or caused to be presented to the California Medicaid program (i.e., Medi-Cal), false or fraudulent claims for improper payment for nursing home services.

403.    The false claims were material to payment.  More specifically, the California Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

404.    By reason of these payments, the California Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT SEVEN
Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(a)

405.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

406.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*

407.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Colorado Medicaid program, false or fraudulent claims for payment or approval for improper payment for nursing home services.

408.    The false claims were material to payment.  More specifically, the Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

409.    By reason of these payments, the Colorado Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT

Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(b)

410.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

411.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*

412.    By virtue of the conduct described above, DEFENDANTS knowingly made, used or caused to made or used false records or statements material to a false or fraudulent claim made to the Colorado Medicaid program for improper payment for nursing home services.

413.    The false claims were material to payment.  More specifically, the Colorado Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

414.    By reason of these payments, the Colorado Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINE

Delaware False Claims and Reporting Act, Del. Code Ann., Title 6, § 1201, *et seq.*

415.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

416.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. Code Ann., Title 6, § 1201, *et seq.*

417.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Delaware Medicaid program, false or fraudulent claims for improper payment for nursing home services.

418. The false claims were material to payment. More specifically, the Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

419. By reason of these payments, the Delaware Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TEN
### Florida False Claims Act, Fla. Stat. Ann. § 68.081-68.09

420. Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

421. This is a claim for treble damages and civil penalties under the Florida False Medicaid Claims Act, Fla. Stat. Ann. § 68.081, *et seq*.

422. By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Florida Medicaid program, false or fraudulent claims for improper payment for nursing home services.

423. The false claims were material to payment. More specifically, the Florida Medicaid program, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be submitted, paid for claims that otherwise would not have been allowed.

424. By reason of these payments, the Florida Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT ELEVEN
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)

425. Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

426.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq*.

427.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Georgia Medicaid program, false or fraudulent claims for improper payment for nursing home services.

428.    The false claims were material to payment.  More specifically, the Georgia Medicaid program, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be submitted, paid for claims that otherwise would not have been allowed.

429.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT TWELVE
Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2)

430.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

431.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq*.

432.    By virtue of the conduct described above, DEFENDANTS knowingly made, used, or caused to be made or used, false statements material to false or fraudulent claims for improper payment for nursing home services.

433.    The false claims were material to payment.  More specifically, the Georgia Medicaid program, unaware of the falsity of the statements made, used, or caused to be made or used by DEFENDANTS, paid for claims for nursing home services that otherwise would not have been allowed.

434.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THIRTEEN
Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1)

435.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

436.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1).

437.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the State of Georgia, false or fraudulent claims for improper payment for nursing home services.

438.    The false claims were material to payment.  More specifically, Georgia, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be submitted, paid for claims that otherwise would not have been allowed.

439.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOURTEEN
Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)

440.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

441.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2).

442.    By virtue of the conduct described above, DEFENDANTS knowingly made, used, or caused to be made or used, false statements to the Georgia Medicaid program and other

Government-funded health insurance programs material to false or fraudulent claims for improper payment for nursing home services.

443.    The false claims were material to payment.  More specifically, Georgia, unaware of the falsity or fraudulent nature of the claims that DEFENDANTS caused to be submitted, paid for claims that otherwise would not have been allowed.

444.    By reason of these payments, Georgia has been damaged, and continues to be damaged, in a substantial amount.

### COUNT FIFTEEN
Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. § 175/1, *et seq.*

445.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

446.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. § 175/1, et seq.

447.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Illinois Medicaid program, false or fraudulent claims for improper payment for nursing home services.

448.    The false claims were material to payment.  More specifically, the Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

449.    By reason of these payments, the Illinois Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT SIXTEEN
Indiana False Claims and Whistleblower Protection Act,
Indiana Code § 5-11-5.5-2(b)(1)

450.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

451.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

452.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Indiana Medicaid program, false or fraudulent claims for improper payment for nursing home services.

453.    The false claims were material to payment.  More specifically, the Indiana Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

454.    By reason of these payments, the Indiana Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT SEVENTEEN**
Indiana False Claims and Whistleblower Protection Act,
Indiana Code § 5-11-5.5-2(b)(2)

455.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

456.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

457.    By virtue of the conduct described above, DEFENDANTS knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a false claim from the Indiana Medicaid program, false or fraudulent claims for improper payment for nursing home services.

458.    The false claims were material to payment.  More specifically, the Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

459.    By reason of these payments, the Indiana Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHTEEN
Iowa False Claims Act, Iowa Code § 685.1, *et seq*.

460.   Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

461.   This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1, *et seq*.

462.   By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Iowa Medicaid program, false or fraudulent claims for improper payment for nursing home services.

463.   The false claims were material to payment.  More specifically, the Iowa Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

464.   By reason of these payments, the Iowa Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINETEEN
Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601, *et seq*.

465.   Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

466.   This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code. Ann. Health-Gen. § 2-602(b).

467.   By virtue of the conduct described above, DEFENDANTS knowingly presented or caused to be presented to the Maryland Medicaid program false or fraudulent claims for improper payment for nursing home services.

468.   The false claims were material to payment.  More specifically, the Maryland Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

469.   By reason of these payments, the Maryland Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY
Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. § 400.601, *et seq.*

470.   Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

471.   This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. § 400.601, *et seq.*

472.   By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Michigan Medicaid program, false or fraudulent claims for nursing homes services.

473.   The false claims were material to payment.  More specifically, the Michigan Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

474.   By reason of these payments, the Michigan Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-ONE
Nevada Submission of False Claims to State or Local Government Act,
Nev. Rev. Stat. Ann. § 357.040

475.   Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

476.   This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, *et seq.*

477.   By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Nevada Medicaid program, false or fraudulent claims for improper payment for nursing home services.

478.   The false claims were material to payment.  More specifically, the Nevada Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

479.   By reason of these payments, the Nevada Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

<u>**COUNT TWENTY-TWO**</u>
Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(b)

480.   Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

481.   This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, *et seq.*

482.   By virtue of the conduct described above, DEFENDANTS knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the Nevada Medicaid program for nursing home services.

483.   The false claims were material to payment.  More specifically, the Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

484.   By reason of these payments, the Nevada Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-THREE
New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

485.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

486.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

487.    By virtue of the conduct described above, DEFENDANTS knowingly caused to be presented to the New Jersey Medicaid program false or fraudulent claims for improper payment for nursing home services.

488.    The false claims were material to payment.  More specifically, the New Jersey Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

489.    By reason of these payments, the New Jersey Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-FOUR
North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(1)

490.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

491.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*

492.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the North Carolina Medicaid program false or fraudulent claims for payment or approval for nursing home services.

493.    The false claims were material to payment.  More specifically, the North Carolina Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

494.    By reason of these payments, the North Carolina Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-FIVE
### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605(a)(2)

495.    Relators reallege and incorporate the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

496.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq*.

497.    By virtue of the conduct described above, DEFENDANTS knowingly made, used, or caused to be made or used, false records or statements to get a false claim paid or approved by the North Carolina Medicaid program for nursing home services.

498.    The false claims were material to payment.  More specifically, the North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

499.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-SIX
### Oklahoma False Claims Act, 63 O.S. § 5053, et seq.

500.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

501.    This is a claim for treble damages and civil penalties under the Oklahoma False Claims Act, 63 OS § 5053, et seq.

502.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Oklahoma Medicaid program, false or fraudulent claims for improper payment for nursing home services.

503. The false claims were material to payment. More specifically, the Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

504. By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-SEVEN
Texas False Claims Act, THRC Chapter 36

505. Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

506. This is a claim for treble damages and civil penalties under the Texas False Claims Act, THRC Chapter 36, *et seq.*

507. By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Texas Medicaid program, false or fraudulent claims for improper payment for nursing home services.

508. The false claims were material to payment. More specifically, the Texas Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

509. By reason of these payments, the Texas Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-EIGHT
Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(1)

510. Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

511. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3, *et seq.*

512.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Virginia Medicaid program, false or fraudulent claims for improper payment for nursing home services.

513.    The false claims were material to payment.  More specifically, the Virginia Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

514.    By reason of these payments, the Virginia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWENTY-NINE
Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3(A)(2)

515.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

516.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act. Va. Code Ann. §8.01-216.1, *et seq.*

517.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, false records or statements to get a false claim paid or approved by the Virginia Medicaid program for nursing home services.

518.    The false claims were material to payment.  More specifically, the Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

519.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THIRTY
Washington Medicaid Fraud Act,
Rev. Code Wash. § 74.66.020(1)(a)

520.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

521.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud Act, Rev. Code Wash. § 74.66.005, *et seq.*

522.    By virtue of the conduct described above, DEFENDANTS knowingly presented, or caused to be presented, to the Washington Medicaid program, false or fraudulent claims for payment or approval for nursing home services.

523.    The false claims were material to payment.  More specifically, the Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

524.    By reason of these payments, the Washington Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT THIRTY-ONE**
Washington Medicaid Fraud Act,
Rev. Code Wash. § 74.66.020(1)(b)

525.    Relators reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

526.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud Act, Rev. Code Wash. § 74.66.005, *et seq.*

527.    By virtue of the conduct described above, DEFENDANTS knowingly made, used or caused to be made or used false records or statements to get a false claim paid or approved by the Washington Medicaid program for nursing home services.

528.    The false claims were material to payment.  More specifically, the Washington Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by DEFENDANTS, paid for claims that otherwise would not have been allowed.

529.    By reason of these payments, the Washington Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THIRTY-TWO
### Unlawful Retaliation in Violation of
### Section 3730(h) of the False Claims Act

530.    Relator Bonner realleges and incorporates each allegation contained in paragraphs above as if fully set forth herein.

531.    Relator Bonner's actions in repeatedly protesting the fraudulent charting discussed herein constituted complaints about MANORCARE's violations of the False Claims Act and, accordingly, constituted protected activity.

532.    MANORCARE retaliated against Relator Bonner by terminating him as set forth more fully hereinabove.   Such retaliation was meant to conceal MANORCARE's egregious and fraudulent actions, as well as to silence Relator Bonner.

533.    31 U.S.C. § 3730(h) provides as follows:

"Any employee, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection."

534.    MANORCARE's fraudulent acts as described herein constitute violations of 31 U.S.C. § 3729, *et. seq.*  Relator Bonner's efforts to disclose and correct MANORCARE's violations of the FCA, as described herein, were made in furtherance of protected activities under § 3730(h) of the FCA.

535.    MANORCARE knew or should have known that Relator Bonner was engaging in

185

protected activities when he revealed Lisa Gray's fraudulent charting to management and other violations of the FCA, as described herein.

536.    As discussed above, DEFENDANTS have assumed liability and responsibility for the acts of MANORCARE and, by virtue of same, are liable for Relator Bonner's retaliation claim.

## XIII.   REQUEST FOR TRIAL BY JURY AND PRAYER

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

**WHEREFORE,** Relators Luvetta Compton and James Bonner, individually, and on behalf of the United States of America and the *Qui Tam* States, demand and pray that judgment be entered as follows against DEFENDANTS under the federal FCA counts and under supplemental FCA counts, as follows:

(a)    In favor of the United States against DEFENDANTS for treble the amount of damages to the United States, Medicare, Medicaid, and other Government-funded health insurance programs, from the false or fraudulent claims for improper payment or approval of nursing home services alleged herein plus the maximum civil penalties (plus interest) for each false claim caused to be submitted, and for each false record submitted by DEFENDANTS' conspiracy to submit false claims;

(b)    In favor of the United States and/or the *Qui Tam* States against DEFENDANTS for disgorgement of the profits earned by DEFENDANTS as a result of their false or fraudulent claims for improper payment or approval of nursing home services alleged herein;

(c)    In favor of Relators for the maximum allowed pursuant to 31 U.S.C. §3730(d) to include reasonable expenses, attorneys' fees and costs incurred by Plaintiffs/Relators;

(d)    For all costs of this federal FCA civil action;

(e)    In favor of the Relators and the United States for such other relief as this Court deems just and equitable;

(f)    In favor of the Relators and the *Qui Tam* states against DEFENDANTS in an amount equal to three times the amount of damages that the *Qui Tam* States have sustained as a result of DEFENDANTS' actions, as well as the statutory maximum penalty against DEFENDANTS for each violation of each state's FCA;

(g)    In favor of Relators for the maximum amount allowed as relators' share pursuant to the *Qui Tam* States FCAs as follows: the California False Claims Act, Cal Govt. Code §12650, *et seq.*; Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. §1201, *et seq.*; Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.;* Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168, *et seq.*; Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121, *et seq.*; Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1, *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5, *et seq.*; Iowa False Claims Act, Iowa Code 685.1, *et seq.*; Maryland False Health Claims Act, Md. Code Ann. § 2-601, *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.610, *et seq.*; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*; New Jersey False Claims Act, N.J. Stat. Ann. §2A:32C-1, *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*; Oklahoma False Claims Act, 63 Okla. Stat. § 5053, *et seq.*; Texas False Claims Act, THRC Ch. 36, *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1, *et seq.*; and Washington Medicaid Fraud False Claims Act, RCW §74.66.005, *et seq.*;

187

(h)    In favor of Relator Bonner for all front pay and two times his back pay since November 2014, plus interest on his back pay calculated at the prime rate, compounded annually, as well as compensatory damages and damages for emotional distress;

(i)    In favor of Relators for all costs and expenses associated with the supplemental claims of the *Qui Tam* States, including attorney's fees and costs;

(j)    In favor of the *Qui Tam* States and Relators for all such other relief as the Court deems just and proper;

(k)    In the event that the United States or any *Qui Tam* State proceeds with this action, Relators, be awarded an appropriate amount for disclosing evidence or information that the United States and/or *Qui Tam* States did not possess when this action was brought to the Government. The amount awarded to Relators also includes the results of Government actions or settlement of claims arising from the expansion of claims through the Government's further investigation directly generated from or attributable to Relators' information; and

(l)    Such other relief as this Court deems just and appropriate.

Dated: September 3, 2025.

Respectfully submitted,

**MILLER SHAH LLP**

*/s/ Nathan C. Zipperian*
Nathan C. Zipperian
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
E-mail: nczipperian@millershah.com

Thomas W. Sheridan
Sheridan & Murray, LLC
424 S. Bethlehem Pike, Third Floor
Fort Washington, PA 19034
Telephone: (215) 977-9500
Facsimile: (215) 977-9800

Joseph Trautwein
Joseph Trautwein & Associates, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Telephone: (215) 764-2301
Facsimile: (267) 464-0400

David Marks
Marks Balette Young & Moss P.L.L.C.
7521 Westview Dr.
Houston, Texas 77055
Telephone: (713) 681-3070
Facsimile: (713) 681-2811

*Attorneys for Relator Compton*

Gavin P. Lentz
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, Pennsylvania 19102
Telephone: (215) 735-3900
Facsimile: (215) 735-2455

*Attorneys for Relator Bonner*